**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEVEST COLEMAN | ) | |
| | ) | Case No.  18 CV 998 |
| Plaintiff, | ) | |
| vs. | ) | Judge Robert Gettleman |
| | ) | Magistrate Judge Sunil Harjani |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF COLEMAN'S SECOND AMENDED COMPLAINT**

Defendant City of Chicago, by its attorneys, THE SOTOS LAW FIRM, P.C., answer

Plaintiff Nevest Coleman's Complaint as follows:

1. Plaintiff Nevest Coleman spent nearly half his life in prison for a rape and murder

he did not commit.

**ANSWER:** Upon information and belief, the City admits that Plaintiff Nevest Coleman spent time in prison following his conviction for the murder and rape of Antwinica Bridgeman. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

2. In 2017, DNA evidence finally exonerated Mr. Coleman. DNA from semen found

on the victim's clothes and underwear, and from underneath her fingernails, both completely

exculpated Mr. Coleman and implicated the real perpetrator: a serial rapist.

**ANSWER:** Upon information and belief, the City admits that in 2017, DNA analysis of several portions of semen located on Bridgeman's clothes, underwear, and from under Bridgeman's fingernails excluded Plaintiff Coleman. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

3.      Tragically, because the Defendant Detectives framed an innocent man for the

crime, the real perpetrator remained free to rape at least three other women.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

4.      Prior to his arrest at age 25, Mr. Coleman had no criminal history and had been

employed full-time as a Comiskey Park groundskeeper for the two years leading up to his arrest.

**ANSWER:**    On information and belief, the City admits that, in 1994, Plaintiff Coleman was 25 years of age and employed as a groundskeeper at Comiskey Park at the time of his arrest. Upon information and belief, the City admits that, in 1994, Plaintiff Coleman had no criminal convictions at the time of his arrest. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

5.      The sum total of the evidence against him was his false confession, which was

coerced by the Defendant Detectives. These same Defendants are notorious for obtaining false

confessions from dozens of other men through violence, threats, and false promises of leniency.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

6.      Although no physical evidence or eyewitnesses tied Mr. Coleman to the crime,

his coerced false confession was enough to send him to prison for life.

**ANSWER:**    Upon information and belief, the City admits that Plaintiff Coleman gave a statement implicating himself in the rape and murder of Bridgeman. Upon information and belief, the City admits that the trial judge sentenced Plaintiff Coleman to natural life for Bridgeman's murder and 30 years for the sexual assault, to be served consecutively. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

7.      Finally, in 2017, all charges against Mr. Coleman were dismissed based on the

new DNA evidence and he regained his freedom.

2

**ANSWER:** Upon information and belief, the City admits that Plaintiff Coleman had his conviction for the rape and murder of Bridgeman vacated and he was released from prison in 2017. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

8. Mr. Coleman now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

**ANSWER:** Upon information and belief, the City admits that Plaintiff Coleman has filed this civil lawsuit seeking money damages based upon his allegations of misconduct. The City denies all allegations of misconduct directed at the City. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

## JURISDICTION AND VENUE

9. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

**ANSWER:** The City admits that Plaintiff Coleman brings this action pursuant to 42 U.S.C. § 1983 and Illinois law and alleges that defendants violated Plaintiff Coleman's constitutional rights and committed torts under Illinois law. The City denies all allegations of misconduct directed at the City. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

10. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:** The City admits jurisdiction is proper.

11. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. In addition, Plaintiff's criminal case was investigated, tried, and appealed in this judicial district, such that a substantial part of the events and omissions giving rise to Plaintiff's claims

3

occurred within this judicial district.

**ANSWER:**     Upon information and belief, the City admits venue is proper.

## PARTIES

12.     Plaintiff Nevest Coleman is a 48-year old resident of Chicago, Illinois. At the time of his arrest, he was 25 years old and lived with his family in the Englewood neighborhood of Chicago.

**ANSWER:**     On information and belief, the City admits that, in 1994, Plaintiff Coleman was 25 years of age and employed as a groundskeeper at Comiskey Park at the time of his arrest. Upon information and belief, the City admits that, in 1994, Plaintiff Coleman had no criminal convictions at the time of his arrest. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

13.      At all relevant times, Defendants Kenneth Boudreau, John Halloran, Michael Clancy, James O'Brien, William Foley, Albert Graf, Stanley Turner, Gerald Carroll, Thomas Kelly, and as-yet unknown Defendant Officers were detectives with the Chicago Police Department and the City of Chicago. These officers participated in the Bridgeman rape and murder investigation, which resulted in Mr. Coleman's wrongful conviction.[1]

**ANSWER:**     Upon information and belief, the City admits Kenneth Boudreau, John Halloran, Michael Clancy, James O'Brien, William Foley, Albert Graf, Gerald Carroll, and Thomas Kelly were duly appointed members of the Chicago Police Department who were involved – in some fashion – in the investigation of Bridgeman's rape and murder. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

14.     GERI LYNN YANOW, the Independent Administrator of the Estate of

---

[1] The City states that Stanley Turner is deceased and that, on information and belief, neither he nor "as-yet unknown Defendant Officers" have been served with process and therefore neither are proper "Defendants." Consequently, unless otherwise stated within the Answer, the City denies all allegations

WILLIAM FOLEY, Deceased, is named as Defendant in her capacity as Independent

Administrator of the Estate of WILLIAM FOLEY, as successor in interest and to defend on

behalf of Defendant WILLIAM FOLEY in this action. WILLIAM FOLEY was a former officer

or employee of the Chicago Police Department and the City of Chicago. He participated in the

Bridgeman rape and murder investigation, which resulted in Mr. Coleman's wrongful

conviction.

**ANSWER:** The City admits Geri Lynn Yanow, is named as Defendant in her capacity as Independent Administrator of the Estate of William Foley, as successor in interest and to defend on behalf of the Estate of William Foley in this action. Upon information and belief, the City further admits William Foley was a duly appointed member of the Chicago Police Department who was involved – in some fashion – in the investigation of Bridgeman's rape and murder. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained within this paragraph.

15. Each of the individually-named Defendant officers acted under color of law and

within the scope of his or her employment at all times relevant to this lawsuit.

**ANSWER:** Upon information and belief, the City admits that William Foley and Defendants Boudreau, Halloran, Clancy, O'Brien, Graf, Carroll and Kelly acted under color of law and within the scope of their employment during the relevant time. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

16. At all relevant times, Defendant Thomas Benoit was a sergeant with the Chicago

Police Department, employed by Defendant City of Chicago. At all relevant times to this lawsuit,

Defendant Benoit was acting under color of law and within the scope of his employment.

**ANSWER:** Upon information and belief, the City denies the allegations contained in this paragraph.

---

directed towards Stanley Turner and/or "as-yet unknown Defendant Officers."

17.     The City of Chicago is an Illinois municipal corporation that under the laws of the State of Illinois (sic), and is or was the employer of the above-named Defendant Officers.

**ANSWER:**     The City admits it is an Illinois municipal corporation and is or was the employer of the Defendants as answered in paragraph 17. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

18.      At all relevant times, Defendant Harold Garfinkel was an attorney licensed to practice law in the State of Illinois. He was employed as an Assistant State's Attorney in the Cook County State's Attorney's Office, and was employed by the Cook County State's Attorney's Office.

**ANSWER:**     Upon information and belief, the City admits that Defendant Harold Garfinkel was employed as an Assistant State's Attorney in the Cook County State's Attorney's Office during the relevant time. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

19.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office, and was at all relevant times the employer of Defendant Garfinkel. Defendant Cook County is a necessary party to this lawsuit.

**ANSWER:**     The City admits Cook County is a governmental entity within the State of Illinois. Upon information and belief, the City admits that Defendant Garfinkel was employed by the Cook County State's Attorney's Office at the relevant time. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

20.     In 1994 Nevest Coleman was a 25-year old family man with a bright future. He had no criminal record. At the time of his arrest, he was employed as a groundskeeper at Comiskey Park, a position he had held for two years.

6

**ANSWER:**   Upon information and belief, the City admits that, in 1994, Plaintiff Coleman was 25 years of age and employed as a groundskeeper at Comiskey Park at the time of his arrest. Upon information and belief, the City admits that, in 1994, Plaintiff Coleman had no criminal convictions at the time of his arrest. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

21.     Mr. Coleman (like every member of his family) graduated high school, and had been employed continuously thereafter. He attended church regularly, where he often volunteered.

**ANSWER:**   The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

22.     When he was arrested, Mr. Coleman had two small children, aged two years and three months, and a big, tight-knit family and lots of friends. He was loved and respected by members of his community.

**ANSWER:**   The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

### The Rape and Murder of Antwinica Bridgeman

23.     During the evening of April 11, 1994, the night before her 20th birthday, Antwinica Bridgeman went missing.  She was not seen again until her body was found in the abandoned basement of the apartment building occupied by the Coleman family.

**ANSWER:**   Upon information and belief, the City admits that Bridgeman went missing after leaving a party on the evening of April 11, 1994, the night before her 20th birthday. Upon information and belief, Bridgeman's body was found in the basement of the apartment building occupied by Plaintiff Coleman and members of his family. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

24.     On April 28, 1994, Nevest Coleman's mother noticed a smell coming from the abandoned basement of their apartment building, and asked Mr. Coleman to investigate.

**ANSWER:**     Upon information and belief the City admits on April 28, 1994, Plaintiff Coleman's mother asked Plaintiff Coleman to investigate a smell emanating from the basement of the apartment building occupied by Plaintiff Coleman and members of his family. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

25.     Mr. Coleman's friend Michael Barber was present, too, and he and Mr. Coleman both went down to investigate. Barber looked through the basement window and saw the body of a dead woman. They immediately notified Mr. Coleman's mother, who called 9-1-1. Police arrived at the scene and recovered Bridgeman's dead body from the basement.

**ANSWER:**     Upon information and belief, the City admits that Michael Barber assisted Plaintiff Coleman in investigating the smell emanating from the basement of the apartment building occupied by Plaintiff Coleman and his family. Upon information and belief, the City admits that Barber observed Bridgeman's body in the basement by looking through a window and that Bridgeman was deceased. Upon information and belief, the City admits that Barber and Plaintiff Coleman informed Plaintiff Coleman's mother of Bridgeman's body and 911 was called. Upon information and belief, the City admits that police officers arrived at the apartment building occupied by Plaintiff Coleman and members of his family and that Bridgeman's body was removed from the basement of that apartment building. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

26.     Defendants Halloran, Boudreau, Foley, and Clancy were tasked to respond to the scene. They entered the basement and obtained first-hand knowledge of the crime scene.

**ANSWER:**     Upon information and belief, the City admits that Halloran, Boudreau, Foley and Clancy responded to the location where Bridgeman's body was discovered and observed that location, which was a basement. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

27.     The crime was horrific. Bridgeman had been raped and impaled with a pipe, and had ultimately suffocated to death on a brick that had been shoved in her mouth. Her body was then discovered in the basement two and a half weeks later.

8

**ANSWER:**     Upon information and belief, the City admits that a pipe had been forcibly inserted into Bridgeman, that a piece of brick or concrete had been inserted into Bridgeman's mouth, and that Bridgeman's body was found in the basement of the apartment building occupied by Plaintiff Coleman and members of his family on April 28, 1994, over two weeks after Bridgeman went missing on April 11, 1994. The City further admits, upon information and belief, that Bridgeman's cause of death was listed as suffocation from the object inserted into her mouth. The City further admits, upon information and belief, that Bridgeman was later determined to have been raped. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

28.     The abandoned basement was accessible only by an exterior door. The basement had been broken into on several occasions, and drug users and homeless people squatted in the space. Inside, police found used condoms, PCP cigarettes, and empty beer cans and juice bottles.

**ANSWER:**     Upon information and belief, the City admits that used condoms, cigarettes containing PCP, and empty beer cans and juice containers were recovered from inside of the basement by law enforcement officers. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**The Interrogation and Creation of False Cases against Nevest Coleman and Derrell Fulton**

29.     The same evening that the body was discovered, Coleman and Barber voluntarily went with police to the station for an interview. According to court testimony and police records, Mr. Coleman was interviewed by Defendants Halloran, Boudreau, Foley, Clancy, and Kelly.

**ANSWER:**     Upon information and belief, the City admits that Plaintiff Coleman and Barber voluntarily went with police officers to the station for an interview on the evening the Bridgeman's body was discovered. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29.

30.     Mr. Coleman truthfully recounted what he knew about the investigation: his mother had asked if he and Barber could determine the source of the smell, Barber looked through the window and saw the body, and the pair told Mr. Coleman's mother who called the

police. Mr. Coleman repeatedly denied involvement in, and knowledge of, Bridgeman's murder, and he was released.

**ANSWER:**    Upon information and belief, the City admits that Plaintiff Coleman informed officers that his mother asked him to investigate the source of the smell emanating from the basement, that Barber looked through the basement window and observed Bridgeman's body, and that Plaintiff Coleman's mother was informed of the discovery of the body and then called police. Upon information and belief, the City admits that Plaintiff Coleman denied knowledge of Bridgeman's homicide. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

31.    Eager to solve such a heinous crime, the Defendant Officers worked with the limited information available to them to develop suspects. Bridgeman's boyfriend reported that a man, Eddie Taylor, had at one point tried to abduct Bridgeman, and that Taylor and another man, Derrell Fulton, had been harassing Bridgeman recently. Fulton's prior sexual assault conviction made him even more of a suspect.

**ANSWER:**    Upon information and belief, the City admits that Bridgeman's boyfriend informed officers that Bridgeman had been involved in a physical altercation with a "Chip" several days prior to April 10, 1994 and that Bridgeman had been having trouble with two individuals known as "Chip" and "Dap" – later identified as Eddie Taylor and Derrell Fulton. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

32.    The Defendant Officers also focused on Coleman and Barber. Barber, who discovered the body, was incarcerated at the time Bridgeman disappeared and thus was cleared. Given that Bridgeman's body was discovered in the basement of the Coleman family's apartment building, Mr. Coleman became a person of interest in the investigation.

**ANSWER:**    Upon information and belief, the City admits that Barber discovered Bridgeman's body and was in law enforcement custody on April 11, 1994 and that Bridgeman's body was discovered in the basement of the Coleman family's apartment building. The City lacks knowledge or information sufficient to form a

10

belief as to the truth of the remaining allegations contained in this paragraph.

33.      Wanting to interrogate Mr. Coleman when he was sleep deprived, some of the

Defendant Officers returned to Coleman's home at around 12:30 a.m. that same night and woke

him. Having nothing to hide, Mr. Coleman returned to the station to answer questions.

**ANSWER:**    Upon information and belief, the City admits that police officers arrived at
Plaintiff Coleman's apartment in the early morning after Plaintiff Coleman had
been released following his initial interview and that Plaintiff Coleman went to a
police station to answer additional questions. The City lacks knowledge or
information sufficient to form a belief as to the truth of the remaining allegations
contained in this paragraph.

34.      Several of the Defendant Officers placed Mr. Coleman in a small, windowless

interrogation room. Approximately eight detectives entered that small room, including but not

limited to Defendants Boudreau, Halloran, Clancy, O'Brien, Foley, Graf, Turner, and Carroll

entered the room. None of the Defendant Officers read Mr. Coleman his *Miranda* rights. With

the Defendants looming over him in intimidating fashion, Mr. Coleman again truthfully

answered their questions and denied involvement.

**ANSWER:**    Upon information and belief, the City admits that police officers interviewed
Plaintiff Coleman about Bridgeman's homicide while Plaintiff Coleman was in an
interview room at the police station. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations contained in
this paragraph.

35.      When Defendants' interrogation did not elicit a confession, they turned to more

coercive tactics. During the 12 hours Mr. Coleman was in custody, Defendants employed a range

of physically and mentally coercive tactics.

**ANSWER:**    Upon information and belief, the City admits that Plaintiff Coleman was in the
police station being interviewed by police officers. Upon information and belief,
the City denies Plaintiff Coleman was in custody for 12 hours prior to his
statement in which he implicated himself in the murder and rape of Bridgeman.

The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

36.     One of the Defendant Officers called Mr. Coleman a "lying-assed nigger."

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

37.     When Mr. Coleman protested that he had told the Defendant Officer everything he knew and was telling the truth, that detective punched him in the face. Mr. Coleman asked why the Defendant Officer had hit him, and the Defendant Officer punched him in the face again. Mr. Coleman fell to the floor and curled up in the fetal position, covering his face with his hands.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

38.     Mr. Coleman repeatedly denied knowing anything about the crimes to no avail.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

39.     A Defendant Officer told Mr. Coleman that he would be struck until he confessed being at the crime scene.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

40.     A Defendant Officer told him that he was not the person they were after, and falsely told him that if he acted as a witness and cooperated to implicate Fulton and Taylor, they would let him go home.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

12

41.     The Defendant Officers then fed Mr. Coleman false information about the rape

and murder.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in this paragraph.

42.     Each Defendant Officer knew about the coercive tactics used by the other

Defendant Officers, including the physical abuse, and that Mr. Coleman was being coerced into

giving a false confession.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in this paragraph.

43.     The Defendants actively consulted with their supervisor, Defendant Benoit,

including discussing the coercive tactics they used to obtain Mr. Coleman's false confession.

**ANSWER:**     To the extent the allegations contained in this paragraph are directed at the City,
the City denies all allegations of misconduct. The City lacks knowledge or
information sufficient to form a belief as to the truth of the remaining allegations
contained in this paragraph.

44.     Before there was any probable cause to believe Mr. Coleman was involved in the

crime, Defendant Garfinkel, an Assistant State's Attorney, came into the interrogation room and

falsely told Mr. Coleman he was there to help him.

**ANSWER:**     Upon information and belief, the City admits that Defendant Garfinkel, an
Assistant State's Attorney, spoke to Plaintiff Coleman. The City lacks knowledge
or information sufficient to form a belief as to the truth of the remaining
allegations contained in this paragraph.

45.     Mr. Coleman told Defendant Garfinkel that he had been beaten, but Defendant

Garfinkel told him that they would deal with that abuse at a different time.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in this paragraph.

13

46.     Defendant Officers and Defendant Garfinkel fed Coleman more information

about the crimes. They described a scenario for Coleman in which he acted as the lookout while

Fulton and Taylor participated in Bridgeman's rape and murder.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in this paragraph.

47.     Believing that he would be allowed to go home if he played his part and

implicated Fulton and Taylor, Mr. Coleman regurgitated the Defendants' false story to

Defendant Garfinkel.

**ANSWER:**     Upon information and belief, the City admits that Plaintiff Coleman made a
statement in which he implicated Fulton and Taylor in the rape and murder of
Bridgeman. The City lacks knowledge or information sufficient to form a belief
as to the truth of the remaining allegations contained in this paragraph.

48.     Defendant Garfinkel led Mr. Coleman through this court-reported "confession."

**ANSWER:**     Upon information and belief, the City admits that Plaintiff's statement implicating
himself in the rape and murder of Bridgeman was court-reported and that
Defendant Garfinkel was present when Plaintiff  made his court-reported
statement. The City lacks knowledge or information sufficient to form a belief as
to the truth of the remaining allegations contained in this paragraph.

49.     By the time he finished providing his false confession at noon, Mr. Coleman had

been interrogated for almost 12 hours and had almost no sleep in over 24 hours.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in this paragraph.

50.     The Defendant Officers and Defendant Garfinkel knew that Mr. Coleman's

"confession" was false and that the only reason he regurgitated it was because of the physical

and mental coercion to which they subjected him, and the false promises of leniency.

**ANSWER:**     Upon information and belief, the City admits that Plaintiff gave a statement

14

implicating himself in the rape and murder of Bridgeman. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

51. Nevertheless, the Defendants falsely charged him with murder.

**ANSWER:** Upon information and belief, the City admits that Plaintiff was charged with the murder of Bridgeman. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

52. Absent Defendant Garfinkel's cooperation, the Defendants Officers could not have alone coerced Mr. Coleman's confession.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

53. Similarly, absent the Defendant Officers' cooperation, Defendant Garfinkel could not have coerced Mr. Coleman's confession.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

54. From the very day of his false confession, Mr. Coleman has maintained that the confession was the product of physical and mental abuse, coercion, and false promises of leniency. Hours after providing the false confession, Mr. Coleman met with Juliette Ferguson, an attorney whom he had never previously met. In that conversation, Mr. Coleman told Attorney Ferguson that his "confession" was false and that he had been beaten at the police station.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

55. Fulton experienced a similar encounter with these same Defendants.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

56. After Fulton was picked up, he was taken to an interrogation room and

15

handcuffed. Defendant Officers, including, but not limited to Foley, Halloran, Clancy, Boudreau,

O'Brien, and Carroll interrogated him over a day and a half.

**ANSWER:** Upon information and belief, the City admits that Fulton was taken into custody and interviewed by police officers. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

57. One of the Defendants hit Fulton in the face and told him that he would take him

somewhere and "put a bullet in [his] brain" if he did not confess.

**ANSWER:** To the extent the allegations contained in this paragraph are directed at the City, the City denies all allegations of misconduct. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

58. The Defendant Officers told Fulton he would be able to go home if he merely

played along and said what they told him to say.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

59. With no probable cause to believe that Fulton was involved in the crime,

Defendant Garfinkel then came into the room told Fulton that unless he confessed, he would be

charged with murder.

**ANSWER:** Upon information and belief, the City admits that Defendant Garfinkel spoke to Fulton. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

60. Defendant Garfinkel prepared a handwritten statement, dictating to Fulton his

involvement in Bridgeman's rape and murder.

**ANSWER:** Upon information and belief, the City admits that Defendant Garfinkel wrote a handwritten statement based on Fulton's statement wherein he described his involvement in Bridgeman's rape and murder. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations

16

contained in this paragraph.

61. Having had almost no sleep for 36 hours and believing he would be released if he

complied, Fulton succumbed to the Defendants' coercion and provided a false confession.

**ANSWER:** Upon information and belief, the City admits that Fulton made a statement
implicating himself in the rape and murder of Bridgeman. The City lacks
knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

62. The Defendant Officers never disclosed their misconduct. In written reports,

Defendant Officers falsely represented the circumstances under which Coleman's and Fulton's

"confessions" were obtained, claiming that they had originated with Coleman and Fulton

themselves, when in reality they had come from Defendants.

**ANSWER:** Upon information and belief, the City admits that police reports document, in
summary, the interviews with Plaintiff Coleman and Fulton and document, in
summary, the statements made by Plaintiff Coleman and Fulton in which each
individual implicated themselves and each other in the rape and murder of
Bridgeman. The City lacks knowledge or information sufficient to form a belief
as to the truth of the remaining allegations contained in this paragraph.

63. Well before the trial, Defendant Officers and Defendant Garfinkel fabricated

reports purporting to memorialize Coleman's and Fulton's false statements. These reports

concealed the coercion used to obtain Coleman's and Fulton's false statements.

**ANSWER:** Upon information and belief, the City admits that police reports document, in
summary, the interviews with Plaintiff Coleman and Fulton and document, in
summary, the statements made by Plaintiff Coleman and Fulton in which each
individual implicated themselves and each other in the rape and murder of
Bridgeman. The City lacks knowledge or information sufficient to form a belief
as to the truth of the remaining allegations contained in this paragraph.

64. Based on the false confessions, juries found Coleman and Fulton guilty of first-

degree murder and aggravated criminal sexual assault.

**ANSWER:** Upon information and belief, the City admits that separate juries found Plaintiff

17

Coleman and Fulton guilty of murder and aggravated criminal sexual assault. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

65. In the death-penalty phase of sentencing, 30 people came forward, even after Coleman had been wrongfully convicted of this heinous crime, to speak to his good character, reliability, kindness, work ethic, good values and resilience in the face of difficulty, and his loving and caring nature. The witnesses comprised Mr. Coleman's family, coworkers, members of his church, and friends.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

66. The trial judge acknowledged that there was no evidence against Coleman other than his "confession," and citing Mr. Coleman's lack of criminal record and the lack of any other evidence, he sentenced Mr. Coleman to natural life for the murder conviction and a consecutive 30-year sentence for the sexual assault.

**ANSWER:** Upon information and belief, the City admits that the trial judge sentenced Plaintiff Coleman to natural life for Bridgeman's murder and 30 years for the sexual assault, to be served consecutively. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

67. In 1999 the Illinois Appellate Court affirmed Coleman's sentence, and the Illinois Supreme Court denied his petition for leave to appeal.

**ANSWER:** On information and belief, the City admits the allegations contained in this paragraph.

68. While Mr. Coleman remained in prison, new evidence—both DNA evidence and evidence about police misconduct—came to light to establish that he and Fulton were innocent.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth

18

of the allegations contained in this paragraph.

69.     In 2016, Mr. Coleman moved under 725 ILCS 5/116-3 for additional forensic testing on DNA found at the crime scene. The Conviction Integrity Unit at the Cook County State's Attorney Office voluntarily reopened the investigation into Bridgeman's murder, and in doing so agreed to conduct new DNA testing.

**ANSWER:**     Upon information and belief, the City admits that Plaintiff Coleman moved under 725 ILCS 5/116-3 for additional forensic testing on DNA found at the crime scene. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

70.     That DNA testing, including testing on semen found on the victim, excluded Coleman, Fulton, Taylor, and Bridgeman's boyfriend as a source of the DNA, and implicated a known serial rapist.

**ANSWER:**     Upon information and belief, the City admits that DNA analysis of the semen found on Bridgeman's clothing excluded Plaintiff Coleman, Fulton, Taylor, and Latham as the source of the DNA. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

71.     Semen was found in the crotch of Bridgeman's underwear. DNA testing on that semen conclusively excluded Coleman, Fulton, Taylor, and Bridgeman's then-boyfriend as sources of the semen.

**ANSWER:**     Upon information and belief, the City admits that DNA analysis of the semen found on Bridgeman's clothing excluded Plaintiff Coleman, Fulton, Taylor, and Latham as the source of the DNA. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

72.     The DNA profile obtained from the semen on her underwear did, however, match to a serial rapist with almost scientific certainty. That rapist has been connected to at least three

19

other rapes.

**ANSWER:**     Upon information and belief, the City admits that a DNA analysis matched the DNA profile of the semen found on Bridgeman's clothing to another individual. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

73.     Analysts also recovered male DNA from underneath the victim's fingernails. Testing on that DNA revealed that although Coleman, Fulton, Taylor, and Bridgeman's boyfriend could not have left that DNA under the victim's fingernails, the same serial rapist could not be excluded from being the source of that DNA.

**ANSWER:**     Upon information and belief, the City admits that DNA analysis of material from under Bridgeman's fingernails excluded Plaintiff Coleman, Fulton, Taylor, and Latham as the source of the DNA. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

74.     In addition, semen found on Bridgeman's sweatshirt similarly excluded Coleman, Fulton, Taylor, and the victim's boyfriend from being the donor of the semen, but did not exclude the serial rapist.

**ANSWER:**     Upon information and belief, the City admits that DNA analysis of the semen found on Bridgeman's clothing excluded Plaintiff Coleman, Fulton, Taylor, and Latham as the source of the DNA. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

75.     The Defendants' misconduct in this case was not an isolated occurrence. To the contrary, they were the result of the City of Chicago's policies and practices of pursuing wrongful convictions through reliance on coerced statements and profoundly flawed investigations.

**ANSWER:**     The City denies the allegations contained in this paragraph.

76.     The Defendant Officers' coercion of false statements from Coleman and Fulton was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

**ANSWER:**     The City denies the allegations contained in this paragraph.

77.     These Defendants' methods went far beyond acceptable police interrogation techniques.

**ANSWER:**     The City denies all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

78.     The wrongful convictions of innocent persons involving coerced and false statements include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Coleman and Fulton. These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) false promises of leniency in exchange for "cooperation" in the form of a statement; and (e) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt.

**ANSWER:**     The City denies all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

79.     For example, Defendant Foley, the lead detective on Mr. Coleman's case, and the detective who obtained Coleman's and Fulton's false confessions, has since been revealed as the detective who obtained a false "confession" from Harold Richardson in the now-notorious "Englewood Four" case. In that case, all four convicted men were exonerated when DNA from a serial rapist murderer was discovered at the crime scene; that same DNA excluded all four

21

defendants. Mr. Richardson was later awarded a Certificate of Innocence despite the confession

obtained by Defendant Foley.

**ANSWER:** The City denies all allegations of misconduct directed at the City. Upon information and belief, the City admits that Foley was part of a homicide investigation in which he took an inculpatory statement from Harold Richardson. Upon information and belief, the City admits that DNA analysis excluded Richardson and three other individuals criminally convicted in that homicide and that Richardson was provided a certificate of innocence for that crime. Upon information and belief, the City denies that Foley was the "lead detective on Mr. Coleman's case." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

80. In that same case, Defendants Foley and Boudreau coerced a false confession

from one of Richardson's co-defendants, Terrill Swift. The City of Chicago recently paid over

$31 million to settle claims that Defendants Foley and Boudreau coerced false confessions from

the Englewood Four.

**ANSWER:** Upon information and belief, the City admits that Terrill Swift was a co-defendant of Richardson and had been interviewed by police officers. The City admits that the civil litigation brought by Richardson, Swift, and two other individuals was resolved pursuant to settlement, without admission of liability and with denial of all alleged wrongdoing, for the amount of approximately $31 million. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

81. After the Englewood Four were exonerated, the FBI discovered an insider's

account of how those false confessions were obtained. Former Assistant State's Attorney

Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the

Englewood Four they could go home if they cooperated by confessing to the crime and

implicating others. They were told "witnesses go home." Johnson further reported that the

detectives created a "cheat sheet" to help them keep their stories straight when testifying at the

subsequent motions to dismiss brought by the Englewood Four.

22

**ANSWER:**    Upon information and belief, the City admits that in 2012, the Federal Bureau of Investigation created as "302 report" purporting to reflect an interview with former ASA Terrance Johnson. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

82.    The Detectives were successful. The motions to suppress were denied and the Englewood Four were convicted despite, just as here, no forensic evidence inculpating them. But for advanced DNA testing, the four would have remained incarcerated like Mr. Coleman.

**ANSWER:**    Upon information and belief, the City admits that the "Englewood Four" criminal defendants' motions to suppress were denied and they were convicted. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

83.    Likewise, Defendant Boudreau is one of the notorious homicide detectives, who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes, including murder.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

84.    In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the "confessions."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

85.    In an examination of thousands of murder cases in Cook County from 1991 through 2000, the Chicago Tribune found that Defendant Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

23

**ANSWER:** The City admits that the Chicago Tribune published such an article in December 2001 which concerned, among other officers, Detective Kenneth Boudreau. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

86.     As the Chicago Tribune observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." *See* "Veteran Detective's Murder Cases Unravel," *Chicago Tribune*, December 17, 2001, available at http://www.chicagotribune.com/news/watchdog/chi-011217confession-story.html (last visited on January 26, 2018).

**ANSWER:** The City admits that the Chicago Tribune published such an article in December 2001 which contained the above-quoted section but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

87.     For a two-year period in the early 1990s, Defendants Boudreau and his partners helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain false confessions.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

88.     Some other examples of abuses by Defendant Officers include the following, all of which are corroborated by sworn testimony:

a.      In November 1992, Defendants Boudreau, Halloran, and O'Brien jointly induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and

24

killing a woman. Notably, records revealed that despite confessing to murder, Williams was actually incarcerated at the time of the crime. Because of his demonstrated innocence, Williams was never charged. Hill and Young, however, were convicted although their confessions implicated Williams, who was undeniably innocent. Again, later DNA evidence exonerated Hill and Young, leading to their release from prison.

b.      Likewise, Defendants Boudreau, Halloran, and O'Brien featured prominently in the case against Tyrone Hood and Wayne Washington, coercing a false "confession" from Washington. Both Hood and Washington later had their murder convictions overturned.

c.      Derrick Flewellen signed a confession coerced by Defendants Boudreau, Halloran, and O'Brien after being interrogated for more than 36 hours, during which time he was slapped, kicked, punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

d.      Defendant Boudreau and a partner obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the 40s, well below the dividing line for mental retardation, and that he was incapable of intelligently waiving his Miranda rights. Neal acquitted notwithstanding his signed confession.

e.      In December 1993, Defendants Boudreau, Carroll, O'Brien, and Graf "solved" two separate murders with confessions from two intellectually impaired juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent

25

any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by those Defendants.

f.      In 1998, Defendant Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled that the boy did not have the mental capacity to waive his rights and threw out the confession. Prosecutors then dropped the charges.

g.      After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no Miranda waiver was created, and his requests to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

h.      In connection with the Ceriale murder, Defendant Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours. When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury, and at least one of them went to jail for it.

i.      Marcus Wiggins brought a lawsuit against Defendant Boudreau alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. Wiggins's mother had been denied access to her son, who was a 13-year old 8th grader at the time of the coerced confession. Six young suspects gave confessions. Two of these confessions were later thrown out on the basis of the "periodic

26

screaming [at the police station] throughout the night," screaming that Boudreau testified he did

not hear. The remaining four were acquitted, including two who had been interrogated by

Boudreau.

j.       Antoine Ward was placed in an interrogation room by Defendant Boudreau,

where he was cuffed to a bench for prolonged periods, unable to use the bathroom (he urinated

on the floor), and beaten. Boudreau told Ward that other witnesses had placed him at the scene of

a murder, but that he would let him go home and help him if he signed a statement saying that he

gave another man a gun. After almost 48 hours in the room, Ward signed the statement written

out by Boudreau, and was convicted of murder.

k.       Fabian Pico was 16 years old when he gave a self-incriminating statement to

Defendants Boudreau and Halloran which was then used to convict him of murder. When Pico

moved to suppress the statement on the grounds that the police did not allow him access to his

mother, Boudreau claimed that he had tried unsuccessfully to reach Pico's mother by phone

before Pico confessed, but this supposed attempted contact is not referenced anywhere in his

written reports.

l.       After being beaten by Defendants Boudreau and O'Brien, Jesse Clemon signed a

written statement with his left hand (because his right hand had been injured). Witnesses in the

station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was

not coerced, but the judge suppressed it anyway due to the "horrendously oppressive"

atmosphere at the station. During their investigation, Defendants Boudreau and O'Brien also

threatened, beat, and electrochocked Jesse's brother, Demoni, and beat his other brother, Iamari,

with a flashlight.

27

m.      Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Defendants Boudreau and Halloran, who then choked and punched him in order to get him to confess to a six-month old shooting. After more than 30 hours in this room with minimal sleep and food, Watkins signed a false incriminating statement.

n.      In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Defendants Boudreau, Halloran, and O'Brien threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. At one point, the detectives believed that they had successfully coerced Mr. Smith to confess, but when the Assistant State's Attorney ("ASA") entered the room, Mr. Smith continued to assert his innocence, whereupon the ASA left and the beating resumed. The same thing happened a second time, this time with another ASA, but again Mr. Smith refused to confess. When that ASA left the room, Defendants Boudreau, Halloran, and O'Brien resumed the beating, whereupon Mr. Smith, deprived of both counsel and sleep for an inordinate time, finally signed a false confession.

o.      Christopher Holly filed a federal civil rights lawsuit against Defendant Boudreau and other detectives alleging that he was framed for a murder in 1998.

p.      Richard Malek alleges that Defendant Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession,

Mr. Malek filed a federal lawsuit against Defendant Boudreau and others.

q.      In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives physically coerced their confessions.

r.      In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by Defendants Boudreau and Halloran, who refused to let him contact his family and beat him into confessing to a murder he did not commit. Tyrone Reyna's codefendants, Nicholas Escamilla and Miguel Morales, were arrested by Defendant Boudreau for murder despite the lack of any physical evidence or eye witnesses linking Escamilla to the crime. Boudreau tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed as well. Miguel Morales was also beaten during his interrogation. However, unlike Escamilla, Morales refused to confess. Boudreau then coerced a friend of Morales into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified that he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

s.      In 1998, Defendants Boudreau and Halloran held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Defendants Boudreau and Halloran placed a book on his chest and stomach and hit the book with a black

29

jack, so as not to leave visible marks on Jackson's body. Meanwhile, Defendants Boudreau and

Halloran, using a torture technique referred to in the Department as "bagging," placed a

typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion,

Jackson eventually confessed to a murder he did not commit.

        t.      In 1991, fifteen year-old John Plummer was interrogated for 36 hours by

Defendants Boudreau, Halloran, Foley, and Clancy. After being physically beaten, he falsely

confessed to a murder.

        u.      In 1992, Arnold Day was interrogated in connection with a murder investigation.

Mr. Day was isolated in an interrogation room for many hours while Defendants Boudreau and

Foley psychologically and physically tortured him until he finally confessed.

        v.      In 1993, Richard Anthony was forced to confess to murder by Defendant

Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in

order to coerce Anthony into giving a false statement. Richard Anthony's co-defendant, Jerry

Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour

interrogation, which included preventing him from contacting an attorney or his family and

refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation,

Gillespie eventually gave a false confession.

        w.      In 1995, Defendants Boudreau and Halloran were part of a team of detectives

who physically abused John Wright until he agreed to implicate Malik Taylor and Michael

Taylor in connection with a murder.

        x.      In 1993, Emmett White was arrested by Defendants Boudreau, O'Brien, and

Clancy, who hit him in the face, punched him in the body, threw him to the ground and stepped

on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse.

y.      In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

z.      Defendants Foley and O'Brien coerced a signed false confession out of Javan Deloney in 1991. To extract the false confession from him, they woke him from his sleep, handcuffed him, and took him to the station. They denied his multiple requests for an attorney, and began yelling at and threatening him. They then turned to physical violence, hitting him in the chest and slapping him in the face, and forcing him to watch them beat his cousin, all despite his insistence that he was not involved in the murder.

aa.      Defendant O'Brien threatened Cortez Brown with the death penalty, beat him with a flashlight, deprived him of food, and denied him access to an attorney.

bb.      Defendant O'Brien also slapped Curtis Mislap in the face, kicked him in the testicles while he was handcuffed, and threatened him. Milsap falsely confessed and was later acquitted.

cc.      Taking a page from John Burge, in 1991 Defendants O'Brien and Boudreau electroshocked Damari Clemon. They beat him and threatened him with a pistol.

dd.      In 1994, Defendants Boudreau, Halloran, Moser, and Graf beat Anthony Williams into falsely confessing to murder and armed robbery.

ee.      In 1993, Defendants Boudreau, O'Brien, and Halloran arrested Nicholas Escamila in his home without a warrant. They handcuffed him to a wall for 15 hours and kept him from eating, sleeping, using the bathroom, and making a phone call. They ridiculed him, screamed

31

him, threatened him and his wife, child, and unborn baby, and punched him in the head, chest, stomach, and back. The Defendants coached Escamila into a false confession, which he signed because he wanted the abuse to end.

ff.     Similarly, in 1987, Defendant Foley worked with other Chicago detectives to obtain a false confession from Frank Bounds for a murder. The detectives hit Bounds on the head and threatened to implicate Bounds's girlfriend in the murder if he did not confess.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph including the sub-paragraphs.

89.     There are many other examples of similar misconduct by the other Defendant Officers.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

90.     It just so happens that these are the same Detectives who obtained the confessions from Coleman and Fulton. Mr. Coleman made an immediate outcry to Attorney Juliette Ferguson on the day of his interrogation. He made that outcry not knowing that the Defendants who obtained his false confession had been accused of the exact same abusive behavior by scores of other men.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

91.     Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the Cook County State's Attorney's Office and from criminal defendants.

**ANSWER:**     The City denies the allegations contained in this paragraph.

92.     As a matter of both policy and practice, municipal policymakers and Department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Department detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**     The City denies the allegations contained in this paragraph.

93.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

**ANSWER:**     The City denies the allegations contained in this paragraph.

94.     The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

**ANSWER:**     The City denies the allegations contained in this paragraph.

95.     The City of Chicago and officials within the Department failed to act to remedy

33

the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Coleman's ongoing injuries.

**ANSWER:**    The City denies the allegations contained in this paragraph.

96.    The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:**    The City denies the allegations contained in this paragraph.

### Mr. Coleman's Exoneration

97.    On August 7, 2017, based on the newly discovered forensic evidence and revelations about Defendant Officers' long histories of misconduct, Mr. Coleman filed a motion under 735 ILCS 5/2-1401 to vacate his conviction and sentence. He raised claims of newly discovered DNA evidence and pointed to numerous instances of other false confessions coerced by the same detectives that coerced Mr. Coleman's false confession.

**ANSWER:**    Upon information and belief, the City admits that Plaintiff Coleman filed a motion under 735 ILCS 5/2-1401 to vacate his conviction and sentence. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

98.    On November 17, 2017, on the State's motion, Judge Porter vacated Mr. Coleman's convictions and life sentence, and Mr. Coleman was released from prison on an I-Bond a few days later.

**ANSWER:**    Upon information and belief, the City admits the allegations contained in this paragraph.

99.    On December 1, 2017, the State dismissed all charges against Mr. Coleman.

**ANSWER:**    Upon information and belief, the City admits the allegations contained in this paragraph.

## Mr. Coleman's Damages

100.    Mr. Coleman spent over 23 years in prison for a crime he did not commit. He must now attempt to make a life for himself outside prison without the benefit of two decades of life experiences which normally equip adults for that task.

**ANSWER:**    Upon information and belief the City admits that Plaintiff Coleman was in custody from April 1994 until November 2017. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

101.    Additionally, the emotional pain and suffering caused by losing more than two decades in the prime of his life—from ages 25 through 48—has been substantial. During his wrongful incarceration, Mr. Coleman was stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right. He missed out on the ability to raise his two children, and share holidays, birthday, funerals, and other life events with his large, tight-knit family and many friends, and on the fundamental freedom to live one's life as an autonomous human being.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

102.    Mr. Coleman's 23 years of wrongful incarceration forced him into a world of isolation in which he lost all contact with his friends and family in the outside world.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

103.    Mr. Coleman has suffered tremendously because of the Defendants' misconduct.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**COUNT I – 42 U.S.C. § 1983**
**False Confession**
**(Fifth Amendment and Fourteenth Amendments)**

104.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     The City incorporates its answer to each paragraph of this Complaint as if fully restated herein.

105.     In the manner described more fully above, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

106.     In addition, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

36

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

107.     In addition, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

108.     Specifically, Defendant Officers and Defendant Garfinkel conducted, participated in, encouraged, advised, and ordered an unconstitutional, lengthy interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

109.     Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

110.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. It was the reason that Plaintiff was prosecuted and convicted.

**ANSWER:**     Upon information and belief, the City admits that Plaintiff Coleman's statement implicating himself in the rape and murder of Bridgeman was entered into evidence during Plaintiff Coleman's criminal trial. The City lacks knowledge or

37

information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

111.     The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

112.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

113.     The misconduct described in this Count by the Defendant Officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VIII.

**ANSWER:**     The City denies the allegations contained in this paragraph.

**COUNT II – 42 U.S.C. § 1983**
**Fabrication of a False Witness Statement**
**(Fourteenth Amendment)**

114.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     The City incorporates its answers to each paragraph of this Complaint as if fully restated here.

115.     In the manner described more fully above, the Defendant Officers and Defendant

Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime,

individually, jointly, and in conspiracy with one another, and others unknown, as well as under

color of law and within the scope of their employment, deprived Plaintiff of his constitutional

right to a fair trial and due process by fabricating witness statements implicating Plaintiff in

crimes he did not commit, which Defendants knew to be false, and by suppressing their own

misconduct and the circumstances in which those witness statements was obtained.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

116.    Specifically, as set forth above, Defendants used physical violence and

psychological abuse to obtain false witness statements implicating Plaintiff. The misconduct

described in this Count was objectively unreasonable and was undertaken intentionally, and in

total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

117.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**    The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

118.    The misconduct described in this Count by the Defendant Officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VIII.

**ANSWER:**    The City denies the allegations contained in this paragraph.

## COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

119.    Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:**    The City incorporates its answers to each paragraph of this Complaint as if fully restated herein.

120.    Defendant Officers caused Plaintiff to be unreasonably seized, detained, imprisoned, and deprived of liberty, and further caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

121.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

122.    The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

123.    The misconduct described in this Count was undertaken by the Defendant Officers under color of law and within the scope of their employment.

**ANSWER:**    Upon information and belief, the City admits that William Foley and Defendants Boudreau, Halloran, Clancy, O'Brien, Graf, Carroll and Kelly acted under color of law and within the scope of their employment during the relevant time. The

40

City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

124.     The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

125.     The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described in Count VIII.

**ANSWER:**     The City denies the allegations contained in this paragraph.

126.     As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COUNT IV – 42 U.S.C. § 1983**
**Due Process**
**(Fourteenth Amendment)**

127.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     The City incorporates its answers to each paragraph of this Complaint as if fully restated herein.

128.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER:**     Upon information and belief, the City admits that William Foley and Defendants Boudreau, Halloran, Clancy, O'Brien, Graf, Carroll and Kelly acted under color of law and within the scope of their employment during the relevant time. The City lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations contained in this paragraph.

129.    In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from prosecutors (including Defendant Garfinkel), among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

130.    The Defendant Officers also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

131.    In addition, the Defendant Officers also destroyed evidence that would have demonstrated Plaintiff's innocence. These Defendants destroyed this evidence knowing that it had exculpatory value. In the alternative, these Defendants destroyed this potentially exculpatory evidence in bad faith.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

132.    In addition, based upon information and belief, the Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

133.    The Defendant Officers' misconduct directly resulted in the unjust and wrongful

criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby

denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

134.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

135.    As a result of the misconduct of the Defendants described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and

suffering, and other grievous and continuing injuries and damages.

**ANSWER:**    The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

136.    The misconduct described in this Count by the Defendant Officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VIII.

**ANSWER:**    The City denies the allegations contained in this paragraph.

## COUNT V – 42 U.S.C. § 1983
## Failure to Intervene

137.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    The City incorporates its answers to each paragraph of this Complaint as if fully restated here.

138.    In the manner described more fully above, by their conduct and under color of

law, during the constitution violations described herein, one or more of the Defendants stood by

43

without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

139.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

140.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

141.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**ANSWER:** The City denies the allegations contained in this paragraph.

## COUNT VI – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

142.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** The City incorporates its answers to each paragraph of this Complaint as if fully restated here.

143.     After Ms. Bridgeman's murder, the Defendants, acting within the scope of their

employment and under color of law, agreed among themselves and with other individuals to act

in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due

process and a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

144.     In this manner, Defendants, acting in concert with other unknown coconspirators,

conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

145.     In furtherance of the conspiracy, each of the coconspirators engaged in and

facilitated numerous overt acts, including but not limited to those set forth above—such as

fabricating evidence, coercing false confessions, committing perjury during hearing and trials—

and was an otherwise willful participant in joint activity.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

146.     As a direct and proximate result of the illicit prior agreement and actions in

furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered

injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:**     The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

147.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:**    The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

148.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**ANSWER:**    The City denies the allegations contained in this paragraph.

### COUNT VII – 42 U.S.C. § 1983
### Supervisory Liability

149.    Each paragraph of this Complaint is incorporated as if fully restated fully herein.

**ANSWER:**    The City incorporates its answers to each paragraph of this Complaint as if fully restated herein.

150.    The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of Defendant Benoit and other Unknown Supervisory Defendants (collectively, "Supervisory Defendants"), when they failed to adequately train and supervise the Defendant Officers.

**ANSWER:**    Upon information and belief, the City denies the involvement of named Defendant Thomas Benoit. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

151.     Specifically these Supervisory Defendants were personally involved in the case against Plaintiff and knew, or, in the absence of their deliberate indifference and recklessness,

46

should have known of their subordinates' unconstitutional actions and related misconduct in the

case.

**ANSWER:**     Upon information and belief, the City denies the involvement of named
Defendant Thomas Benoit. The City lacks knowledge or information sufficient to
form a belief as to the truth of the remaining allegations contained in this
paragraph.

152.     Furthermore, these Supervisory Defendants failed to supervise the individual

defendants in constitutionally adequate law enforcement practices, particularly those which

concerned interviews of suspects, thereby encouraging and/or permitting these defendants and

other employees to coerce and fabricate false inculpatory evidence, which cause the

constitutional deprivations suffered by Plaintiff.

**ANSWER:**     Upon information and belief, the City denies the involvement of named
Defendant Thomas Benoit. The City lacks knowledge or information sufficient to
form a belief as to the truth of the remaining allegations contained in this
paragraph.

153.     These interview techniques, fabrications, and other investigative procedures were

contrary to accepted methods used by law enforcement agencies. The fact that the Supervisory

Defendants failed to train and supervise their subordinates to ensure that they employed proper

investigation procedures demonstrates deliberate indifference and reckless disregard for

Plaintiff's constitutional rights.

**ANSWER:**     Upon information and belief, the City denies the involvement of named
Defendant Thomas Benoit. The City lacks knowledge or information sufficient to
form a belief as to the truth of the remaining allegations contained in this
paragraph.

154.     The personal involvement of the Supervisory Defendants, through their actions

and omissions, proximately and directly caused the constitutional deprivations and grievous

personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

**ANSWER:** Upon information and belief, the City denies the involvement of named Defendant Thomas Benoit. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:** Upon information and belief, the City denies the involvement of named Defendant Thomas Benoit. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

## COUNT VIII – 42 U.S.C. § 1983
## Policy and Practice Claim against the City of Chicago

156. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** The City incorporates its answers to each paragraph of this Complaint as if fully restated herein.

157. As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

**ANSWER:** The City denies the allegations contained in this paragraph.

158. Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

**ANSWER:** The City denies the allegations contained in this paragraph.

159. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate

48

rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

**ANSWER:**     The City denies the allegations contained in this paragraph.

160.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

**ANSWER:**     The City denies the allegations contained in this paragraph.

161.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress

and after suffering abuse, to committing crimes to which they had no connection.

**ANSWER:**    The City denies the allegations contained in this paragraph.

162.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

**ANSWER:**    The City denies the allegations contained in this paragraph.

163.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to

50

prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

**ANSWER:**     The City denies the allegations contained in this paragraph.

164.     These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

**ANSWER:**     The City denies the allegations contained in this paragraph.

165.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**     The City denies the allegations contained in this paragraph.

166.     As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

**ANSWER:**     The City denies the allegations contained in this paragraph.

167.     In addition, the misconduct described in this Count was undertaken pursuant to

51

the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

**ANSWER:**     The City denies the allegations contained in this paragraph.

168.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**ANSWER:**     The City denies the allegations contained in this paragraph.

### COUNT VIII – State Law Claim
### Malicious Prosecution

169.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     The City incorporates its answers to each paragraph of this Complaint as if fully restated herein.

170.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

171.     The Defendant Officers and caused Plaintiff [sic] to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

172. Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that those statements were false and perjured. The Defendants also fabricated evidence by coercing false inculpatory testimony from Plaintiff and his codefendant. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Bridgeman rape and murder, and all inculpatory evidence was coerced or fabricated. Furthermore, the Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence that would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

173. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

174. The charges against Plaintiff were terminated in Plaintiff's favor.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

175. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but

lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

## COUNT IX – State Law Claim
## Intentional Infliction of Emotional Distress

176. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** The City incorporates its answers to each paragraph of this Complaint as if
restated fully herein.

177. The acts and conduct of the Defendants as set forth above were extreme and

outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they

were undertaken with an intent to cause, or were in reckless disregard of the probability that their

conduct would cause, severe emotional distress to Plaintiff, as alleged more fully above.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

178. As a direct and proximate result of the Defendants' actions, Plaintiff suffered and

continues to suffer severe emotional distress.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but
lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in this paragraph.

## COUNT X – State Law Claim
## Civil Conspiracy

179. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** The City incorporates its answers to each paragraph of this Complaint as if
restated fully herein.

180. As described more fully in the preceding paragraphs, the Defendants, acting in

concert with other known and unknown coconspirators, conspired by concerted action to

54

accomplish an unlawful purpose by unlawful means.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

181.   In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and intentional infliction of emotional distress upon him.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

182.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

183.   As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is alleged more fully above.

**ANSWER:** The City denies any and all allegations of misconduct directed at the City but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**COUNT XI – State Law Claim**
**Respondeat Superior**

184.   Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** The City incorporates its answers to each paragraph of the Complaint as if restated fully herein.

185.   In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department, acting at all relevant

times within the scope of their employment and under color of law.

**ANSWER:**    Upon information and belief, the City admits that William Foley and Defendants Boudreau, Halloran, Clancy, O'Brien, Graf, Carroll and Kelly acted under color of law and within the scope of their employment during the relevant time The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

186.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**    The City denies this is a full and accurate statement of the law and, accordingly, denies the allegations contained in this paragraph.

187.    In committing the acts alleged in the preceding paragraphs, Defendant Garfinkel was a member of, and agent of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of his employment and under color of law.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

188.    Defendant Cook County is liable as principal for all torts committed by its agents.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COUNT XII – State Law Claim**
**Indemnification**

189.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City incorporates its answers to each paragraph of this Complaint as if restated fully herein.

190.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

56

**ANSWER:**    The City denies this is a full and accurate statement of the law and, accordingly, denies the allegations contained in this paragraph.

191.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**    Upon information and belief, the City admits that William Foley and Defendants Boudreau, Halloran, Clancy, O'Brien, Graf, Carroll and Kelly acted under color of law and within the scope of their employment during the relevant time The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

192.    Defendant Cook County was at all times material to this complaint responsible to indemnify Defendant Garfinkel for acts taken within the scope of his employment, and is therefore responsible for any judgment entered against Defendant Garfinkel and for any judgment entered against him, making the County a necessary party to this complaint.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

WHEREFORE, Defendant City request judgment in their favor and against the Plaintiff, costs of suit, and such other relief as the Court deems appropriate.

## **AFFIRMATIVE DEFENSES**

Defendants City of Chicago, by and through its attorneys, The Sotos Law Firm, P.C., asserts the following affirmative defenses to Plaintiff's First Amended Complaint:

1.    The City is not liable to Plaintiff if its employees or agents are not liable to the Plaintiff. 745 ILCS 10/2-109.

2.    Pursuant to 42 U.S.C. § 1983, a municipality is not liable under a theory of *respondeat superior* for the constitutional violations of its employees. *See Board of county Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997).

3.　　Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

4.　　To the extent any injuries or damages claimed by Plaintiff was proximately caused, in whole or in part, by any wrongful conduct on the part of Plaintiff, any verdict or judgment obtained by Plaintiff on any of his claims brought under Illinois law and based on any finding of "reckless" willful and wanton behavior, as opposed to "intentional" willful and wanton behavior, must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case. See, Poole of City of Rolling Meadows, 167 Ill.2d 41, 656 N.E.2d 768, 212 Ill. Dec. 171 (1995).

5.　　The City is not liable under Section 1983 if Plaintiff does not prove any violation of his constitutional rights. See, City of Los Angeles v. Heller, 475 U.S. 796, 79 (1986).

6.　　The City is immune from the imposition of punitive damages under both state and federal law. Punitive damages cannot be imposed against a municipality in an § 1983 action. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). Moreover, under Illinois law, the City cannot be required to indemnify an employee for punitive or exemplary damages, nor may it pay a judgment for punitive damages on behalf of an employee. 745 ILCS 10/2-102.

7.　　As to Plaintiff's state law claims, Defendant City is not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" See Kerns v. Engelke, 76 Ill.2d 154, 166 (1979).

8.　　Under the Tort Immunity Act, there is a one-year statute of limitations on claims

arising under state law. 745 ILCS 10/8-101. Plaintiff's cause of action for intentional infliction of emotional distress accrued more than one year prior to his initiation of this litigation. Accordingly, Plaintiff's intentional infliction of emotional distress claim is untimely and should be dismissed. In addition, as civil conspiracy is not a stand-alone claim under state law, Plaintiff's conspiracy to commit emotion distress claim should be dismissed.

9.     Plaintiff's federal claims are barred in part or in whole by the applicable statute of limitations.

### JURY DEMAND

Defendant, City of Chicago hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 20, 2019                                 Respectfully Submitted,

                                                     /s/Sara J. Schroeder
                                                     SARA J. SCHROEDER, Atty. No. 06322803
                                                     *One of the Attorneys for Defendant City of Chicago*

James G. Sotos
Jeffrey N. Given
Lisa M. Meador
Sara J. Schroeder
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
Tel: (630) 735-3300
sschroeder@jsotoslaw.com

## CERTIFICATE OF SERVICE

I certify under penalty of perjury, pursuant to 28 U.S.C.A. § 1746, that on June 20, 2019, I electronically filed the foregoing **Defendant City Of Chicago's Answer and Affirmative Defenses to Plaintiff Coleman's Second Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

***Attorneys for Plaintiff Coleman***
Russell Ainsworth
Jonathan I. Loevy
Arthur Loevy
Rachel Brady
Loevy & Loevy
311 N. Aberdeen, 3rd FL
Chicago, Illinois 60607
312-243-5900
russell@loevy.com
jon@loevy.com
arthur@loevy.com
brady@loevy.com

***Attorneys for Cook County and Harold Garfinkel***
T. Andrew Horvat
Derek Kuhn
Cook County State's Attorney's Office
50 West Washington Street, Rm. 500
Chicago, Illinois 60602
312-603-3369
timothy.horvat@cookcountyil.gov
derek.kuhn@cookcountyil.gov

***Attorneys for Individual Defendants***
Eileen E. Rosen
Patrick R. Moran
Andrew J. Grill
Austin G. Rahe
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, Illinois 60602
312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
agrill@rfclaw.com
arahe@rfclaw.com

/s/Sara J. Schroeder
SARA J. SCHROEDER, Atty. No. 06322803
*One of the Attorneys for Defendant City of Chicago*

60