**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NEVEST COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Vs. | ) | Case No. 18 CV 00998 |
| | ) | |
| CITY OF CHICAGO, KENNETH | ) | |
| BOUDREAU, JOHN HALLORAN, | ) | |
| MICHAEL CLANCY, JAMES O'BRIEN, | ) | Judge Robert Gettleman |
| GERI LYNN YANOW, as Independent | ) | Magistrate Judge Sunil Harjani |
| Administrator of the Estate of WILLIAM | ) | |
| FOLEY, ALBERT GRAF, WILLIAM | ) | |
| MOSER, STANLEY TURNER, GERALD | ) | |
| CARROLL, THOMAS KELLY, SERGEANT | ) | |
| THOMAS BENOIT, as-yet UNKNOWN | ) | |
| OFFICERS OF THE CHICAGO POLICE | ) | |
| DEPARTMENT, ASSISTANT STATE'S | ) | |
| ATTORNEY HAROLD GARFINKEL, and | ) | |
| COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## COOK COUNTY DEFENDANTS' ANSWER TO
## PLAINTIFF'S SECOND AMENDED COMPLAINT

Now come Defendants Cook County and Harold Garfinkel (for purposes of this

Answer, defined as "Defendants"), by their attorney KIMBERLY M. FOXX, State's Attorney

of Cook County, through her Assistant State's Attorney, Derek Kuhn and answers Plaintiff's

Second Amended Complaint as follows:

### INTRODUCTION

1.     Plaintiff Nevest Coleman spent nearly half his life in prison for a rape and

murder he did not commit.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations contained in Paragraph 1 and, accordingly, deny them.**

2.    In 2017, DNA evidence finally exonerated Mr. Coleman. DNA from semen found on the victim's clothes and underwear, and from underneath her fingernails, both completely exculpated Mr. Coleman and implicated the real perpetrator: a serial rapist.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 and, accordingly, deny them.**

3.    Tragically, because the Defendant Detectives framed an innocent man for the crime, the real perpetrator remained free to rape at least three other women.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 and, accordingly, deny them.**

4.    Prior to his arrest at age 25, Mr. Coleman had no criminal history and had been employed full-time as a Comiskey Park groundskeeper for the two years leading up to his arrest.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 and, accordingly, deny them.**

5.    The sum total of the evidence against him was his false confession, which was coerced by the Defendant Detectives. These same Defendants are notorious for obtaining false confessions from dozens of other men through violence, threats, and false promises of leniency.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 that are directed at other defendants and, accordingly, deny them. Defendants deny the remaining allegations contained in paragraph 5**.

6.      Although no physical evidence or eyewitnesses tied Mr. Coleman to the crime, his coerced false confession was enough to send him to prison for life.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 and, accordingly, deny them**.

7.      Finally, in 2017, all charges against Mr. Coleman were dismissed based on the new DNA evidence and he regained his freedom.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 and, accordingly, deny them.**

8.      Mr. Coleman now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 and, accordingly, deny them.**

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

**Answer: Defendants admit that this action is brought pursuant to 42 U.S.C. §1983 for alleged violations of Plaintiff's constitutional rights, but deny any alleged wrongdoing.**

10.      This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

**Answer**: **Defendants admit that jurisdiction is proper.**

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. In addition, Plaintiff's criminal case was investigated, tried, and appealed in this judicial district, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Answer: Defendants admit that venue is proper and that this Court has jurisdiction over the alleged claims. Defendants deny, however, the allegations and events asserted by Plaintiff insofar as they are directed to Defendant Garfinkel and further deny liability to Plaintiff for any and all claims asserted in the Amended Complaint.**

## PARTIES

12.     Plaintiff Nevest Coleman is a 48-year old resident of Chicago, Illinois. At the time of his arrest, he was 25 years old and lived with his family in the Englewood neighborhood of Chicago.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and, accordingly, deny them.**

13.     At all relevant times, Defendants Kenneth Boudreau, John Halloran, Michael Clancy, James O'Brien, Albert Graf, Stanley Turner, Gerald Carroll, Thomas Kelly, and as-yet unknown Defendant Officers were detectives with the Chicago Police Department and the City of Chicago. These officers participated in the Bridgeman rape and murder investigation, which resulted in Mr. Coleman's wrongful conviction.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 and, accordingly, deny them.**

14.     GERI LYNN YANOW, the Independent Administrator of the Estate of WILLIAM FOLEY, Deceased, is named as Defendant in her capacity as Independent

Administrator of the Estate of WILLIAM FOLEY, as successor in interest and to defend on behalf of Defendant WILLIAM FOLEY in this action. WILLIAM FOLEY was a former officer or employee of the Chicago Police Department and the City of Chicago. He participated in the Bridgeman rape and murder investigation, which resulted in Mr. Coleman's wrongful conviction.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and, accordingly, deny them.**

15. Each of the individually-named Defendant officers acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and, accordingly, deny them**.

16. At all relevant times, Defendant Thomas Benoit was a sergeant with the Chicago Police Department, employed by Defendant City of Chicago. At all times relevant to this lawsuit, Defendant Benoit was acting under color of law and within the scope of his employment.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and, accordingly, deny them.**

17. The City of Chicago is an Illinois municipal corporation that under the laws of the State of Illinois, and is or was the employer of the above-named Defendant Officers.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and, accordingly, deny them.**

18. At all relevant times, Defendant Harold Garfinkel was an attorney licensed to practice law in the State of Illinois. He was employed as an Assistant State's Attorney

in the Cook County State's Attorney's Office, and was employed by the Cook County State's Attorney's Office.

**Answer: Defendants admit that Defendant Harold Garfinkel is an attorney licensed to practice law in the State of Illinois and was a duly appointed Assistant State's Attorney. Defendants deny each and every remaining allegation contained in paragraph 18.**

19.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office, and was at all relevant times the employer of Defendant Garfinkel. Defendant Cook County is a necessary party to this lawsuit.

**Answer: Defendants admit that Defendant Cook County is a governmental entity within the State of Illinois. Defendants deny that Cook County is or was Garfinkel's employer. Defendants admit that Cook County may have a duty to indemnify Garfinkel. Defendants deny the remaining allegations contained in Paragraph 19.**

## FACTS

20.     In 1994 Nevest Coleman was a 25-year old family man with a bright future. He had no criminal record. At the time of his arrest, he was employed as a groundskeeper at Comiskey Park, a position he had held for two years.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and, accordingly, deny them.**

21.     Mr. Coleman (like every member of his family) graduated high school, and had been employed continuously thereafter. He attended church regularly, where he often volunteered.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 and, accordingly, deny them.**

22.     When he was arrested, Mr. Coleman had two small children, aged two years and three months, and a big, tight-knit family and lots of friends. He was loved and respected by members of his community.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 and, accordingly, deny them.**

23.     During the evening of April 11, 1994, the night before her 20th birthday, Antwinica Bridgeman went missing. She was not seen again until her body was found in the abandoned basement of the apartment building occupied by the Coleman family.

**Answer: Defendants admit Antwinica Bridgeman went missing on April 11, 1994. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 23 and, accordingly, deny them.**

24.     On April 28, 1994, Nevest Coleman's mother noticed a smell coming from the abandoned basement of their apartment building, and asked Mr. Coleman to investigate.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 and, accordingly, deny them.**

25.     Mr. Coleman's friend Michael Barber was present, too, and he and Mr. Coleman both went down to investigate. Barber looked through the basement window and saw the body of a dead woman. They immediately notified Mr. Coleman's mother, who called 9-1-1. Police arrived at the scene and recovered Bridgeman's dead body from the basement.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 and, accordingly, deny them.**

26.     Defendants Halloran, Boudreau, Foley, and Clancy were tasked to respond to the scene. They entered the basement and obtained first-hand knowledge of the crime scene.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 and, accordingly, deny them.**

27.     The crime was horrific. Bridgeman had been raped and impaled with a pipe, and had ultimately suffocated to death on a brick that had been shoved in her mouth. Her body was then discovered in the basement two and a half weeks later.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 and, accordingly, deny them.**

28.     The abandoned basement was accessible only by an exterior door. The basement had been broken into on several occasions, and drug users and homeless people squatted in the space. Inside, police found used condoms, PCP cigarettes, and empty beer cans and juice bottles.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and, accordingly, deny them.**

29.     The same evening that the body was discovered, Coleman and Barber voluntarily went with police to the station for an interview. According to court testimony and police records, Mr. Coleman was interviewed by Defendants Halloran, Boudreau, Foley, Clancy, and Kelly.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations contained in Paragraph 29 and, accordingly, deny them.**

30. Mr. Coleman truthfully recounted what he knew about the investigation: his mother had asked if he and Barber could determine the source of the smell, Barber looked through the window and saw the body, and the pair told Mr. Coleman's mother who called the police. Mr. Coleman repeatedly denied involvement in, and knowledge of, Bridgeman's murder, and he was released.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 and, accordingly, deny them.**

31. Eager to solve such a heinous crime, the Defendant Officers worked with the limited information available to them to develop suspects. Bridgeman's boyfriend reported that a man, Eddie Taylor, had at one point tried to abduct Bridgeman, and that Taylor and another man, Derrell Fulton, had been harassing Bridgeman recently. Fulton's prior sexual assault conviction made him even more of a suspect.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 and, accordingly, deny them.**

32. The Defendant Officers also focused on Coleman and Barber. Barber, who discovered the body, was incarcerated at the time Bridgeman disappeared and thus was cleared. Given that Bridgeman's body was discovered in the basement of the Coleman family's apartment building, Mr. Coleman became a person of interest in the investigation.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 and, accordingly, deny them.**

33. Wanting to interrogate Mr. Coleman when he was sleep deprived, some of the Defendant Officers returned to Coleman's home at around 12:30 a.m. that same night and

woke him. Having nothing to hide, Mr. Coleman returned to the station to answer questions.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 and, accordingly, deny them.**

34. Several of the Defendant Officers placed Mr. Coleman in a small, windowless interrogation room. Approximately eight detectives entered that small room, including but not limited to Defendants Boudreau, Halloran, Clancy, O'Brien, Foley, Graf, Turner, and Carroll entered the room. None of the Defendant Officers read Mr. Coleman his *Miranda* rights. With the Defendants looming over him in intimidating fashion, Mr. Coleman again truthfully answered their questions and denied involvement.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 and, accordingly, deny them.**

35. When Defendants' interrogation did not elicit a confession, they turned to more coercive tactics. During the 12 hours Mr. Coleman was in custody, Defendants employed a range of physically and mentally coercive tactics.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 and, accordingly, deny them.**

36. One of the Defendant Officers called Mr. Coleman a "lying-assed nigger."

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and, accordingly, deny them.**

37. When Mr. Coleman protested that he had told the Defendant Officer everything he knew and was telling the truth, that detective punched him in the face. Mr. Coleman asked why the Defendant Officer had hit him, and the Defendant Officer punched him in the face again. Mr. Coleman fell to the floor and curled up in the fetal position, covering his face with

his hands.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and, accordingly, deny them.**

38.     Mr. Coleman repeatedly denied knowing anything about the crimes to no avail.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 and, accordingly, deny them.**

39.     A Defendant Officer told Mr. Coleman that he would be struck until he confessed being at the crime scene.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 and, accordingly, deny them.**

40.     A Defendant Officer told him that he was not the person they were after, and falsely told him that if he acted as a witness and cooperated to implicate Fulton and Taylor, they would let him go home.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 and, accordingly, deny them.**

41.     The Defendant Officers then fed Mr. Coleman false information about the rape and murder.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 and, accordingly, deny them.**

42.     Each Defendant Officer knew about the coercive tactics used by the other Defendant Officers, including the physical abuse, and that Mr. Coleman was being coerced into giving a false confession.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations contained in Paragraph 42 and, accordingly, deny them.**

43.     The Defendants actively consulted with their supervisor, Defendant Benoit, including discussing the coercive tactics they used to obtain Mr. Coleman's false confession.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 and, accordingly, deny them.**

44.     Before the was any probable cause to believe Mr. Coleman was involved in the crime, Defendant Garfinkel, an Assistant State's Attorney, came into the interrogation room and falsely told Mr. Coleman he was there to help him.

**Answer: Defendants admit that Garfinkel took a statement from Coleman after he had confessed to the police. Defendants deny each and every remaining allegation contained in paragraph 44.**

45.     Mr. Coleman told Defendant Garfinkel that he had been beaten, but Defendant Garfinkel told him that they would deal with that abuse at a different time.

**Answer**: **Defendants deny each and every remaining allegation contained in paragraph 45.**

46.     Defendant Officers and Defendant Garfinkel fed Coleman more information about the crimes. They described a scenario for Coleman in which he acted as the lookout while Fulton and Taylor participated in Bridgeman's rape and murder.

**Answer: Defendants deny the allegations contained in Paragraph 46 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the remaining allegations contained in Paragraph 46 and, accordingly, deny them.**

47.    Believing that he would be allowed to go home if he played his part and implicated Fulton and Taylor, Mr. Coleman regurgitated the Defendants' false story to Defendant Garfinkel.

**Answer: Defendants deny the allegations contained in Paragraph 47 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 47 and, accordingly, deny them.**

48.    Defendant Garfinkel led Mr. Coleman through this court-reported "confession."

**Answer: Defendants admit that Coleman made a court reported confession to Garfinkel. Defendants deny each and every remaining allegation contained in paragraph 48.**

49.    By the time he finished providing his false confession at noon, Mr. Coleman had been interrogated for almost 12 hours and had almost no sleep in over 24 hours.

**Answer: Defendants deny the allegations contained in Paragraph 49 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 49 and, accordingly, deny them.**

50.    The Defendant Officers and Defendant Garfinkel knew that Mr. Coleman's "confession" was false and that the only reason he regurgitated it was because of the physical and mental coercion to which they subjected him, and the false promises of leniency.

**Answer: Defendants deny the allegations contained in Paragraph 50 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a**

belief as to the truth of the remaining allegations contained in Paragraph 50 and, accordingly, deny them.

51.     Nevertheless, the Defendants falsely charged him with murder.

**Answer: Defendants deny the allegations contained in Paragraph 51 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 51 and, accordingly, deny them.**

52.     Absent Defendant Garfinkel's cooperation, the Defendants Officers could not have alone coerced Mr. Coleman's confession.

**Answer: Defendants deny the allegations contained in Paragraph 52.**

53.     Similarly, absent the Defendant Officers' cooperation, Defendant Garfinkel could not have coerced Mr. Coleman's confession.

**Answer: Defendants deny the allegations contained in Paragraph 53 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 53 and, accordingly, deny them.**

54.     From the very day of his false confession, Mr. Coleman has maintained that the confession was the product of physical and mental abuse, coercion, and false promises of leniency. Hours after providing the false confession, Mr. Coleman met with Juliette Ferguson, an attorney whom he had never previously met. In that conversation, Mr. Coleman told Attorney Ferguson that his "confession" was false and that he had been beaten at the police station.

**Answer: Defendants lack knowledge or information sufficient to form a belief as**

to the truth of the allegations contained in Paragraph 54 and, accordingly, deny them.

55.     Fulton experienced a similar encounter with these same Defendants.

**Answer**: **Defendants deny the allegations contained in Paragraph 55 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 55 and, accordingly, deny them.**

56.     After Fulton was picked up, he was taken to an interrogation room and handcuffed. Defendant Officers, including, but not limited to Foley, Halloran, Clancy, Boudreau, O'Brien, and Carroll interrogated him over a day and a half.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56 that are directed at other defendants and, accordingly, deny them.**

57.     One of the Defendants hit Fulton in the face and told him that he would take him somewhere and "put a bullet in [his] brain" if he did not confess.

**Answer: Defendants deny the allegations contained in Paragraph 57 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57 that are directed at other defendants and, accordingly, deny them.**

58.     The Defendant Officers told Fulton he would be able to go home if he merely played along and said what they told him to say.

**Answer**: **Defendants deny the allegations contained in Paragraph 58 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 58 and,**

accordingly, deny them.

59.     With no probable cause to believe that Fulton was involved in the crime, Defendant Garfinkel then came into the room told Fulton that unless he confessed, he would be charged with murder.

**Answer: Defendants deny the allegations contained in paragraph 59**

60.     Defendant Garfinkel prepared a handwritten statement, dictating to Fulton his involvement in Bridgeman's rape and murder.

**Answer: Defendants admit that Garfinkel prepared a written statement memorializing Plaintiff's admissions to his involvement in Bridgeman's rape and murder. Defendants deny each and every remaining allegation contained in paragraph 60.**

61.     Having had almost no sleep for 36 hours and believing he would be released if he complied, Fulton succumbed to the Defendants' coercion and provided a false confession.

**Answer: Defendants deny the allegations contained in Paragraph 61 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 61 and, accordingly, deny them.**

62.     The Defendant Officers never disclosed their misconduct. In written reports, Defendant Officers falsely represented the circumstances under which Coleman's and Fulton's "confessions" were obtained, claiming that they had originated with Coleman and Fulton themselves, when in reality they had come from Defendants.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62 and, accordingly, deny them.**

63.     Well before the trial, Defendant Officers and Defendant Garfinkel fabricated reports purporting to memorialize Coleman's and Fulton's false statements. These reports concealed the coercion used to obtain Coleman's and Fulton's false statements.

**Answer**: **Defendants deny the allegations contained in Paragraph 63 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 63 and, accordingly, deny them.**

64.     Based on the false confessions, juries found Coleman and Fulton guilty of first-degree murder and aggravated criminal sexual assault.

**Answer: Defendants admit that juries found Coleman and Fulton guilty of first degree murder and aggravated criminal sexual assault.  Defendants deny each and every remaining allegation contained in paragraph 64.**

65.     In the death-penalty phase of sentencing, 30 people came forward, even after Coleman had been wrongfully convicted of this heinous crime, to speak to his good character, reliability, kindness, work ethic, good values and resilience in the face of difficulty, and his loving and caring nature. The witnesses comprised Mr. Coleman's family, coworkers, members of his church, and friends.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 and, accordingly, deny them.**

66.     The trial judge acknowledged that there was no evidence against Coleman other than his "confession," and citing Mr. Coleman's lack of criminal record and the lack of any

other evidence; he sentenced Mr. Coleman to natural life for the murder conviction and a consecutive 30-year sentence for the sexual assault.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66 and, accordingly, deny them.**

67.     In 1999 the Illinois Appellate Court affirmed Coleman's sentence, and the Illinois Supreme Court denied his petition for leave to appeal.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 and, accordingly, deny them.**

68.     While Mr. Coleman remained in prison, new evidence—both DNA evidence and evidence about police misconduct—came to light to establish that he and Fulton were innocent.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 and, accordingly, deny them.**

69.     In 2016, Mr. Coleman moved under 725 ILCS 5/116-3 for additional forensic testing on DNA found at the crime scene. The Conviction Integrity Unit at the Cook County State's Attorney Office voluntarily reopened the investigation into Bridgeman's murder, and in doing so agreed to conduct new DNA testing.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 and, accordingly, deny them.**

70.     That DNA testing, including testing on semen found on the victim, excluded Coleman, Fulton, Taylor, and Bridgeman's boyfriend as a source of the DNA, and implicated a known serial rapist.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to**

the truth of the allegations contained in Paragraph 70 and, accordingly, deny them.

71.     Semen was found in the crotch of Bridgeman's underwear. DNA testing on that semen conclusively excluded Coleman, Fulton, Taylor, and Bridgeman's then-boyfriend as sources of the semen.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 and, accordingly, deny them.**

72.     The DNA profile obtained from the semen on her underwear did, however, match to a serial rapist with almost scientific certainty. That rapist has been connected to at least three other rapes.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and, accordingly, deny them.**

73.     Analysts also recovered male DNA from underneath the victim's fingernails. Testing on that DNA revealed that although Coleman, Fulton, Taylor, and Bridgeman's boyfriend could not have left that DNA under the victim's fingernails, the same serial rapist could not be excluded from being the source of that DNA.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 and, accordingly, deny them.**

74.     In addition, semen found on Bridgeman's sweatshirt similarly excluded Coleman, Fulton, Taylor, and the victim's boyfriend from being the donor of the semen, but did not exclude the serial rapist.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 and, accordingly, deny them.**

75.     The Defendants' misconduct in this case was not an isolated occurrence. To

the contrary, they were the result of the City of Chicago's policies and practices of pursuing

wrongful convictions through reliance on coerced statements and profoundly flawed

investigations.

**Answer: Defendants deny the allegations contained in Paragraph 75 regarding**

**Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a**

**belief as to the truth of the remaining allegations contained in Paragraph 75 and,**

**accordingly, deny them.**

76.     The Defendant Officers' coercion of false statements from Coleman and

Fulton was undertaken pursuant to, and proximately caused by, a policy and practice on the

part of the Department.

**Answer: Defendants lack knowledge or information sufficient to form a belief as**

**to the truth of the allegations contained in Paragraph 76 that are directed at other**

**defendants and, accordingly, deny them.**

77.     These Defendants' methods went far beyond acceptable police

interrogation techniques.

**Answer: Defendants deny the allegations contained in Paragraph 77 regarding**

**Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief**

**as to the truth of the remaining allegations contained in Paragraph 77 and, accordingly,**

**deny them**.

78.     The wrongful convictions of innocent persons involving coerced and false

statements include numerous cases in which Department detectives used the very same tactics

that the Defendants employed against Coleman and Fulton. These tactics include: (a) physical

abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d)

false promises of leniency in exchange for "cooperation" in the form of a statement; and (e) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and, accordingly, deny them.**

79.     For example, Defendant Foley, the lead detective on Mr. Coleman's case, and the detective who obtained Coleman's and Fulton's false confessions, has since been revealed as the detective who obtained a false "confession" from Harold Richardson in the now-notorious "Englewood Four" case. In that case, all four convicted men were exonerated when DNA from a serial rapist murderer was discovered at the crime scene; that same DNA excluded all four defendants. Mr. Richardson was later awarded a Certificate of Innocence despite the confession obtained by Defendant Foley.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 and, accordingly, deny them.**

80.     In that same case, Defendants Foley and Boudreau coerced a false confession from one of Richardson's co-defendants, Terrill Swift. The City of Chicago recently paid over $31 million to settle claims that Defendants Foley and Boudreau coerced false confessions from the Englewood Four.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 that are directed at other defendants and, accordingly, deny them.**

81.     After the Englewood Four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney

Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motions to dismiss brought by the Englewood Four.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 and, accordingly, deny them.**

82.    The Detectives were successful. The motions to suppress were denied and the Englewood Four were convicted despite, just as here, no forensic evidence inculpating them. But for advanced DNA testing, the four would have remained incarcerated like Mr. Coleman.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 and, accordingly, deny them.**

83.    Likewise, Defendant Boudreau is one of the notorious homicide detectives, who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes, including murder.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 and, accordingly, deny them.**

84.    In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the "confessions."

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 and, accordingly, deny them.**

85.     In an examination of thousands of murder cases in Cook County from 1991 through 2000, the Chicago Tribune found that Defendant Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85 and, accordingly, deny them.**

86.     As the Chicago Tribune observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." *See* "Veteran Detective's Murder Cases Unravel," *Chicago Tribune*, December 17, 2001, available at http://www.chicagotribune.com/news/watchdog/chi-011217confession-story.html (last visited on January 26, 2018).

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 and, accordingly, deny them.**

87.     For a two-year period in the early 1990s, Defendants Boudreau and his partners helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain false confessions.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 and, accordingly, deny them.**

88.     Some other examples of abuses by Defendant Officers include the following, all of which are corroborated by sworn testimony:

a. In November 1992, Defendants Boudreau, Halloran, and O'Brien jointly induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Notably, records revealed that despite confessing to murder, Williams was actually incarcerated at the time of the crime. Because of his demonstrated innocence, Williams was never charged. Hill and Young, however, were convicted although their confessions implicated Williams, who was undeniably innocent. Again, later DNA evidence exonerated Hill and Young, leading to their release from prison.

b. Likewise, Defendants Boudreau, Halloran, and O'Brien featured prominently in the case against Tyrone Hood and Wayne Washington, coercing a false "confession" from Washington. Both Hood and Washington later had their murder convictions overturned.

c. Derrick Flewellen signed a confession coerced by Defendants Boudreau, Halloran, and O'Brien after being interrogated for more than 36 hours, during which time he was slapped, kicked, punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

d. Defendant Boudreau and a partner obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the 40s, well below the dividing line for mental retardation, and that he was incapable of intelligently waiving his Miranda rights. Neal was acquitted notwithstanding his signed

confession.

e.  In December 1993, Defendants Boudreau, Carroll, O'Brien, and Graf "solved" two separate murders with confessions from two intellectually impaired juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by those Defendants.

f.  In 1998, Defendant Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled that the boy did not have the mental capacity to waive his rights and threw out the confession. Prosecutors then dropped the charges.

g.  After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no Miranda waiver was created, and his requests to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

h.  In connection with the Ceriale murder, Defendant Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of

coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours. When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury, and at least one of them went to jail for it.

i. Marcus Wiggins brought a lawsuit against Defendant Boudreau alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. Wiggins's mother had been denied access to her son, who was a 13-year old 8th grader at the time of the coerced confession. Six young suspects gave confessions. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. The remaining four were acquitted, including two who had been interrogated by Boudreau.

j. Antoine Ward was placed in an interrogation room by Defendant Boudreau, where he was cuffed to a bench for prolonged periods, unable to use the bathroom (he urinated on the floor), and beaten. Boudreau told Ward that other witnesses had placed him at the scene of a murder, but that he would let him go home and help him if he signed a statement saying that he gave another man a gun. After almost 48 hours in the room, Ward signed the statement written out by Boudreau, and was convicted of murder.

k. Fabian Pico was 16 years old when he gave a self-incriminating statement to Defendants Boudreau and Halloran which was then used to convict him of murder. When Pico moved to suppress the statement on the grounds that the

police did not allow him access to his mother, Boudreau claimed that he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed, but this supposed attempted contact is not referenced anywhere in his written reports.

l. After being beaten by Defendants Boudreau and O'Brien, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured). Witnesses in the station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station. During their investigation, Defendants Boudreau and O'Brien also threatened, beat, and electrochocked Jesse's brother, Demoni, and beat his other brother, Iamari, with a flashlight.

m. Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Defendants Boudreau and Halloran, who then choked and punched him in order to get him to confess to a six-month old shooting. After more than 30 hours in this room with minimal sleep and food, Watkins signed a false incriminating statement.

n. In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Defendants Boudreau, Halloran, and O'Brien threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. At one point, the detectives believed that they had successfully coerced Mr. Smith to confess, but when the Assistant State's Attorney ("ASA") entered the room, Mr. Smith continued to assert his innocence, whereupon the ASA left and the beating

resumed. The same thing happened a second time, this time with another ASA, but again Mr. Smith refused to confess. When that ASA left the room, Defendants Boudreau, Halloran, and O'Brien resumed the beating, whereupon Mr. Smith, deprived of both counsel and sleep for an inordinate time, finally signed a false confession.

o. Christopher Holly filed a federal civil rights lawsuit against Defendant Boudreau and other detectives alleging that he was framed for a murder in 1998.

p. Richard Malek alleges that Defendant Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Defendant Boudreau and others.

q. In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives physically coerced their confessions.

r. In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an

interrogation by Defendants Boudreau and Halloran, who refused to let him contact his family and beat him into confessing to a murder he did not commit. Tyrone Reyna's codefendants, Nicholas Escamilla and Miguel Morales, were arrested by Defendant Boudreau for murder despite the lack of any physical evidence or eye witnesses linking Escamilla to the crime. Boudreau tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed as well. Miguel Morales was also beaten during his interrogation. However, unlike Escamilla, Morales refused to confess. Boudreau then coerced a friend of Morales into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified that he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

s.  In 1998, Defendants Boudreau and Halloran held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Defendants Boudreau and Halloran placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. Meanwhile, Defendants Boudreau and Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

t.  In 1991, fifteen year-old John Plummer was interrogated for 36 hours by Defendants Boudreau, Halloran, Foley, and Clancy. After being physically

beaten, he falsely confessed to a murder.

u. In 1992, Arnold Day was interrogated in connection with a murder investigation.
Mr. Day was isolated in an interrogation room for many hours while Defendants
Boudreau and Foley psychologically and physically tortured him until he finally
confessed.

v. In 1993, Richard Anthony was forced to confess to murder by Defendant
Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the
restroom in order to coerce Anthony into giving a false statement. Richard
Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau
and his partner during his 30 hour interrogation, which included preventing him
from contacting an attorney or his family and refusing to allow him to use the
bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually
gave a false confession.

w. In 1995, Defendants Boudreau and Halloran were part of a team of detectives who
physically abused John Wright until he agreed to implicate Malik Taylor and
Michael Taylor in connection with a murder.

x. In 1993, Emmett White was arrested by Defendants Boudreau, O'Brien, and
Clancy, who hit him in the face, punched him in the body, threw him to the
ground and stepped on his face, dragging his head across the floor of the
interrogation room, all in an attempt to get him to falsely confess. Photographs of
Mr. White corroborated his testimony of his abuse.

y. In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach
and groin with a flashlight, and punched and choked him.

z. Defendants Foley and O'Brien coerced a signed false confession out of Javan Deloney in 1991. To extract the false confession from him, they woke him from his sleep, handcuffed him, and took him to the station. They denied his multiple requests for an attorney, and began yelling at and threatening him. They then turned to physical violence, hitting him in the chest and slapping him in the face, and forcing him to watch them beat his cousin, all despite his insistence that he was not involved in the murder.

aa. Defendant O'Brien threatened Cortez Brown with the death penalty, beat him with a flashlight, deprived him of food, and denied him access to an attorney.

bb. Defendant O'Brien also slapped Curtis Mislap in the face, kicked him in the testicles while he was handcuffed, and threatened him. Milsap falsely confessed and was later acquitted.

cc. Taking a page from John Burge, in 1991 Defendants O'Brien and Boudreau electroshocked Damari Clemon. They beat him and threatened him with a pistol.

dd. In 1994, Defendants Boudreau, Halloran, Moser, and Graf beat Anthony Williams into falsely confessing to murder and armed robbery.

ee. In 1993, Defendants Boudreau, O'Brien, and Halloran arrested Nicholas Escamila in his home without a warrant. They handcuffed him to a wall for 15 hours and kept him from eating, sleeping, using the bathroom, and making a phone call. They ridiculed him, screamed him, threatened him and his wife, child, and unborn baby, and punched him in the head, chest, stomach, and back. The Defendants coached Escamila into a false confession, which he signed because he wanted the abuse to end.

ff. Similarly, in 1987, Defendant Foley worked with other Chicago detectives to obtain a false confession from Frank Bounds for a murder. The detectives hit Bounds on the head and threatened to implicate Bounds's girlfriend in the murder if he did not confess.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 and, accordingly, deny them.**

89. There are many other examples of similar misconduct by the other Defendant Officers.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89 and, accordingly, deny them.**

90. It just so happens that these are the same Detectives who obtained the confessions from Coleman and Fulton. Mr. Coleman made an immediate outcry to Attorney Juliette Ferguson on the day of his interrogation. He made that outcry not knowing that the Defendants who obtained his false confession had been accused of the exact same abusive behavior by scores of other men.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90 and, accordingly, deny them.**

91. Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the Cook County State's Attorney's Office and from criminal defendants.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91 and, accordingly, deny them.**

92.     As a matter of both policy and practice, municipal policymakers and Department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Department detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92 and, accordingly, deny them.**

93.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 and, accordingly, deny them.**

94.     The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

**Answer: Defendants lack knowledge or information sufficient to form a belief as**

**to the truth of the allegations contained in Paragraph 94 and, accordingly, deny them.**

95.     The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Coleman's ongoing injuries.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95 and, accordingly, deny them.**

96.     The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 that are directed at other defendants and, accordingly, deny them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 96 and, accordingly, deny them.**

97.     On August 7, 2017, based on the newly discovered forensic evidence and revelations about Defendant Officers' long histories of misconduct, Mr. Coleman filed a motion under 735 ILCS 5/2-1401 to vacate his conviction and sentence. He raised claims of newly discovered DNA evidence and pointed to numerous instances of other false confessions coerced by the same detectives that coerced Mr. Coleman's false confession.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 and, accordingly, deny them.**

98.     On November 17, 2017, on the State's motion, Judge Porter vacated Mr. Coleman's convictions and life sentence, and Mr. Coleman was released from prison on an I-Bond a few days later.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and, accordingly, deny them.**

99.     On December 1, 2017, the State dismissed all charges against Mr. Coleman.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 and, accordingly, deny them.**

100.    Mr. Coleman spent over 23 years in prison for a crime he did not commit. He must now attempt to make a life for himself outside prison without the benefit of two decades of life experiences which normally equip adults for that task.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 100 and, accordingly, deny them.**

101.    Additionally, the emotional pain and suffering caused by losing more than two decades in the prime of his life—from ages 25 through 48—has been substantial. During his wrongful incarceration, Mr. Coleman was stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right. He missed out on the ability to raise his two children, and share holidays, birthday, funerals, and other life events with his large, tight-knit family and many friends, and on the fundamental freedom to live one's life as an autonomous human being.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 and, accordingly, deny them.**

102.    Mr. Coleman's 23 years of wrongful incarceration forced him into a world

of isolation in which he lost all contact with his friends and family in the outside world.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 and, accordingly, deny them.**

103.    Mr. Coleman has suffered tremendously because of the Defendants' misconduct.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 and, accordingly, deny them.**

**COUNT I – 42 U.S.C. § 1983**
**False Confession**
**(Fifth Amendment and Fourteenth Amendments)**

104.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

105.    In the manner described more fully above, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**Answer**: **Defendants deny each and every allegation contained in paragraph 105.**

106.    In addition, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force

Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

**Answer**: **Defendants deny each and every allegation contained in paragraph 106.**

107. In addition, the Defendant Officers and Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

**Answer: Defendants deny each and every allegation contained in paragraph 107.**

108. Specifically, Defendant Officers and Defendant Garfinkel conducted, participated in, encouraged, advised, and ordered an unconstitutional, lengthy interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself.

**Answer**: **Defendants deny the allegations contained in Paragraph 108 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 108 and, accordingly, deny them.**

109. Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

**Answer**: **Defendants deny the allegations contained in Paragraph 109 regarding**

**Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 109 and, accordingly, deny them.**

110.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. It was the reason that Plaintiff was prosecuted and convicted.

**Answer: Defendants deny the allegations contained in Paragraph 110 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 110 and, accordingly, deny them.**

111.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**Answer: Defendants deny the allegations contained in Paragraph 111 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 111 and, accordingly, deny them.**

112.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Answer: Defendants deny the allegations contained in Paragraph 112 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a**

**belief as to the truth of the remaining allegations contained in Paragraph 112 and,**

**accordingly, deny them.**

113.     The misconduct described in this Count by the Defendant Officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the

manner more fully described below in Count VIII.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations contained in Paragraph 113 and, accordingly, deny them.**

**COUNT II – 42 U.S.C. §
1983
Fabrication of a False Witness
Statement (Fourteenth Amendment)**

114.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate their answers to each of the foregoing**

**paragraphs as if fully set forth herein.**

115.     In the manner described more fully above, the Defendant Officers and

Defendant Garfinkel, acting as investigators and without probable cause to suspect Plaintiff of

any crime, individually, jointly, and in conspiracy with one another, and others unknown, as

well as under color of law and within the scope of their employment, deprived Plaintiff of his

constitutional right to a fair trial and due process by fabricating witness statements implicating

Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing

their own misconduct and the circumstances in which those witness statements was obtained.

**Answer: Defendants deny each and every allegation contained in paragraph 115.**

116.     Specifically, as set forth above, Defendants used physical violence and

psychological abuse to obtain false witness statements implicating Plaintiff. The misconduct

described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**Answer**: **Defendants deny the allegations contained in Paragraph 116 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 116 and, accordingly, deny them.**

117.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Answer**: **Defendants deny the allegations contained in Paragraph 117 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 117 and, accordingly, deny them.**

118.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and, accordingly, deny them.**

**COUNT III – 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable**
**Cause (Fourth and Fourteenth Amendments)**

119.    Each paragraph of this Complaint is incorporated as if fully restated herein.

**Answer**: **Defendants incorporate their answers to each of the foregoing**

paragraphs as if fully set forth herein.

120.    Defendant Officers caused Plaintiff to be unreasonably seized, detained, imprisoned, and deprived of liberty, and further caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 directed to the Defendant Officers and, accordingly, deny them. Defendants deny each and every remaining allegation contained in paragraph 120.**

121.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 directed to the Defendant Officers and the City of Chicago and, accordingly, deny them. Defendants deny each and every remaining allegation contained in paragraph 121.**

122.    The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**Answer**: **Defendants deny the allegations contained in Paragraph 122 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 122 and, accordingly, deny them.**

123.    The misconduct described in this Count was undertaken by the

Defendant Officers under color of law and within the scope of their employment.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 and, accordingly, deny them.**

124.    The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

**Answer: Defendants deny the allegations contained in Paragraph 124 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 and, accordingly, deny them**.

125.    The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described in Count VIII.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 directed to the Defendant Officers and the City of Chicago and, accordingly, deny them. Defendants deny each and every remaining allegation contained in paragraph 125.**

126.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

**Answer**: **Defendants deny the allegations contained in Paragraph 126 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 126 and, accordingly, deny them.**

**COUNT IV – 42 U.S.C. § 1983**
**Due Process**

**(Fourteenth Amendment)**

127.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer**: **Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

128.    As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 128 and, accordingly, deny them.**

129.    In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from prosecutors (including Defendant Garfinkel), among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**Answer: Defendants deny the allegations contained in Paragraph 129 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 128 and, accordingly, deny them.**

130.    The Defendant Officers also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained. Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff.

**Answer: Defendants deny the allegations contained in Paragraph 130 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a**

belief as to the truth of the remaining allegations contained in Paragraph 130 and, accordingly, deny them.

131. In addition, the Defendant Officers also destroyed evidence that would have demonstrated Plaintiff's innocence. These Defendants destroyed this evidence knowing that it had exculpatory value. In the alternative, these Defendants destroyed this potentially exculpatory evidence in bad faith.

**Answer: Defendants deny the allegations contained in Paragraph 131 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 131 and, accordingly, deny them.**

132. In addition, based upon information and belief, the Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

**Answer: Defendants deny the allegations contained in Paragraph 132 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 132 and, accordingly, deny them.**

133. The Defendant Officers' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

**Answer: Defendants deny the allegations contained in Paragraph 133 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 133 and,**

**accordingly, deny them.**

134.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**Answer: Defendants deny the allegations contained in Paragraph 134 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 134 and, accordingly, deny them.**

135.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**Answer: Defendants deny the allegations contained in Paragraph 135 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 135 and, accordingly, deny them.**

136.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136 and, accordingly, deny them.**

## COUNT V – 42 U.S.C. § 1983
## Failure to Intervene

137.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

138.    In the manner described more fully above, by their conduct and under color of law, during the constitution violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

**Answer: Defendants deny the allegations contained in Paragraph 138 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 138 and, accordingly, deny them.**

139.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**Answer: Defendants deny the allegations contained in Paragraph 139 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 139 and, accordingly, deny them.**

140.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**Answer**: **Defendants deny each and every allegation contained in paragraph 140.**

141.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the

manner more fully described below in Count VIII.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 141 and, accordingly, deny them.**

## COUNT VI – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

142.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein**

143.     After Ms. Bridgeman's murder, the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and a fair trial, all as described in the various paragraphs of this Complaint.

**Answer: Defendants deny the allegations contained in Paragraph 143 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 143 and, accordingly, deny them.**

144.     In this manner, Defendants, acting in concert with other unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**Answer: Defendants deny the allegations contained in Paragraph 144 regarding Defendant Garfinkel.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 144 and, accordingly, deny them.**

145.     In furtherance of the conspiracy, each of the coconspirators engaged in and

facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, coercing false confessions, committing perjury during hearing and trials and was an otherwise willful participant in joint activity.

**Answer: Defendants deny the allegations contained in Paragraph 145 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 145 and, accordingly, deny them.**

146. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**Answer: Defendants deny the allegations contained in Paragraph 146 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 146 and, accordingly, deny them.**

147. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**Answer**: **Defendants deny each and every allegation contained in paragraph 147.**

148. The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as**

**to the truth of the allegations contained in Paragraph 148 and, accordingly, deny them.**

## COUNT VII – 42 U.S.C. § 1983
### Supervisory Liability

149.    Each paragraph of this Complaint is incorporated as if fully restated fully herein.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

150.    The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of Defendant Benoit and other Unknown Supervisory Defendants (collectively, "Supervisory Defendants"), when they failed to adequately train and supervise the Defendant Officers.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 150 and, accordingly, deny them.**

151.    Specifically these Supervisory Defendants were personally involved in the case against Plaintiff and knew, or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 and, accordingly, deny them.**

152.    Furthermore, these Supervisory Defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects, thereby encouraging and/or permitting these defendants and other employees to coerce and fabricate false inculpatory evidence, which cause the constitutional deprivations suffered by Plaintiff.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152 and, accordingly, deny them.**

153. These interview techniques, fabrications, and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that the Supervisory Defendants failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 153 and, accordingly, deny them.**

154. The personal involvement of the Supervisory Defendants, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 154 and, accordingly, deny them**.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 155 and, accordingly, deny them.**

**COUNT VIII – 42 U.S.C. § 1983**
**Policy and Practice Claim against the City of**
**Chicago**

156. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

157.    As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

158.    Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

159.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

160.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

161.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

162.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often

lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

163.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no**

answer is due.

164. These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

165. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

166. As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

167. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed

against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

168.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**Answer: Count VIII is not directed against the Defendants and, accordingly, no answer is due.**

### COUNT VIII – State Law Claim Malicious Prosecution

169.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

170.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 170 and, accordingly, deny them.**

171.     The Defendant Officers and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were

instituted and continued maliciously, resulting in injury.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 171 and, accordingly, deny them.**

172.  Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that those statements were false and perjured. The Defendants also fabricated evidence by coercing false inculpatory testimony from Plaintiff and his codefendant. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Bridgeman rape and murder, and all inculpatory evidence was coerced or fabricated. Furthermore, the Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence that would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

**Answer: Defendants deny the allegations contained in Paragraph 172 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 172 and, accordingly, deny them.**

173.  The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**Answer: Defendants deny the allegations contained in Paragraph 173 regarding Defendant Garfinkel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 173 and, accordingly, deny them.**

174.     The charges against Plaintiff were terminated in Plaintiff's favor.

**Answer**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 174 and, accordingly, deny them.**

175.     As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**Answer**: **Defendants deny each and every allegation contained in paragraph 175.**

## COUNT IX – State Law Claim
### Intentional Infliction of Emotional Distress

176.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

177.     The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with an intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as alleged more fully above.

**Answer**: **Defendants deny each and every allegation contained in paragraph 177.**

178.     As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**Answer**: **Defendants deny each and every allegation contained in paragraph 178.**

## COUNT X – State Law
### Claim Civil Conspiracy

179.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs**

**as if fully set forth herein.**

180.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**Answer**: **Defendants deny each and every allegation contained in paragraph 180.**

181.     In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and intentional infliction of emotional distress upon him.

**Answer**: **Defendants deny each and every allegation contained in paragraph 181.**

182.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**Answer**: **Defendants deny each and every allegation contained in paragraph 182.**

183.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is alleged more fully above.

**Answer**: **Defendants deny each and every allegation contained in paragraph 183.**


**COUNT XI – State Law**
**Claim Respondeat Superior**

184.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

185.     In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department, acting at

all relevant times within the scope of their employment and under color of law.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 185 directed to the Defendant Officers and the City of Chicago and, accordingly, deny them. Defendants deny each and every remaining allegation contained in paragraph 185.**

186.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 186 directed to the Defendant Officers and the City of Chicago and, accordingly, deny them. Defendants deny each and every remaining allegation contained in paragraph 186.**

187.    In committing the acts alleged in the preceding paragraphs, Defendant Garfinkel was a member of, and agent of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of his employment and under color of law.

**Answer: Defendants admit Defendant Garfinkel was acting within the scope of his employment and under the color of law as an Assistant States Attorney in the Cook County State's Attorney's Office.  Defendants deny each and every remaining allegation contained in paragraph 187.**

188.    Defendant Cook County is liable as principal for all torts committed by its agents.

**Answer: Defendants admit that Cook is a necessary party to this lawsuit in that it may have a duty to indemnify Defendant Garfinkel. Defendants deny each and every remaining allegation contained in paragraph 188.**

## COUNT XII – State Law
## Claim Indemnification

189.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**Answer: Defendants incorporate their answers to each of the foregoing paragraphs as if fully set forth herein.**

190.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**Answer: Defendants admit that Cook County is a necessary party to this lawsuit in that it may have a duty to indemnify Defendant Garfinkel. Defendants deny each and every remaining allegation contained in paragraph 190.**

191.     The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 191 and, accordingly, deny them.**

192.     Defendant Cook County was at all times material to this complaint responsible to indemnify Defendant Garfinkel for acts taken within the scope of his employment, and is therefore responsible for any judgment entered against Defendant Garfinkel and for any judgment entered against him, making the County a necessary party to this complaint.

**Answer: Defendants admit that Cook County is a necessary party to this lawsuit in that it may have a duty to indemnify Defendant Garfinkel. Defendants deny each and every remaining allegation contained in paragraph 192.**

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### Absolute Prosecutorial Immunity

At all relevant times, Defendant Garfinkel was assigned to the felony review unit of the Cook County State's Attorneys' Office and, in this capacity, evaluated whether criminal charges should have been filed against certain individuals (though he was not involved in the evaluation of criminal charges against the Plaintiff). When Defendant Garfinkel spoke with suspects or witnesses, took statements, and ultimately determined whether criminal charges should be approved, he performed acts toward initiating a prosecution and presenting the State's case against those other persons. Because the conduct complained of on the part of Defendant Garfinkel arises out of the evaluation of evidence and taking statements for the purpose of initiation and prosecution of criminal charges (against persons other than Plaintiff), Plaintiff's claims are barred on the basis of absolute prosecutorial immunity.

### SECOND AFFIRMATIVE DEFENSE
### Qualified Immunity

At all relevant times, Defendant Garfinkel was an Assistant State's Attorney assigned to the felony review unit of the Cook County State's Attorney's Office. To the extent any of his actions are not protected by absolute prosecutorial immunity, they are protected by qualified immunity as his actions were at all times proper in light of clearly established law.

### THIRD AFFIRMATIVE DEFENSE
### Sovereign Immunity

Plaintiff's claims against Defendant Garfinkel are really claims against a State official based upon his actions as an Assistant State's Attorney, functions that fall within the scope of his

employment and authority as an Assistant State's Attorney.

Plaintiff's claims against Defendant Garfinkel relate to the initiation of charges against, and the criminal prosecution of, Plaintiff. The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal prosecution. The prosecution of Plaintiff's case is, therefore, well within the scope of the State's Attorney's authority. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Defendant Harold Garfinkel.

### FOURTH AFFIRMATIVE DEFENSE
### Statute of Limitations

Plaintiff's §1983 claims and state law claims accrued more than two years earlier than the filing of Plaintiff's Complaint and, thus, these claims are time-barred.

### FIFTH AFFIRMATIVE DEFENSE
### Absence of Causation

There were intervening and superseding causes of Plaintiff's prosecution following the limited role Defendant Harold Garfinkel played months earlier in the matters alleged in Plaintiff's Amended Complaint.

### SIXTH AFFIRMATIVE DEFENSE
### Tort Immunity Act 745 ILCS 10/2-204

Because Defendant Harold Garfinkel was, at all times relevant to the Plaintiff's complaint, a public employee acting within the scope of his employment, he is immune from suit pursuant to 745 ILCS 10/2-204 for any injury caused by the act or omission of another person.

### SEVENTH AFFIRMATIVE DEFENSE

**Tort Immunity Act 745 ILCS 10/2-
202**

The acts or omissions that Defendant Harold Garfinkel allegedly took would have been acts or omissions in his capacity as public employee in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Defendant Harold Garfinkel is immune from suit pursuant to 745 ILCS 10/2-202.

**EIGHTH AFFIRMATIVE
DEFENSE
Failure to Mitigate Damages**

Plaintiff has failed to mitigate the damages he claims to have sustained.

**NINTH AFFIRMATIVE DEFENSE
Good Faith**

Defendant Garfinkel always acted in good faith and in furtherance of lawful objectives.

WHEREFORE, Defendant Harold Garfinkel respectfully requests that this Court enter judgment in his favor and against Plaintiff, Nevest Coleman, that the action be dismissed with prejudice, and that costs be assessed against Plaintiff.

**JURY DEMAND**

Plaintiff, NEVEST COLEMAN, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

DATED:  July 18, 2019

Respectfully submitted,

KIMBERLY M. FOXX
State's Attorney of Cook County

BY:  */s/ Derek R. Kuhn* _____
Derek R. Kuhn
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-5527

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Kuhn, a Cook County Assistant State's Attorney, hereby certify that, on July 18, 2019, I filed the foregoing using the Court's CM-ECF system, which effected service on all counsel of record.

BY:    <u>/s/ *Derek R. Kuhn*</u> _____
Derek R. Kuhn
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-5527