

# Transcript of Thomas Kelly

**Date:** July 14, 2020
**Case:** Coleman -v- City of Chicago, et al.; Fulton -v- Foley, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Pls.' Exhibit 7

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4     -------------------------------x
5    DERRELL FULTON, a/k/a          :
6    DARRYL FULTON,                 :
7         Plaintiffs,              :
8         v.                       :
9    CHICAGO POLICE OFFICER         : Case No. 17-cv-8696
10   WILLIAM FOLEY, et al.,         :
11        Defendants,              :
12   -------------------------------x
13    (Caption continued on next page)
14
15        Deposition of THOMAS KELLY
16             Conducted Virtually
17           Thursday, July 14, 2020
18                 10:11 a.m.
19
20
21
22    Job No.:  308628
23    Pages:  1 - 189
24    Reported by:  Lucia R. Block, CSR
```

---

**Page 2**

```
1    (Caption continued from previous page)
2    -------------------------------x
3    NEVEST COLEMAN,                :
4         Plaintiff,               :
5         v.                       : Case No. 18-cv-998
6    CITY OF CHICAGO, et            :
7    al.,                          :
8         Defendants.              :
9    -------------------------------x
10
11       Deposition of THOMAS KELLY, conducted
12    virtually:
13
14
15
16       PURSUANT TO NOTICE BEFORE LUCIA R. BLOCK, A
17    CERTIFIED SHORTHAND REPORTER AND A NOTARY PUBLIC
18    IN AND FOR THE STATE OF ILLINOIS.
19
20
21
22
23
24
```

---

**Page 3**

```
1            A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF DERRELL FULTON:
4        NICHOLAS CURRAN, ESQ.
5        LAW OFFICES OF KATHLEEN T. ZELLNER
6        1901 BUTTERFIELD ROAD, SUITE 650
7        DOWNERS GROVE, ILLINOIS  60515
8        630-955-1212
9    ON BEHALF OF THE PLAINTIFF COLEMAN:
10       RUSSELL AINSWORTH, ESQ.
11       RACHEL BRADY, ESQ.
12       LOEVY & LOEVY
13       311 North Aberdeen, 3rd Floor
14       Chicago, Illinois  60607
15       312-243-5900
16   ON BEHALF OF THE DEFENDANT CHICAGO POLICE
17   OFFICER WILLIAM FOLEY, et al.,
18       ANDREW GRILL, ESQ.
19       BRITTANY JOHNSON, ESQ.
20       ROCK FUSCO & CONNELLY
21       321 NORTH CLARK STREET, SUITE 2200
22       Chicago, Illinois
23       312-494-1000
24
```

---

**Page 4**

```
1        A P P E A R A N C E S (Continued)
2
3    ON BEHALF OF THE DEFENDANT CITY OF CHICAGO, et
4    al.,
5        LISA M. MEADOR, ESQ.
6        THE SOTOS LAW FIRM, P.C.
7        141 WEST JACKSON, SUITE 1240A
8        Chicago, Illinois
9        630-735-3313
10   ON BEHALF OF THE COOK COUNTY STATE'S ATTORNEY's
11   OFFICE
12       DAVID ADELMAN, ESQ.
13       RYAN GILLESPIE, ESQ.
14       KIMBERLY M. FOXX, COOK COUNTY STATE'S
15       ATTORNEY
16       69 WEST WASHINGTON STREET
17       Chicago, Illinois  60602
18       312-603-1880
19
20
21
22
23
24
```

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

5

C O N T E N T S

EXAMINATION OF THOMAS KELLY                    PAGE

   Examination By Mr. Ainsworth                7

   Examination By Mr. Curran                 160

   Examination By Mr. Grill                  169

   Examination By Mr. Adelman                177

   Further Examination By Mr. Ainsworth      179

   Further Examination By Mr. Curran         181

   Further Examination By Mr. Grill          185

E X H I B I T S

   (Attached to transcript.)

KELLY DEPOSITION EXHIBITS                      PAGE

   Exhibit   No. 1                            46

   Exhibit   No. 2                            81

   Exhibit   No. 3                            98

   Exhibit   No. 4                           103

   Exhibit   No. 5                           108

   Exhibit   No. 6                           115

   Exhibit   No. 7                           146

   Exhibit   No. 8                           150

---

6

P R O C E E D I N G S

THE REPORTER:  Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that he is, in fact, Thomas Kelly.

THE WITNESS:  Yes.

MR. AINSWORTH:  Yes.  On behalf of Plaintiff Coleman, I agree.

MR. CURRAN:  On behalf of Plaintiff Fulton, I agree.

MR. GRILL:  On behalf of the Defendant officers, I agree.

MR. ADELMAN:  On behalf of the County defendants, I agree.

MS. MEADOR:  On behalf of the City, I agree.

(Witness sworn.)

---

7

THOMAS KELLY, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. AINSWORTH:

Q  Would you please state and spell your name for the record, sir.

A  My last name is Kelly, K-E-L-L-Y; my first name is Thomas, T-H-O-M-A-S; my middle initial is "F."

Q  And, sir, have you given a deposition before?

A  Yes, sir.

Q  How many times have you been deposed before?

A  I'm not sure.

Q  When was the last time you were deposed?

A  Over ten years ago.

Q  All right.  Because it's been a while, I'm going to go over some of the rules; is that okay, sir?

A  Yes, sir.

Q  The first thing I'm going to ask you to do is --

---

8

MR. GRILL:  Russell, before you get --

MR. AINSWORTH:  -- to give your answers --

MR. GRILL:  -- too far -- let's just put the agreement on the record real quick, before you get too far into it.  I just don't want to interrupt you later, so...

MR. AINSWORTH:  You're -- you're kidding me, right?

MR. GRILL:  No.  So you guys -- you and Mr. Moran had a discussion about the video recording of this deposition.

It's our understanding that you're using your own Zoom account to record this deposition and that the agreement that you and Mr. Moran reached was that the video recording of this deposition will not be used by either party until Judge Harjani makes a decision as to its use in light of how it's being recorded, that it's not being recorded on the account -- on an account controlled by the court reporter's office.

MR. AINSWORTH:  You mean you're asking me to affirm what I agreed to in writing last night?  That's what you're asking -- and that I just con- -- affirmed to you --

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

3 (9 to 12)

9

1      MR. GRILL:  I'm asking you -- I'm putting
2 on the record what the agreement was.  That's all.
3 If you -- if I've misstated something, go ahead
4 and correct me, my understanding of what the
5 agreement was.
6      MR. AINSWORTH:  No.  Let's proceed.
7 BY MR. AINSWORTH:
8    Q  Okay.  So, Mr. Kelly, let's just go over
9 the rules, so --
10      MR. GRILL:  Did I misstate something,
11 Russell?
12      MR. AINSWORTH:  No.  I said you didn't
13 misstate anything.
14      MR. GRILL:  You just said "no."  I didn't
15 know if that was, no, that you were disagreeing
16 with me or, no, that I misstated something.
17 So thanks.  Go ahead.  I won't interrupt you.
18      MR. AINSWORTH:  Anyone else want to
19 interject anything?
20      (No audible response.)
21      MR. AINSWORTH:  Thank you.
22 BY MR. AINSWORTH:
23    Q  Mr. Kelly, and only Mr. Kelly, in these --
24 in this proceeding, I'm going to ask you give a

10

1 verbal answer, a yes or no if the question calls
2 for it, rather than relying on a nod of the head
3 or saying "uh-huh" or "uh-uh."  Okay?
4    **A  I don't normally say "huh."**
5    Q  Well, I --
6    **A  I --**
7    Q  -- appreciate --
8    **A  I understand you, sir.**
9    Q  Okay.  And I'm going to ask you to wait
10 until I'm done with my question even if you know
11 what my question will be before beginning your
12 answer.  All right?
13    **A  Yes, sir.**
14    Q  And I'll try and do the same to you and,
15 that is, wait until you're done with your answer
16 before I begin my next question to make life
17 easier for the court reporter.
18    **A  I understand.**
19    Q  All right.  If you don't understand any of
20 my questions, please ask me to rephrase the
21 question, reask the question, or, in some way,
22 indicate to me that you do not understand my
23 question.  Fair?
24    **A  Yes, sir.**

11

1    Q  And if you answer my question, I'll assume
2 that you've understood my question as I've posed
3 it.  Fair?
4    **A  Yes, sir.**
5    Q  Do you have any medical condition or are
6 you taking any medication or do you have any
7 condition that would be affect your ability to
8 testify truthfully and accurately here today?
9    **A  I had double bypass surgery in January**
10 **of 2020.  And I'm on several medications for that;**
11 **however, there are no after effects that I'm aware**
12 **of.**
13    Q  When you say there are no after effects
14 that you're aware of, what are you referring to?
15    **A  Well, there's no shortness of breath.**
16 **There's no chest pain.  That's my nonmedical**
17 **observations of how I feel.**
18    Q  Well, that's good to hear, sir.  I
19 understand that's still a major procedure.  And if
20 at any time during this deposition you need a
21 break, please just alert us, and we'll accommodate
22 you; do you understand?
23    **A  Yes, sir.**
24    Q  All we ask is that you answer any question

12

1 that's pending before we break.  Okay?
2    **A  Yes, sir.**
3    Q  Do you have any difficulties with your
4 memory?
5    **A  No, sir.**
6    Q  Has anyone told you that you have
7 difficulties with your memory?
8    **A  No, sir.**
9    Q  Are any of the medications that you're on
10 affecting your ability to testify truthfully and
11 accurately here today?
12    **A  No, sir.**
13    Q  Do you have any concern that either your
14 medical procedure that you had in January or any
15 other medical condition or medication that you're
16 taking would affect your ability to testify
17 truthfully and accurately here today?
18    **A  No, sir.**
19    Q  Have you taken all of the medications that
20 you were prescribed today?
21    **A  Yes, sir.**
22    Q  Are there any -- is there anything that
23 you're not taking that you think would --
24    **A  Excuse me.  Could I clarify that?  I take**

Transcript of Thomas Kelly
Conducted on July 14, 2020

4 (13 to 16)

13

1 one medication in the evening.
2    Q  Okay.
3    A  I have morning medication and evening
4 medication.
5    Q  You have morning medication?
6    A  I take some medication in the morning, and
7 it's a statin for cholesterol.  I take that --
8 that you're supposed to take before you go to bed.
9    Q  All right.  And you've taken your morning
10 medication today; is that right?
11    A  Yes, sir.
12    Q  Okay.  I understand that you served in the
13 military; is that correct?
14    A  Yes, sir.
15    Q  How long did you serve?
16    A  Three years.
17    Q  You served in the Army; is that right?
18    A  Yes, sir.
19    Q  And where did you serve?
20    A  Do you want boot camp and the whole or
21 just the basic --
22    Q  Give me --
23    A  -- the long-term assignment?
24    Q  The -- the thumbnail sketch.

14

1    A  Okay.  After boot camp and advanced
2 training, I served in Würzburg, Germany for
3 approximately a year.
4       After that, in December of 1966, I was
5 assigned to the military assistance command in
6 Vietnam, which is located in -- I don't recall the
7 name, but it was near Biên Hòa, South Vietnam.  It
8 was probably in the Biên Hòa province.
9    Q  And how long did you serve there?
10    A  12 months.
11    Q  And then where were you assigned?
12    A  Fort Benjamin Harrison.  And it's
13 Indianapolis, Indiana.
14    Q  Were you then discharged from the service
15 from --
16    A  Yes, sir, August -- August of 1967.
17    Q  Were you awarded any commendations or
18 medals by the Army that were not similarly awarded
19 to each member of your -- the group that you were
20 stationed with?
21    A  I was awarded the Bronze Star but not for
22 valor.
23    Q  What were you awarded the Bronze Star for?
24    A  Evidently they liked my work, what I did.

15

1    Q  What were you doing for the military in
2 Vietnam?
3    A  I worked in the G3, which is the
4 operations and planning.  The military assistance
5 command in Vietnam was generally comprised of
6 officers, which I was not one, who would go out
7 with the ARVN, or the Army of the Republic of
8 Vietnam, for about six months at a time.  They'd
9 go out in the field with them and advise them.
10 Normally, there was a team of -- a team that went
11 out with a particular group from the ARVN.
12    Q  And would you conduct that work going out
13 in the field?
14    A  Oh, no, sir.
15    Q  No.  So what was your role?
16    A  Basically, a clerk or an administrative
17 assistant in the -- I worked for seven or eight
18 officers.
19    Q  And you had an honorable discharge; is
20 that correct?
21    A  Yes, sir.
22    Q  What was your rank upon discharge?
23    A  Specialist 5 or E5.
24    Q  Are you a high school graduate?

16

1    A  Yes, sir.
2    Q  Where did you graduate high school from?
3    A  Mendel Catholic College Prep.
4    Q  And when did you graduate from high
5 school?
6    A  May or June of 1964.
7    Q  Did you attend any post high school
8 educational institution?
9    A  I -- when I was in the police academy,
10 there were several compulsory college courses that
11 were given to us.  And within a year or so after
12 being on the police department, it suddenly dawned
13 on me that if I went under the college bill, I
14 would get paid, so I just -- I took maybe -- I
15 would say I possibly have 12 to 16 hours of
16 college.  I have no idea what they were.
17    Q  Where did you accrue those college credits
18 from?
19    A  Loop College is -- to the best of my
20 recollection.
21    Q  And that was -- so you took some of them
22 while you were at the academy and then some of
23 them in the couple years after the academy?
24    A  I think it was a couple years.  It wasn't

Transcript of Thomas Kelly
Conducted on July 14, 2020

5 (17 to 20)

---

**17**

1 too long afterwards. And then the -- I can't
2 remember the time limit, but my time limit to
3 participate expired. That was the end of that.
4    Q Did you ever pursue a degree?
5    A No, sir.
6    Q And you never obtained a degree or
7 certificate from any post-high school educational
8 institution; is that correct?
9    A That's correct.
10   Q What did you do after you were discharged
11 from the Army and before you started at the
12 Chicago Police Department?
13   A I worked construction as a laborer for
14 several months. I was laid off. And then I was a
15 bartender for about a year.
16   Q Did you ever serve in the military police?
17   A No, sir.
18   Q Do you have family members who were police
19 officers when you applied to be a member of the
20 Chicago Police Department?
21   A Yes.
22   Q How many?
23   A Two.
24   Q And who were they?

---

**18**

1   A One was my uncle, and the other was my
2 great uncle.
3   Q When you joined, where was your uncle
4 assigned?
5   A He was assigned to Area 3 youth division.
6   Q Did you have other -- since you joined the
7 force, did you have other members of your family
8 also join the Chicago Police Department?
9   A No, sir.
10   Q Are you married?
11   A Yes, sir.
12   Q How long have you been married?
13   A 45 years.
14   Q Congratulations. Do you have any
15 children?
16   A Yes, I do.
17   Q How many children do you have?
18   A Two.
19   Q Do you have any grandchildren?
20   A One.
21   Q Hopefully you'll be able to see your
22 grandchild again soon.
23     And in what fields do your children work?
24   A One is in retail, and the other is in

---

**19**

1 wealth management.
2   Q All right. I understand you joined the
3 Chicago Police Department in 1969; is that
4 correct?
5   A Yes, sir.
6   Q Did you attend the academy?
7   A Yes, sir.
8   Q And did you attend the academy for the
9 same amount of time that other people who joined
10 the academy at the same time as you were there?
11   A I don't believe so. Shortly -- when I
12 joined, it had been extended to seven months in
13 the academy. I believe --
14   Q Your cohort -- the people who joined at
15 the same time as you also spent seven months in
16 the academy; is that right?
17   A Yes, sir.
18   Q Upon completion of your time at the
19 academy, where were you assigned?
20   A The 9th District.
21   Q Where was that at the time?
22   A 35th and Lowell.
23   Q Do you have any say in that assignment?
24   A Did I have any say?

---

**20**

1   Q Yeah.
2   A No.
3   Q I didn't think so.
4     How long did you remain in the 9th
5 District?
6   A About a year, I believe, maybe a little
7 bit more.
8   Q While you were in the 9th District, did
9 you patrol in a marked squared car?
10   A Yes, sir.
11   Q And you did that for the entire time you
12 were at the 9th District?
13   A Yes, sir.
14   Q Where did you go after the 9th District?
15   A Area 1 task force.
16   Q What did you do at the Area 1 task force?
17   A Patrolled high-crime areas.
18   Q Would you patrol in a marked squad car in
19 uniform?
20   A I would say 90 percent of the time.
21   Q What about the 10 percent of the time when
22 you weren't patrolling in a marked squad car and
23 uniform?
24   A It would be soft clothing, casual clothing

Transcript of Thomas Kelly
Conducted on July 14, 2020

21

1  in an unmarked -- again, upon the availability,
2  generally, it was in an unmarked squad car.
3     Q   Did you have to apply to be a member of
4  the Area 1 task force?
5     A   I went for an interview, yes, sir,
6  expressed my desire to go there.
7     Q   Why did you have a desire to go to the
8  Area 1 task force?
9     A   I didn't care for the 9th District was the
10 main reason.  I also had a -- a friend who was
11 assigned there.
12    Q   Why did you not care for the 9th District?
13    A   It was very, very slow.
14    Q   Not a lot of crime?
15    A   There was crime, but I would say that most
16 of it -- most of the assignments I had you -- you
17 dealt with a lot of domestic issues.
18    Q   How long were you assigned to the Area 1
19 task force?
20    A   Several years.
21    Q   All right.  What was your next assignment?
22    A   The 3rd District.
23    Q   In the time that you were at the Area 1
24 task force, did your duties remain the same that

22

1  you described to us before?
2     A   Yes, sir.
3     Q   And where was the 3rd District when you
4  were assigned there?
5     A   75th and Maryland.
6     Q   Why did you transfer to the 3rd District?
7     A   It wasn't voluntary.
8     Q   Do you know why you were transferred from
9  Area 1 task force to the 3rd District?
10    A   I had been suspended from the police
11 department, and I was reassigned as part of my
12 punishment, in my opinion, to the 3rd District.
13    Q   And why were you suspended from the
14 Chicago Police Department?
15    A   In a nutshell, there was an allegation of
16 missing funds, and I failed the Polygraph exam.
17    Q   Were you telling the truth when you went
18 to the Polygraph?
19    A   Yes, sir, I was.
20    Q   But the powers that be credited the
21 Polygraph over your denial; is that correct?
22    A   Yes, they did.
23    Q   Was there any other evidence against you
24 apart from the --

23

1     (Technical difficulties.  Reporter
2  clarification.)
3     MS. MEADOR:  I was just saying it was -- I
4  was trying to unmute myself.  I'm trying to stay
5  muted so it's quiet on my end.  To the prior
6  question, I object as to foundation.  Sorry.  I'll
7  try and be faster.
8  BY MR. AINSWORTH:
9     Q   Okay.  Let me reask this question.  Was
10 there any other --
11    A   Could I ask you a question, sir?  Could I
12 ask you a question?
13    Q   I might not answer, but you can certainly
14 ask.
15    A   Who was -- who just spoke?
16    Q   That was Lisa Meador.  She represents the
17 City of Chicago.
18    A   Okay.  Thank you.
19    Q   To your knowledge, was there any other
20 evidence suggesting that you had taken the missing
21 funds apart from the Polygraph results?
22    A   No.
23    Q   Do you know why you were asked to give a
24 Polygraph exam?

24

1     A   Yes, I do.
2     Q   Why?
3     A   The complainant took a Polygraph exam.
4     Q   And so why does the fact that the
5  complainant took a Polygraph exam suggest to you
6  that you were asked to take a Polygraph exam?
7     A   He, apparently, to the best of my
8  recollection, passed the Polygraph, ergo, I
9  couldn't be telling the truth.
10    Q   I see.  So were you and the other person
11 the only two people who could have taken the
12 funds?  Is that what you're saying?
13    A   No, that's not what I'm saying, sir.
14 Would you like me to expand on it?  I will.
15    Q   Please do.
16    A   Myself and another officer were on our way
17 in at the end of our tour when we saw a gentleman
18 coming not directly towards us, but he was coming
19 towards us the wrong way on a one-way street.  It
20 was around 33rd and Michigan, I think.
21    Anyway, before we could stop him, he ran
22 into a parked car.  He -- we stopped.  He got out,
23 said he didn't feel well.  So we laid him down --
24 we didn't physically lay him down, we told him to

Transcript of Thomas Kelly
Conducted on July 14, 2020

25

1 lay down in the back seat of our squad car.
2      I then asked him for his identification.
3 He handed me his wallet, I believe, with his
4 driver's license. In those days traffic cars --
5 personnel assigned to the traffic division would
6 handle -- we did not handle traffic accidents. We
7 called for a traffic car. A traffic car came. We
8 told the traffic officer briefly what we had
9 observed. We left and went home.
10    Q And how was there then an allegation that
11 you had taken money?
12    A He made the allegation the next day, the
13 person who was driving the car.
14    Q I see. And they credited the civilian
15 over your statement; is that fair to say?
16    A That's very fair to say, yes, sir.
17    Q And how long was your suspension?
18    A 30 days.
19    Q Did you grieve that suspension?
20    A I don't believe you could grieve -- this
21 is back in the '70s. To the best of my
22 recollection, I didn't, no.
23    Q All right. Okay. For how long were you
24 assigned to the 3rd District?

26

1      A Almost -- I think it was almost a year to
2 the day.
3    Q And what was your next assignment?
4    A After the 3rd District, sir?
5    Q Yes.
6    A I went back to -- I believe it was -- it
7 was the same assignment I had left, but I think
8 the unit name had been changed to Area 1 special
9 operations group.
10    Q While you were at the 3rd District, were
11 you assigned to patrol?
12    A Yes, sir.
13    Q Did you work in a -- did you work a beat
14 in a marked squad car in uniform?
15    A Yes, sir.
16    Q And when you went back to Area 1, you had
17 the same duties that you had previously at Area 1;
18 is that right?
19    A Yes, sir.
20    Q And for how long did you serve in Area 1
21 what you believe was special ops?
22    A Just so I can clarify for you, possibly, I
23 stayed there until, I believe it was, March
24 of 1987; however, the name was changed once again

27

1 to Area 1 gangs. And I don't remember the year.
2    Q Did it become gangs in 1981? Does that
3 sound familiar?
4    A I don't know. I don't remember.
5    Q All right. And then in 1987 you made
6 detective; is that right?
7    A Yes, sir.
8    Q How many times did you sit for the -- did
9 you -- were you promoted off the list?
10    A Yes, I was.
11    Q How many times did you sit for the
12 detective exam?
13    A Once.
14    Q Then there is a list created based on the
15 results of the exams that -- that you took?
16    A In those days there was, yes, sir.
17    Q And then you were promoted off the list of
18 people who qualified based on the results of the
19 exam; is that right?
20    A Yes, sir.
21    Q When you became a detective, did you go to
22 detective school?
23    A Yes, I did.
24    Q What do you call it? I called it

28

1 "detective school." What did you call it?
2    A That's fine. I don't know if there is a
3 formal name. That's -- I know what you mean.
4    Q How long was detective school?
5    A Four or five weeks.
6    Q And upon completion of the detective
7 school, where were you assigned?
8    A Area 1 violent crimes.
9    Q Did you want to work at Area 1 violent
10 crimes?
11    A Yes, sir, I did.
12    Q Why did you want to work at Area 1 violent
13 crimes?
14    A I was familiar with the area having worked
15 in that -- that building for the majority of the
16 prior time I had been on the police department.
17 Again, I knew some people, some other detectives
18 who had worked there, and they seemed to speak
19 highly of the area.
20    Q Did you know any detectives when you
21 joined who were at Area 1 violent crimes? Sorry.
22    A Yes, I knew some of them. Yes, sir.
23    Q Who did you know?
24    A In Area 1?

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

29

1    Q  Yes.
2    A  I knew Joe Murphy.
3    Q  Anyone else you knew?
4    A  Jim O'Leary.
5    Q  Who else?
6    A  Brian Regan.
7    Q  Anyone else?
8    A  Steve Glynn.
9    Q  Anyone else?
10   A  I knew a lot of them by sight having
11 worked with them on prior occasions --
12   Q  When you joined there -- sorry.  Go ahead.
13   A  No, I'm done.  Go ahead.
14   Q  When you joined Area 1, which watch were
15 you assigned to?
16   A  Initially, days.
17   Q  When did it switch away from days?
18   A  Maybe eight or nine months.
19   Q  Was that by choice?
20   A  To leave days?
21   Q  Yeah.
22   A  Yes, sir.  Yes, sir.
23   Q  Why did you want to leave days?
24   A  I don't like days.

---

30

1    Q  Why didn't you like days?
2    A  I just don't like anything about days.  I
3  never have.
4    Q  What about days don't you like?
5    A  I must be afraid of the sun, huh?  No, I
6  just don't care for it.  I don't know how to
7  explain it to you.  I don't like -- I don't like
8  days.
9    Q  Is it -- is it the hours in that you have
10 to -- you didn't like being -- having to be at
11 work, you know, from 8:00 to 4:00 or 9:00 to 5:00,
12 or was it something about the -- the activities
13 that you conducted on the job during that time
14 that you didn't like?
15   A  I just found it to be long days.  Eight
16 hours would seem like 12 hours to me.
17   Q  What was your preferred watch?
18   A  Afternoons.
19   Q  All right.  And why did you like
20 afternoons?
21   A  Less traffic, more opportunities for
22 overtime, more court time.
23   Q  Why were there more opportunities for
24 overtime?

---

31

1    A  A large majority of the violent crimes
2  that we were assigned to handle would happen in
3  the afternoon or evening hours, and there would be
4  sometimes an extension of your tour of duty.
5    Q  How would you get overtime, let's say, in
6  the time frame 1994 while you were at Area 1?
7    A  How would I -- how would I get assigned --
8    Q  What did you have to do to get overtime?
9    A  Be assigned to a task that could not be
10 done in the prescribed amount of time or the --
11 not the prescribed amount of time, the time before
12 my tour of duty would end.
13   Q  And would you have to ask to get overtime?
14   A  Yes.
15   Q  Who would you have to ask to get overtime?
16   A  You would inform whoever had originally
17 given you the assignment that you were still on
18 the assignment.
19   Q  Would they have to sign something to, you
20 know, denote that you were entitled to overtime
21 for that task?
22   A  They would sign a time-due slip, or the
23 supervisor who had relieved whoever was working
24 that watch would sign it upon the completion of my

---

32

1  tour of duty.
2    Q  And what if the sergeant, or whomever gave
3  you the assignment in the beginning, was no longer
4  on -- you know, working at the time that you were
5  assigned to do overtime, who would you ask?
6    A  There were supervisors, at a minimum of a
7  sergeant, on all three watches.
8    I would let the -- if it was midnights,
9  which it would be probably, the afternoon sergeant
10 would tell the midnight sergeant Kelly, and
11 whoever, are still out on a murder, we'll say, for
12 example, and he would be aware of it.
13   Q  And you also said there's more
14 availability for court time?  Did you say that?
15   A  Yes.  You would be going on your own time,
16 your own off time.
17   Q  To court.  And you would be compensated
18 for that time in court?
19   A  Yes, sir.
20   Q  And so would court time be overtime if you
21 were attending court on your own time?
22   A  Yes.
23   Q  When you were first assigned to Area 1,
24 were you assigned a regular partner?

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

33

1    A   No.
2    Q   For how long did you go without a regular
3  partner at Area 1?
4    A   Maybe five to six weeks.
5    Q   And then were you assigned to a partner?
6    A   Yes.
7    Q   Who were you assigned to have as a
8  partner?
9    A   That was Jim Ward, W-A-R-D.
10   Q   How long were you and Jim Ward partners?
11   A   I don't recall.  Several years.
12   Q   So he switched to afternoons with you?
13   A   For a while, yes.
14   Q   Who was your next partner after Jim Ward?
15   A   I believe it was Rich Paladino.
16   Q   For how long were you and Rich Paladino
17 partnered?
18   A   Again, several years.
19   Q   Who was your partner after Rich Paladino?
20   A   Then I believe it was -- I believe I might
21 have gone back with Jim Ward for a while.
22   Q   There were a couple of Paladinos at Area
23 1; is that right?
24   A   No.

34

1    Q   Just the one?
2    A   Yes, sir.
3    Q   And was Rich Paladino the Paladino who had
4  served at Area 2 and then moved over to Area 1?
5        MR. GRILL:  Objection to form of the
6  question.
7        (Reporter clarification.)
8        MR. GRILL:  Objection to form.
9  BY MR. AINSWORTH:
10   Q   You can answer, sir.
11   A   Oh, I'm sorry.  I'm sorry.  I don't
12 believe --
13   Q   Do you recall the question?
14   A   No, I remember.
15       I don't believe Rich Paladino ever worked
16 at Area 2.  I could be mistaken.
17   Q   All right.  What other partners did you
18 have?
19   A   Jim Riley.  Do you want me to spell it,
20 sir, or no?
21   Q   That's okay.
22       Who else?
23   A   Roger Murphy.
24   Q   Who else?

35

1    A   That's it, to the best of my recollection.
2    Q   Were you at Area 1 until your retirement?
3    A   Yes, sir.
4    Q   And did you serve in Area 1 violent crimes
5  from 1987 until your retirement?
6    A   Yes, sir.
7    Q   When did you retire?
8    A   June 29th of 2009.
9    Q   Since your retirement have you had any
10 employment?
11   A   No, sir.
12   Q   Do you intend to have any employment?
13   A   Hopefully not.
14   Q   All right.  How are you enjoying your --
15 your retirement, sir?
16       MR. GRILL:  Objection to form.
17       If you understand that, go ahead and
18 answer.
19 BY THE WITNESS:
20   A   Just fine, thank you.
21 BY MR. AINSWORTH:
22   Q   All right.  And you retired when you hit
23 the mandatory retirement age; is that correct?
24   A   Yes, sir.

36

1    Q   Did you receive any training while you
2  were -- well, strike that.
3        While you were at the academy, were you
4  trained on how to take notes?
5        MR. GRILL:  Objection to form.
6        You can answer it if you understand the
7  question.
8  BY THE WITNESS:
9    A   Can you kind of rephrase that a little
10 bit, sir, please.
11 BY MR. AINSWORTH:
12   Q   Sure.  Were you trained that it was
13 important for police officers to take notes
14 because you might make a lot of arrests in a year,
15 and you might not remember what happened without
16 the aid of your notes?
17       MR. GRILL:  Objection to form.
18       MS. MEADOR:  Join.  That's Lisa Meador.
19 Join.
20       MR. GRILL:  You can answer if you
21 understand the question.  Go ahead.
22 BY THE WITNESS:
23   A   I think I was always aware that notes were
24 important before that time, sir.

Transcript of Thomas Kelly
Conducted on July 14, 2020

37

1  BY MR. AINSWORTH:
2     Q  All right.  Did the police department of
3  the academy train you that paperwork was an
4  important part of a police officer's job?
5     A  Yes, sir.
6     Q  And is paperwork an important part of a
7  police officer's job?
8     A  Yes, sir, it is.
9     Q  While you were at the academy, were you
10 trained on how to interview witnesses?
11    A  This is in the detective portion of it or
12 no?
13    Q  Just the academy, back in '69.
14    A  I don't specifically recall.
15    Q  How about in detective school, were you
16 trained on how to interview witnesses?
17    A  Again, I don't specifically recall.
18    Q  I'm not asking you for what you were
19 trained but just were you trained on how to
20 interview witnesses?
21    A  I don't remember.
22       MR. GRILL:  In the detectives'...
23       MR. AINSWORTH:  Yeah, in the detective
24 school.

38

1  BY MR. AINSWORTH:
2     Q  Were you trained on how to interrogate
3  suspects while you were at the detective school?
4     A  Possibly.
5     Q  Did you interrogate suspects during your
6  career at Area 1?
7     A  Yes, sir.
8     Q  What was your practice in interrogating
9  suspects?  How would you conduct an interrogation?
10       MR. GRILL:  Objection; foundation.
11       You can answer the question.
12 BY THE WITNESS:
13    A  Is the suspect under arrest, sir, at this
14 time or...
15 BY MR. AINSWORTH:
16    Q  Yes, sir.
17    A  I would inform him of his rights.  I would
18 read them from the preprinted form.
19       After each individual right, I would ask
20 him if he understood what I had just stated to him
21 or read to him.
22       At the conclusion of all the rights, after
23 he had acknow- -- he or she had acknowledged each
24 of the rights, I would tell them I was now going

39

1  to question them, and they could either answer or
2  not answer.
3       I would also tell them broadly why they
4  were under arrest.
5     Q  When you interrogated a suspect, would you
6  assume that the suspect was guilty?
7     A  No.
8     Q  When you interrogated a suspect, would you
9  suggest reasons why committing the crime would be
10 less reprehensible --
11       MR. GRILL:  Objection --
12 BY MR. AINSWORTH:
13    Q  -- such as that they were pressured to do
14 it or the suspect had good reason to do it or the
15 suspect, you know, acted in haste or something
16 like that?
17       MR. GRILL:  Hang on.
18       Objection --
19       MS. MEADOR:  Lisa Meador.  Objection to
20 form.
21       MR. GRILL:  Yeah.
22       (Reporter clarification.)
23       MR. GRILL:  Same objection.
24       Go ahead if you can --

40

1  BY THE WITNESS:
2     A  No, sir.
3  BY MR. AINSWORTH:
4     Q  How would you interrogate suspects?
5       MR. GRILL:  Objection; form.
6  BY MR. AINSWORTH:
7     Q  Like once you get to the point where
8  you're going to ask some questions, would you --
9  would you ask them leading questions and try to
10 get them to admit?  Would you confront them with
11 the evidence that you had?  Would you just simply
12 ask them what happened?  How would you conduct
13 your interrogations?
14       MR. GRILL:  Objection; form.  It's
15 compound; foundation, as well.
16       Go ahead if you can answer.
17 BY THE WITNESS:
18    A  I would start by asking them what
19 happened.
20 BY MR. AINSWORTH:
21    Q  All right.  And --
22    A  Or -- and -- and where they were,
23 possibly, at the time of the incident.
24    Q  And were you aware, while you were a

Transcript of Thomas Kelly
Conducted on July 14, 2020

11 (41 to 44)

41

1 detective, that false confessions can occur?
2    MR. GRILL: Objection; form, foundation.
3 BY THE WITNESS:
4    **A I don't think I know exactly what the --**
5 **can you broaden the question a little bit or**
6 **explain it, sir?**
7 **BY MR. AINSWORTH:**
8    Q Sure. As a detective you're constantly
9 gathering information and looking for
10 inconsistencies; is that fair to say?
11    **A As regard to the person under arrest or**
12 **the suspect?**
13    Q Or a witness, right.
14    MR. GRILL: Objection; form.
15 BY THE WITNESS:
16    **A (No audible response.)**
17 **BY MR. AINSWORTH:**
18    Q Let me -- let me clarify my question
19 because I see you struggling.
20    How I would say it is that sometimes
21 inconsistencies in people's stories are the result
22 of a memory mishap -- memory slip or just because
23 people perceive things in different ways from
24 their different vantage points; would you agree

42

1 with me?
2    MR. GRILL: Objection; form, incomplete
3 hypothetical, calls for speculation.
4    You can answer. Go ahead.
5 BY THE WITNESS:
6    **A Also, sometimes, sir, people lie.**
7 **BY MR. AINSWORTH:**
8    Q Right. And so that's the other half of it
9 is that sometimes an inconsistency is an
10 indication of an intentional effort to deceive; is
11 that right?
12    **A Yes, sir.**
13    Q And so, as an experienced detective, you
14 would take in information from various witnesses
15 and compare it to the facts that you knew them
16 from other witnesses and from, you know, the
17 forensics and crime scene and try to determine
18 whether somebody's, you know, inconsistency was
19 simply a -- a misremembering or if it was
20 indicative of an intent to deceive; is that fair
21 to say?
22    **A That's a fair statement, yes, sir.**
23    Q Because you wanted to know whether
24 statements provided to you were reliable or not,

43

1 correct?
2    **A That's correct.**
3    Q And one way to gauge reliability of a
4 suspect's statement to you, a confession to you,
5 is to determine whether that confession contains
6 information that only the perpetrator would know,
7 right?
8    MR. GRILL: Objection; form, foundation,
9 incomplete hypothetical.
10    MR. ADELMAN: Join.
11    MS. MEADOR: Lisa Meador join, also.
12    THE WITNESS: Sir?
13    MR. AINSWORTH: Yes.
14    THE WITNESS: Who was that gentleman, if
15 you don't mind?
16    MR. AINSWORTH: That was David Adelman.
17 He represents Hal Garfinkel.
18    MR. ADELMAN: I'm an assistant State's
19 attorney.
20    THE WITNESS: Oh, okay. I'm sorry. I
21 didn't know who you were.
22    Could you repeat the question, sir,
23 please.
24

44

1 BY MR. AINSWORTH:
2    Q I'll try.
3    MR. GRILL: You could have it read back if
4 you want.
5    MR. AINSWORTH: No, it's okay.
6 BY MR. AINSWORTH:
7    Q You were trained, while you were a Chicago
8 police detective, that one way to gauge the
9 reliability of a suspect's statement was to not
10 reveal nonpublic crime scene facts to the suspect
11 and see if the suspect would provide details of
12 the crime that would only be known by the
13 perpetrator?
14    MR. GRILL: Form. Objection; form.
15    MR. ADELMAN: Join.
16 BY THE WITNESS:
17    **A I would say that's a true statement, yes,**
18 **sir.**
19 **BY MR. AINSWORTH:**
20    Q Because you wanted to know if -- if the
21 statement to you was -- was accurate and reliable
22 or if somebody was sending you on a wild goose
23 chase; fair to say?
24    **A If someone told me that they had cut the**

Transcript of Thomas Kelly
Conducted on July 14, 2020

45

1 victim's throat and the victim had been shot and
2 the victim's throat was fine, I would think that
3 would be an inconsistency, yes, sir.
4    Q   Yeah.  And so you would withhold certain
5 nonpublic facts about the crime, such as whether
6 the victim had been shot or stabbed, to find out
7 what the suspect was going to say about the crime;
8 is that fair to say?
9    A   That's fair to say.
10   Q   And that was part of your training at the
11 Chicago Police Department; is that right, to
12 conduct interrogations in that way?
13       MR. GRILL:  Objection; form.
14 BY THE WITNESS:
15   A   It may have been, it's just -- to me it's
16 just common sense.
17 BY MR. AINSWORTH:
18   Q   All right.  Were you trained in how to
19 testify?
20       MR. GRILL:  Objection; form, foundation as
21 well.
22       If you understand it, go ahead.
23 BY THE WITNESS:
24   A   I would say minimally.

46

1 BY MR. AINSWORTH:
2    Q   All right.  Well, let me show you a -- I'd
3 like to --
4    A   Could we back up for a second on that last
5 answer --
6    Q   Certainly.
7    A   -- is that all right?
8    Q   Yes.
9    A   Not -- I don't believe in the police
10 academy there was any specific testimony -- I
11 mean, it's -- excuse me, any specific classes
12 regarding testimony other than tell the truth.
13   Q   Okay.  Let me show you what we'll mark as
14 Exhibit No. 1 to your deposition.  I'm going to
15 show it to you on the screen.
16       (Kelly Exhibit No. 1 was marked for
17 identification.)
18 BY MR. AINSWORTH:
19   Q   All right.  So we'll mark this as Exhibit
20 No. 1.  This is labeled Exhibit Thomas Kelly
21 training record.
22   A   I see it, yes, sir.
23   Q   All right.  I'm going to direct your
24 attention to Page 9 of this document.

47

1       MS. MEADOR:  Russell, can you give me the
2 Bates range, please?
3       MR. AINSWORTH:  It's City 2538 -- oh,
4 sorry.
5       The first page is City 2530, and the last
6 page is City 2540.  And each of these pages has
7 been e-mailed to counsel.
8       MS. MEADOR:  This was part of the e-mail
9 you sent right before the dep, Russell?
10       MR. AINSWORTH:  This has been e-mailed to
11 you, yes.
12       MS. MEADOR:  Right.  Just in the one you
13 sent right before the dep, just for clarification.
14 Thank you.
15       MR. AINSWORTH:  Oh, you're trying to
16 say -- I see.  You're trying to say that it was
17 sent shortly before the dep.  That's what you want
18 to put in the record; is that it?
19       MS. MEADOR:  Well, because you seem to be
20 intent on making some sort of inference that you
21 sent it prior.  I'm just clarifying as to the
22 timing.  We can --
23       MR. AINSWORTH:  Sorry.  I thought I did
24 send it prior to the dep like -- I thought we were

48

1 saying the same thing, but...
2 BY MR. AINSWORTH:
3    Q   Mr. Kelly --
4    A   Yes, sir.  I'm going to -- one second.
5 I...
6       (Brief pause.)
7 BY MR. AINSWORTH:
8    Q   All right.  Mr. Kelly?
9    A   Yes, sir.
10   Q   Looking -- you see where I've highlighted
11 on Exhibit No. 1, Page 9, V109, "Courtroom
12 Demeanor Credibility," there were two days of
13 training?  Do you see --
14   A   Oh, I do see that.  Yes, sir.
15   Q   Okay.  And then there was a third day of
16 training down here where it says, "Courtroom
17 Demeanor Getting Prepared"; do you see that, sir?
18   A   Yes, sir, I do.
19   Q   So on three different days you were
20 provided training on courtroom demeanor; is that
21 right?
22   A   Someone may have read something at roll
23 call, but this -- to the best of my recollection,
24 this is not like an all-day course at the training

Transcript of Thomas Kelly
Conducted on July 14, 2020

49

1  academy.  You had to get --
2     Q  I wasn't suggest-- -- go ahead, sir.
3     **A  No, go ahead.  I'm sorry.**
4     Q  I wasn't suggesting it was an all-day
5  training, but do you recall watching a video on
6  how to increase your credibility in court?
7     **A  No, I don't.**
8     Q  All right.  What were your -- what was the
9  training that you were provided on how to appear
10 more credible in court?
11    **A  Other than telling the truth and speak up**
12 **so people can hear you.  I -- I don't know if**
13 **there's an inference there that -- I just don't**
14 **like the way you phrased the question.  I know**
15 **that's my problem, but...**
16    Q  What don't you like about the way I
17 phrased the question, sir?
18    **A  Well --**
19       MR. GRILL:  Objection; argumentative.
20 Just ask him another question.
21 BY MR. AINSWORTH:
22    Q  You can answer, sir.
23       MR. GRILL:  It's argumentative.
24

50

1  BY MR. AINSWORTH:
2     Q  You can answer the question.
3        MR. GRILL:  Do you understand the
4  question --
5        THE WITNESS:  Yes.  My --
6        MR. GRILL:  -- or do you want him to ask
7  you another question?
8  BY THE WITNESS:
9     **A  Ask me another question.**
10       MR. AINSWORTH:  No.  No.  Mr. Grill, you
11 cannot do that.  That is completely inappropriate,
12 and I will end this deposition -- or I'll pause
13 this deposition, and we will call the judge.  You
14 cannot do that.
15       MR. GRILL:  You're arguing --
16       MR. AINSWORTH:  I've asked a question.
17 You can make your -- I'm speaking.
18          You can make your objection.  You can note
19 it for the record.  If you're directing him not to
20 answer because you're asserting a privilege, then
21 please do so, otherwise simply state your
22 objection --
23       MR. GRILL:  You asked him -- you asked him
24 an argumentative question.

51

1        MR. AINSWORTH:  So you're saying that --
2  then are you saying that you're directing him not
3  to answer because, if so --
4        MR. GRILL:  No, I haven't said anything
5  like that, Russell, and the record
6  is explicably --
7        MR. AINSWORTH:  All right.  Then --
8        MR. GRILL:  -- clear about that.
9        MR. AINSWORTH:  -- then let's -- let's
10 proceed.
11       MR. GRILL:  So quit it.  Just ask him a
12 question.  You're arguing with him.  That's the
13 problem.
14       MR. AINSWORTH:  Mr. Grill, please just
15 state your objection succinctly for the record,
16 and I will ask this question of Mr. Kelly.
17 BY MR. AINSWORTH:
18    Q  Mr. Kelly, what didn't you like about the
19 way that I was phrasing the question?
20       MR. GRILL:  Same objections.
21 BY THE WITNESS:
22    **A  I think there's an inference the way you**
23 **asked the question.  I don't know how -- I got the**
24 **inference that there was some kind of training**

52

1  **here how to make yourself more credible, and my**
2  **only problem with that is the credibility is to**
3  **tell the truth --**
4  **BY MR. AINSWORTH:**
5     Q  I see.
6     **A  -- not go in there looking like you just**
7  **fell off of a -- a hay wagon.  I mean, that's part**
8  **of your demeanor, my demeanor anyway.**
9     Q  All right.  Well, on those -- those two
10 different -- I'm pointing you again to Exhibit
11 No. 1, Page 9 where it refers to two different
12 trainings on two different days entitled,
13 "Courtroom Demeanor Credibility."  And so I'm just
14 referring to the training that you received on
15 courtroom demeanor credibility on two different
16 days.
17        What were you trained in how to be more
18 credible in court?
19       MR. GRILL:  It's asked and answered --
20       MS. MEADOR:  Objection, form.
21       MR. GRILL:  Yeah.
22 BY THE WITNESS:
23    **A  Sir, I don't even know if I was working**
24 **those two days.**

Transcript of Thomas Kelly
Conducted on July 14, 2020

53

1  BY MR. AINSWORTH:
2     Q  All right.  Well, this is what the City
3  produced to us as your employee training record.
4  That's -- that's your name at the top of the page
5  where it says "Kelly, Thomas"; do you see that?
6     **A  Sir, I'll -- I'll tell you right now.  I**
7  **was on the police department for 40 years.  I have**
8  **never seen a form like this before.  I know it's a**
9  **legitimate form, I'm not questioning that, but I**
10 **have no idea -- I had no idea there was such a**
11 **form.**
12    Q  And your appointment date was March 3,
13 1969 --
14    **A  Sir, I'm sure it's me.  I -- I'm not**
15 **arguing --**
16    Q  Okay.
17    **A  -- that with you.**
18    Q  All right.  So this is what the City has
19 represented to us is your -- is a record of the
20 trainings that you received.  You were not in the
21 practice of claiming to be at work when you
22 weren't at work; is that right?
23    **A  No, sir.**
24    Q  Okay.  So I'm just asking you, sir --

54

1     **A  Sir, I --**
2     Q  Well, let me ask this way --
3     **A  All I can tell you is I don't -- I've**
4  **already answered the question, to the best of my**
5  **ability.**
6     Q  Well, let me ask you a new question:  Were
7  you trained to look at the jury as a way of
8  appearing more credible?
9        MR. GRILL:  Objection --
10       MS. MEADOR:  Objection; form.
11       MR. GRILL:  Thank you.  Asked and
12 answered, too.
13 BY MR. AINSWORTH:
14    Q  You can answer, sir.
15    **A  I don't believe I ever received any**
16 **training from the police department regarding**
17 **that.  I would say, in preparation for any jury**
18 **trial where I would testify, a State's attorney**
19 **would, generally speaking, remind you to make some**
20 **eye contact at a minimum with the members of the**
21 **jury.**
22    Q  And is that what you would do when you
23 were -- would testify, to make eye contact with
24 the jury?

55

1        MR. GRILL:  Objection; form, foundation.
2  BY THE WITNESS:
3     **A  Yes, I would look at the jury.**
4  BY MR. AINSWORTH:
5     Q  Why would you make eye contact with the
6  jury when you would testify?
7        MR. GRILL:  Objection; incomplete
8  hypothetical, form, and foundation.
9  BY THE WITNESS:
10    **A  I would say that it's common practice, if**
11 **you're addressing someone, to make eye contact**
12 **with someone.  I wouldn't sit up there and, you**
13 **know, put my head down and stare at my shoes.**
14 **It's just common courtesy.  You're speaking to**
15 **them.**
16 **BY MR. AINSWORTH:**
17    Q  Well, you're speaking -- you're answering
18 questions from a State's attorney or -- or a
19 defense counsel, right?
20    **A  Yes, but certainly the members of the jury**
21 **are the deciders eventually.**
22    Q  And you wanted the jury to listen to you,
23 right?
24    **A  Yes, I did.**

56

1     Q  You wanted the jury to find you credible,
2  correct?
3     **A  That would be up to the jury.**
4     Q  But you wanted them to find you credible,
5  correct?
6     **A  I was credible.**
7     Q  I understand that, sir, I'm just asking
8  you that you wanted the jury to find you credible,
9  correct?
10       MS. MEADOR:  Objection; asked and
11 answered.
12 BY MR. AINSWORTH:
13    Q  Is that correct, sir?
14    **A  Yes.**
15    Q  All right.  And then on the next page,
16 Page 10, you see that there's yet another training
17 on courtroom demeanor credibility; do you see
18 that?
19    **A  Yes, sir.  Could -- could we go back to**
20 **the prior -- whatever it was, V...**
21    Q  Yeah.
22    **A  All right.  Here, sir, on --**
23    Q  And we're looking --
24       MR. AINSWORTH:  Just for the record we're

Transcript of Thomas Kelly
Conducted on July 14, 2020

15 (57 to 60)

57

1  looking at Page 9 of Exhibit 1.
2  BY MR. AINSWORTH:
3     Q  Go ahead, sir.
4     **A  Yes, sir.  On V159 on the 15th of November**
5  **2004, it states that I had a training on diversity**
6  **regarding Hinduism.  I certainly have no**
7  **recollection of that, and it is on my permanent**
8  **training record.**
9     Q  All right.  So you have --
10    **A  That's just a point of clarification for**
11 **me.**
12    Q  All right.  So you have no recollection of
13 ever being trained on diversity Hinduism, is that
14 right, by the Chicago Police Department?
15    **A  That's correct.**
16    Q  Do you think that -- are you trying to
17 communicate that because you don't recall it you
18 believe that you were never trained on diversity
19 Hinduism?
20    **A  Yes, I never was that I recall.**
21    Q  And, thus, you believe you were never
22 trained on courtroom demeanor credibility; is that
23 right?
24    **A  I'm not saying that.  I'm just saying I**

58

1  **don't recall it.**
2     Q  Okay.  And do you -- are you saying that
3  you believe the City of Chicago's records
4  regarding the training that you provi- -- you were
5  provided are inaccurate?
6     **A  I think that's quite a possibility, yes,**
7  **sir.**
8     Q  Why do you believe it's a possibility that
9  your training record kept and provided by the City
10 of Chicago Police Department is inaccurate?
11    **A  40 years of being a Chicago policeman...**
12    Q  All right.  So --
13    **A  (Continuing) ... not everything is**
14 **accurate.**
15    Q  So, in your experience as a Chicago police
16 officer, police records have often been found
17 inaccurate; is that what you're saying?
18    **A  No, that's not what I'm saying.**
19       MS. MEADOR:  Objection; form.
20       MR. GRILL:  Join.
21 BY MR. AINSWORTH:
22    Q  All right.  So are you saying that certain
23 police records are accurate and other police
24 records are not accurate?

59

1        MR. GRILL:  Objection --
2        MS. MEADOR:  Objection; form, founda- --
3     (Reporter clarification.)
4        MS. MEADOR:  Go ahead, Andrew.
5        MR. GRILL:  Objection; form,
6  mischaracterizes his testimony.
7        MS. MEADOR:  I'll object to form and
8  foundation.
9  BY MR. AINSWORTH:
10    Q  You can answer the question, sir.
11    **A  Could you run it by me one more time,**
12 **please.**
13    Q  Sure.  Are you saying that some Chicago
14 police records are accurate and some Chicago
15 police records are inaccurate?
16       MS. MEADOR:  Same objection.
17       MR. GRILL:  Join.
18 BY THE WITNESS:
19    **A  All I'm saying is that all of the training**
20 **listed here was not necessarily given or read in**
21 **my presence, even though I may have been working**
22 **that day.**
23 BY MR. AINSWORTH:
24    Q  And you said that you believe that the

60

1  record might be inaccurate because of your
2  experience with 40 years on the police force.  And
3  I'm trying to find out what it was about your
4  experience with the Chicago police force that
5  leads you to believe that the Chicago Police
6  Department's record of the training you were
7  provided might be inaccurate?
8     **A  Because I look at this, and I certainly**
9  **don't remember some of it.  Now, I may have gotten**
10 **it, but I don't remember it.**
11    Q  All right.  So, I guess, this is one of
12 the situations where it might be a lapse in
13 memory, right?
14    **A  Well, I don't remember too much about 1971**
15 **regarding training.  No, I don't.**
16    Q  Well, I'm not talking about 1971.  To be
17 clear, this training was provided in 2004, right?
18    **A  Yes, sir.**
19    **Sir, I'm on a water pill.  Can I take a**
20 **break, if you don't mind?**
21       MR. AINSWORTH:  Certainly.
22       THE WITNESS:  Thank you.
23       MR. AINSWORTH:  Let's go off the record.
24    (Short recess.)

Transcript of Thomas Kelly
Conducted on July 14, 2020

61

1    MR. AINSWORTH:  Let's go back on the
2  record.
3  BY MR. AINSWORTH:
4    Q  Mr. Kelly, did you have experience with
5  Chicago police records being unreliable?
6    MS. MEADOR:  Objection to form.
7    MR. GRILL:  Join.
8  BY THE WITNESS:
9    A  No, sir.
10 BY MR. AINSWORTH:
11   Q  So you think it would be a -- an
12 aberration for this particular document,
13 Exhibit 1, to be inaccurate; is that what you're
14 saying?
15   MS. MEADOR:  Objection; form,
16 mischaracterizes the witness's testimony.
17   MR. GRILL:  Join.
18 BY THE WITNESS:
19   A  It may be.
20 BY MR. AINSWORTH:
21   Q  When you were a detective, would you
22 send -- would you send suspects to take Polygraph
23 exams?
24   A  After they agreed to take the exam, yes,

62

1  sir.
2    Q  So you would offer them to take a
3  Polygraph exam, correct?
4    A  Not all.  Some, yes, sir.
5    Q  Some.  You thought it was a helpful
6  investigative tool; is that right?
7    A  Yes, sir.
8    Q  And why did you think it was a helpful
9  investigative tool to give somebody a Polygraph
10 exam?
11   A  Well, if the results were that the person
12 was not being truthful, you could certainly
13 confront them with that.
14   Q  And so interrogations you would confront
15 witnesses with evidence; is that right?
16   A  Yes.
17   Q  And see how they would respond, correct?
18   A  Yes, sir.
19   Q  All right.  When you worked Gang Crime
20 South, were you assigned to a particular gang?
21   A  No.  There were gang -- gang specialists,
22 and it was just a regular force of patrol
23 officers.  I was not a gang specialist.
24   Q  I see.  Okay.  I wanted to ask you,

63

1  turning back to Exhibit 1, it appears in this
2  record that you were provided an in-service
3  detective homicide seminar on March 8, 1991; do
4  you see that, sir?
5    A  Yes, sir.
6    Q  Do you recall that training on -- a
7  homicide seminar?
8    A  No, I don't.
9    Q  Do you know what you were trained with
10 regard to how to investigate homicides in that
11 training in March of 1991?
12   A  No, sir.
13   Q  Were you trained to investigate homicides
14 any differently from any other crime?
15   A  Yes, I would say so.
16   Q  How were you trained to investigate
17 homicides differently from other crimes?
18   A  Well, certainly the protection of the
19 crime scene, all evidence, as opposed to a
20 shoplifter.
21   Q  Okay.  So more vigorous collection of
22 evidence and protection of evidence; is that fair
23 to say?
24   MS. MEADOR:  Objection as to form.

64

1  BY THE WITNESS:
2    A  Generally -- generally, there's more
3  evidence to collect or process than a shoplifting.
4  BY MR. AINSWORTH:
5    Q  All right.  How else were you trained to
6  investigate a homicide differently from other
7  types of crimes?
8    MR. GRILL:  Objection; form.
9  BY THE WITNESS:
10   A  There was a -- when I arrived in Area 1
11 violent crimes, I was given a -- I think it's
12 about a two-page outline of requirements for the
13 reports or categories, such as evidence,
14 witnesses, et cetera, the victim.
15 BY MR. AINSWORTH:
16   Q  And what about that two-page resource you
17 were provided?
18   A  It's an outline.  It's what the powers to
19 be -- other than the body of the investigation
20 itself, it's certain information that, if it was
21 available, was required to go into a preliminary
22 report, preliminary supplementary.
23   Q  What was that document called?
24   A  I have no idea.  It's not an official

Transcript of Thomas Kelly
Conducted on July 14, 2020

65

1  document.  It's a working --
2      Q  Who provided it?
3      A  Somebody in Area 1.  I don't recall, sir.
4      Q  And how did that document tell you to
5  investigate homicides differently from other
6  crimes?
7      A  I thought -- the document didn't tell me
8  how to investigate it.  The document told me what
9  was required in garnering basic information, and
10 there was more information that would be required
11 on a regular -- a normal case report.
12     Q  What was -- what was required or suggested
13 by that document that would be more than what was
14 required on a report for a different type of
15 crime?
16     A  As much detailed information on the
17 victim, contact information on the victim; the
18 medical examiner's number on the victim; the
19 apparent -- to our -- with my untrained eye, the
20 apparent injuries; if there was an offender either
21 in custody or a description of a wanted offender
22 or offenders, that would also be in there; if a
23 State's attorney was notified if there was someone
24 in custody; as much possible witness information

66

1  as you could get for contact points; places of
2  employment, et cetera, so that you could reach out
3  for them four years down the road and hopefully
4  contact them; personnel assigned, the crime lab
5  personnel; what evidence the crime lab recovered.
6      It's just more -- it's more detailed than
7  a normal, we'll say, theft report.
8      Q  In 1987 you received a commendation from
9  the department for identifying a rental car that
10 had been stolen; do you recall that incident?
11     A  Not specifically, no.
12     Q  Do you recall the Antwinica Bridgeman
13 murder investigation?
14     A  No.
15     Q  What did you do to prepare for this
16 deposition?
17     MR. GRILL:  Object to that question to the
18 extent it touches on anything you and I talked
19 about.  You can answer that question, but leave
20 out, in your answer, anything you and I discussed.
21 BY MR. AINSWORTH:
22     Q  And let me withdraw that question because
23 that's a fair point by Counsel.
24     Did you -- not telling me what was said,

67

1  but did you meet with anyone to prepare for your
2  deposition?
3      A  Yes, I did.
4      Q  Who did you meet with?
5      A  My two attorneys down here, my two fine
6  attorneys, sir.
7      Q  All right.  I'm going to assume that's
8  Mr. Grill and Mr. Moran; is that -- is that
9  correct?
10     A  That's correct, yes, sir.
11     Q  Was anyone else present for that meeting?
12     A  No, sir.
13     Q  And was that meeting in person or virtual?
14     A  In person.
15     Q  All right.  Did you meet at the Rock Fusco
16 office?
17     A  Yes, I did.
18     Q  For how long was that meeting?  And,
19 again, not what was said but just how long it was?
20     A  Several hours.
21     Q  More than three hours?
22     A  Yes, sir, I think it was.
23     Q  And when did you meet?
24     A  Yesterday, the 13th of July.

68

1      Q  Okay.  Did you meet with your attorneys to
2  prepare for a deposition prior to that?
3      A  No, sir.
4      Q  What documents did you review in
5  preparation for your deposition?
6      A  The GPR that I had prepared regarding the
7  interview with Mr. Coleman.
8      Q  Did you review any other documents?
9      A  No, I did not.
10     Q  Did you review any photographs?
11     A  No, I did not.
12     Q  Did you review any -- any supp reports?
13     A  No, I did not.
14     Q  Do you know if your name is on any supp
15 reports in this case, the Antwinica Bridgeman
16 investigation case?
17     A  I -- I have no idea who that is.
18     Q  Well, the case that you've been sued on,
19 sir, do you know if your name is on any of the
20 supp reports in that case?
21     A  I don't know.
22     Q  Did you review any transcripts of
23 testimony in this case?
24     A  No, I did not.

Transcript of Thomas Kelly
Conducted on July 14, 2020

18 (69 to 72)

69

1    Q  Did you talk with anyone apart from your
2  attorneys about your deposition?
3    A  No, I did not.
4    Q  Have you talked to any of the other
5  defendants in this case outside the presence of
6  your counsel?  So I'm -- I'm specifically just --
7  you know, if you're talking with them when your
8  counsel is present, I don't want you to tell me
9  about that; but if you're talking to other
10  defendants when your attorneys were not present,
11  has that happened, where you talked to some of the
12  other defendants about this case since you've been
13  sued without your lawyers being present?
14    A  No, I have not.
15    Q  Why not?  Why haven't you talked to any of
16  your old buddies about this lawsuit?
17    MS. MEADOR:  Objection --
18    MR. GRILL:  Objection, form.
19    MS. MEADOR:  -- form and foundation.
20  I'm sorry, Andrew.  Go ahead.
21    MR. GRILL:  That's okay.  We're just
22  thinking the same, Lisa.  That's all.
23    MS. MEADOR:  Okay.  I'll -- I'll join your
24  objections.

70

1  BY THE WITNESS:
2    A  Is there a question hanging there, sir?
3  BY MR. AINSWORTH:
4    Q  Yeah, well, let me ask you this:  Do you
5  think this lawsuit is a bunch of baloney?
6    MR. GRILL:  Objection.
7    Go ahead.
8  BY THE WITNESS:
9    A  No, I don't.
10  BY MR. AINSWORTH:
11    Q  Okay.  Do you think that -- did you want
12  to know, from your fellow detectives, you know,
13  what happened during this investigation that --
14  that led to a conviction being overturned and a
15  lawsuit being filed?
16    A  No.
17    Q  Why not?
18    A  I had nothing to do with the case other
19  than one GPR, sir.
20    Q  All right.  Do you know Kenny Boudreau?
21    A  Yes, sir, I do.
22    Q  How do you know him?
23    A  Through work in Area 1.
24    Q  All right.  Can you describe him, his

71

1  physical appearance, back in 1994?
2    A  He's about five-ten, a little chunky.  I
3  think in those days he probably wore his hair a
4  little bit longer than I did.
5    Q  What color hair?
6    A  I think it's kind of like what I used to
7  refer to as "dishwater blond."  Am I showing my
8  age?
9    Q  Did he have -- did he wear glasses back in
10  the 1994 time frame?
11    A  I don't think so.
12    Q  And did he have facial hair back in that
13  1994 time frame?
14    A  He may have had a mustache.  I'm not sure.
15    Q  And you worked with Kenny Boudreau for a
16  number of years, right?
17    A  Not as a partner.  We were in the same
18  unit, yes.
19    Q  And he started in -- 1990 sound about
20  right?
21    A  I don't know for sure.
22    Q  What was your physical appearance back in
23  1994?  And I'll -- and I'll represent to you that
24  I've -- I've seen you refer to your physical

72

1  description as 6 foot 2, 220.  Would that be an
2  accurate description of your height and weight
3  back in 1994?
4    A  I don't think I weighed 220.  I would say
5  around 200 pounds.
6    Q  All right.  What about the height?
7    A  I don't think I had started to shrink yet.
8  I think that's accurate.
9    Q  All right.  6 foot 2 and 200.  What color
10  hair did you have back in 1994?
11    A  Brown, I guess.  Dark brown.
12    Q  Did you wear glasses?
13    A  What year is this now when this occurred?
14  '94?
15    Q  1994.
16    A  Well, I was 40 years old when I got
17  glasses, so I guess I didn't have them yet.
18    Q  All right.  And did you have any facial
19  hair?
20    A  Did I?  No.
21    Q  What about the '70s?  Did you have facial
22  hair then?
23    A  I had a mustache at one time, and I can't
24  really tell you when.  Probably '70s.

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

**73**

1  Q  Okay.  How about Jack Halloran?  Do you
2  know Jack Halloran at Area 1?
3  **A  Yes, I do.**
4  Q  You worked with him for a long time,
5  right?
6  **A  Not as a partner, no.**
7  Q  But he was in the same unit as you for a
8  long time?
9  **A  Yes, sir.**
10  Q  Over a decade?
11  **A  Yes.  Yes, sir.**
12  Q  How would you describe his height and
13  weight?
14  **A  Six foot maybe, in good shape, looked like**
15  **he might have worked out a little bit, you know,**
16  **wore his hair parted down the middle.  I'd say**
17  **it's a light -- light brownish hair, not long,**
18  **well kept.**
19  Q  Did he have any facial hair?
20  **A  I don't think so.**
21  Q  All right.  Did he wear glasses?
22  **A  Not that I recall.**
23  Q  Mike Clancy.  How would you describe his
24  physical appearance back in 1994?

**74**

1  **A  Six-oneish, I think.  Six foot, six-one,**
2  **average build.  I believe he had dark hair.  I**
3  **don't think he had facial hair.**
4  Q  What about glasses?
5  **A  I don't recall.  I don't know.**
6  Q  All right.  Jim O'Brien.  How would you
7  describe his appearance back in 1994?
8  **A  About six-three, six-four, a large**
9  **build -- not fat, just a large build.  I don't**
10  **believe -- no, he didn't wear glasses, dark hair,**
11  **black hair, I would say.  I don't recall facial**
12  **hair.**
13  Q  Was he the tallest guy in Area 1 back in
14  '94?
15  **A  No, I don't believe he was.**
16  MS. MEADOR:  Objection --
17  BY MR. AINSWORTH:
18  Q  Who --
19  MS. MEADOR:  -- foundation.  My apologies.
20  MR. GRILL:  Join.
21  BY MR. AINSWORTH:
22  Q  Who was the tallest guy in Area 1 at the
23  time?
24  MR. GRILL:  Objection; form.

**75**

1  MS. MEADOR:  Same objection.
2  MR. GRILL:  Foundation.
3  BY THE WITNESS:
4  **A  I really don't recall, sir.  I don't think**
5  **that O'Brien was.**
6  **BY MR. AINSWORTH:**
7  Q  Okay.  What about Bill Foley?  What was
8  his physical appearance like?
9  **A  He was, again, about six-foot, thin build,**
10  **kind of blondish hair.  I believe he had a**
11  **mustache, and he may have worn glasses but a -- a**
12  **thin build.**
13  Q  And your description of him is for --
14  approximately 1994 time frame; is that right?
15  **A  Yes, sir.**
16  Q  All right.  How about Al Graf?  What was
17  his physical appearance like in the 1994 time
18  frame?
19  **A  He's probably in that six-foot range, a**
20  **little chunky, mustache, brown or black hair.  I**
21  **don't believe he wore glasses.**
22  Q  Bill Moser.  What was his appearance like
23  in about 1994?
24  **A  About six-one, chunky, blondish hair.  I**

**76**

1  believe he had a mustache.  I don't think he wore
2  glasses.
3  Q  Stan Turner.  How would you describe his
4  appearance back in 1994?
5  **A  Who, sir?**
6  Q  Stan Turner.
7  **A  He's a male, black.**
8  Q  Why did you say "male, black"?
9  **A  You asked me to describe him.**
10  MR. GRILL:  Objection.
11  BY MR. AINSWORTH:
12  Q  You didn't call -- you -- describe any of
13  the other people that we've talked about as
14  "males," right?
15  MR. GRILL:  Objection; argumentative,
16  form.
17  BY MR. AINSWORTH:
18  Q  I'm just -- I'm just observing that, you
19  know, the only person you called "male" was Stan
20  Turner as a male, black; did I get that right?
21  MR. GRILL:  Objection, form.  It's
22  argumentative.
23  BY MR. AINSWORTH:
24  Q  You can answer the question.

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

77

1    A   He was the only one I described as male,
2  yes.
3    Q   All right.  And so did he have any facial
4  hair?
5    A   I don't think so.
6    Q   Did he wear glasses?
7    A   I don't think so.
8    Q   And about how tall was he?
9    A   Six foot, six-one.
10   Q   What kind of build?
11   A   Heavy, not -- slightly heavy.
12   Q   How about Gerry Carroll?  What was his
13  physical description?  How would you describe it
14  back in about 1994?
15   A   Five-eleven, six foot, kind of chunky
16  then, straight hair, probably brownish.  I don't
17  believe he wore glasses.
18   Q   What about facial hair?
19   A   Not that I recall.
20   Q   Do you know assistant State's attorney Hal
21  Garfinkel?
22   A   I remember the name from his time at
23  felony review.
24   Q   And tell us about your interactions with

---

78

1  Hal Garfinkel.  Did you have any?
2    A   I may have had cases with him when he was
3  in felony review.
4    Q   Did you ever testify at a trial where he
5  was the prosecutor?
6    A   Not that I recall, but it's possible.
7    Q   Which of these officers that -- whose
8  names I just read to you -- and I can read them
9  back if you need them, but which ones did you
10  socialize with back in the '90s?  And it's Kenny
11  Boudreau, Jack O'Brien, Mike Clancy -- sorry, Jack
12  Halloran, Mike Clancy, Jim O'Brien, Bill Foley, Al
13  Graf, Bill Moser, and Gerry Carroll and Stan
14  Turner.
15      MR. GRILL:  Objection -- objection to
16  form.
17 BY THE WITNESS:
18   A   Can you clarify "socialize," what you mean
19  exactly?
20 BY MR. AINSWORTH:
21   Q   Yeah.  Go get a drink with them outside of
22  work, do something social with them outside of
23  work hours, go to their house?
24   A   Generally, any type of a -- like a

---

79

1  promotion party or a retirement party I would
2  socialize with them then.  I would not say I
3  socialized with them on a -- any of the fellas on
4  a regular basis.
5    Q   Did you know any of those people I --
6  whose names I just read better than the others?
7      MR. GRILL:  Objection to form.
8 BY THE WITNESS:
9    A   I would say Graf, Moser, and Halloran.
10 BY MR. AINSWORTH:
11   Q   How do you know Graf, Moser and Halloran
12  better than the others?
13   A   From prior assignments.  We were in the
14  same units.
15   Q   Which units was that?
16   A   I believe with Halloran it was what was
17  called the gang unit.
18      With Moser and Graf it would have been, I
19  believe, special operations group.
20   Q   Did you attend any of the other
21  defendants' weddings?
22   A   No, I don't believe I did.
23   Q   When was the last time you saw -- and I'll
24  just go down the list.

---

80

1      When was the last time you saw Kenny
2  Boudreau?
3    A   I believe a couple years ago at a --
4  matter of fact, I don't know how long he's been
5  retired, but it was a little gathering.  I believe
6  it was his last day of work on the police
7  department.
8    Q   Where was that held?
9    A   I believe it was at Barraco's at 111th
10  and -- that's roughly between California and
11  Kedzie, about 111.
12   Q   How about Jack Halloran?  When was the
13  last time you saw him?
14   A   I think I saw him at a tavern.  We had a
15  little retirement party for somebody, and I don't
16  recall who, probably within the last two years
17  maybe.
18   Q   But not Boudreau's party?
19   A   Oh, he may have been there, yes.
20   Q   I see.  How about Mike Clancy?  When was
21  the last time you saw him?
22   A   It's at least 11 years.  I don't recall --
23 I don't know.  I have no idea, but I haven't seen
24 him since I retired.

Transcript of Thomas Kelly
Conducted on July 14, 2020

81

1    Q  What about Jim O'Brien?  When was the last
2  time you talked to him?
3    A  Probably at the little Boudreau party.
4    Q  Have you talked to him or reached out to
5  him since he got ill?
6    A  No, I haven't.
7    Q  How about Al Graf?  When was the last time
8  you spoke to him?
9    A  It, again, is -- it's been a couple years.
10  And it -- I don't recall the exact function, but
11  it would have been something that was like a
12  retirement or promotion.  It would have been
13  related to where I -- where I previously worked.
14    Q  And how about Bill Moser?
15    A  11, 12, years.
16    Q  And Gerry Carroll.  When was the last time
17  you spoke to him?
18    A  Again, at -- probably at Boudreau's little
19  party.
20    Q  Let me show you what we'll mark as Exhibit
21  No. 2.  This is a -- a photograph Bates numbered
22  Scene -- I'm sorry, City 304.
23      (Kelly Exhibit No. 2 was marked for
24  identification.)

82

1  BY MR. AINSWORTH:
2    Q  All right.  Do you see a -- this is a
3  photograph taken in 1994, and I just want you to
4  take a look at this and see if you can identify
5  any of the people you see in this photograph
6  starting with the -- on the left there's three
7  people over here.
8    A  I'll tell you, it's extremely hard for me
9  to see it.  Can you enlarge it or not?
10    Q  I can try.
11      (Brief pause.)
12  BY MR. AINSWORTH:
13    Q  Starting with the left-hand side of this
14  photo, I might be able to...
15    A  I can see it now fairly well.
16    Q  Okay.  Who are those people on the
17  left-hand side with -- one with the men in what
18  appears to be a green jacket with his back to the
19  camera and then two other individuals.
20    A  I have -- I don't know who has his back to
21  the camera, but that would appear -- that would
22  appear to be Gerry Carroll on the left with a --
23  it looks like a green collar on a dark jacket.
24      And to his right...

83

1    Q  Or it's his left, right?
2    A  Yeah, my -- I'm sorry, my right, his left,
3  I think that's O'Brien.
4    Q  All right.  And now let's just move on
5  over.
6      Do you recognize anyone in this group at
7  the top of the photo by the doorway?
8    A  No, it's -- it's very hard to see.  You're
9  talking about the guy with the cap on in the white
10  shirt?
11    Q  Yeah.
12    A  No, I -- I can't see his face.
13    Q  All right.  And we have a group of people
14  over here.  Can you recognize any of the people in
15  this kind of circle behind the pole?
16    A  That is -- really the only one looking
17  somewhat straight ahead is Bill Foley, got a tan
18  trench coat on and glasses.
19    Q  Can you recognize any of the other
20  individuals in that group?
21    A  No.  Not with certainty, no.
22    Q  Do any of them look familiar to you?
23    A  Not -- yeah, to a degree, yeah, but I
24  can't tell you who they are.

84

1    Q  Well, who looks familiar?
2    A  Well, everyone in a trench coat I presume
3  is the police.  And there's an officer in uniform
4  whose face I can't see.  I presume they all work
5  in Area 1, but I can't tell you who they are.
6    Q  All right.  What about the guy all the way
7  to the right of the photo with a -- what appears
8  to be a clipboard or a pad of paper under his arm?
9    A  If you -- could you -- I don't know
10  without you maybe enlarging it.
11    Q  All right.  Do you see that fellow?
12    A  Yeah.  I don't know who it is.
13    Q  All right.  That was Exhibit 2.
14      Do you have -- when you reviewed the GPR
15  of your -- the GPR of a conversation with Nevest
16  Coleman, did that refresh your recollection about
17  any of the events concerning the murder
18  investigation of Antwinica Bridgeman?
19    A  The -- I recall that the pipe in her
20  vagina was rather unusual.  I do remember that --
21  hearing that somewhere, and that was really all I
22  remember about it.
23    Q  Do you believe that you were present for a
24  conversation with Nevest Coleman?

Transcript of Thomas Kelly
Conducted on July 14, 2020

85

1    A  I was present for a conversation with
2  Nevest Coleman, yes.
3    Q  How do you know that?
4    A  Because I took a GPR with Mr. Coleman,
5  signed my name to the GPR.
6    Q  Who else was present for that
7  conversation?
8    A  Mr. Coleman and myself.
9    Q  How do you -- do you know if anyone else
10 was present?
11   A  For the conversation it was between
12 Mr. Coleman and myself.
13   Q  And how do you know that nobody else was
14 present for that conversation?
15   A  I just know because I would have put down
16 who else was present on the GPR.
17   Q  That was your practice, to write the name
18 of anyone else who was present when you're
19 conducting an interview; is that correct?
20   A  Yes, sir.
21   Q  And the absence of another police
22 officer's name on your GPR suggests to you that
23 you conducted the interview of Nevest Coleman
24 alone, correct?

86

1    A  Yes, sir.
2    Q  And it's fair to say you don't have any
3  independent recollection of that conversation
4  where you can say from memory I was the only
5  person there, you're just relying on your notes;
6  is that right?
7    A  I know what my practice is -- I almost
8  said "was," what my practice -- or, excuse me,
9  what my practice was from my time as a detective.
10   Q  But have you no independent recollection
11 of the conversation with Nevest Coleman; is that
12 right?
13   A  Without referring to that, no.
14   Q  But even when you referred to the GPR,
15 that doesn't let -- allow you to remember what
16 happened, you're just reading off the GPR,
17 correct?
18   A  Correct.
19   Q  You don't remember what Nevest Coleman
20 looked like; is that right?
21   A  No, I don't.
22   Q  Do you recall where that interview took
23 place?
24   A  At 51st and Wentworth on the second floor,

87

1  in a open area on the second floor.
2    Q  How do you know the conversation took
3  place at 51st and Wentworth on the second floor in
4  an open area?
5    A  Because, to the best of my recollection,
6  Mr. Coleman, I believe, was brought in by beat
7  officer or officers, and he was seated at one of
8  the chairs in that area.
9    Q  And do you recall that happening, or is
10 there something that you're using to refresh your
11 recollection?
12   A  That is where I conducted interviews of
13 witnesses.
14   Q  I understand that, sir.  I'm trying to
15 find out if you recall Nevest Coleman actually
16 sitting in one of those chairs or you're just
17 presuming because that's where you would typically
18 conduct interviews of witnesses?
19   A  The latter.  I'm presuming that's where I
20 would conduct witness interviews.
21   Q  So you don't actually know where the
22 conversation with Nevest Coleman took place; is
23 that correct?
24   A  No.

88

1    Q  And, sir, during this deposition, at
2  certain times you've had a mask on and certain
3  times you've had a mask off.  And, you know,
4  whatever suits your personal comfort is fine by
5  us.  I just want to make sure there's nothing
6  about either the wearing of the mask or not
7  wearing the mask that affects your ability to
8  testify truthfully and accurately here today; is
9  that right?
10   A  It has a tendency to fog up my glasses.
11   Q  But it doesn't affect your ability to
12 testify truthfully --
13   A  No, it does not.  No, sir.
14   Q  Thank you, sir.
15      All right.  Okay.  In 1994 who was your
16 partner?
17   A  I think it was Rich Paladino.
18   Q  Do you know if Rich Paladino was working
19 on April 28, 1994 when you -- when you created the
20 GPR about your conversation with Nevest Coleman?
21   A  No, I don't.
22   Q  What watch were you working in April 1994?
23   A  Third watch afternoons.
24   Q  What time would you typically arrive for

Transcript of Thomas Kelly
Conducted on July 14, 2020

89

1   your watch?
2       A   4:30.
3       Q   Is that the time that your watch would
4   begin?
5       A   Yes, sir.
6       Q   And when did your watch end?
7       A   1:00.  1:00 a.m.
8       Q   And would you get there a little earlier
9   to change and get ready for work, or would you
10  just arrive at 4:30?
11      A   I'd arrive raring to go, sir.  I -- there
12  was no changing.
13      Q   All right.  So you would get there at 4:30
14  when were you supposed to be there, right?
15      A   Or a little bit earlier, depending upon
16  traffic.
17      Q   All right.  Do you recall anything about
18  April 28, 1994?
19      A   No, sir.
20      Q   You mentioned learning about a woman who
21  had a pipe in her vagina.  Did you learn that on
22  the day that the pipe was discovered in the
23  victim's vagina?
24      A   Probably not.

90

1       Q   Why do you say "probably not"?
2       A   I just don't recall knowing anything about
3   it for several days.
4       Q   How did you learn about a victim having a
5   pipe in her vagina?
6       A   I'm sure it was just a conversation at
7   work.
8       Q   Were you at the scene where a victim was
9   discovered about with a pipe in her vagina?
10      A   No, I was not at the scene.  No, sir.
11      Q   Had you recovered decomposing bodies
12  before -- or strike that.
13          In your career as a Chicago police
14  detective, have you been at the scene where a
15  decomposing body was found?
16      A   Yes.
17      Q   How many times has that happened?
18      A   I can't tell you.  I don't know.  More
19  than ten, I would imagine.
20      Q   Did you recover any -- were you at the
21  scene of any decomposing bodies on Garfield
22  Boulevard?
23      A   Ever?
24      Q   Yes.

91

1       A   I don't recall -- I don't know.
2       Q   Do you know why it was that you were
3   speaking to Nevest Coleman on April 28, 1994?
4       A   Yes, sir.
5       Q   Why is that?
6       A   He was a witness, an outcry witness to
7   discovery of the deceased.
8       Q   And what about Nevest Coleman being an
9   outcry witness to the discovery of a body means
10  that you were the one to question him?
11      A   You lost me there.  I'm sorry.
12      Q   Sure.  Do you know why it was you who was
13  questioning Nevest Coleman as opposed to somebody
14  else or another detective?
15      A   I believe I was in the office at the area
16  at the time.  I think a supervisor probably told
17  me to interview him.
18      Q   Why do you believe -- or what do you base
19  your belief that you're in the office at the time
20  on?
21      A   Because that's where the interview took
22  place.
23      Q   All right.  But there's nothing else that
24  suggests to you that you were in the office at the

92

1   time that you were asked to speak to Nevest
2   Coleman; is that right?
3       A   Correct.
4       Q   And do you have any recollection of anyone
5   asking you to speak to Nevest Coleman?
6       A   Not specifically, no.
7       Q   Do you know if it was a supervisor or a
8   fellow detective who asked you to speak to Nevest
9   Coleman?
10      A   No, I don't recall.
11      Q   Did you -- how late did you work that
12  evening?
13      A   I don't think I worked overtime.  I think
14  just a normal tour of duty.
15      Q   Why do you -- why do you not think you
16  worked overtime that day?
17      A   I just don't think I did.
18      Q   When you filled out supp reports as a
19  detective in around 1994, how would you determine
20  which detectives to include as assigned detectives
21  to the case?
22      A   We always -- whoever either had the
23  initial assignment, they were referred to as the
24  paper car and anyone else who came out to lend a

Transcript of Thomas Kelly
Conducted on July 14, 2020

93

1  hand.
2      Q  And what does coming out to lend a hand
3  mean?  Like interviewing witnesses, for example?
4      A  Yes.
5      Q  So in 1994 would you have included
6  yourself in a supp report as an assigned detective
7  because you interviewed Nevest Coleman?
8      A  If I was doing the supp?
9      Q  Yeah.
10      A  Yes, I would.
11      Q  Any reason to leave you off the supp
12  report?
13      A  Would I leave my own self off of a supp
14  report after I --
15      Q  Well, let's put it differently.  That's a
16  poorly worded question, and you were right to
17  point it out to me.  I appreciate that.
18          Do you know why you're not mentioned in
19  Foley and Clancy's supp report regarding the
20  investigation that led to the arrest and
21  prosecution of Nevest Coleman?
22          MR. GRILL:  Objection; form, foundation.
23  BY THE WITNESS:
24      A  No, I don't.

94

1  BY MR. AINSWORTH:
2      Q  When you were a detective back in 1994,
3  would you sometimes fill out arrest reports?
4      A  Yes, sir.
5      Q  And how would you determine which officers
6  to include as arresting officers on an arrest
7  report?
8      A  Any officers who were physically present I
9  would put down on the arrest report and possibly
10  officers who would -- assisted in various portions
11  of the investigation I might put down on the
12  arrest report as assisting.
13      Q  Why would you include officers who weren't
14  present for the arrest of an individual as
15  assisting arresting officers?
16      A  Why not?  It would be in the body of the
17  arrest report.
18      Q  It would -- but you would note it on the
19  arrest report, right?
20      A  I would put assisting officers, yes, in
21  the --
22      Q  Did you --
23      A  -- body...
24          (Reporter clarification.)

95

1  BY THE WITNESS:
2      A  In the body of the arrest report.
3  BY MR. AINSWORTH:
4      Q  Okay.  And did you want the arresting
5  officers to get credit for the arrest even though
6  they weren't present for the arrest?
7          MR. GRILL:  Objection; form.
8  BY THE WITNESS:
9      A  They would certainly get credit, yes.
10  BY MR. AINSWORTH:
11      Q  And that was one of the ways to measure
12  the productivity of a police officer was to show
13  how many arrests were made, right?
14      A  I have no idea.
15          MS. MEADOR:  Objection; foundation.
16  BY MR. AINSWORTH:
17      Q  Why did you want officers who weren't
18  present for an arrest to get credit?
19          MR. GRILL:  Objection; form.
20  BY THE WITNESS:
21      A  To show that they had participated in the
22  investigation.
23  BY MR. AINSWORTH:
24      Q  Why did you want to show that they

96

1  participated in the investigation?
2      A  To thank them for their help.
3      Q  So that was your way of thanking them, by
4  including them on the arrest report; is that -- is
5  that fair to say?
6      A  It's fair to say, if they participated in
7  the investigation.
8      Q  Right.  And that you included them, their
9  name, as an assisting arresting officer even if
10  they weren't present as a way of thanking them; is
11  that what you're saying?
12      A  Yes.
13      Q  Were you trained to thank officers by
14  including on an arrest report, signed under
15  penalty of perjury, that they were the assisting
16  arresting officers even though they weren't
17  present for the arrest?
18          MS. MEADOR:  Objection; form.
19          MR. GRILL:  Join.
20  BY MR. AINSWORTH:
21      Q  Or is that something that you would just
22  do?
23      A  Something I would do.
24      Q  Do you know other police officers to do

Transcript of Thomas Kelly
Conducted on July 14, 2020

25 (97 to 100)

97

1 that, to do the same thing, where they would
2 include officers who weren't present for the
3 arrest on an arrest report as a means of thanking
4 those officers?
5    **A  I have no idea, sir.**
6    Q  Have you heard of that before, where
7 people would include officers who weren't present
8 for the physical arrest of a suspect as assisting
9 arresting officers on the arrest report?
10   **A  I don't know.**
11   Q  Did your partner ever do that, either
12 Paladino or Riley?
13   **A  I don't know.**
14   Q  Or Jim Ward?
15   **A  I don't know.**
16   Q  Well, when you're -- sometimes you would
17 fill out the arrest reports, right?
18   **A  Yes, sir.**
19   Q  And sometimes your partner would fill out
20 the arrest report, correct?
21   **A  Yes, sir.**
22   Q  And you would ensure that the arrest
23 report was accurate before you signed it, correct?
24   **A  Yes.**

98

1    Q  And so in all the years that you were a
2 detective for 22 years, did one of your partners
3 include on an arrest report the presence of
4 officers who weren't physically present for arrest
5 but include them as assisting arresting officers
6 on the arrest report?
7    **A  I don't know.**
8    Q  You didn't -- you're -- you were reviewing
9 it for accuracy, as you said, right, but you
10 weren't paying attention to whether --
11      (Reporter clarification.)
12 BY MR. AINSWORTH:
13   Q  And so even though you were reviewing the
14 arrest -- arrest reports for accuracy, you weren't
15 looking to see if the officers named as assisting
16 arresting officers were present at the scene or
17 not; is that right?
18   **A  That's correct.**
19   Q  Let me -- I'm going to show you what we'll
20 mark as Exhibit No. 3.
21      (Kelly Exhibit No. 3 was marked for
22 identification.)
23      MR. AINSWORTH:  And this is a -- all
24 right.  This document is Bates numbered RFC129

99

1 through RFC132.
2      MR. GRILL:  Hey, Russell?
3      MR. AINSWORTH:  Yes, sir.
4      MR. GRILL:  Would this be an all right
5 time to take a -- I need a bathroom break if we
6 could.  Would this be an appropriate time?  If
7 you've got some more questions that you can flip
8 through quickly, I can hold it, but --
9      MR. AINSWORTH:  Sure.  And then -- and
10 then we'll break.
11 BY MR. AINSWORTH:
12   Q  I just wanted to ask you, sir, have you
13 seen this document before, Exhibit No. 3?
14   **A  Yes, sir.**
15   Q  All right.  When have you seen this
16 document?
17   **A  On the 28th of April, 1994.**
18   Q  Okay.  Have you seen it since then?
19   **A  Now I -- no, not until now.**
20   Q  Okay.  Is that your writing on the -- on
21 Page 1 of Exhibit No. 3?
22   **A  Yes, sir.**
23   Q  All right.  And that's your name,
24 Detective T. Kelly?

100

1    **A  Yes, sir.**
2    Q  All right.  Do you know why you filled out
3 this request for identification records?
4    **A  It was a request for a criminal history of**
5 **Michael Barber.**
6    Q  Do you know why you filled out this
7 request for criminal history for Michael Barber?
8    **A  Not really.  At this time, no, I don't.**
9    Q  And did you get it -- is -- the signature
10 of the sergeant, did you obtain that signature?
11   **A  Yes.**
12   Q  And would that -- who signed that?
13   **A  Sergeant Ridges.**
14   Q  Jack Ridges?
15   **A  Yes.**
16   Q  All right.  And then we have a few more of
17 these.  There's -- Page 2 is a request for Nevest
18 Coleman's criminal history report; do you see
19 that?
20   **A  Yes, sir.**
21   Q  And that's your handwriting, as well; is
22 that correct?
23   **A  Yes, sir.**
24   Q  And then we've got a criminal history

Transcript of Thomas Kelly
Conducted on July 14, 2020

26 (101 to 104)

101

1  report request for Miguel Coleman; do you see
2  that?
3      **A  Yes, sir.**
4      Q  That's your handwriting, as well?
5      **A  Yes, sir.**
6      Q  And then a criminal history report request
7  for Louis Coleman, Jr.; do you see that?
8      **A  Yes, sir, I see it.**
9      Q  All right.  So --
10      MR. AINSWORTH:  All right.  Why don't we
11  take a break, and then we'll continue on.
12      (Short recess.)
13      MR. AINSWORTH:  Let's go back on the
14  record.
15  BY MR. AINSWORTH:
16      Q  All right, sir.  So when we broke, we were
17  talking about Exhibit No. 3, which was the request
18  for criminal histories for four different
19  individuals.
20      Do you know why you were the particular
21  detective who requested those criminal histories?
22      **A  I had asked Mr. Coleman who he resided**
23  **with.  He told me.  And I wanted to see if any of**
24  **those persons had a criminal history.**

102

1      Q  All right.  Are you speculating about what
2  you did, or do you recall Mr. Coleman telling you
3  who he resided with and then you thinking, ooh,
4  I'd like to get -- find out what criminal records
5  those people have?
6      **A  I read the GPR, and I asked Mr. Coleman**
7  **who he resided with.**
8      Q  And so just to be really clear, Mr. Kelly,
9  the -- what I'm getting is at do you have a
10  recollection of actually thinking, oh, that's
11  interesting what -- the information Nevest is
12  giving me, I'd like to know what their criminal
13  backgrounds are; or are you reading the GPR and
14  then speculating that at the time you asked for
15  the criminal history reports because Nevest gave
16  you that information?
17      **A  It's because I read the GPR.**
18      Q  All right.  So you're just -- you're
19  basing it on like filling in the gaps based on
20  your reading of the GPR now; is that right?
21      **A  I don't recall.**
22      Q  And I guess that's my -- my question.
23      Do you have any recollection of actually
24  requesting the criminal history reports?

103

1      **A  No.**
2      Q  Do you have any recollection of the
3  circumstances surrounding you asking for those
4  criminal history reports?
5      **A  It was my practice to attempt to find if**
6  **any criminal histories existed.**
7      Q  All right.  I understand that it's your
8  practice, but do you have any specific
9  recollection of this -- these four requests for
10  criminal histories, the circumstances that led to
11  them?
12      **A  No.**
13      Q  Do you know if you did it on your own or
14  somebody else asked you to request them?
15      **A  I don't specifically recall.**
16      Q  Do you know what -- at what point during
17  your shift that you requested the criminal history
18  reports?
19      **A  No, I don't.**
20      MR. AINSWORTH:  I'm going to -- let's mark
21  as Exhibit No. 4 the GPR that you created.  I'm
22  going to share that with you.
23      (Kelly Exhibit No. 4 was marked for
24  identification.)

104

1  BY MR. AINSWORTH:
2      Q  All right.  So, sir, do you see this
3  document, first off, it's dated April 28; do you
4  see that?
5      **A  Yes, sir.**
6      Q  Or sorry.  I highlighted the wrong thing.
7  Let me fix that.
8      It's dated, third watch, April 28, 1994,
9  correct?
10      **A  Yes, sir.**
11      Q  And third watch is the watch that you
12  would work that you called "afternoons"; is that
13  right?
14      **A  Yes, sir.**
15      Q  And is it your handwriting that appears in
16  this GPR?
17      **A  Yes, sir.**
18      Q  What is a GPR?
19      **A  General progress report.**
20      Q  What's the purpose of a general progress
21  report?
22      **A  Note taking, basically.**
23      Q  So when you spoke to Nevest Coleman, he
24  provided you with his name and his date of birth,

Transcript of Thomas Kelly
Conducted on July 14, 2020

27 (105 to 108)

105
1  right?
2      A  Yes.
3      Q  His address and his phone number, correct?
4      A  Yes.
5      Q  His employer and told you how to contact
6  him at Comiskey Park by asking for the ground
7  crew; is that right?
8      A  Yes, sir.
9      Q  And he provided you with the location of
10  Comiskey Park, right?
11      A  Yes, sir.
12      Q  And he gave you his social security
13  number, right?
14      A  Yes, sir.
15      Q  And then -- I just want to confirm that
16  I'm able -- you have good handwriting, given all
17  the different types of handwriting we see, but I
18  just want to make sure that I'm reading this
19  correctly.  So I'm going to read it to you and ask
20  you if I've -- if I've got it right.
21      So the first line of the narrative portion
22  reads:  "We thought we smelled something several
23  days ago"; is that correct?
24      A  Yes, sir.

106
1      Q  And then it reads:  "On today's date my
2  mother" -- what is that word?
3      A  "Asked."
4      Q  "Asked me to check the basement to see if
5  there was a dead cat or dog in the basement"; is
6  that correct?
7      A  Yes, sir.
8      Q  "Me and Mike tried to open the back door
9  to the basement, and we couldn't push the door
10  open, felt like there was something behind the
11  door.
12      "We went and got batteries for our
13  flashlight, and Mike looked in the window and saw
14  the body."
15      Did I read that correctly?
16      A  Yes, sir.
17      Q  "We went upstairs and told my mother.  She
18  called the police."
19      Did I read that correctly?
20      A  Yes, sir.
21      Q  And it says:  "I live with my mother,
22  Cecelia Coleman; father, Louis Coleman; brother,
23  Miguel Coleman, 23 years on the first floor of 917
24  West 55th Street."

107
1      Did I read that correctly?
2      A  Yes, sir.
3      Q  And then it says:  "On the second floor my
4  sister, Jennice Coleman, and another brother,
5  Louis Coleman, Jr., a/k/a Tony."
6      Did I read that correctly?
7      A  Yes, sir.
8      Q  And then your signature appears in the
9  bottom left-hand corner; is that right?
10      A  Yes, sir.
11      Q  Did Sergeant Benoit sign it in the
12  supervisor box?
13      A  Yes, sir.
14      Q  What did you do with this document, the
15  GPR, after you created it?
16      A  Gave it to the sergeant.
17      Q  All right.  Which sergeant did you give it
18  to?
19      A  I don't recall.
20      Q  Why did you give it to the sergeant?
21      A  So that he could give it to Foley and
22  Clancy.
23      Q  Why didn't you give it to Foley and
24  Clancy?

108
1      A  I don't believe they were in.
2      Q  Do you have any recollection about whether
3  you gave it to the sergeant or you gave it to
4  Foley or Clancy?
5      A  No.
6      Q  So why did you say you believe you gave
7  it -- you didn't believe Foley and Clancy were in?
8      A  My standard procedure would be to give it
9  to the sergeant.
10      Q  Okay.  Do you have any recollection, one
11  way or the other, whether Foley or Clancy were
12  there when you turned in this report?
13      A  No.
14      Q  And so what was your belief that they
15  weren't there at the station based on?
16      A  I don't know.
17      (Kelly Exhibit No. 5 was marked for
18  identification.)
19  BY MR. AINSWORTH:
20      Q  All right.  I'd like to -- I'm going to
21  mark as Exhibit 5 the large exhibit that's Bates
22  numbered RFC1 through 200.  I'm going to share
23  that with you.
24      I'll represent to you this is the

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

109

1  investigative file, and I'm going to skip ahead to
2  144 -- RFC144. That's typewritten, so I don't
3  have to ask you about that one, but I do want to
4  ask you about some of these others.
5      Do you recognize the handwriting on this
6  GPR Bates numbered RFC151 from Exhibit 4 [sic]?
7      **A This Latoya Davis?**
8      Q Yes.
9      **A No, I don't.**
10     Q Do you know if it's Clancy's handwriting?
11     **A I don't know.**
12     Q All right. How about RFC152? Do you
13  recognize that handwriting?
14     **A No, I don't.**
15     Q All right. Let's go to -- all right.
16  17- -- RFC172. Do you recognize the handwriting
17  on this page?
18     **A No, I don't.**
19     Q Do you recognize it to be Bill Foley's?
20     **A No, I don't.**
21     Q All right. How about Page 1 -- RFC173?
22     **A No, I don't recognize the handwriting.**
23     Q Do you recognize the handwriting at
24  RFC174?

---

110

1      **A No, I don't.**
2      Q And same question for RFC175?
3      **A No, I don't.**
4      Q Do you recognize the handwriting on
5  RFC176?
6      **A No, I don't.**
7      Q Do you recognize the handwriting on
8  RFC177?
9      **A No, I don't.**
10     Q Do you recognize the handwriting on
11  RFC178?
12     **A No, I don't.**
13     Q Do you recognize the handwriting on
14  RFC179?
15     **A No, I don't.**
16     Q Do you recognize the handwriting on
17  RFC180?
18     **A No, I don't.**
19     Q Do you recognize -- oh, this is you,
20  right?
21     **A Yes, it is.**
22     Q All right. See how much neater your's
23  is -- neater yours is than the others? It's
24  pretty good. All right.

---

111

1      Let's look --
2      MR. GRILL: Objection.
3  BY MR. AINSWORTH:
4      Q -- at RFC182.
5      Do you recognize the handwriting on this
6  one?
7      **A No, I don't.**
8      Q Do you know whose signature that is down
9  in the bottom left corner on this one?
10     **A Can you make it bigger?**
11     Q Yes, I can.
12     **A I recognize the name "Golubiak."**
13     Q All right. Can you describe Golubiak's
14  appearance back in 1994?
15     **A Six-one, six-two, good shape. He was a**
16  **runner, kind of brownish hair.**
17     Q Did he have glasses?
18     **A I don't recall.**
19     Q Facial hair?
20     **A Not that I recall, but I'm not sure.**
21     Q What kind of build did he have? He was a
22  runner?
23     **A Lean build.**
24     Q So of all the detectives that you

---

112

1  described to me the tallest one was O'Brien; is
2  that fair to say? He was the only one who was
3  six-three or higher? Six-three? Six-four, right?
4      **A Yes, sir.**
5      Q All right. So then I'm showing you --
6  let's do a -- 183.
7      Is that -- do you recognize that
8  handwriting on 183?
9      **A No, sir, I don't.**
10     Q Do you know whose signature that is on --
11  on this page in the bottom left-hand corner?
12     **A If you can enlarge it, I might be able to**
13  **tell.**
14     (Brief pause.)
15  BY THE WITNESS:
16     **A Harrison.**
17  BY MR. AINSWORTH:
18     Q What was Harrison's first name?
19     **A Patricia.**
20     Q All right. 184, do you recognize that
21  handwriting?
22     **A No, I don't.**
23     Q Do you recognize it to be Graf's
24  handwriting?

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

29 (113 to 116)

113

1    **A  You're going to have to do -- go down**
2 **again.**
3    Q  You mean to look at the signature?  I'm
4 just --
5    (Simultaneous crosstalk.)
6 BY MR. AINSWORTH:
7    Q  -- talking about the handwriting.
8    **A  No, I don't recognize the handwriting.**
9    Q  Do you recognize the handwriting on 185?
10   **A  No, I don't.**
11   Q  Do you recognize the handwriting on 186?
12   **A  No, I don't.**
13   Q  Do you recognize the handwriting on 187?
14   **A  No, I don't.**
15   Q  Do you recognize the handwriting on 188?
16   **A  No, I don't.**
17   Q  Do you recognize the handwriting on 189?
18   **A  No, I don't.**
19   Q  Do you recognize the handwriting on 190?
20   **A  No, I don't.**
21   Q  Do you recognize the handwriting on 191?
22   **A  No, I don't.**
23   Q  Do you recognize the handwriting on 192?
24   **A  No, I don't.**

114

1    Q  And do you recognize the handwriting on
2 193?
3    **A  No, I don't.**
4    Q  Do you recognize the handwriting on 195?
5    **A  No, I don't.**
6    Q  And I think that's it.  All right.
7    Prior to today had you heard -- had you
8 seen any of the exhibits -- or any of those GPRs
9 that we just showed you apart from the one with
10 your handwriting on it?
11   **A  No, sir.**
12   Q  I'm going to --
13   MR. AINSWORTH:  That was Exhibit 5,
14 correct, Counsel?
15   MR. GRILL:  You're asking me?
16   MR. AINSWORTH:  Yeah, anyone.
17   MR. ADELMAN:  Yes.
18   MR. AINSWORTH:  Yes.
19 BY MR. AINSWORTH:
20   Q  I mistakenly referred to it as Exhibit 4
21 when I was going through at one point.  I just
22 want it to be clear that I was showing the witness
23 Exhibit No. 5.
24   MR. GRILL:  That --

115

1    MR. AINSWORTH:  Excuse me.
2    MR. GRILL:  Yeah, you were just -- I was
3 just going to help you clarify that it's excerpts
4 from RFC1 through 200, right?
5    MR. AINSWORTH:  That's correct, which
6 we've marked as Exhibit No. 5.  Okay.
7    (Kelly Exhibit No. 6 was marked for
8 identification.)
9 BY MR. AINSWORTH:
10   Q  Now I'd like to show you what we've
11 marked -- what we'll mark as Exhibit No. 6.  So
12 I'll share it with you, and then I'll read the
13 Bates numbers for everybody playing along at home.
14   This is -- the document is labeled "Supp
15 Report," and then RFC80 to 96.
16   Sir, have you reviewed this document,
17 the -- the scene supp and CLEAR supp for Nevest
18 Coleman and Derrell Fulton?
19   **A  No, sir.**
20   Q  All right.  I'm going to just show you
21 portions of the narrative section of this report,
22 although you're entitled and welcome to read as
23 much of this report as you'd like, to see if it
24 refreshes your recollections of any of the events

116

1 described within this report.  Okay?
2    **A  Yes.**
3    Q  Is that all right with you?
4    **A  Sure.**
5    Q  I'm going to show you on Page RFC82 of the
6 document it lists some of the arresting officers
7 there, and then it scrolls down to the next page
8 and lists additional arresting officers and shows
9 the time, date, and location of arrest for Coleman
10 and Fulton.
11   It shows the charges for Coleman and
12 Fulton.  It describes the injuries to Coleman and
13 Fulton -- sorry, injuries to the victim.  My
14 apologies.
15   MS. MEADOR:  I had just taken my mute off,
16 Russell.
17   MR. AINSWORTH:  I -- I feel your pain.
18 BY MR. AINSWORTH:
19   Q  All right.  And then I'm going to scroll
20 down to the narrative section, unless you'd like
21 to look at other portions of the preliminary part
22 of this report.
23   **A  No.  Go right ahead.**
24   Q  All right.  So you're listed as a -- as a

Transcript of Thomas Kelly
Conducted on July 14, 2020

117

1 personnel assigned to the -- to the case. Do you
2 see that on Page 84 of Exhibit No. 6?
3    A  Yes.
4    Q  All right.  Is this large enough for you
5 to read, sir?
6    A  Yes, sir, it is.
7    Q  All right.  Would you kindly read through
8 this narrative portion of this report and tell me
9 if it refreshes your recollection as to any of the
10 events that are described either here or events
11 that we've talked about previously in this
12 deposition, such as the GPR that's -- the
13 interview you had with Nevest Coleman?  And just
14 let me know when you're done with the paragraph,
15 and then I'll move it down.
16    (Brief pause.)
17    THE WITNESS:  You could move it down.
18    MR. AINSWORTH:  And take your time.
19 Nobody is going to judge you on your speed of
20 reading.
21    (Witness peruses document.)
22 BY THE WITNESS:
23    A  You can go on, sir, please.  You can go
24 down.

118

1    If you can go down, sir -- oh, wait.  Go
2 ahead, sir.  Go ahead.  You can go down, sir.  You
3 can go down, sir.
4 BY MR. AINSWORTH:
5    Q  Is that good?
6    A  Yeah.  That's fine.  Thank you.
7    (Witness peruses document.)
8 BY THE WITNESS:
9    A  You can go down.  You can go down, sir.
10 You can go down, sir.  You can go down.
11 BY MR. AINSWORTH:
12    Q  To the next paragraph?
13    A  Yeah, I'm done.  You can go to 11, Page 11
14 I believe it is.
15    (Witness peruses document.)
16 BY THE WITNESS:
17    A  You can go down, sir.  You can go down,
18 sir.  You can go down.  Go down, sir.  You can go
19 down.  You can go down, sir.
20 You can go down.  You can go down.  You can go
21 down, sir.  You can go down.  You can go down.
22    Go down, sir.  Last page.
23 BY MR. AINSWORTH:
24    Q  Last page?

119

1    A  You can go a little further.  That's fine.
2    (Witness peruses document.)
3 BY THE WITNESS:
4    A  Okay.
5 BY MR. AINSWORTH:
6    Q  All right.  So I've asked you to read from
7 pages -- page -- the narrative portion's report,
8 which spanned Pages 7 through 16 of this report.
9    And you've had an opportunity to read
10 that; is that correct?
11    A  Yes, sir.
12    Q  Did reading those -- reading those
13 portions of this report that you did, did that
14 refresh your recollection at all of anything about
15 the Antwinica Bridgeman investigation?
16    A  No.
17    Q  Did it refresh your recollection at all of
18 your conversation with Nevest Coleman?
19    A  No.
20    Q  Did it refresh your recollection of
21 ordering the criminal history reports that you
22 ordered?
23    A  No.
24    Q  Did it refresh your recollection as to any

120

1 of the questions that I've asked you thus far that
2 you did not recall was your answer?
3    A  No, sir.
4    Q  Now, you spent 22 years in homi- -- in
5 violent crimes, correct?
6    A  Yes, sir.
7    Q  All right.  I want to ask you about on --
8 on Page 12 do you see where Nevest Coleman has
9 been questioned by the police and says that he saw
10 the victim and Chip and Dap talking to the victim
11 in the alley behind his house.  He went on to say
12 he saw the victim and Chip and Dap go into his
13 basement.
14    He stated that after a short time he went
15 to the basement door and observed the victim
16 orally copulating Chip, and she was also engaged
17 with Dap in anal intercourse.
18    He then went on to say that he became
19 frightened and ran his into apartment one floor
20 above the crime scene where he remained for the
21 rest of the night.
22    Do you see that, sir?
23    A  Yes, I see it.
24    Q  Okay.  And then in the -- further down in

Transcript of Thomas Kelly
Conducted on July 14, 2020

121

1  the report it says that Coleman then said he
2  wanted to tell the entire truth.
3      And then he says that the version he just
4  provided about seeing Dap and Chip with the victim
5  and him running away wasn't true?
6      And then he goes on to detail his -- his
7  confession to the murder in the following
8  paragraphs of this report; is that a fair summary?
9    **A  Yes, sir.**
10   Q  All right.  But before he tells the truth,
11 according to the report, he, Nevest Coleman,
12 provides a story where he sees Chip and Dap with
13 the victim in the alley behind his house.
14     He looks -- he -- from the basement door,
15 in April, he observes the victim orally copulating
16 Chip and engaging in sex with Dap and that he
17 becomes frightened and runs away.  Okay.
18     I'm just laying that as foundation because
19 I want to then ask you about at the bottom of
20 Page 14 of this report, the report reads that,
21 according to Derrell Fulton, he observed Chip and
22 Nevest and the victim go into the basement and
23 that he went down into the basement and while --
24 or sorry.  While he was standing in the basement

122

1  doorway, he observed the victim orally copulating
2  Chip, and Nevest Coleman was having vaginal
3  intercourse with the victim.
4      He then went on to say that Chip and
5  Nevest Coleman turned towards Fulton and saw that
6  Fulton was standing in the doorway.  Fulton went
7  on to say that he then panicked and ran away from
8  the scene and went home.
9      And then, on the following page, it then
10 says that -- Fulton then says, well, that's not
11 what happened.  And then he goes on to provide
12 his -- he then provides his confession of what
13 actually happened according to the report; is that
14 a fair statement?
15   **A  Yes.**
16   Q  So as an experienced homicide detective,
17 sir, would you be curious to know why both Nevest
18 Coleman and Darrell Fulton are saying -- are
19 providing a story to the police in which each of
20 them stands in the basement -- in the door to the
21 basement and sees the other, along with a third
22 individual, having sex with the victim in a very
23 similar way, where the victim is orally copulating
24 one man, while the other has either vaginal or

123

1  anal sex with -- with her and then becomes scared,
2  runs from the doorway, and runs home.
3      Would you, as an experienced detective,
4  want to know why both Derrell Fulton and Nevest
5  Coleman are telling the same lie during the course
6  of their interrogation?
7      MR. GRILL:  Objection; form, foundation,
8  incomplete hypothetical, and calls for
9  speculation.
10     MR. ADELMAN:  Join.
11     MS. MEADOR:  Join.
12 BY MR. AINSWORTH:
13   Q  You can answer, sir.
14   **A  Sir, I have no idea of any of the**
15 **investigation.**
16   Q  I understand that, sir.  That's why I'm
17 coming to you kind of as, you know, somebody who
18 brings 22 years of homicide investigation
19 experience plus another 18 years of policing to
20 bear on this question.
21     And so, based on your experience, as an
22 experienced Chicago police detective, wouldn't you
23 want to know why both Nevest Coleman and Derrell
24 Fulton are telling very similar lies during the

124

1  course of their separate interrogations?
2      MR. GRILL:  Same objection; incomplete
3  hypothetical, calls for speculation, form,
4  foundation.
5      MS. MEADOR:  Join.
6      MR. ADELMAN:  Join.
7  BY THE WITNESS:
8    **A  Sir, that's hypothetical, and I'm not**
9  **going to speculate.**
10 BY MR. AINSWORTH:
11   Q  Oh, I'm not asking you to speculate, sir.
12 I'm asking what you would do, based on your
13 training and experience, okay?  And I'm asking
14 you, based on your training and experience, if you
15 received the information documented in Exhibit
16 No. 6 that I've just pointed to you, would you
17 follow up with the suspects and ask them why they
18 were providing those particular lies?
19     MR. GRILL:  Same objection; still calls
20 for speculation.  It's an incomplete hypothetical,
21 form, and foundation.
22     MR. ADELMAN:  Join.
23     MS. MEADOR:  Join.
24

Transcript of Thomas Kelly
Conducted on July 14, 2020

125

1  BY THE WITNESS:
2      A  Sir, I could give you the same answer if
3  you want me to repeat it.
4  BY MR. AINSWORTH:
5      Q  No.  What I'm looking for, sir, is -- is
6  what you would do as an experienced police
7  detective?
8          MR. GRILL:  Still calls for speculation,
9  and it's an incomplete hypothetical, form, and
10 foundation.
11         MR. AINSWORTH:  And there's --
12         MS. MEADOR:  Join.
13         MR. ADELMAN:  Join.
14         MR. AINSWORTH:  There's nothing improper
15 by asking the question during discovery.
16         MR. GRILL:  I'm not saying there's
17 anything improper -- well, I'm -- let me take that
18 back.
19         I'm not saying you can't ask the question.
20 I'm saying that your question is -- calls him,
21 regardless, to speculate, and it's an incomplete
22 hypothetical.  You know he wasn't -- well, I won't
23 speak.  That's my objection.  You can keep going
24 around.

126

1  BY MR. AINSWORTH:
2      Q  You can answer it, sir.
3      A  Sir, it's a hypothetical situation, and I
4  do not want to speculate on it.
5      Q  Why, sir?  Why?
6      A  Because I don't speculate, sir.
7      Q  Well, sir, earlier today you told me,
8  under oath, in response to one of my questions,
9  that you talked to Nevest Coleman in the open area
10 on the second floor of 51st and Wentworth.  Do you
11 recall the answer to that question?
12     A  Yes, I do.
13     Q  All right.  Not having any recollection of
14 meeting Nevest Coleman or knowing where he was,
15 you speculated, based on the contents of your GPR,
16 that you spoke to him in the open area on the
17 second floor of 51st and Wentworth, correct?
18         MR. GRILL:  Object --
19         MS. MEADOR:  Objection; mischaracterizes
20 the witness's testimony.
21         MR. ADELMAN:  Join --
22         MR. GRILL:  Go ahead.
23         (Reporter clarification.)
24         MR. GRILL:  I'm just going to join that

127

1  objection.
2          MR. ADELMAN:  And I'll join that as well.
3  BY MR. AINSWORTH:
4      Q  Can you answer the question, sir?
5          MR. GRILL:  Do you remember the question?
6  BY THE WITNESS:
7      A  I don't remember the question, sir.
8  BY MR. AINSWORTH:
9      Q  All right.  So my question was that
10 when -- earlier in this deposition you told me
11 that you were on the second floor talking to
12 Nevest Coleman in the open area of 51st and
13 Wentworth when you had no recollection of actually
14 speaking to Nevest Coleman, right?
15         MR. GRILL:  Objection; mischaracterizes
16 his testimony.
17         MS. MEADOR:  Join.
18 BY MR. AINSWORTH:
19     Q  Can you answer the question, sir?
20     A  Did I tell you that before?  Yes, I did.
21     Q  All right.  And so I'm simply asking what
22 was your practice, sir, if witnesses told you --
23 or strike that.
24         If two suspects in a criminal

128

1  investigation told you inconsistent versions of
2  events, would you follow up with each to find out
3  which one was true and which one was false or if
4  both were false?
5      A  Again, sir, it's a hypothetical.
6      Q  And so what?
7          MR. GRILL:  Objection; form.
8  BY MR. AINSWORTH:
9      Q  What would you do, as a -- as a 22-year
10 experienced violent crimes detective?
11     A  Sir, it's a hypothetical, and I don't care
12 to speculate on it.
13     Q  Well, why not, sir?
14         MR. GRILL:  Objection; argumentative.
15         MR. ADELMAN:  Join.
16 BY MR. AINSWORTH:
17     Q  Why don't you care to speculate?
18     A  I don't like to --
19         MR. GRILL:  Same objection --
20         MS. MEADOR:  I'm going to --
21         MR. GRILL:  -- argumentative.  Go ahead.
22         MS. MEADOR:  I'm just going to object that
23 he answered your question, Russell.
24         MR. AINSWORTH:  Do not -- do not make

Transcript of Thomas Kelly
Conducted on July 14, 2020

33 (129 to 132)

129

1  those objections, Lisa.  Thank you very much.
2  BY MR. AINSWORTH:
3     Q  What --
4        MS. MEADOR:  My objection is asked and
5  answered.  It's a proper objection, Russell.  You
6  just don't like his answer.
7        MR. AINSWORTH:  No.
8  BY MR. AINSWORTH:
9     Q  Why don't you like to speculate,
10 Mr. Kelly?
11       MS. MEADOR:  Asked and answered.
12       MR. GRILL:  Join.
13 BY MR. AINSWORTH:
14    Q  You can answer, sir.
15       MR. GRILL:  What's the question?
16 BY MR. AINSWORTH:
17    Q  Why don't you like to speculate, sir?
18       MS. MEADOR:  Same objection.
19       MR. GRILL:  Oh, well, that's -- that's
20 asked and answered -- form.  It's asked and
21 answered, Russell.  He's -- he's told you why.
22       MR. AINSWORTH:  Do not -- no speaking
23 objections.  Thank you.
24       MR. GRILL:  I didn't say anything.  I'm

130

1  just saying he told you why.  I'm not repeating
2  what he said.
3        MR. AINSWORTH:  Mr. Grill.
4  BY MR. AINSWORTH:
5     Q  What's the answer, sir?
6     A  Are you speaking to me or Mr. Grill, sir?
7     Q  To you, sir.  To Mr. Kelly.
8        MR. GRILL:  Same objection.
9  BY THE WITNESS:
10    A  It's a hypothetical, and I don't care to
11 speculate on hypotheticals.
12 BY MR. AINSWORTH:
13    Q  No, my question is:  Why don't you care to
14 speculate?
15       MR. GRILL:  Asked and answered.
16       MS. MEADOR:  Objection; asked and
17 answered.  He just answered you.  Stop --
18       MR. AINSWORTH:  No, he --
19       MS. MEADOR:  -- move on.
20       MR. AINSWORTH:  Do not take that tone with
21 me, Miss Meador --
22       MS. MEADOR:  Move on.
23       MR. AINSWORTH:  -- I mean -- that's
24 totally inappropriate, and I have a record.  I

131

1  know exactly what answers have been provided and
2  what questions have been asked.  And I know
3  there's no answer to this question, so --
4        MS. MEADOR:  He -- he just answered you.
5        Miss Court Reporter, can you please read
6  back the witness's last answer.
7        MR. AINSWORTH:  Yes, let's.
8        MR. GRILL:  Question and answer, actually.
9        (Record read as requested.)
10       MR. AINSWORTH:  Right, in response to my
11 question:  Why don't you want to speculate?
12 BY MR. AINSWORTH:
13    Q  So the question, sir, is why don't you
14 want to speculate?
15       MR. GRILL:  Asked and answered.
16       MS. MEADOR:  Join.
17 BY THE WITNESS:
18    A  It's a hypothetical situation, sir, and I
19 don't care to speculate on a hypothetical
20 situation.
21 BY MR. AINSWORTH:
22    Q  Why don't you care to speculate?
23       MR. GRILL:  Asked and answered.  That's
24 literally the exact same question.

132

1        MR. AINSWORTH:  I know --
2        MS. MEADOR:  Join.
3        MR. AINSWORTH:  -- I'm not getting a
4  responsive answer --
5        MR. GRILL:  He's told you --
6        MR. AINSWORTH:  -- and I have a record.
7        MR. GRILL:  He's told you because he -- he
8  says he doesn't want to speculate because it's a
9  hypothetical.
10 BY MR. AINSWORTH:
11    Q  Why does --
12       MR. GRILL:  He said it like three times
13 now.
14       MR. CURRAN:  If I could interject, I'm
15 pretty sure the -- the rules require a deponent to
16 not be evasive in their answers, and I don't
17 believe the deponent has substantively answered
18 the question.
19       We could -- if you prefer, we could
20 certify the question, file a motion, and come back
21 and have the deponent answer it, or he could just
22 answer the question.
23       MR. GRILL:  You can file a motion on it if
24 you want.  I think --

Transcript of Thomas Kelly
Conducted on July 14, 2020

133

1    MR. CURRAN: So that would be your
2 preference, to come back?
3    MR. GRILL: No, it would not -- no, I'm
4 not at all agreeing that I'd bring him back, if --
5 if that's the only question you're certifying, and
6 you really want to file a motion on that, I mean,
7 when he's answered it. I don't think that --
8    MR. CURRAN: I disagree with the
9 premise --
10    MR. GRILL: -- I think that the question,
11 frankly, is -- it calls for speculation. It's not
12 a proper question. Now he's answered it three,
13 four times.
14    MR. CURRAN: You don't think spec- -- a
15 question which asks for speculation is proper in a
16 deposition?
17    MR. GRILL: I'm saying that -- I think
18 that it -- it creates an admissibility issue when
19 you're asking him to speculate. I don't think
20 that his answer is improper. I don't think it's
21 evasive. I think he's answered it.
22    And I think the reality here is that
23 Russell and, I guess, you as well, Nick, just
24 don't like the answer.

134

1    MR. CURRAN: No, the -- the problem is
2 when the deponent does not actually answer the
3 question.
4    MS. MEADOR: Our position is he's answered
5 the question, and you can't require him to
6 speculate. He has said he's not going to
7 speculate because it's a hypothetical. That's his
8 answer. You can't require him to do so. Move on.
9    MR. AINSWORTH: We can ask him why. It's
10 a perfectly acceptable question. I don't know why
11 you're getting so upset.
12    MS. MEADOR: But he's already answered it.
13    MR. AINSWORTH: He's clear he hasn't --
14    (Simultaneous crosstalk. Zoom audio
15 malfunction.)
16    MS. MEADOR: You guys are the one like
17 starting to threaten the -- the witness's
18 character and filing motions.
19    MR. CURRAN: I --
20    MR. AINSWORTH: Well, I --
21    MR. CURRAN: I -- I think the record
22 will very clearly show we didn't threaten the
23 deponent --
24    (Reporter clarification.)

135

1    MR. CURRAN: So my point is this is just
2 really superfluous. Nobody has threatened the
3 character of the deponent. That's absurd.
4    The issue here is a proper question has
5 been asked, and no substantive answer has been
6 given --
7    MR. GRILL: But --
8    MR. CURRAN: -- that's my position, at
9 least.
10    MR. GRILL: -- the -- guys, the point of a
11 deposition here -- and I think everybody would
12 agree with this -- is to ask questions and then
13 have the witness give truthful answers. Asking
14 somebody to speculate doesn't --
15    MR. AINSWORTH: Mr. Grill --
16    MR. GRILL: -- satisfy that.
17    MR. AINSWORTH: Mr. Grill, I -- what are
18 you doing? What are you -- like, what are you
19 doing?
20    MR. GRILL: What are you doing?
21    MR. AINSWORTH: Just knock it off.
22    MS. MEADOR: Knock what off?
23    MR. AINSWORTH: You can't do that.
24    MR. GRILL: Do what, Russell?

136

1    MR. AINSWORTH: You can't start coaching a
2 witness. You can't start telling, you know --
3    MR. GRILL: Oh, so you guys --
4    MR. AINSWORTH: It's a perfectly --
5    MR. GRILL: -- are the only ones
6 allowed --
7    MR. AINSWORTH: -- acceptable --
8    (Simultaneous crosswalk. Reporter
9 clarification.)
10    MR. GRILL: Rules, apparently, only apply,
11 in Russell's point of view, to one side here, so
12 you guys can talk, but we're not allowed to say
13 anything back. My bad.
14    MR. AINSWORTH: Thank you.
15 BY MR. AINSWORTH:
16    Q All right. Mr. Kelly, why don't you want
17 to speculate? Why don't you want to answer a
18 hypothetical?
19    MR. GRILL: Same objections.
20 BY THE WITNESS:
21    A Because I don't speculate on hypothetical
22 situations.
23 BY MR. AINSWORTH:
24    Q Is that a personal preference? Is that

Transcript of Thomas Kelly
Conducted on July 14, 2020

35 (137 to 140)

137

1  a -- something you were trained to do?  Is that
2  coming from a religious background?  Why is it
3  that you don't care to speculate?
4       MS. MEADOR:  Objection; form.
5       MR. GRILL:  Objection.
6       You can answer, if you can.
7  BY THE WITNESS:
8    A  It's a hypothetical situation, and I don't
9  care to speculate.
10 BY MR. AINSWORTH:
11   Q  Did you ever sit for the sergeant's exam?
12   A  Yes, I did.
13   Q  How many times?
14   A  Once.
15   Q  All right.  On the detective's exam, were
16 scenarios posed to you where you were asked to
17 then respond based on what you would do as a
18 detective?
19   A  I have no idea, no recollection.
20   Q  Okay.  Are you saying, sir, that you would
21 have no problem if a detective did not follow up
22 on the fact that two suspects in the same murder
23 investigations are both providing the exact same
24 lie during their interrogations?

138

1    A  It's a hypothetical situation, and I'm not
2  going to speculate on it.
3    Q  Sir, so -- where were police files kept in
4  1994 at Area 1?
5    A  In the sergeant's office.
6    Q  Could anyone access those files, or how
7  would you get access to a file in the sergeant's
8  office, I should say?
9    A  My particular -- I would tell the sergeant
10 I'm taking out the Jones file to look at it.
11   Q  Would you have to sign a card?
12   A  I don't recall, sir.
13   Q  Do you recall there being green -- green
14 cards in the file that you would have to sign to
15 check out a file?
16   A  I don't recall.
17   Q  Did you -- did you sometimes call felony
18 review to have them come to the station to review
19 a case?
20   A  Yes.
21   Q  How would you go about that?
22   A  Dial the number at 26th and California.
23 They had a -- I would refer to them as a
24 dispatcher, and you would ask someone to either

139

1    come in or call you in the -- wherever you
2    happened to be.
3       Q  All right.  And when felony review arrived
4  on a case that you were working on, would you
5  speak with the felony review assistant State's
6  attorney to fill them in on what was going on?
7       A  Yes.
8       Q  Would you show them paperwork?
9       A  Yes.
10      Q  Would you show them whatever paperwork you
11 had on the case at that point in time?
12      A  Yes.
13      Q  Would you sometimes sit in on statements
14 that were obtained from suspects by the assistant
15 State's attorney?
16      A  Yes.
17      Q  And would you -- what would happen to that
18 statement that was written up by the assistant
19 State's attorney and signed by the suspect and by
20 the -- and yourself as a witness?
21      A  I don't --
22      MS. MEADOR:  Objection; form.
23 BY THE WITNESS:
24      A  -- recall.

140

1  BY MR. AINSWORTH:
2       Q  Would you make sure that that confession
3  was part of the official file maintained by the
4  police department?
5       A  Yes.
6       Q  And how would you -- how would you make
7  sure that the statement that's signed -- or the
8  confession that's signed by the suspect, and by
9  the assistant State's attorney and yourself, would
10 be made part of the official police file?
11      A  It would have been left in the sergeant's
12 in basket.
13      Q  And that would be the original statement
14 to ensure its authenticity; is that right?
15      MR. GRILL:  Objection; form, foundation.
16      MR. ADELMAN:  Join.
17 BY MR. AINSWORTH:
18      Q  You can answer, sir.
19      A  I don't recall.
20      Q  Did you ever see a -- did you ever know
21 assistant State's attorneys to maintain their own
22 files regarding a homicide that you were working?
23      MR. GRILL:  Objection; foundation.
24      MR. ADELMAN:  Join.

Transcript of Thomas Kelly
Conducted on July 14, 2020

141

1  BY THE WITNESS:
2      A  If they had a felony review folder.
3  BY MR. AINSWORTH:
4      Q  And that would -- that they would use to
5  take notes on, correct?
6      A  I don't know what they did with it.
7      Q  Did you ever know assistant State's
8  attorneys to take copies of police reports?
9      A  I don't know, sir.
10     Q  Did you ever know felony review assistant
11 State's attorneys to take copies or the originals
12 of statements by suspects?
13     A  I don't recall, sir.
14     Q  The Exhibit No. 3 that I showed you
15 previously, the statement by Nevest Coleman on the
16 GPR that you created, did Nevest Coleman say
17 anything to you other than what's -- what appears
18 in that document?
19     A  No.
20     Q  I'll show it to you again.
21        Was he cooperative?
22     A  I don't recall.
23     Q  If he was uncooperative, would you have
24 noted that?

142

1      A  I don't know.
2      Q  Well, for example, if Nevest Coleman had
3  refused to answer a question, would you have noted
4  what question he had refused to answer?  Like
5  wouldn't tell me, you know, what he did after
6  finding the body or something like that?
7      A  I don't know, sir.
8      Q  Well, wouldn't you want to know if a
9  witness was refusing to answer questions in a
10 homicide investigation?
11     A  I don't know.
12     Q  You don't know if you would -- well, going
13 back to what we were talking about previously in
14 this deposition, sometimes when witnesses don't
15 want to provide information, it could be for a
16 benign reason of fear or they're having a bad day;
17 but sometimes it could be indicative that they're
18 trying to cover up, you know, their viability in a
19 crime, right?
20     A  I don't know, sir.
21     Q  What don't you know?  You don't know --
22 you don't know that there -- there might be
23 different explanations for why somebody would
24 refuse to answer a question?

143

1      A  Again, it's hypothetical.
2      Q  So I'm not asking about a hypothetical.
3  I'm asking about experiences that you've had in
4  your career where witnesses refuse to answer
5  questions.  That's happened to you before, right?
6      A  I don't recall, sir.
7      Q  All right.  So in your career as a Chicago
8  police officer, you've never had it happen where
9  somebody answered some questions but then refused
10 to tell you where their boyfriend was or what they
11 did earlier that day; is that what you're saying?
12     A  I don't recall.
13     Q  And -- and you don't have any -- as you
14 told us before, you don't have any problem with
15 your memory, right?
16     A  That's correct.
17     Q  All right.  Have you ever seen a fellow
18 Chicago police officer violate any of the rules or
19 regulations of the Chicago Police Department?
20     A  Not to my knowledge, no, sir.
21     Q  You've never observed another Chicago
22 police officer violate the rules or regulations;
23 is that right?
24     A  Not to my knowledge, no, sir.

144

1      Q  How many times have you been disciplined
2  by the Chicago Police Department?
3      A  I don't recall, sir.
4      Q  Well, how many times have you been
5  suspended?
6      A  I don't recall, sir.
7      Q  You think you -- do you think you'd
8  remember how many times you've been suspended?
9        MS. MEADOR:  Objection; form.
10       MR. GRILL:  Join.
11 BY THE WITNESS:
12     A  Sir, can I take a break?
13 BY MR. AINSWORTH:
14     Q  Sure.  Just answer the question.
15     A  Can you repeat it again, please.
16     Q  Yeah.  I believe the question was how
17 many -- do you think you -- I think it was do you
18 think you would remember how many times you've
19 been suspended?
20     A  I remember one in particular, but I think
21 that there was another one possibly.
22       MR. AINSWORTH:  All right.  Let's take a
23 break.
24       MR. GRILL:  How long?  Five minutes?

Transcript of Thomas Kelly
Conducted on July 14, 2020

145

1     MR. AINSWORTH: Whatever the witness would
2 like.
3     MR. GRILL: Five minutes.
4     (Short recess.)
5     MR. AINSWORTH: Let's go back on the
6 record.
7 BY MR. AINSWORTH:
8   Q Sir, are there any of your answers to the
9 deposition thus far that you'd like to amend or
10 correct in any way?
11     MS. MEADOR: Objection --
12     MR. GRILL: In the whole dep?
13     MS. MEADOR: -- form.
14     MR. GRILL: Form.
15     MR. AINSWORTH: Yes.
16     (Reporter clarification.)
17     MR. AINSWORTH: There's no answer yet.
18 BY THE WITNESS:
19   **A I don't know, sir.**
20 **BY MR. AINSWORTH:**
21   Q All right. Are you feeling okay to
22 continue with the deposition?
23   **A Oh, obviously.**
24   Q All right. Just let us know if you need

146

1 anything.
2     So I want to show you what we'll mark as
3 Exhibit No. 7.
4     (Kelly Exhibit No. 7 was marked for
5 identification.)
6 BY MR. AINSWORTH:
7   Q All right. This is Exhibit Bates numbered
8 RFC000192.
9     And I'm -- what I'm going to ask you to
10 do, sir, is to read over this handwritten GPR and
11 tell us if it has any -- if it refreshes any
12 recollection of your conversation with Nevest
13 Coleman on April 28, 1994.
14   **A No, it doesn't.**
15   Q Do you want me to scroll down?
16   **A It's not my document or I didn't prepare**
17 **it.**
18   Q I understand, sir. And, I guess, my
19 question is if there are any inconsistencies
20 between the version that's written on this page
21 and the version that Nevest Coleman provided to
22 you, you can't say anything one way or the other
23 about which is more likely to be true; is that
24 right?

147

1     MR. GRILL: Objection to form --
2     MS. MEADOR: Objection; form.
3     MR. GRILL: -- foundation.
4     MS. MEADOR: Join.
5 BY THE WITNESS:
6   **A Again, you would be asking me to speculate**
7 **on a hypothetical.**
8 **BY MR. AINSWORTH:**
9   Q All right. Well, I'm not asking you a
10 hypothetical, sir. I'm asking you about the two
11 GPRs and any inconsistencies between them. You
12 can't tell us which one is more likely to be true;
13 is that right?
14     MS. MEADOR: Objection; form.
15     MR. GRILL: Join.
16 BY THE WITNESS:
17   **A I only can tell you what I wrote.**
18 **BY MR. AINSWORTH:**
19   Q Right. And so I -- I take from that
20 answer -- and I just want to make sure I got it
21 right, because this is my interpretation, and I
22 want to give you the opportunity to correct me if
23 I'm wrong -- that, because you can only tell us
24 what you wrote, you can't explain away any

148

1 inconsistencies or discrepancies between the
2 account in Exhibit 7 versus the account that you
3 wrote down in Exhibit 3; is that right?
4   **A Yes.**
5   Q Did you know that -- did you hear about
6 Nevest Coleman or Derrell Fulton being released
7 from prison?
8   **A I saw on Channel -- I think it was Channel**
9 **7, and I can't tell you, a couple years ago**
10 **maybe -- that Mr. Coleman had gone back to work at**
11 **White Sox Park.**
12   Q When you saw that news report, did you
13 realize that you had worked on that case?
14   **A Absolutely no idea, no, sir.**
15   Q Do you have any opinion as to whether
16 Nevest Coleman is guilty or innocent of the murder
17 of Antwinica Bridgeman?
18   **A No, sir.**
19   Q Do you have any opinion as to whether
20 Derrell Fulton is guilty or innocent of the
21 Antwinica Bridgeman murder?
22   **A No, sir.**
23   Q Do you have any opinion as to whether
24 Eddie Taylor's guilty or innocent of the Antwinica

Transcript of Thomas Kelly
Conducted on July 14, 2020

38 (149 to 152)

149

1 Bridgeman murder?
2    A  No, sir.
3    Q  Were you ever contacted by the State's
4 attorneys who were conducting a reinvestigation
5 into the case?
6    A  No, sir.
7    Q  You were suspended for 30 days back in the
8 '70s.  You thought there was another time you were
9 suspended; is that correct?
10    A  Probably at least two more.  I'm not
11 positive.
12    Q  How long were the other two suspensions,
13 according to your memory?
14    A  I think they were both five days.
15    Q  Do you remember a case involving Demarco
16 Spates?
17    A  I don't think so.
18    Q  Do you remember being accused of being
19 with two other detectives, a detective Roger
20 Murphy and a detective Allen Szudarski, spelled
21 S-Z-U-D-A-R-S-K-I, and having a -- a gentleman in
22 your car, one of your fellow detectives, punching
23 him, driving him around, and then dropping him
24 back off without creating a contact card?

150

1    A  I'm familiar with the allegation.
2    Q  All right.  Are you familiar with the
3 sustained allegations against you, which cont- --
4 which included violation of Rule 6 for
5 disobedience or an -- of an order or directive,
6 whether written or oral, and violation of Rule 14,
7 making a false report written or oral?
8    A  I think I may have retired by that point,
9 but I'm not positive.
10    Q  This is back in '06, so before your
11 retirement.
12    A  This is a document you put up here for me,
13 that was --
14    Q  Oh, shoot.  I'm sharing this.  I'm so
15 sorry.  I should note that for the record.
16    This is Exhibit 8.
17    (Kelly Exhibit No. 8 marked for
18 identification.)
19 BY MR. AINSWORTH:
20    Q  And this is a document that's -- I didn't
21 realize I was displaying it to you.  My apologies,
22 sir -- Bates numbered City 22117 and Bates stamped
23 City 22118, City 22119.
24    And so the -- these were sustained

151

1 allegations against you based on -- yeah, and then
2 also a sustained violation of Rule 2, which -- of
3 any action or conduct which impedes the
4 department's effort to achieve its policy and
5 goals or brings discredit upon the department.
6    A  These may have been sustained.  Do you
7 have a date on this report, sir?  Do you know when
8 this was...
9    Q  Yes.  This is part of the -- it's bringing
10 up -- all right.  This is -- so, I guess -- here.
11 Let me stop sharing so I can take a look, and I'll
12 just tell you -- or I'll -- I'll show it to you if
13 you'd like to see.
14    A  It says '17 December 10 up in the
15 right-hand corner.
16    Q  Yes, for the -- for -- that's the updated
17 report, correct.
18    And so based on that you think that you
19 were retired before they could suspend you or
20 anything like that; is that right?
21    A  I was forced off by my age.
22    MS. MEADOR:  Russell?
23    MR. AINSWORTH:  Yes.
24    MS. MEADOR:  Just for the record for those

152

1 exhibits, just identifying that they're
2 confidential records so to the extent anyone would
3 use it for pleadings, they would be redacted from
4 the video.
5    MR. AINSWORTH:  I'm not -- they are
6 confidential, and they remain confidential, if
7 that's what you're asking.
8    MS. MEADOR:  Yeah.  I don't know exactly
9 what -- how they might be used, but, you know,
10 obviously when exhibits are marked in a deposition
11 that are confidential they're designated on the
12 record as being so.  So I guess, to that extent,
13 I'm just designating that those are confidential.
14 Thank you.
15 BY MR. AINSWORTH:
16    Q  All right.  Did you ever talk to Murphy or
17 Szudarski about what punishment they received as a
18 result of the sustained findings against them?
19    A  I believe Szudarski also retired prior --
20 I believe prior to that.
21    Murphy has been totally exonerated, to the
22 best of my knowledge.
23    Q  Why do you believe that Murphy was totally
24 exonerated from the sustained findings against

Transcript of Thomas Kelly
Conducted on July 14, 2020

---

153

1  him?
2  **A  Because he told me he was.**
3  Q  All right.  When did he tell you that?
4  **A  We were partners for an extended period of**
5  **time.  I don't know.  Whatever the -- it was**
6  **finally adjudicated.**
7  Q  Well, that was after you retired, so you
8  weren't partners anymore, correct?
9  **A  I was a friend of his.**
10  Q  All right.  Were you a witness to either
11  Detective Rogers or Szudarski striking Demarco
12  Spates?
13  **A  No.**
14  Q  Did you lie in your to-from report
15  regarding your recollection of the encounter
16  between you and your fellow detectives and Demarco
17  Spates?
18  **A  No.**
19  Q  Specifically, did you lie in your to-from
20  report and claim that you didn't create a contact
21  card regarding your encounter with Demarco Spates
22  because you had to -- you were called to the scene
23  of a shooting?
24  **A  I do recall saying that, yes, sir.**

---

154

1  Q  All right.  And then do you recall
2  allegations from a guy named Charles Booker who
3  sued you?
4  **A  Yes, I do.**
5  Q  All right.  And are those allegations true
6  that were brought against you by Charles Booker?
7  **A  Absolutely not.**
8  Q  All right.  Well, let me ask you, sir --
9  sorry.  I have the wrong document in front of me.
10  Well, while I'm here, I'll ask you about
11  Mike Purnell.  Do you remember Mike Purnell suing
12  you?
13  **A  I don't remember the name, no.**
14  Q  Do you know how many times you've been
15  sued?
16  **A  I'm guessing five or six.**
17  Q  All right.  Do you know what the outcome
18  of the lawsuits that Mike Purnell brought against
19  you and Ed Farley and Bob Lenahan and Jim Riley?
20  **A  I would need a little help here with who**
21  **he is.**
22  Q  Sure.  This is the case where there was a
23  shooting at -- I think it was the one at Ogden
24  Park.

---

155

1  **A  I recall now.  My memory is refreshed.**
2  Q  And --
3  **A  No, I don't know the outcome.  Pardon me.**
4  Q  You don't know that the City of Chicago
5  paid $370,000 to Mike Purnell?
6  **A  No, sir.**
7  Q  And, eventually, Mike Purnell gave a
8  confession in that case, right?
9  **A  I believe so.**
10  Q  And he alleged it was coerced, correct?
11  **A  I don't know about that part of it, sir.**
12  Q  Well, what about the part where the judge
13  suppressed his confession; do you know about that
14  part?
15  **A  I don't recall it, no.**
16  Q  Do you recall Mike Purnell being held at
17  Area 1 for 66 to 68 hours?
18  **A  No, I don't.**
19  Q  Do you recall Mike Purnell alleging that
20  the air conditioning at Area 1 was uncomfortably
21  cold while he was there in order to deprive him of
22  sleep?
23  **A  No, I don't, sir.**
24  Q  Do you recall Mike Purnell alleging that

---

156

1  he had to urinate on himself because he wasn't
2  taken to the -- allowed to use the restroom?
3  **A  No, I don't, sir.**
4  Q  Do you recall Mike Purnell alleging that
5  he was deprived of food and water for over
6  48 hours?
7  **A  No, sir.**
8  Q  Can you describe the interrogation rooms
9  at Area 1 for us back in 1994, what they looked
10  like?
11  **A  Purnell is 1994?**
12  Q  No, he's 2000.  I'm -- I'm switching
13  slightly to say that he's -- to ask you about what
14  the interrogation rooms looked like back in 1994
15  at Area 1?
16  **A  They were probably eight by ten, ten by**
17  **ten rectangular.  I believe some had one bench,**
18  **some had two benches, and a ring in the wall to**
19  **affix handcuffs to.**
20  Q  Were the light switches on the inside of
21  the room or the outside of the room?
22  **A  I don't recall.**
23  Q  Were they -- could a person detained in an
24  interrogation room reach the light switch by

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

40 (157 to 160)

157

1  themselves?
2  **A  I don't know.**
3  Q  Were you required by department regulation
4  in 1994 to handcuff a suspect inside the
5  interrogation room when you were not interacting
6  with that suspect?
7  **A  Yes, sir.**
8  Q  And would you follow that practice when
9  you were not interacting with a suspect to keep
10 the person handcuffed within the interrogation
11 room?
12 **A  Yes, sir.**
13 Q  And then take the handcuffs off when you
14 were interacting with them; is that right?
15 **A  Not specifically, no.**
16 Q  All right.  But, in any event, that's what
17 the ring on the wall was for, to have a secure
18 place to ensure that anybody in that room wasn't
19 going to attack anybody who came into that room,
20 right?
21 **A  Or harm themselves, too, I would say, sir.**
22 Q  Or harm themselves, too, yeah.
23     And, to your knowledge, other detectives
24 in Area 1 in 1994 conformed to the same practice

158

1  of handcuffing suspects inside the interrogation
2  room when they were unattended; is that correct?
3  **A  I don't know.**
4     MR. GRILL: Objection; form, foundation.
5  BY MR. AINSWORTH:
6  Q  What do you mean you don't know?
7     MR. GRILL: Objection; form,
8  argumentative.
9  BY MR. AINSWORTH:
10 Q  All right.  Let me ask it this way:  There
11 were times when you would go into interrogation
12 rooms while you were at Area 1 and there would be
13 a suspect there and you were not the last person
14 to interact with that suspect.  You would expect,
15 when you walked into the room, that the person
16 would be restrained to the ring on the wall,
17 right?
18 **A  Yes.**
19 Q  You wouldn't have to be worried that the
20 person might be laying in wait for you each time
21 you went into the interrogation room, right?
22     MR. GRILL: Objection; form.
23 BY THE WITNESS:
24 **A  No, I wasn't worried.**

159

1  BY MR. AINSWORTH:
2  Q  Okay.  Do you recall being reprimanded for
3  getting overtime for going to court without going
4  through the proper procedures?
5  **A  No, I don't.**
6  Q  Do you know any of the -- do you know the
7  residents at 917 West Garfield?
8  **A  No, I don't, sir.**
9  Q  Have you ever been -- have you ever been
10 there before to your knowledge?
11 **A  Not to my knowledge.**
12 Q  Do you know any other members of Nevest
13 Coleman's family?
14 **A  Not to my knowledge.**
15 Q  Do you know any other members of Derrell
16 Fulton's family?
17 **A  No, sir.**
18 Q  And do you know any members of Antwinica
19 Bridgeman's family?
20 **A  No, sir.**
21 Q  Is there anything else that you can tell
22 us about the Antwinica Bridgeman homicide
23 investigation that you haven't told us here today?
24     MR. GRILL: Objection; form.

160

1  BY THE WITNESS:
2  **A  No, sir.**
3  BY MR. AINSWORTH:
4  Q  Do you have any suspicions as to who
5  killed Antwinica Bridgeman?
6  **A  No, sir, I don't.**
7     MR. AINSWORTH: All right.  Sir, I don't
8  have any further questions for you, but other
9  attorneys here might.
10         EXAMINATION
11 BY MR. CURRAN:
12 Q  Sir, my name is Nick Curran.  I represent
13 Derrell Fulton.  I have just a few follow-up
14 questions for you.
15     Are you okay to proceed, or did you want
16 to take a break?
17 **A  I'm fine.  Go right ahead.**
18 Q  Thank you.
19     Back in 1994, when you were working as a
20 detective, did you typically wear a name plate?
21 **A  No, sir.**
22 Q  Did any of the other detectives that you
23 worked with at the area wear name plates?
24 **A  No, sir.**

Transcript of Thomas Kelly
Conducted on July 14, 2020

41 (161 to 164)

161

1    Q  Would you say that there -- anything
2  unique about Mr. Clancy's appearance back in 1994?
3    **A  Not that I recall, no, sir.**
4    Q  Do you recall anything unique about Bill
5  Foley's appearance in 1994?
6    **A  No, sir.**
7    Q  Can you just briefly describe for me the
8  process back in 1994 for requesting criminal
9  records of an individual?
10   **A  You would -- the actual IR number may have**
11 **been available on a computer at that time, only**
12 **the IR number, if there was one.**
13     **After you obtained the IR number, you had**
14 **to fill out a form, put the person's name on**
15 **there, the IR number.  You had to sign the form.**
16     **Then the form was faxed, the**
17 **identification section.  Then sometime after they**
18 **received the fax, the fax would be sent back to**
19 **Area 1 or whatever area it was.**
20   Q  And just is so the record is clear, what
21 is an IR number?
22   **A  Investigative record.**
23   Q  And how would a person be assigned an IR
24 number, if you know?

162

1    **A  You would have to be fingerprinted, to the**
2  **best of my knowledge.**
3    Q  Back in April of 1994, was there a typical
4  turnaround time for receiving the return fax with
5  an individual's criminal history?
6    **A  No, sir.**
7    Q  Would the records that you requested,
8  related to an individual's criminal history,
9  include their criminal history as a juvenile?
10   **A  No, sir.**
11   Q  Did you, back in April of 1994, have the
12 ability to obtain a juvenile criminal history?
13   **A  I don't recall.**
14   Q  I think the answer to this question is
15 probably obvious, so then you do not recall the
16 procedure, or if there was a procedure, whereby
17 you could obtain those records?
18   **A  That's correct.**
19   Q  Over the course of your career, how many
20 times would you approximate you met with assistant
21 State's attorneys working in felony review?
22   **A  At least 50, but I -- I know it's more.  I**
23 **don't want to throw out some other number.**
24   Q  So quite a few times, is that fair, over

163

1  the course of --
2    **A  Quite a few times.  Yes, sir.**
3    Q  Do you recall if any of the attorneys in
4  felony review maintained a briefcase at the area?
5      MR. GRILL:  Objection; foundation or form.
6      MR. ADELMAN:  Join.
7  BY THE WITNESS:
8    **A  I don't know, sir.**
9  **BY MR. CURRAN:**
10   Q  Do you have any recollection of any of the
11 attorneys in felony review -- a place where they
12 could keep records at the area?
13     MR. GRILL:  Objection; form.
14 BY THE WITNESS:
15   **A  I don't recall, sir.**
16 **BY MR. CURRAN:**
17   Q  Do you have any recollection of what gang
18 activity, if any, there was at 917 West Garfield
19 back in April of 1994?
20   **A  I have no idea.  No, sir.**
21   Q  Were you ever contacted by the conviction
22 integrity unit concerning Derrell Fulton?
23   **A  No, sir.**
24   Q  Same question as to Nevest Coleman?

164

1    **A  Same answer, sir.**
2    Q  Okay.  Have you ever been interviewed by
3  the conviction integrity unit related to any other
4  case that you've worked on?
5    **A  To the best of my recollection, no.**
6    Q  Do you have e-mail addresses for any of
7  the other named defendants in this lawsuit?
8    **A  No, I don't.**
9    Q  Do you have phone numbers for any of the
10 other named defendants in this lawsuit?
11   **A  I might have Al Graf's.**
12   Q  To your knowledge, do you have the phone
13 numbers of any of the other named defendants in
14 this lawsuit?
15   **A  I think I have Al Graf's.**
16   Q  And that's the only one?
17   **A  Yes, sir.**
18   Q  Have you ever sent any text messages to Al
19 Graf concerning this case?
20   **A  I've never sent a text message in my life,**
21 **sir.**
22   Q  Okay.  Have you ever been interviewed by
23 the FBI concerning claims of abuse at Area 1?
24   **A  No, sir.**

Transcript of Thomas Kelly
Conducted on July 14, 2020

42 (165 to 168)

---

**165**

1    Q  Would you agree with me that, as a
2  detective, there were times where your job
3  required you to make speculation based on the
4  evidence that you had in a case you were
5  investigating?
6       MR. GRILL:  Objection; form, foundation
7  incomplete hypothetical, calls for speculation.
8  BY MR. CURRAN:
9    Q  Go ahead, sir.
10       MR. GRILL:  You can answer.
11 BY THE WITNESS:
12    **A  I would have to speculate, and I don't**
13 **care to speculate, sir, on a hypothetical.**
14 **BY MR. CURRAN:**
15    Q  I understand that, sir, but did you ever,
16 during the course of your extensive history as a
17 detective, speculate -- make speculation based on
18 the evidence you had in a case?
19    **A  No.**
20    Q  So you didn't speculate ever?
21    **A  Not that I recall, no, sir.**
22       MR. CURRAN:  Okay.  I don't think I
23 have -- actually, let me ask you one more
24 question.

**166**

1  BY MR. CURRAN:
2    Q  You said that -- or a couple of -- a
3  series of follow-up questions related to one
4  topic, I should say.
5       You had said that you were administered a
6  Polygraph in connection with a claim that you had
7  taken some money from someone; is that correct?
8    **A  Money was missing.**
9    Q  And who was it that was saying money was
10 missing?
11    **A  The person who was involved in the traffic**
12 **accident.**
13    Q  Did he specifically claim that you had
14 taken money from his wallet?
15    **A  No, not that I recall.**
16    Q  And you took a Polygraph examination in
17 relation to that accusation; is that correct?
18    **A  That's correct, sir.**
19    Q  And you failed that Polygraph examination;
20 is that correct?
21    **A  I don't feel I did, but...**
22    Q  Why is it you don't think that you failed
23 the Polygraph examination?
24    **A  Because I told the truth.**

**167**

1    Q  Okay.  So then is it, in your opinion,
2  possible to tell the truth and fail a Polygraph
3  examination?
4    **A  Yes.**
5    Q  And does that change your approach to the
6  utility of Polygraph examinations in conducting
7  your investigations as a detective?
8    **A  No.**
9    Q  Why not?
10    **A  It's an investigative tool.  It's not**
11 **admissible in court.**
12    Q  Okay.  So you still used it as an
13 investigative tool, even though you felt that you
14 had taken one and received a false deceptive
15 reading on it?
16    **A  Yes.**
17       MR. CURRAN:  No other questions.
18       MR. AINSWORTH:  I just have a quick
19 follow-up.
20            EXAMINATION
21 BY MR. AINSWORTH:
22    Q  Sir, have you ever used force against a
23 suspect inside an interrogation room?
24    **A  No, sir.**

**168**

1    Q  Have you ever used force against a suspect
2  inside an interview room?
3    **A  No, sir.**
4    Q  Have you ever witnessed another detective
5  use force against a suspect or a witness inside an
6  interview room?
7    **A  No, sir.**
8       MR. AINSWORTH:  I don't have any further
9  questions.
10       MR. GRILL:  I have a couple follow-up
11 unless -- I'll just jump in.
12       MR. ADELMAN:  You go ahead.  I'll go
13 after.
14       MR. GRILL:  Russell, can you bring up
15 Exhibit 1, the training history?
16       MR. AINSWORTH:  Yes.  Just give me one
17 second, and I'll -- I'll do that.
18       And let me know if you'd like to be able
19 to do it yourself.
20       MR. GRILL:  Thanks.  Yeah, I'll let you
21 know.  Thank you.
22       MR. AINSWORTH:  Okay.
23       MR. GRILL:  But go ahead.  You can control
24 it for now.

Transcript of Thomas Kelly
Conducted on July 14, 2020

169

1    MR. AINSWORTH: Sure.
2    MR. GRILL: Okay. Thanks.
3         EXAMINATION
4 BY MR. GRILL:
5    Q All right. Detective Kelly, you've seen
6 Exhibit 1 earlier today, and you were asked a
7 bunch of questions about it.
8    As you can see at the top, this training
9 record is about 11 pages long, correct?
10   A I can't tell from this end. I believe --
11   MR. GRILL: Russ, do you want to --
12 BY MR. GRILL:
13   Q Do you see where Russell's --
14   A Oh, I see it. I see it. Yes, sir.
15   Q Okay. And sitting here today, do you --
16 you know, you've gone through this document
17 earlier today during Mr. Ainsworth's examination.
18   Do you -- sitting here today, do you
19 recall each one of these, you know, training, you
20 know, events that are catalogued on this 11-page
21 document?
22   A No, sir, I don't.
23   Q All right. And, in light of that, can
24 you -- sitting here today, can you say whether

170

1 this document is, indeed, complete or accurate?
2    A No, I can't.
3    MR. AINSWORTH: Objection; leading.
4    MR. CURRAN: Also asked and answered.
5    MR. GRILL: Okay. Russell, can you bring
6 up the GPR that Detective Kelly authored,
7 whichever exhibit that is.
8    MR. AINSWORTH: Sure. It's Exhibit 3.
9    MR. GRILL: Thanks. If you want to just
10 like scan down a little bit so we have kind of the
11 body of it.
12   MR. AINSWORTH: Yes.
13   MR. GRILL: Thanks.
14 BY MR. GRILL:
15   Q All right. Can you see it on your --
16   A Yeah, I see it. Thank you.
17   Q All right. So, Detective Kelly, when you
18 wrote this GPR -- well, what I want to do is ask
19 you some questions about how this GPR came about.
20   Do you -- sitting here today, do you
21 recall how it was that you were speaking to
22 Mr. Coleman -- why it was that were you speaking
23 to Mr. Coleman in April of 1994 at Area 1?
24   A Mr. Coleman was, what I believed when I

171

1 talked to him, an outcry witness to a crime.
2    Q Well, what I'm -- what I'm asking for is
3 like did you just go up to him and speak to him
4 yourself or did -- or was there some other
5 reason -- like on your own, or was there some
6 other reason you were talking to him?
7    A No, I would have been either directed to
8 speak to him or asked by someone to speak to him,
9 Mr. Coleman.
10   Q And when you spoke to him, do you recall
11 how long your conversation with Mr. Coleman was?
12   A I would say five minutes at the most.
13   Q Why do you say that?
14   A It's a very short interview. It's about
15 two-thirds to three-quarters of a page.
16   Q So you're saying it's short because of the
17 length of the GPR itself?
18   A Yes, sir.
19   Q And when you spoke to Mr. Coleman, do you
20 have a recollection of where you would have been
21 at Area 1 when you had this conversation with him?
22   A In the large, open area.
23   Q Do you know what floor that would have
24 been on?

172

1    A Second floor.
2    Q And why would you say that you would have
3 been in the large, open area on the second floor?
4    A That's where the detective division
5 offices are. That's where interviews were
6 conducted.
7    Q How can you be sure you weren't in a
8 interrogation room?
9    A Mr. Coleman was not under arrest. There
10 would be no point or purpose to put him in an
11 interrogation room.
12   Q Do you recall if Mr. Coleman was
13 handcuffed when you spoke to him?
14   A He was not handcuffed.
15   Q How do you know that?
16   A Because he would have been in an
17 interrogation room, and I would have advised him
18 of his rights prior to talking to him.
19   Q Would you have documented that in the GPR?
20   A Yes, sir.
21   Q When you speak with a -- an individual
22 during a criminal investigation and that person is
23 in handcuffs, do you typically make a note of that
24 or no?

Transcript of Thomas Kelly
Conducted on July 14, 2020

44 (173 to 176)

173

1     A  No.
2         MR. CURRAN:  Objection; calls for
3  speculation.
4         MR. GRILL:  Okay.
5  BY MR. GRILL:
6     Q  In this case -- you were asked -- well,
7  here I'll just ask it this way:  If Coleman, when
8  you spoke with him, had refused to answer any of
9  the questions that you were posing to him, would
10 you have documented that?
11    A  Yes, I would have.
12        MR. CURRAN:  Objection; calls for
13 speculation.
14        MR. AINSWORTH:  Join.
15 BY MR. GRILL:
16    Q  How do you know that you would have
17 documented it?
18    A  That is my practice.  I would have put
19 refused to be interviewed on the GPR.  That would
20 have been the end of the GPR.
21    Q  Do you -- did you write anything like that
22 in Exhibit 3?
23    A  No, sir.
24    Q  Okay.  So in addition to writing this

174

1  GPR -- or strike that question.
2         When you got done writing this GPR, did
3  you -- what did you do with the GPR?
4         MR. CURRAN:  Objection; foundation.
5  BY THE WITNESS:
6     A  My practice or common practice was to give
7  it to a sergeant.
8  BY MR. GRILL:
9     Q  Okay.  And what was your practice at this
10 time in 1994, in April of 1994, when you're
11 conducting a witness interview, in this case since
12 you described him an outcry witness interview,
13 when, relative to the interview, would you have
14 written the GPR?
15    A  This GPR was written as I interviewed him.
16 I asked him what happened, he started to tell me,
17 and I would write along.
18    Q  Okay.  And -- so, basically, what I
19 understand you to be describing is you writing
20 this particular GPR that's Exhibit 3
21 contemporaneously, that is, at the same time, that
22 Mr. Coleman is talking to you; do I have that
23 right?
24    A  Yes, you do, sir.

175

1     Q  And when you were done writing this GPR,
2  did you do anything else to verify with
3  Mr. Coleman, specifically, that you had
4  actually -- what you had written down was
5  accurate?
6     A  No, I did not.
7     Q  Did you give Mr. Coleman an opportunity to
8  read your GPR after you got done writing this GPR
9  out?
10    A  My normal practice was, at the conclusion
11 of the GPR, I would read whatever I had written
12 down and ask, in this case, Mr. Coleman, if there
13 was anything he wanted to add or if this was --
14    Q  Oh, okay.
15    A  -- a summary of what he had told me.
16    Q  And your practice would have been to read
17 the GPR back to Mr. Coleman?
18    A  Correct.
19    Q  For the purposes of ensuring that what you
20 wrote down was correct and if he had anything to
21 add?
22    A  Yes, sir.
23    Q  Okay.  Do you believe that's what you did
24 in this case?

176

1     A  I did it all the time, yes, sir.  I do
2  believe that.
3     Q  Okay.  You've been shown, during your
4  deposition today, a number of supplemental
5  reports.  In fact, you read one that was over ten
6  pages long today; do you remember that?
7     A  Yes, sir.
8     Q  Did you have any role, or did you
9  participate, in drafting any of the supplemental
10 reports in this homicide investigation?
11    A  No, sir.
12    Q  It's my understanding that the only other
13 thing that you did, in addition to talking to
14 Mr. Coleman for those five minutes and writing
15 that GPR, was to submit the requests for the
16 criminal histories, correct?
17    A  Yes, sir.
18    Q  To your recollection, and based on the
19 evidence and documents that you reviewed here, in
20 preparation for this deposition and during your
21 deposition, is there any other role or activity
22 that you did in relation to the Antwinica
23 Bridgeman homicide investigation?
24    A  No, sir.

Transcript of Thomas Kelly
Conducted on July 14, 2020

45 (177 to 180)

---

177

1    MR. GRILL:  All right.  I've got nothing
2 else, if anybody else has questions.
3    MR. ADELMAN:  Yeah, I do.
4    (Zoom audio malfunction.)
5    MR. ADELMAN:  I'm sorry?
6    MS. MEADOR:  I just said no questions for
7 the City.
8    MR. ADELMAN:  Oh, okay.
9            EXAMINATION
10 BY MR. ADELMAN:
11   Q  Let's see.  Detective Kelly, my name is
12 David Adelman.  I'm an assistant State's attorney.
13      You had mentioned before that you had
14 heard the name of assistant State's attorney Hal
15 Garfinkel.  Do you recall saying that?
16   **A  Yes, sir, I do.**
17   Q  Okay.  And, let's see, did you know -- you
18 said you recalled hearing the name, but do you
19 actually remember him?
20   **A  I don't -- if you showed me a picture of**
21 **him, I wouldn't recognize him.  Could we leave --**
22   Q  Okay.
23   **A  -- it at that?  I'm sure I had cases with**
24 **him.  It's kind of an unusual name, I think.**

---

178

1    Q  Do you know -- do you know, either in --
2 in 1994 were you aware that Nevest Coleman and
3 Derrell Fulton each gave statements to ASA
4 Garfinkel?
5    **A  No, I wasn't.**
6    Q  Okay.  Are you aware of that now?
7    **A  I believe I am.**
8    Q  And were you -- and you weren't present --
9 strike that.
10      Were you present in the room when ASA
11 Garfinkel took the statements from either Nevest
12 Coleman or Derrell Fulton?
13   **A  No, sir.**
14   Q  Okay.  It's -- is it fair to say you
15 obviously did not hear what was said between ASA
16 Garfinkel and Nevest Coleman?
17   **A  That's fair to say, yes, sir.**
18   Q  Okay.  And it's -- is it fair to say that
19 you did not hear what was said between Derrell
20 Fulton and ASA Garfinkel?
21   **A  Yes, sir, that's also correct.**
22   Q  And is it fair to say that you did not
23 observe ASA Garfinkel taking the statement --
24 statements from Nevest Coleman and Derrell Fulton?

---

179

1    **A  That's also correct, sir.**
2       MR. ADELMAN:  Okay.  All right.  I have
3 nothing further.
4          FURTHER EXAMINATION
5 BY MR. AINSWORTH:
6    Q  Sir, given that you don't recall your
7 conversation with Nevest Coleman, you can't tell
8 us definitively whether you read the GPR to him at
9 the end of your conversation; is that correct?
10   **A  I can only tell you what my common**
11 **practice was, what I did all the time.**
12   Q  So what you actually did you would be
13 speculating as to it, right?
14      MR. GRILL:  Objection; form.
15 BY THE WITNESS:
16   **A  Well, I'd be responding to a hypothetical**
17 **to you, once again, I believe, and I'd have to**
18 **speculate on that.**
19 **BY MR. AINSWORTH:**
20   Q  All right.  So you're not going to tell us
21 what you actually did during your conversation
22 with Nevest Coleman.  Whether you took notes
23 contemporaneously or whether you read the GPR back
24 to him at the end, you don't know one way or the

---

180

1 other what you actually did, right?
2    **A  I know I did contem- --**
3       MS. MEADOR:  Objection to form.
4 BY THE WITNESS:
5    **A  -- contemporane- --**
6       MR. GRILL:  Thank you.  I was -- just give
7 us a second.
8       Objection; form, argumentative.
9       Go ahead.
10 BY THE WITNESS:
11   **A  I take notes contemporaneously when I**
12 **interview witnesses.**
13 **BY MR. AINSWORTH:**
14   Q  Okay.  But you don't remember this
15 conversation, right?  I know -- I know your
16 practice to do that right, and that's what you
17 recall doing as your practice, right?
18   **A  Yes, sir.**
19   Q  But you can't tell us whether you took
20 notes contemporaneously because that would require
21 you to speculate as to what you actually did on
22 this one occasion, right?
23   **A  No, sir.**
24   Q  All right.  So you don't know if you're

---

Transcript of Thomas Kelly
Conducted on July 14, 2020

181

1 taking notes contemporaneously, correct?
2    MR. GRILL: Objection; form, foundation.
3 BY MR. AINSWORTH:
4    Q  Although it was your practice to do so?
5    **A  Yes, sir.**
6    Q  And you don't know if you read the GPR
7 back to Mr. Coleman after you wrote it up,
8 although it was your practice to do so, correct?
9    **A  That's correct.**
10    MR. AINSWORTH: I don't have any further
11 questions.
12    MR. CURRAN: Very brief follow-up on that.
13          FURTHER EXAMINATION
14 BY MR. CURRAN:
15    Q  Sir, you did not write in your GPR that
16 you read the GPR to Mr. Coleman, correct?
17    **A  No, sir.**
18    Q  Why not?
19    **A  It's not my practice.**
20    Q  Why wasn't it your practice?
21    **A  He was a witness at that point.**
22    Q  You've taken handwritten statements from
23 witnesses; is that correct?
24

182

1    (Zoom audio malfunction.  Reporter
2 clarification.)
3 BY MR. CURRAN:
4    Q  You've taken handwritten statements from
5 witness, I presume, as a detective?
6    MR. GRILL: Objection; form, foundation.
7 BY MR. CURRAN:
8    Q  Yes or no, sir?
9    **A  No.**
10    Q  You've never, as a detective, taken a
11 handwritten statement -- or, excuse me.  Strike
12 that.  Let me rephrase the question.
13    Have you ever been present when a
14 handwritten statement has been taken from a
15 witness?
16    **A  Yes, sir.**
17    Q  And is that in the context of an attorney
18 from felony review taking a handwritten statement?
19    **A  Yes, sir.**
20    Q  And you recall, in those handwritten
21 statements, there's typically an indication that
22 the witness was provided the opportunity to review
23 the statement and make changes if they desire to
24 do so; is that correct?

183

1    A  Yes, sir.
2    Q  And I would presume part of reason for
3 that is to memorialize the fact that the witness,
4 in fact, had the opportunity to review the
5 statement; is that correct?
6    **A  I don't know, sir.**
7    Q  Okay.  Was there a reason you did not
8 memorialize the fact that it was your practice to
9 have a witness review a GPR, the GPR itself?
10    MR. GRILL: Objection; mischaracterizes
11 his testimony.
12 BY MR. CURRAN:
13    Q  Okay.  Let me back up then, sir.
14    Was it your practice to document that you
15 allowed a witness to review a GPR?
16    MR. GRILL: It still mischaracterizes his
17 testimony.
18    MR. CURRAN: It was a question, Andrew.  I
19 didn't characterize his testimony.
20 BY MR. CURRAN:
21    Q  Go ahead, sir.
22    MR. GRILL: Then it's a -- then it's a
23 form -- it's a form and foundation objection then,
24 Nick.

184

1    MR. CURRAN: I would assume he would know
2 what his practice was, so your foundation
3 objection is --
4    MR. GRILL: I can --
5    MR. CURRAN: -- frivolous.
6    MR. GRILL: -- I can help you if you'd
7 like.
8    MR. CURRAN: No, that's okay.
9 BY MR. CURRAN:
10    Q  Sir, do you understand the question?
11    **A  No, sir.  Try again, please.**
12    Q  Was it your practice to document, in your
13 GPRs, that you allowed a witness to review the GPR
14 in which you took notes pertaining to the
15 statement that they gave you?
16    MR. GRILL: Same objections.
17 BY THE WITNESS:
18    **A  No.**
19 BY MR. CURRAN:
20    Q  Why not?
21    **A  Because it wasn't my practice and, to the**
22 **best of my knowledge, it wasn't required.**
23    Q  Okay.
24    MR. CURRAN: I don't have anything else.

Transcript of Thomas Kelly
Conducted on July 14, 2020

47 (185 to 188)

185

1     MR. GRILL:  I've got one question -- well,
2 assuming it doesn't lead to other stuff.
3         FURTHER EXAMINATION
4 BY MR. GRILL:
5   Q  Detective Kelly, when you were at Area 1
6 in April and you were speaking with Mr. Coleman,
7 did you know what the name of the victim was at
8 the time you spoke with Mr. Coleman?
9   **A  No, I did not.**
10   Q  How do you know that?
11     MR. CURRAN:  If I could insert an
12 objection:  Foundation, calls for speculation,
13 given that the witness has already testified he
14 can't remember anything.
15     MR. GRILL:  Thanks for the speaking
16 objection.
17     MR. CURRAN:  Go ahead.
18 BY MR. GRILL:
19   Q  How do you know that?
20   **A  At the top of the GPR, where Mr. Coleman's**
21 **interview is, there's a box for the victim's name**
22 **to be inserted.**
23   Q  And what's in that box in your GPR?
24   **A  Nothing.**

186

1     MR. GRILL:  I have nothing else.
2     MR. AINSWORTH:  Sounds like speculation to
3 me.
4     I don't have any further questions.
5 Nothing else.
6     MR. GRILL:  I don't know -- I don't know
7 how it's speculation when he's referring --
8 referencing to an actual piece of a report, but we
9 can all argue about it later.
10     Anybody else?
11     MR. CURRAN:  No.
12     MR. ADELMAN:  No.
13     MS. MEADOR:  No.
14     MR. ADELMAN:  No, nothing else.
15     MR. GRILL:  Okay.  We're going to reserve
16 signature on this.  And thanks.
17     And then, Russell, you'll send over the
18 copy of the video?
19     MR. AINSWORTH:  Yes.
20     Anybody who wants a copy of the video,
21 just let me know, and I'll send it to everybody.
22     MR. ADELMAN:  Yeah, you may as well send
23 it to everyone.
24     MR. AINSWORTH:  Okay.

187

1 (Off the record at 2:39 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

188

1     ACKNOWLEDGMENT OF DEPONENT
2
3     I, THOMAS KELLY, do hereby acknowledge
4 that I have read and examined the foregoing
5 testimony and the same is a true, correct, and
6 complete transcription of the testimony given by
7 me and any corrections appear on the attached
8 errata sheet signed by me.
9
10
11
12 _____     _____
13 (DATE)         (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24

Transcript of Thomas Kelly
Conducted on July 14, 2020

48 (189 to 192)

189

1     CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2

3       I, Lucia R. Block, Certified Shorthand

4 Reporter No. 084-003160, CSR, and a Notary Public

5 in and for the County of Cook, State of Illinois,

6 the officer before whom the foregoing deposition

7 was taken, do hereby certify that the foregoing

8 transcript is a true and correct record of the

9 testimony given; that said testimony was taken by

10 me and thereafter reduced to typewriting under my

11 direction; that reading and signing was requested

12 and that I am neither counsel for, related to, nor

13 employed by any of the parties to this case and

14 have no interest, financial or otherwise, in its

15 outcome.

16       IN WITNESS WHEREOF, I have hereunto set my

17 hand and affixed my notarial seal this 28th day of

18 July, 2020.

19 My commission expires May 31, 2021.

20

21     *Lucia Block*

22     _____

23     LUCIA R. BLOCK

24     NOTARY PUBLIC IN AND FOR ILLINOIS

Transcript of Thomas Kelly
Conducted on July 14, 2020

49

| A |
|---|

**aberdeen**
3:13
**aberration**
61:12
**ability**
11:7, 12:10,
12:16, 54:5,
88:7, 88:11,
162:12
**able**
18:21, 82:14,
105:16, 112:12,
168:18
**about**
8:10, 15:8,
17:15, 20:6,
20:21, 30:2,
30:4, 30:12,
37:15, 45:5,
45:7, 49:16,
51:8, 51:18,
60:3, 60:14,
60:16, 64:12,
64:16, 66:19,
69:2, 69:9,
69:12, 69:16,
71:2, 71:19,
72:6, 72:21,
73:1, 74:4,
74:8, 75:7,
75:9, 75:16,
75:23, 75:24,
76:13, 77:8,
77:12, 77:14,
77:18, 77:24,
80:11, 80:12,
80:20, 81:1,
81:7, 81:14,
83:9, 84:6,
84:16, 84:22,
88:6, 88:20,
89:17, 89:20,
90:2, 90:4,
90:9, 91:8,
101:17, 102:1,
108:2, 109:3,

109:4, 109:12,
109:21, 113:7,
117:11, 119:14,
120:7, 121:4,
121:19, 138:21,
142:13, 143:2,
143:3, 146:23,
147:10, 148:5,
152:17, 154:10,
155:11, 155:12,
155:13, 156:13,
159:22, 161:2,
161:4, 169:7,
169:9, 170:19,
171:14, 186:9
**above**
120:20
**absence**
85:21
**absolutely**
148:14, 154:7
**absurd**
135:3
**abuse**
164:23
**academy**
16:9, 16:22,
16:23, 19:6,
19:8, 19:10,
19:13, 19:16,
19:19, 36:3,
37:3, 37:9,
37:13, 46:10,
49:1
**acceptable**
134:10, 136:7
**access**
138:6, 138:7
**accident**
166:12
**accidents**
25:6
**accommodate**
11:21
**according**
121:11, 121:21,
122:13, 149:13
**account**
8:13, 8:19,

148:2
**accrue**
16:17
**accuracy**
98:9, 98:14
**accurate**
44:21, 58:14,
58:23, 58:24,
59:14, 72:2,
72:8, 97:23,
170:1, 175:5
**accurately**
11:8, 12:11,
12:17, 88:8
**accusation**
166:17
**accused**
149:18
**achieve**
151:4
**acknow**
38:23
**acknowledge**
6:5, 188:3
**acknowledged**
38:23
**acknowledgment**
188:1
**acted**
39:15
**action**
151:3
**activities**
30:12
**activity**
163:18, 176:21
**actual**
161:10, 186:8
**actually**
87:15, 87:21,
102:10, 102:23,
122:13, 127:13,
131:8, 134:2,
165:23, 175:4,
177:19, 179:12,
179:21, 180:1,
180:21
**add**
175:13, 175:21

**addition**
173:24, 176:13
**additional**
116:8
**address**
105:3
**addresses**
164:6
**addressing**
55:11
**adelman**
4:12, 5:6,
6:18, 43:10,
43:16, 43:18,
44:15, 114:17,
123:10, 124:6,
124:22, 125:13,
126:21, 127:2,
128:15, 140:16,
140:24, 163:6,
168:12, 177:3,
177:5, 177:8,
177:10, 177:12,
179:2, 186:12,
186:14, 186:22
**adjudicated**
153:6
**administered**
166:5
**administrative**
15:16
**admissibility**
6:7, 133:18
**admissible**
167:11
**admit**
40:10
**advanced**
14:1
**advise**
15:9
**advised**
172:17
**affect**
11:7, 12:16,
88:11
**affecting**
12:10

Transcript of Thomas Kelly
Conducted on July 14, 2020

50

affects
88:7
affirm
8:22
affirmed
8:24
affix
156:19
affixed
189:17
afraid
30:5
after
11:11, 11:13,
14:1, 14:4,
16:11, 16:23,
17:10, 20:14,
26:4, 33:14,
33:19, 38:19,
38:22, 61:24,
93:14, 107:15,
120:14, 142:5,
153:7, 161:13,
161:17, 168:13,
175:8, 181:7
afternoon
31:3, 32:9
afternoons
30:18, 30:20,
33:12, 88:23
afternoons"
104:12
afterwards
17:1
again
18:22, 21:1,
26:24, 28:17,
33:18, 37:17,
52:10, 67:19,
75:9, 81:9,
81:18, 113:2,
128:5, 141:20,
143:1, 144:15,
147:6, 179:17,
184:11
against
22:23, 150:3,
151:1, 152:18,

152:24, 154:6,
154:18, 167:22,
168:1, 168:5
age
35:23, 71:8,
151:21
ago
7:18, 80:3,
148:9
ago"
105:23
agree
6:13, 6:15,
6:17, 6:19,
6:21, 41:24,
135:12, 165:1
agreed
8:22, 61:24
agreeing
133:4
agreement
8:4, 8:14, 9:2,
9:5
ahead
9:3, 9:17,
29:12, 29:13,
35:17, 36:21,
39:24, 40:16,
42:4, 45:22,
49:2, 49:3,
57:3, 59:4,
69:20, 70:7,
83:17, 109:1,
116:23, 118:2,
126:22, 128:21,
160:17, 165:9,
168:12, 168:23,
180:9, 183:21,
185:17
aid
36:16
ainsworth's
169:17
air
155:20
al
1:10, 2:7,
3:17, 4:4,

75:16, 78:12,
81:7, 164:11,
164:15, 164:18
alert
11:21
all-day
48:24, 49:4
allegation
22:15, 25:10,
25:12, 150:1
allegations
150:3, 151:1,
154:2, 154:5
alleged
155:10
alleging
155:19, 155:24,
156:4
allen
149:20
alley
120:11, 121:13
allow
86:15
allowed
136:6, 136:12,
156:2, 183:15,
184:13
almost
26:1, 86:7
alone
85:24
along
115:13, 122:21,
174:17
already
54:4, 134:12,
185:13
also
18:8, 19:15,
21:10, 32:13,
39:3, 42:6,
43:11, 65:22,
120:16, 151:2,
152:19, 170:4,
178:21, 179:1
although
115:22, 181:4,

181:8
always
36:23, 92:22
amend
145:9
amount
19:9, 31:10,
31:11
anal
120:17, 123:1
andrew
3:18, 59:4,
69:20, 183:18
another
24:16, 49:20,
50:7, 50:9,
56:16, 85:21,
91:14, 107:4,
123:19, 143:21,
144:21, 149:8,
168:4
answer
10:1, 10:12,
10:15, 11:1,
11:24, 23:13,
34:10, 35:18,
36:6, 36:20,
38:11, 39:1,
39:2, 40:16,
42:4, 46:5,
49:22, 50:2,
50:20, 51:3,
54:14, 59:10,
66:19, 66:20,
76:24, 120:2,
123:13, 125:2,
126:2, 126:11,
127:4, 127:19,
129:6, 129:14,
130:5, 131:3,
131:6, 131:8,
132:4, 132:21,
132:22, 133:20,
133:24, 134:2,
134:8, 135:5,
136:17, 137:6,
140:18, 142:3,
142:4, 142:9,

Transcript of Thomas Kelly
Conducted on July 14, 2020

51

142:24, 143:4,
144:14, 145:17,
147:20, 162:14,
164:1, 165:10,
173:8
**answered**
52:19, 54:4,
54:12, 56:11,
128:23, 129:5,
129:11, 129:20,
129:21, 130:15,
130:17, 131:4,
131:15, 131:23,
132:17, 133:7,
133:12, 133:21,
134:4, 134:12,
143:9, 170:4
**answering**
55:17
**answers**
8:2, 131:1,
132:16, 135:13,
145:8
**antwinica**
66:12, 68:15,
84:18, 119:15,
148:17, 148:21,
148:24, 159:18,
159:22, 160:5,
176:22
**anybody**
157:18, 157:19,
177:2, 186:10,
186:20
**anymore**
153:8
**anyone**
9:18, 12:6,
29:3, 29:7,
29:9, 67:1,
67:11, 69:1,
83:6, 85:9,
85:18, 92:4,
92:24, 114:16,
138:6, 152:2
**anything**
9:13, 9:19,
12:22, 30:2,

51:4, 66:18,
66:20, 89:17,
90:2, 119:14,
125:17, 129:24,
136:13, 141:17,
146:1, 146:22,
151:20, 159:21,
161:1, 161:4,
173:21, 175:2,
175:13, 175:20,
184:24, 185:14
**anyway**
24:21, 52:8
**apart**
22:24, 23:21,
69:1, 114:9
**apartment**
120:19
**apologies**
74:19, 116:14,
150:21
**apparent**
65:19, 65:20
**apparently**
24:7, 136:10
**appear**
49:9, 82:21,
82:22, 188:7
**appearance**
71:1, 71:22,
73:24, 74:7,
75:8, 75:17,
75:22, 76:4,
111:14, 161:2,
161:5
**appearing**
54:8
**appears**
63:1, 82:18,
84:7, 104:15,
107:8, 141:17
**applied**
17:19
**apply**
21:3, 136:10
**appointment**
53:12
**appreciate**
10:7, 93:17

**approach**
167:5
**appropriate**
99:6
**approximate**
162:20
**approximately**
14:3, 75:14
**april**
88:19, 88:22,
89:18, 91:3,
99:17, 104:3,
104:8, 121:15,
146:13, 162:3,
162:11, 163:19,
170:23, 174:10,
185:6
**area**
18:5, 20:15,
20:16, 21:4,
21:8, 21:18,
21:23, 22:9,
26:8, 26:16,
26:17, 26:20,
27:1, 28:8,
28:9, 28:12,
28:14, 28:19,
28:21, 28:24,
29:14, 31:6,
32:23, 33:3,
33:22, 34:4,
34:16, 35:2,
35:4, 38:6,
64:10, 65:3,
70:23, 73:2,
74:13, 74:22,
84:5, 87:1,
87:4, 87:8,
91:15, 126:9,
126:16, 127:12,
138:4, 155:17,
155:20, 156:9,
156:15, 157:24,
158:12, 160:23,
161:19, 163:4,
163:12, 164:23,
170:23, 171:21,
171:22, 172:3,

185:5
**areas**
20:17
**argue**
186:9
**arguing**
50:15, 51:12,
53:15
**argumentative**
49:19, 49:23,
50:24, 76:15,
76:22, 128:14,
128:21, 158:8,
180:8
**arm**
84:8
**army**
13:17, 14:18,
15:7, 17:11
**around**
24:20, 72:5,
92:19, 125:24,
149:23
**arrest**
38:13, 39:4,
41:11, 93:20,
94:3, 94:6,
94:9, 94:12,
94:14, 94:17,
94:19, 95:2,
95:5, 95:6,
95:18, 96:4,
96:14, 96:17,
97:3, 97:8,
97:9, 97:17,
97:20, 97:22,
98:3, 98:4,
98:6, 98:14,
116:9, 172:9
**arresting**
94:6, 94:15,
95:4, 96:9,
96:16, 97:9,
98:5, 98:16,
116:6, 116:8
**arrests**
36:14, 95:13
**arrive**
88:24, 89:10,

Transcript of Thomas Kelly
Conducted on July 14, 2020

52

89:11
**arrived**
64:10, 139:3
**arvn**
15:7, 15:11
**asa**
178:3, 178:10,
178:15, 178:20,
178:23
**asked**
23:23, 24:6,
25:2, 50:16,
50:23, 51:23,
52:19, 54:11,
56:10, 76:9,
92:1, 92:8,
101:22, 102:6,
102:14, 103:14,
106:3, 106:4,
119:6, 120:1,
129:4, 129:11,
129:20, 130:15,
130:16, 131:2,
131:15, 131:23,
135:5, 137:16,
169:6, 170:4,
171:8, 173:6,
174:16
**asking**
8:21, 8:23,
9:1, 37:18,
40:18, 53:24,
56:7, 92:5,
103:3, 105:6,
114:15, 124:11,
124:12, 124:13,
125:15, 127:21,
133:19, 135:13,
143:2, 143:3,
147:6, 147:9,
147:10, 152:7,
171:2
**asks**
133:15
**asserting**
50:20
**assigned**
14:5, 14:11,

18:4, 18:5,
19:19, 21:11,
21:18, 22:4,
25:5, 25:24,
26:11, 28:7,
29:15, 31:2,
31:7, 31:9,
32:5, 32:23,
32:24, 33:5,
33:7, 62:20,
66:4, 92:20,
93:6, 117:1,
161:23
**assignment**
13:23, 19:23,
21:21, 26:3,
26:7, 31:17,
31:18, 32:3,
92:23
**assignments**
21:16, 79:13
**assistance**
14:5, 15:4
**assistant**
15:17, 43:18,
77:20, 139:5,
139:14, 139:18,
140:9, 140:21,
141:7, 141:10,
162:20, 177:12,
177:14
**assisted**
94:10
**assisting**
94:12, 94:15,
94:20, 96:9,
96:15, 97:8,
98:5, 98:15
**assume**
11:1, 39:6,
67:7, 184:1
**assuming**
185:2
**attached**
5:12, 188:7
**attack**
157:19
**attempt**
103:5

**attend**
16:7, 19:6,
19:8, 79:20
**attending**
32:21
**attention**
46:24, 98:10
**attorney**
4:15, 43:19,
54:18, 55:18,
65:23, 77:20,
139:6, 139:15,
139:19, 140:9,
177:12, 177:14,
182:17
**attorney's**
4:10
**attorneys**
67:5, 67:6,
68:1, 69:2,
69:10, 140:21,
141:8, 141:11,
149:4, 160:9,
162:21, 163:3,
163:11
**audible**
9:20, 41:16
**audio**
134:14, 177:4,
182:1
**august**
14:16
**authenticity**
140:14
**authored**
170:6
**availability**
21:1, 32:14
**available**
64:21, 161:11
**average**
74:2
**awarded**
14:17, 14:18,
14:21, 14:23
**aware**
11:11, 11:14,
32:12, 36:23,

40:24, 178:2,
178:6
**away**
29:17, 121:5,
121:17, 122:7,
147:24

**B**

**back**
25:1, 25:21,
26:6, 26:16,
33:21, 37:13,
44:3, 46:4,
56:19, 61:1,
63:1, 71:1,
71:9, 71:12,
71:22, 72:3,
72:10, 73:24,
74:7, 74:13,
76:4, 77:14,
78:9, 78:10,
82:18, 82:20,
94:2, 101:13,
106:8, 111:14,
125:18, 131:6,
132:20, 133:2,
133:4, 136:13,
142:13, 145:5,
148:10, 149:7,
149:24, 150:10,
156:9, 156:14,
160:19, 161:2,
161:8, 161:18,
162:3, 162:11,
163:19, 175:17,
179:23, 181:7,
183:13
**background**
137:2
**backgrounds**
102:13
**bad**
136:13, 142:16
**baloney**
70:5
**barber**
100:5, 100:7
**barraco's**
80:9

Transcript of Thomas Kelly
Conducted on July 14, 2020

53

bartender
17:15
base
91:18
based
6:8, 27:14,
27:18, 102:19,
108:15, 123:21,
124:12, 124:14,
126:15, 137:17,
151:1, 151:18,
165:3, 165:17,
176:18
basement
106:4, 106:9,
120:13, 120:15,
121:14, 121:22,
121:23, 121:24,
122:20, 122:21
basement"
106:5
basic
13:21, 65:9
basically
15:16, 104:22,
174:18
basing
102:19
basis
79:4
basket
140:12
bates
47:2, 81:21,
98:24, 108:21,
109:6, 115:13,
146:7, 150:22
bathroom
99:5
batteries
106:12
bear
123:20
beat
26:13, 87:6
became
27:21, 120:18
because
7:19, 36:14,

41:19, 41:22,
42:23, 44:20,
47:19, 50:20,
51:3, 57:17,
60:1, 60:8,
66:22, 85:4,
85:15, 87:5,
87:17, 91:21,
93:7, 102:15,
102:17, 121:18,
126:6, 132:7,
132:8, 134:7,
136:21, 147:21,
147:23, 153:2,
153:22, 156:1,
166:24, 171:16,
172:16, 180:20,
184:21
become
27:2
becomes
121:17, 123:1
bed
13:8
been
7:2, 7:14,
7:19, 18:12,
19:12, 22:10,
26:8, 28:16,
45:1, 45:6,
45:15, 47:7,
47:10, 58:16,
59:21, 66:10,
68:18, 69:12,
79:18, 80:4,
80:19, 81:9,
81:11, 81:12,
90:14, 120:9,
131:1, 131:2,
135:5, 140:11,
144:1, 144:4,
144:8, 144:19,
151:6, 152:21,
154:14, 159:9,
161:11, 164:2,
164:22, 171:7,
171:20, 171:24,
172:3, 172:16,

173:20, 175:16,
176:3, 182:13,
182:14
before
2:16, 7:12,
7:15, 8:1, 8:4,
10:11, 10:16,
12:1, 13:8,
17:11, 22:1,
24:21, 31:11,
36:24, 47:9,
47:13, 47:17,
53:8, 90:12,
97:6, 97:23,
99:13, 121:10,
127:20, 143:5,
143:14, 150:10,
151:19, 159:10,
177:13, 189:6
begin
10:16, 89:4
beginning
10:11, 32:3
behalf
3:3, 3:9, 3:16,
4:3, 4:10, 6:12,
6:14, 6:16,
6:18, 6:20
behind
83:15, 106:10,
120:11, 121:13
being
8:18, 8:19,
16:12, 30:10,
57:13, 58:11,
61:5, 62:12,
69:13, 70:14,
70:15, 91:8,
138:13, 148:6,
149:18, 152:12,
155:16, 159:2
belief
91:19, 108:14
believe
19:11, 19:13,
20:6, 25:3,
25:20, 26:6,
26:21, 26:23,

33:15, 33:20,
34:12, 34:15,
46:9, 54:15,
57:18, 57:21,
58:3, 58:8,
59:24, 60:5,
74:2, 74:10,
74:15, 75:10,
75:21, 76:1,
77:17, 79:16,
79:19, 79:22,
80:3, 80:5,
80:9, 84:23,
87:6, 91:15,
91:18, 108:1,
108:6, 108:7,
118:14, 132:17,
144:16, 152:19,
152:20, 152:23,
155:9, 156:17,
169:10, 175:23,
176:2, 178:7,
179:17
believed
170:24
bench
156:17
benches
156:18
benign
142:16
benjamin
14:12
benoit
107:11
best
16:19, 24:7,
25:21, 35:1,
48:23, 54:4,
87:5, 152:22,
162:2, 164:5,
184:22
better
79:6, 79:12
between
80:10, 85:11,
146:20, 147:11,
148:1, 153:16,

Transcript of Thomas Kelly
Conducted on July 14, 2020

54

178:15, 178:19
**bigger**
111:10
**bill**
16:13, 75:7,
75:22, 78:12,
78:13, 81:14,
83:17, 109:19,
161:4
**birth**
104:24
**bit**
20:7, 36:10,
41:5, 71:4,
73:15, 89:15,
170:10
**biên**
14:7, 14:8
**black**
74:11, 75:20,
76:7, 76:8,
76:20
**block**
1:24, 2:16,
189:3, 189:23
**blond**
71:7
**blondish**
75:10, 75:24
**bob**
154:19
**bodies**
90:11, 90:21
**body**
64:19, 90:15,
91:9, 94:16,
94:23, 95:2,
106:14, 142:6,
170:11
**booker**
154:2, 154:6
**boot**
13:20, 14:1
**both**
122:17, 123:4,
123:23, 128:4,
137:23, 149:14
**bottom**
107:9, 111:9,

112:11, 121:19
**boudreau**
70:20, 71:15,
78:11, 80:2,
81:3
**boudreau's**
80:18, 81:18
**boulevard**
90:22
**box**
107:12, 185:21,
185:23
**boyfriend**
143:10
**brady**
3:11
**break**
11:21, 12:1,
60:20, 99:5,
99:10, 101:11,
144:12, 144:23,
160:16
**breath**
11:15
**brian**
29:6
**bridgeman**
66:12, 68:15,
84:18, 119:15,
148:17, 148:21,
149:1, 159:22,
160:5, 176:23
**bridgeman's**
159:19
**brief**
48:6, 82:11,
112:14, 117:16,
181:12
**briefcase**
163:4
**briefly**
25:8, 161:7
**bring**
133:4, 168:14,
170:5
**bringing**
151:9
**brings**
123:18, 151:5

**brittany**
3:19
**broaden**
41:5
**broadly**
39:3
**broke**
101:16
**bronze**
14:21, 14:23
**brother**
106:22, 107:4
**brought**
87:6, 154:6,
154:18
**brown**
72:11, 75:20
**brownish**
73:17, 77:16,
111:16
**buddies**
69:16
**build**
74:2, 74:9,
75:9, 75:12,
77:10, 111:21,
111:23
**building**
28:15
**bunch**
70:5, 169:7
**butterfield**
3:6
**bypass**
11:9

| C |
| --- |

**california**
80:10, 138:22
**call**
27:24, 28:1,
48:23, 50:13,
76:12, 138:17,
139:1
**called**
7:2, 25:7,
27:24, 64:23,
76:19, 79:17,

104:12, 106:18,
153:22
**calls**
10:1, 42:3,
123:8, 124:3,
124:19, 125:8,
125:20, 133:11,
165:7, 173:2,
173:12, 185:12
**came**
25:7, 92:24,
157:19, 170:19
**camera**
82:19, 82:21
**camp**
13:20, 14:1
**can't**
17:1, 72:23,
83:12, 83:24,
84:4, 84:5,
90:18, 125:19,
134:5, 134:8,
135:23, 136:1,
136:2, 146:22,
147:12, 147:24,
148:9, 169:10,
170:2, 179:7,
180:19, 185:14
**cannot**
50:11, 50:14
**cap**
83:9
**caption**
1:13, 2:1
**car**
20:9, 20:18,
20:22, 21:2,
24:22, 25:1,
25:7, 25:13,
26:14, 66:9,
92:24, 149:22
**card**
138:11, 149:24,
153:21
**cards**
138:14
**care**
21:9, 21:12,

Transcript of Thomas Kelly
Conducted on July 14, 2020

55

30:6, 128:11,
128:17, 130:10,
130:13, 131:19,
131:22, 137:3,
137:9, 165:13
**career**
38:6, 90:13,
143:4, 143:7,
162:19
**carroll**
77:12, 78:13,
81:16, 82:22
**cars**
25:4
**case**
1:9, 2:5,
65:11, 68:15,
68:16, 68:18,
68:20, 68:23,
69:5, 69:12,
70:18, 92:21,
117:1, 138:19,
139:4, 139:11,
148:13, 149:5,
149:15, 154:22,
155:8, 164:4,
164:19, 165:4,
165:18, 173:6,
174:11, 175:12,
175:24, 189:13
**cases**
78:2, 177:23
**casual**
20:24
**cat**
106:5
**catalogued**
169:20
**categories**
64:13
**catholic**
16:3
**cecelia**
106:22
**certain**
45:4, 58:22,
64:20, 88:2
**certainly**
23:13, 46:6,

55:20, 57:6,
60:8, 60:21,
62:12, 63:18,
95:9
**certainty**
83:21
**certificate**
17:7, 189:1
**certified**
2:17, 189:3
**certify**
132:20, 189:7
**certifying**
133:5
**cetera**
64:14, 66:2
**chairs**
87:8, 87:16
**change**
89:9, 167:5
**changed**
26:8, 26:24
**changes**
182:23
**changing**
89:12
**channel**
148:8
**character**
134:18, 135:3
**characterize**
183:19
**charges**
116:11
**charles**
154:2, 154:6
**chase**
44:23
**check**
106:4, 138:15
**chest**
11:16
**chicago**
1:9, 2:6, 3:14,
3:16, 3:22, 4:3,
4:8, 4:17,
17:12, 17:20,
18:8, 19:3,

22:14, 23:17,
44:7, 45:11,
57:14, 58:10,
58:11, 58:15,
59:13, 59:14,
60:4, 60:5,
61:5, 90:13,
123:22, 143:7,
143:18, 143:19,
143:21, 144:2,
155:4
**chicago's**
58:3
**children**
18:15, 18:17,
18:23
**chip**
120:10, 120:12,
120:16, 121:4,
121:12, 121:16,
121:21, 122:2,
122:4
**choice**
29:19
**cholesterol**
13:7
**chunky**
71:2, 75:20,
75:24, 77:15
**circle**
83:15
**circumstances**
103:3, 103:10
**city**
2:6, 4:3, 6:20,
23:17, 47:3,
47:5, 47:6,
53:2, 53:18,
58:3, 58:9,
81:22, 150:22,
150:23, 155:4,
177:7
**civilian**
25:14
**claim**
153:20, 166:6,
166:13
**claiming**
53:21

**claims**
164:23
**clancy**
73:23, 78:11,
78:12, 80:20,
107:22, 107:24,
108:4, 108:7,
108:11
**clancy's**
93:19, 109:10,
161:2
**clarification**
23:2, 34:7,
39:22, 47:13,
57:10, 59:3,
94:24, 98:11,
126:23, 134:24,
136:9, 145:16,
182:2
**clarify**
12:24, 26:22,
41:18, 78:18,
115:3
**clarifying**
47:21
**clark**
3:21
**classes**
46:11
**clear**
51:8, 60:17,
102:8, 114:22,
115:17, 134:13,
161:20
**clearly**
134:22
**clerk**
15:16
**clipboard**
84:8
**clothing**
20:24
**coaching**
136:1
**coat**
83:18, 84:2
**coerced**
155:10

Transcript of Thomas Kelly
Conducted on July 14, 2020                                        56

cohort
19:14
cold
155:21
coleman
2:3, 3:9, 6:13,
68:7, 84:16,
84:24, 85:2,
85:4, 85:8,
85:12, 85:23,
86:11, 86:19,
87:6, 87:15,
87:22, 88:20,
91:3, 91:8,
91:13, 92:2,
92:5, 92:9,
93:7, 93:21,
101:1, 101:7,
101:22, 102:2,
102:6, 104:23,
106:22, 106:23,
107:4, 107:5,
115:18, 116:9,
116:11, 116:12,
117:13, 119:18,
120:8, 121:1,
121:11, 122:2,
122:5, 122:18,
123:5, 123:23,
126:9, 126:14,
127:12, 127:14,
141:15, 141:16,
142:2, 146:13,
146:21, 148:6,
148:10, 148:16,
163:24, 170:22,
170:23, 170:24,
171:9, 171:11,
171:19, 172:9,
172:12, 173:7,
174:22, 175:3,
175:7, 175:12,
175:17, 176:14,
178:2, 178:12,
178:16, 178:24,
179:7, 179:22,
181:7, 181:16,
185:6, 185:8

coleman's
100:18, 159:13,
185:20
collar
82:23
collect
64:3
collection
63:21
college
16:3, 16:10,
16:13, 16:16,
16:17, 16:19
color
71:5, 72:9
come
132:20, 133:2,
138:18, 139:1
comfort
88:4
coming
24:18, 93:2,
123:17, 137:2
comiskey
105:6, 105:10
command
14:5, 15:5
commendation
66:8
commendations
14:17
commission
189:19
committing
39:9
common
45:16, 55:10,
55:14, 174:6,
179:10
communicate
57:17
compare
42:15
compensated
32:17
complainant
24:3, 24:5
complete
170:1, 188:6

completely
50:11
completion
19:18, 28:6,
31:24
compound
40:15
comprised
15:5
compulsory
16:10
computer
161:11
con
8:24
concern
12:13
concerning
84:17, 163:22,
164:19, 164:23
conclusion
38:22, 175:10
condition
11:5, 11:7,
12:15
conditioning
155:20
conduct
15:12, 38:9,
40:12, 45:12,
87:18, 87:20,
151:3
conducted
1:16, 2:11,
30:13, 85:23,
87:12, 172:6
conducting
85:19, 149:4,
167:6, 174:11
confession
43:4, 43:5,
121:7, 122:12,
140:2, 140:8,
155:8, 155:13
confessions
41:1
confidential
152:2, 152:6,

152:11, 152:13
confirm
105:15
conformed
157:24
confront
40:10, 62:13,
62:14
congratulations
18:14
connection
166:6
connelly
3:20
constantly
41:8
construction
17:13
cont
150:3
contact
54:20, 54:23,
55:5, 55:11,
65:17, 66:1,
66:4, 105:5,
149:24, 153:20
contacted
149:3, 163:21
contains
43:5
contem
180:2
contemporane
180:5
contemporaneously
174:21, 179:23,
180:11, 180:20,
181:1
contents
126:15
context
182:17
continue
101:11, 145:22
continued
1:13, 2:1, 4:1
continuing
58:13

Transcript of Thomas Kelly
Conducted on July 14, 2020

57

control
168:23
controlled
8:20
conversation
84:15, 84:24,
85:1, 85:7,
85:11, 85:14,
86:3, 86:11,
87:2, 87:22,
88:20, 90:6,
119:18, 146:12,
171:11, 171:21,
179:7, 179:9,
179:21, 180:15
conviction
70:14, 163:21,
164:3
cook
4:10, 4:14,
189:5
cooperative
141:21
copies
141:8, 141:11
copulating
120:16, 121:15,
122:1, 122:23
copy
186:18, 186:20
corner
107:9, 111:9,
112:11, 151:15
correct
9:4, 13:13,
15:20, 17:8,
17:9, 19:4,
22:21, 35:23,
43:1, 43:2,
56:2, 56:5,
56:9, 56:13,
57:15, 62:3,
62:17, 67:9,
67:10, 85:19,
85:24, 86:17,
86:18, 87:23,
92:3, 97:20,
97:23, 98:18,

100:22, 104:9,
105:3, 105:23,
106:6, 114:14,
115:5, 119:10,
120:5, 126:17,
141:5, 143:16,
145:10, 147:22,
149:9, 151:17,
153:8, 155:10,
158:2, 162:18,
166:7, 166:17,
166:18, 166:20,
169:9, 175:18,
175:20, 176:16,
178:21, 179:1,
179:9, 181:1,
181:8, 181:9,
181:16, 181:23,
182:24, 183:5,
188:5, 189:8
corrections
188:7
correctly
105:19, 106:15,
106:19, 107:1,
107:6
could
12:24, 23:11,
24:11, 24:21,
25:20, 31:9,
34:16, 39:1,
43:22, 44:3,
46:4, 56:19,
59:11, 62:12,
66:1, 66:2,
84:9, 99:6,
107:21, 117:17,
125:2, 132:14,
132:19, 132:21,
138:6, 142:15,
142:17, 151:19,
156:23, 162:17,
163:12, 177:21,
185:11
couldn't
24:9, 106:9
counsel
6:2, 6:6, 47:7,

55:19, 66:23,
69:6, 69:8,
114:14, 189:12
county
4:10, 4:14,
6:18, 189:5
couple
16:23, 16:24,
33:22, 80:3,
81:9, 148:9,
166:2, 168:10
course
48:24, 123:5,
124:1, 162:19,
163:1, 165:16
courses
16:10
court
1:1, 8:20,
10:17, 30:22,
32:14, 32:17,
32:18, 32:20,
32:21, 49:6,
49:10, 52:18,
131:5, 159:3,
167:11, 189:1
courtesy
55:14
courtroom
48:11, 48:16,
48:20, 52:13,
52:15, 56:17,
57:22
cover
142:18
create
153:20
created
27:14, 88:19,
103:21, 107:15,
141:16
creates
133:18
creating
149:24
credibility
48:12, 49:6,
52:2, 52:13,

52:15, 56:17,
57:22
credible
49:10, 52:1,
52:18, 54:8,
56:1, 56:4,
56:6, 56:8
credit
95:5, 95:9,
95:18
credited
22:20, 25:14
credits
16:17
crew
105:7
crime
21:14, 21:15,
39:9, 42:17,
44:10, 44:12,
45:5, 45:7,
62:19, 63:14,
63:19, 65:15,
66:4, 66:5,
120:20, 142:19,
171:1
crimes
28:8, 28:10,
28:13, 28:21,
31:1, 35:4,
63:17, 64:7,
64:11, 65:6,
120:5, 128:10
criminal
100:4, 100:7,
100:18, 100:24,
101:6, 101:18,
101:21, 101:24,
102:4, 102:12,
102:15, 102:24,
103:4, 103:6,
103:10, 103:17,
119:21, 127:24,
161:8, 162:5,
162:8, 162:9,
162:12, 172:22,
176:16
crosstalk
113:5, 134:14

Transcript of Thomas Kelly
Conducted on July 14, 2020

58

crosswalk
136:8
csr
1:24, 189:4
curious
122:17
curran
3:4, 5:4, 5:8,
6:14, 132:14,
133:1, 133:8,
133:14, 134:1,
134:19, 134:21,
135:1, 135:8,
160:11, 160:12,
163:9, 163:16,
165:8, 165:14,
165:22, 166:1,
167:17, 170:4,
173:2, 173:12,
174:4, 181:12,
181:14, 182:3,
182:7, 183:12,
183:18, 183:20,
184:1, 184:5,
184:8, 184:9,
184:19, 184:24,
185:11, 185:17,
186:11
custody
65:21, 65:24
cut
44:24
cv
1:9, 2:5

**D**

dap
120:10, 120:12,
120:17, 121:4,
121:12, 121:16
dark
72:11, 74:2,
74:10, 82:23
darrell
122:18
darryl
1:6
date
53:12, 104:24,

106:1, 116:9,
151:7, 188:13
dated
104:3, 104:8
david
4:12, 43:16,
177:12
davis
109:7
dawned
16:12
day
25:12, 26:2,
48:15, 59:22,
80:6, 89:22,
92:16, 142:16,
143:11, 189:17
days
25:4, 25:18,
27:16, 29:16,
29:17, 29:20,
29:23, 29:24,
30:1, 30:2,
30:4, 30:8,
30:15, 48:12,
48:19, 52:12,
52:16, 52:24,
71:3, 90:3,
105:23, 149:7,
149:14
dead
106:5
dealt
21:17
decade
73:10
deceased
91:7
deceive
42:10, 42:20
december
14:4, 151:14
deceptive
167:14
deciders
55:21
decision
8:17

decomposing
90:11, 90:15,
90:21
defendant
3:16, 4:3, 6:16
defendants
1:11, 2:8,
6:19, 69:5,
69:10, 69:12,
79:21, 164:7,
164:10, 164:13
defense
55:19
definitively
179:8
degree
17:4, 17:6,
83:23
demarco
149:15, 153:11,
153:16, 153:21
demeanor
48:12, 48:17,
48:20, 52:8,
52:13, 52:15,
56:17, 57:22
denial
22:21
denote
31:20
dep
47:9, 47:13,
47:17, 47:24,
145:12
department
16:12, 17:12,
17:20, 18:8,
19:3, 22:11,
22:14, 28:16,
37:2, 45:11,
53:7, 54:16,
57:14, 58:10,
66:9, 80:7,
140:4, 143:19,
144:2, 151:5,
157:3
department's
60:6, 151:4

depending
89:15
deponent
132:15, 132:17,
132:21, 134:2,
134:23, 135:3,
188:1
deposed
7:14, 7:17
deposition
1:15, 2:11,
5:14, 7:11,
8:11, 8:13,
8:16, 11:20,
46:14, 50:12,
50:13, 66:16,
67:2, 68:2,
68:5, 69:2,
88:1, 117:12,
127:10, 133:16,
135:11, 142:14,
145:9, 145:22,
152:10, 176:4,
176:20, 176:21,
189:6
deprive
155:21
deprived
156:5
derrell
1:5, 3:3,
115:18, 121:21,
123:4, 123:23,
148:6, 148:20,
159:15, 160:13,
163:22, 178:3,
178:12, 178:19,
178:24
describe
70:24, 73:12,
73:23, 74:7,
76:3, 76:9,
76:12, 77:13,
111:13, 156:8,
161:7
described
22:1, 77:1,
112:1, 116:1,

Transcript of Thomas Kelly
Conducted on July 14, 2020                                          59

describes
116:12
describing
174:19
description
65:21, 72:1,
72:2, 75:13,
77:13
designated
152:11
designating
152:13
desire
21:6, 21:7,
182:23
detail
121:6
detailed
65:16, 66:6
details
44:11
detained
156:23
detective
27:6, 27:12,
27:21, 27:22,
28:1, 28:4,
28:6, 37:11,
37:15, 37:23,
38:3, 41:1,
41:8, 42:13,
44:8, 61:21,
63:3, 86:9,
90:14, 91:14,
92:8, 92:19,
93:6, 94:2,
98:2, 99:24,
101:21, 122:16,
123:3, 123:22,
125:7, 128:10,
137:18, 137:21,
149:19, 149:20,
153:11, 160:20,
165:2, 165:17,
167:7, 168:4,
169:5, 170:6,
170:17, 172:4,

177:11, 182:5,
182:10, 185:5
detective's
137:15
detectives
28:17, 28:20,
37:22, 70:12,
92:20, 111:24,
149:19, 149:22,
153:16, 157:23,
160:22
determine
42:17, 43:5,
92:19, 94:5
dial
138:22
different
41:23, 41:24,
48:19, 52:10,
52:11, 52:12,
52:15, 65:14,
101:18, 105:17,
142:23
differently
63:14, 63:17,
64:6, 65:5,
93:15
difficulties
12:3, 12:7,
23:1
direct
46:23
directed
171:7
directing
50:19, 51:2
direction
189:11
directive
150:5
directly
24:18
disagree
133:8
disagreeing
9:15
discharge
15:19, 15:22

discharged
14:14, 17:10
disciplined
144:1
discovered
89:22, 90:9
discovery
91:7, 91:9,
125:15
discredit
151:5
discrepancies
148:1
discussed
66:20
discussion
8:10
dishwater
71:7
disobedience
150:5
dispatcher
138:24
displaying
150:21
district
1:1, 1:2,
19:20, 20:5,
20:8, 20:12,
20:14, 21:9,
21:12, 21:22,
22:3, 22:6,
22:9, 22:12,
25:24, 26:4,
26:10
diversity
57:5, 57:13,
57:18
division
1:3, 18:5,
25:5, 172:4
document
46:24, 61:12,
64:23, 65:1,
65:4, 65:7,
65:8, 65:13,
98:24, 99:13,
99:16, 104:3,

107:14, 115:14,
115:16, 116:6,
117:21, 118:7,
118:15, 119:2,
141:18, 146:16,
150:12, 150:20,
154:9, 169:16,
169:21, 170:1,
183:14, 184:12
documented
124:15, 172:19,
173:10, 173:17
documents
68:4, 68:8,
176:19
dog
106:5
doing
15:1, 93:8,
135:18, 135:19,
135:20, 180:17
domestic
21:17
done
10:10, 10:15,
29:13, 31:10,
117:14, 118:13,
174:2, 175:1,
175:8
door
106:8, 106:9,
106:11, 120:15,
121:14, 122:20
doorway
83:7, 122:1,
122:6, 123:2
double
11:9
down
24:23, 24:24,
25:1, 48:16,
55:13, 66:3,
67:5, 73:16,
79:24, 85:15,
94:9, 94:11,
111:8, 113:1,
116:7, 116:20,
117:15, 117:17,

Transcript of Thomas Kelly
Conducted on July 14, 2020       60

117:24, 118:1,
118:2, 118:3,
118:9, 118:10,
118:17, 118:18,
118:19, 118:20,
118:21, 118:22,
120:24, 121:23,
146:15, 148:3,
170:10, 175:4,
175:12, 175:20
**downers**
3:7
**drafting**
176:9
**drink**
78:21
**driver's**
25:4
**driving**
25:13, 149:23
**dropping**
149:23
**duly**
7:2
**during**
11:20, 30:13,
38:5, 70:13,
88:1, 103:16,
123:5, 123:24,
125:15, 137:24,
165:16, 169:17,
172:22, 176:3,
176:20, 179:21
**duties**
21:24, 26:17
**duty**
31:4, 31:12,
32:1, 92:14

**E**

**e-mail**
47:8, 164:6
**e-mailed**
47:7, 47:10
**e5**
15:23
**each**
14:19, 38:19,

38:23, 47:6,
122:19, 128:2,
158:20, 169:19,
178:3
**earlier**
89:8, 89:15,
126:7, 127:10,
143:11, 169:6,
169:17
**easier**
10:17
**eastern**
1:3
**ed**
154:19
**eddie**
148:24
**educational**
16:8, 17:7
**effects**
11:11, 11:13
**effort**
42:10, 151:4
**eight**
15:17, 29:18,
30:15, 156:16
**either**
8:16, 12:13,
39:1, 65:20,
88:6, 92:22,
97:11, 117:10,
122:24, 138:24,
153:10, 171:7,
178:1, 178:11
**else**
9:18, 29:3,
29:5, 29:7,
29:9, 34:22,
34:24, 64:5,
67:11, 85:6,
85:9, 85:13,
85:16, 85:18,
91:14, 91:23,
92:24, 103:14,
159:21, 175:2,
177:2, 184:24,
186:1, 186:5,
186:10, 186:14

**employed**
189:13
**employee**
53:3
**employer**
105:5
**employment**
35:10, 35:12,
66:2
**encounter**
153:15, 153:21
**end**
17:3, 23:5,
24:17, 31:12,
50:12, 89:6,
169:10, 173:20,
179:9, 179:24
**engaged**
120:16
**engaging**
121:16
**enjoying**
35:14
**enlarge**
82:9, 112:12
**enlarging**
84:10
**enough**
117:4
**ensure**
97:22, 140:14,
157:18
**ensuring**
175:19
**entire**
20:11, 121:2
**entitled**
31:20, 52:12,
115:22
**ergo**
24:8
**errata**
188:8
**esq**
3:4, 3:10,
3:11, 3:18,
3:19, 4:5, 4:12,
4:13

**et**
1:10, 2:6,
3:17, 4:3,
64:14, 66:2
**evasive**
132:16, 133:21
**even**
10:10, 52:23,
59:21, 86:14,
95:5, 96:9,
96:16, 98:13,
167:13
**evening**
13:1, 13:3,
31:3, 92:12
**event**
157:16
**events**
84:17, 115:24,
117:10, 128:2,
169:20
**eventually**
55:21, 155:7
**ever**
17:4, 17:16,
34:15, 54:15,
57:13, 78:4,
90:23, 97:11,
137:11, 140:20,
141:7, 141:10,
143:17, 149:3,
152:16, 159:9,
163:21, 164:2,
164:18, 164:22,
165:15, 165:20,
167:22, 168:1,
168:4, 182:13
**everybody**
115:13, 135:11,
186:21
**everyone**
84:2, 186:23
**everything**
58:13
**evidence**
22:23, 23:20,
40:11, 62:15,
63:19, 63:22,

Transcript of Thomas Kelly
Conducted on July 14, 2020                                             61

64:3, 64:13,
66:5, 165:4,
165:18, 176:19
**evidently**
14:24
**exact**
81:10, 131:24,
137:23
**exactly**
41:4, 78:19,
131:1, 152:8
**exam**
22:16, 23:24,
24:3, 24:5,
24:6, 27:12,
27:19, 61:24,
62:3, 62:10,
137:11, 137:15
**examination**
5:2, 5:3, 5:4,
5:5, 5:6, 5:7,
5:8, 5:9, 7:4,
160:10, 166:16,
166:19, 166:23,
167:3, 167:20,
169:3, 169:17,
177:9, 179:4,
181:13, 185:3
**examinations**
167:6
**examined**
7:3, 188:4
**examiner's**
65:18
**example**
32:12, 93:3,
142:2
**exams**
27:15, 61:23
**excerpts**
115:3
**excuse**
12:24, 46:11,
86:8, 115:1,
182:11
**exhibit**
5:16, 5:17,
5:18, 5:19,

5:20, 5:21,
5:22, 5:23,
46:14, 46:16,
46:19, 46:20,
48:11, 52:10,
57:1, 61:13,
63:1, 81:20,
81:23, 84:13,
98:20, 98:21,
99:13, 99:21,
101:17, 103:21,
103:23, 108:17,
108:21, 109:6,
114:13, 114:20,
114:23, 115:6,
115:7, 115:11,
117:2, 124:15,
141:14, 146:3,
146:4, 146:7,
148:2, 148:3,
150:16, 150:17,
168:15, 169:6,
170:7, 170:8,
173:22, 174:20
**exhibits**
5:14, 114:8,
152:1, 152:10
**existed**
103:6
**exonerated**
152:21, 152:24
**expand**
24:14
**expect**
158:14
**experience**
58:15, 60:2,
60:4, 61:4,
123:19, 123:21,
124:13, 124:14
**experienced**
42:13, 122:16,
123:3, 123:22,
125:6, 128:10
**experiences**
143:3
**expired**
17:3

**expires**
189:19
**explain**
30:7, 41:6,
147:24
**explanations**
142:23
**explicably**
51:6
**expressed**
21:6
**extended**
19:12, 153:4
**extension**
31:4
**extensive**
165:16
**extent**
66:18, 152:2,
152:12
**extremely**
82:8
**eye**
54:20, 54:23,
55:5, 55:11,
65:19

---
F
---
**f**
7:10
**face**
83:12, 84:4
**facial**
71:12, 72:18,
72:21, 73:19,
74:3, 74:11,
77:3, 77:18,
111:19
**fact**
6:9, 24:4,
80:4, 137:22,
176:5, 183:3,
183:4, 183:8
**facts**
42:15, 44:10,
45:5
**fail**
167:2

**failed**
22:16, 166:19,
166:22
**fair**
10:23, 11:3,
25:15, 25:16,
41:10, 42:20,
42:22, 44:23,
45:8, 45:9,
63:22, 66:23,
86:2, 96:5,
96:6, 112:2,
121:8, 122:14,
162:24, 178:14,
178:17, 178:18,
178:22
**fairly**
82:15
**false**
41:1, 128:3,
128:4, 150:7,
167:14
**familiar**
27:3, 28:14,
83:22, 84:1,
150:1, 150:2
**family**
17:18, 18:7,
159:13, 159:16,
159:19
**far**
8:3, 8:5,
120:1, 145:9
**farley**
154:19
**faster**
23:7
**fat**
74:9
**father**
106:22
**fax**
161:18, 162:4
**faxed**
161:16
**fbi**
164:23
**fear**
142:16

Transcript of Thomas Kelly
Conducted on July 14, 2020
62

feel
11:17, 24:23,
116:17, 166:21
feeling
145:21
fell
52:7
fellas
79:3
fellow
70:12, 84:11,
92:8, 143:17,
149:22, 153:16
felony
77:23, 78:3,
138:17, 139:3,
139:5, 141:2,
141:10, 162:21,
163:4, 163:11,
182:18
felt
106:10, 167:13
few
100:16, 160:13,
162:24, 163:2
field
15:9, 15:13
fields
18:23
file
109:1, 132:20,
132:23, 133:6,
138:7, 138:10,
138:14, 138:15,
140:3, 140:10
filed
70:15
files
138:3, 138:6,
140:22
filing
134:18
fill
94:3, 97:17,
97:19, 139:6,
161:14
filled
92:18, 100:2,

100:6
filling
102:19
finally
153:6
financial
189:14
find
45:6, 56:1,
56:4, 56:8,
60:3, 87:15,
102:4, 103:5,
128:2
finding
142:6
findings
152:18, 152:24
fine
28:2, 35:20,
45:2, 67:5,
88:4, 118:6,
119:1, 160:17
fingerprinted
162:1
firm
4:6
first
7:2, 7:8, 7:23,
32:23, 47:5,
104:3, 105:21,
106:23, 112:18
five
28:5, 33:4,
144:24, 145:3,
149:14, 154:16,
171:12, 176:14
five-eleven
77:15
five-ten
71:2
fix
104:7
flashlight
106:13
flip
99:7
floor
3:13, 86:24,

87:1, 87:3,
106:23, 107:3,
120:19, 126:10,
126:17, 127:11,
171:23, 172:1,
172:3
fog
88:10
folder
141:2
foley
1:10, 3:17,
75:7, 78:12,
83:17, 93:19,
107:21, 107:23,
108:4, 108:7,
108:11
foley's
109:19, 161:5
follow
124:17, 128:2,
137:21, 157:8
follow-up
160:13, 166:3,
167:19, 168:10,
181:12
following
121:7, 122:9
follows
7:3
food
156:5
foot
72:1, 72:9,
73:14, 74:1,
77:9, 77:15
force
18:7, 20:15,
20:16, 21:4,
21:8, 21:19,
21:24, 22:9,
60:2, 60:4,
62:22, 167:22,
168:1, 168:5
forced
151:21
foregoing
188:4, 189:6,

189:7
forensics
42:17
form
34:5, 34:8,
35:16, 36:5,
36:17, 38:18,
39:20, 40:5,
40:14, 41:2,
41:14, 42:2,
43:8, 44:14,
45:13, 45:20,
52:20, 53:8,
53:9, 53:11,
54:10, 55:1,
55:8, 58:19,
59:2, 59:5,
59:7, 61:6,
61:15, 63:24,
64:8, 69:18,
69:19, 74:24,
76:16, 76:21,
78:16, 79:7,
93:22, 95:7,
95:19, 96:18,
123:7, 124:3,
124:21, 125:9,
128:7, 129:20,
137:4, 139:22,
140:15, 144:9,
145:13, 145:14,
147:1, 147:2,
147:14, 158:4,
158:7, 158:22,
159:24, 161:14,
161:15, 161:16,
163:5, 163:13,
165:6, 179:14,
180:3, 180:8,
181:2, 182:6,
183:23
formal
28:3
formally
6:3
fort
14:12
found
30:15, 58:16,

Transcript of Thomas Kelly
Conducted on July 14, 2020

63

90:15
**founda**
59:2
**foundation**
23:6, 38:10,
40:15, 41:2,
43:8, 45:20,
55:1, 55:8,
59:8, 69:19,
74:19, 75:2,
93:22, 95:15,
121:18, 123:7,
124:4, 124:21,
125:10, 140:15,
140:23, 147:3,
158:4, 163:5,
165:6, 174:4,
181:2, 182:6,
183:23, 184:2,
185:12
**four**
28:5, 66:3,
101:18, 103:9,
133:13
**foxx**
4:14
**frame**
31:6, 71:10,
71:13, 75:14,
75:18
**frankly**
133:11
**friend**
21:10, 153:9
**frightened**
120:19, 121:17
**frivolous**
184:5
**front**
154:9
**fulton**
1:5, 1:6, 3:3,
6:15, 115:18,
116:10, 116:12,
116:13, 121:21,
122:5, 122:6,
122:10, 122:18,
123:4, 123:24,

148:6, 148:20,
160:13, 163:22,
178:3, 178:12,
178:20, 178:24
**fulton's**
159:16
**function**
81:10
**funds**
22:16, 23:21,
24:12
**further**
5:7, 5:8, 5:9,
119:1, 120:24,
160:8, 168:8,
179:3, 179:4,
181:10, 181:13,
185:3, 186:4
**fusco**
3:20, 67:15

---

**G**

**g3**
15:3
**gang**
62:19, 62:20,
62:21, 62:23,
79:17, 163:17
**gangs**
27:1, 27:2
**gaps**
102:19
**garfield**
90:21, 159:7,
163:18
**garfinkel**
43:17, 77:21,
78:1, 177:15,
178:4, 178:11,
178:16, 178:20,
178:23
**garnering**
65:9
**gathering**
41:9, 80:5
**gauge**
43:3, 44:8
**gave**
32:2, 102:15,

105:12, 107:16,
108:3, 108:6,
155:7, 178:3,
184:15
**general**
104:19, 104:20
**generally**
15:5, 21:2,
54:19, 64:2,
78:24
**gentleman**
24:17, 43:14,
149:21
**germany**
14:2
**gerry**
77:12, 78:13,
81:16, 82:22
**getting**
48:17, 102:9,
132:3, 134:11,
159:3
**gillespie**
4:13
**give**
8:2, 9:24,
13:22, 23:23,
47:1, 62:9,
107:17, 107:20,
107:21, 107:23,
108:8, 125:2,
135:13, 147:22,
168:16, 174:6,
175:7, 180:6
**given**
7:11, 16:11,
31:17, 59:20,
64:11, 105:16,
135:6, 179:6,
185:13, 188:6,
189:9
**giving**
102:12
**glasses**
71:9, 72:12,
72:17, 73:21,
74:4, 74:10,
75:11, 75:21,

76:2, 77:6,
77:17, 83:18,
88:10, 111:17
**glynn**
29:8
**go**
7:20, 9:3, 9:8,
9:17, 13:8,
15:6, 15:9,
20:14, 21:6,
21:7, 27:21,
29:12, 29:13,
33:2, 35:17,
36:21, 39:24,
40:16, 42:4,
45:22, 49:2,
49:3, 52:6,
56:19, 57:3,
59:4, 60:23,
61:1, 64:21,
69:20, 70:7,
78:21, 78:23,
79:24, 89:11,
101:13, 109:15,
113:1, 116:23,
117:23, 118:1,
118:2, 118:3,
118:9, 118:10,
118:13, 118:17,
118:18, 118:19,
118:20, 118:21,
118:22, 119:1,
120:12, 121:22,
126:22, 128:21,
138:21, 145:5,
158:11, 160:17,
165:9, 168:12,
168:23, 171:3,
180:9, 183:21,
185:17
**goals**
151:5
**goes**
121:6, 122:11
**going**
7:20, 7:23,
9:24, 10:9,
15:12, 32:15,

Transcript of Thomas Kelly
Conducted on July 14, 2020

64

38:24, 40:8,
45:7, 46:14,
46:23, 48:4,
67:7, 98:19,
103:20, 103:22,
105:19, 108:20,
108:22, 109:1,
113:1, 114:12,
114:21, 115:3,
115:20, 116:5,
116:19, 117:19,
124:9, 125:23,
126:24, 128:20,
128:22, 134:6,
138:2, 139:6,
142:12, 146:9,
157:19, 159:3,
179:20, 186:15
**golubiak**
111:12
**golubiak's**
111:13
**gone**
33:21, 148:10,
169:16
**good**
11:18, 39:14,
73:14, 105:16,
110:24, 111:15,
118:5
**goose**
44:22
**gotten**
60:9
**gpr**
68:6, 70:19,
84:14, 84:15,
85:4, 85:5,
85:16, 85:22,
86:14, 86:16,
88:20, 102:6,
102:13, 102:17,
102:20, 103:21,
104:16, 104:18,
107:15, 109:6,
117:12, 126:15,
141:16, 146:10,
170:6, 170:18,

170:19, 171:17,
172:19, 173:19,
173:20, 174:1,
174:2, 174:3,
174:14, 174:15,
174:20, 175:1,
175:8, 175:11,
175:17, 176:15,
179:8, 179:23,
181:6, 181:15,
181:16, 183:9,
183:15, 184:13,
185:20, 185:23
**gprs**
114:8, 147:11,
184:13
**graduate**
15:24, 16:2,
16:4
**graf**
75:16, 78:13,
79:9, 79:11,
79:18, 81:7,
164:19
**graf's**
112:23, 164:11,
164:15
**grandchild**
18:22
**grandchildren**
18:19
**great**
18:2
**green**
82:18, 82:23,
138:13
**grieve**
25:19, 25:20
**ground**
105:6
**group**
14:19, 15:11,
26:9, 79:19,
83:6, 83:13,
83:20
**grove**
3:7
**guess**
60:11, 72:11,

72:17, 102:22,
133:23, 146:18,
151:10, 152:12
**guessing**
154:16
**guilty**
39:6, 148:16,
148:20, 148:24
**guy**
74:13, 74:22,
83:9, 84:6,
154:2
**guys**
8:9, 134:16,
135:10, 136:3,
136:12

---

**H**

**hair**
71:3, 71:5,
71:12, 72:10,
72:19, 72:22,
73:16, 73:17,
73:19, 74:2,
74:3, 74:10,
74:11, 74:12,
75:10, 75:20,
75:24, 77:4,
77:16, 77:18,
111:16, 111:19
**hal**
43:17, 77:20,
78:1, 177:14
**half**
42:8
**halloran**
73:1, 73:2,
78:12, 79:9,
79:11, 79:16,
80:12
**hand**
93:1, 93:2,
189:17
**handcuff**
157:4
**handcuffed**
157:10, 172:13,
172:14

**handcuffing**
158:1
**handcuffs**
156:19, 157:13,
172:23
**handed**
25:3
**handle**
25:6, 31:2
**handwriting**
100:21, 101:4,
104:15, 105:16,
105:17, 109:5,
109:10, 109:13,
109:16, 109:22,
109:23, 110:4,
110:7, 110:10,
110:13, 110:16,
111:5, 112:8,
112:21, 112:24,
113:7, 113:8,
113:9, 113:11,
113:13, 113:15,
113:17, 113:19,
113:21, 113:23,
114:1, 114:4,
114:10
**handwritten**
146:10, 181:22,
182:4, 182:11,
182:14, 182:18,
182:20
**hang**
39:17
**hanging**
70:2
**happen**
31:2, 139:17,
143:8
**happened**
36:15, 40:12,
40:19, 69:11,
70:13, 86:16,
90:17, 122:11,
122:13, 139:2,
143:5, 174:16
**happening**
87:9

Transcript of Thomas Kelly
Conducted on July 14, 2020                                                65

hard
82:8, 83:8
harjani
8:17
harm
157:21, 157:22
harrison
14:12, 112:16
harrison's
112:18
haste
39:15
hay
52:7
head
10:2, 55:13
hear
11:18, 49:12,
148:5, 178:15,
178:19
heard
97:6, 114:7,
177:14
hearing
84:21, 177:18
heavy
77:11
height
72:2, 72:6,
73:12
held
80:8, 155:16
help
96:2, 115:3,
154:20, 184:6
helpful
62:5, 62:8
here
11:8, 12:11,
12:17, 48:16,
52:1, 56:22,
59:20, 67:5,
82:7, 83:14,
88:8, 117:10,
133:22, 135:4,
135:11, 136:11,
150:12, 151:10,
154:10, 154:20,

159:23, 160:9,
169:15, 169:18,
169:24, 170:20,
173:7, 176:19
hereby
188:3, 189:7
herein
7:2
hereunto
189:16
hey
99:2
high
15:24, 16:2,
16:4, 16:7
high-crime
20:17
higher
112:3
highlighted
48:10, 104:6
highly
28:19
himself
156:1
hinduism
57:6, 57:13,
57:19
histories
101:18, 101:21,
103:6, 103:10,
176:16
history
100:4, 100:7,
100:18, 100:24,
101:6, 101:24,
102:15, 102:24,
103:4, 103:17,
119:21, 162:5,
162:8, 162:9,
162:12, 165:16,
168:15
hit
35:22
hold
99:8
home
25:9, 115:13,

122:8, 123:2
homi
120:4
homicide
63:3, 63:7,
64:6, 122:16,
123:18, 140:22,
142:10, 159:22,
176:10, 176:23
homicides
63:10, 63:13,
63:17, 65:5
honorable
15:19
hopefully
18:21, 35:13,
66:3
hours
16:15, 30:9,
30:16, 31:3,
67:20, 67:21,
78:23, 155:17,
156:6
house
78:23, 120:11,
121:13
however
11:11, 26:24
huh
10:4, 30:5
hypothetical
42:3, 43:9,
55:8, 123:8,
124:3, 124:8,
124:20, 125:9,
125:22, 126:3,
128:5, 128:11,
130:10, 131:18,
131:19, 132:9,
134:7, 136:18,
136:21, 137:8,
138:1, 143:1,
143:2, 147:7,
147:10, 165:7,
165:13, 179:16
hypotheticals
130:11
hòa
14:7, 14:8

| I |
| --- |

idea
16:16, 53:10,
64:24, 68:17,
80:23, 95:14,
97:5, 123:14,
137:19, 148:14,
163:20
identification
25:2, 46:17,
81:24, 98:22,
100:3, 103:24,
108:18, 115:8,
146:5, 150:18,
161:17
identify
82:4
identifying
66:9, 152:1
ill
81:5
illinois
1:2, 2:18, 3:7,
3:14, 3:22, 4:8,
4:17, 189:5,
189:24
imagine
90:19
impedes
151:3
important
36:13, 36:24,
37:4, 37:6
improper
125:14, 125:17,
133:20
in-service
63:2
inaccurate
58:5, 58:10,
58:17, 59:15,
60:1, 60:7,
61:13
inappropriate
50:11, 130:24
incident
40:23, 66:10

Transcript of Thomas Kelly
Conducted on July 14, 2020                                          66

include
92:20, 94:6,
94:13, 97:2,
97:7, 98:3,
98:5, 162:9
included
93:5, 96:8,
150:4
including
96:4, 96:14
incomplete
42:2, 43:9,
55:7, 123:8,
124:2, 124:20,
125:9, 125:21,
165:7
inconsistencies
41:10, 41:21,
146:19, 147:11,
148:1
inconsistency
42:9, 42:18,
45:3
inconsistent
128:1
increase
49:6
indeed
170:1
independent
86:3, 86:10
indiana
14:13
indianapolis
14:13
indicate
10:22
indication
42:10, 182:21
indicative
42:20, 142:17
individual
38:19, 94:14,
122:22, 161:9,
172:21
individual's
162:5, 162:8
individuals
82:19, 83:20,

101:19
inference
47:20, 49:13,
51:22, 51:24
inform
31:16, 38:17
information
41:9, 42:14,
43:6, 64:20,
65:9, 65:10,
65:16, 65:17,
65:24, 102:11,
102:16, 124:15,
142:15
initial
7:9, 92:23
initially
29:16
injuries
65:20, 116:12,
116:13
innocent
148:16, 148:20,
148:24
insert
185:11
inserted
185:22
inside
156:20, 157:4,
158:1, 167:23,
168:2, 168:5
instead
6:4
institution
16:8, 17:8
integrity
163:22, 164:3
intend
35:12
intent
42:20, 47:20
intentional
42:10
interact
158:14
interacting
157:5, 157:9,

157:14
interactions
77:24
intercourse
120:17, 122:3
interest
189:14
interesting
102:11
interject
9:19, 132:14
interpretation
147:21
interrogate
38:2, 38:5,
40:4
interrogated
39:5, 39:8
interrogating
38:8
interrogation
38:9, 123:6,
156:8, 156:14,
156:24, 157:5,
157:10, 158:1,
158:11, 158:21,
167:23, 172:8,
172:11, 172:17
interrogations
40:13, 45:12,
62:14, 124:1,
137:24
interrupt
8:6, 9:17
interview
21:5, 37:10,
37:16, 37:20,
68:7, 85:19,
85:23, 86:22,
91:17, 91:21,
117:13, 168:2,
168:6, 171:14,
174:11, 174:12,
174:13, 180:12,
185:21
interviewed
93:7, 164:2,
164:22, 173:19,

174:15
interviewing
93:3
interviews
87:12, 87:18,
87:20, 172:5
investigate
63:10, 63:13,
63:16, 64:6,
65:5, 65:8
investigating
165:5
investigation
64:19, 66:13,
68:16, 70:13,
84:18, 93:20,
94:11, 95:22,
96:1, 96:7,
119:15, 123:15,
123:18, 128:1,
142:10, 159:23,
172:22, 176:10,
176:23
investigations
137:23, 167:7
investigative
62:6, 62:9,
109:1, 161:22,
167:10, 167:13
involved
166:11
involving
149:15
ir
161:10, 161:12,
161:13, 161:15,
161:21, 161:23
issue
133:18, 135:4
issues
21:17
itself
64:20, 171:17,
183:9

J

jack
73:1, 73:2,

Transcript of Thomas Kelly
Conducted on July 14, 2020                              67

78:11, 80:12,
100:14
**jacket**
82:18, 82:23
**jackson**
4:7
**january**
11:9, 12:14
**jennice**
107:4
**jim**
29:4, 33:9,
33:10, 33:14,
33:21, 34:19,
74:6, 78:12,
81:1, 97:14,
154:19
**job**
1:22, 30:13,
37:4, 37:7,
165:2
**joe**
29:2
**johnson**
3:19
**join**
18:8, 36:18,
36:19, 43:10,
43:11, 44:15,
58:20, 59:17,
61:7, 61:17,
69:23, 74:20,
96:19, 123:10,
123:11, 124:5,
124:6, 124:22,
124:23, 125:12,
125:13, 126:21,
126:24, 127:2,
127:17, 128:15,
129:12, 131:16,
132:2, 140:16,
140:24, 144:10,
147:4, 147:15,
163:6, 173:14
**joined**
18:3, 18:6,
19:2, 19:9,
19:12, 19:14,

28:21, 29:12,
29:14
**jones**
138:10
**jr**
101:7, 107:5
**judge**
8:17, 50:13,
117:19, 155:12
**july**
1:17, 67:24,
189:18
**jump**
168:11
**june**
16:6, 35:8
**jury**
54:7, 54:17,
54:21, 54:24,
55:3, 55:6,
55:20, 55:22,
56:1, 56:3, 56:8
**juvenile**
162:9, 162:12

**K**

**k-e-l-l-y**
7:8
**kathleen**
3:5
**kedzie**
80:11
**keep**
125:23, 157:9,
163:12
**kelly**
1:15, 2:11,
5:2, 5:14, 6:10,
7:1, 7:8, 9:8,
9:23, 32:10,
46:16, 46:20,
48:3, 48:8,
51:16, 51:18,
53:5, 61:4,
81:23, 98:21,
99:24, 102:8,
103:23, 108:17,
115:7, 129:10,

130:7, 136:16,
146:4, 150:17,
169:5, 170:6,
170:17, 177:11,
185:5, 188:3
**kenny**
70:20, 71:15,
78:10, 80:1
**kept**
58:9, 73:18,
138:3
**kidding**
8:7
**killed**
160:5
**kimberly**
4:14
**kind**
36:9, 51:24,
71:6, 75:10,
77:10, 77:15,
83:15, 111:16,
111:21, 123:17,
170:10, 177:24
**kindly**
117:7
**knew**
28:17, 28:22,
29:2, 29:3,
29:10, 42:15
**knock**
135:21, 135:22
**knowing**
90:2, 126:14
**knowledge**
23:19, 143:20,
143:24, 152:22,
157:23, 159:10,
159:11, 159:14,
162:2, 164:12,
184:22
**known**
44:12

**L**

**lab**
66:4, 66:5
**labeled**
46:20, 115:14

**laborer**
17:13
**laid**
17:14, 24:23
**lapse**
60:12
**large**
31:1, 74:8,
74:9, 108:21,
117:4, 171:22,
172:3
**last**
7:8, 7:17,
8:22, 46:4,
47:5, 79:23,
80:1, 80:6,
80:13, 80:16,
80:21, 81:1,
81:7, 81:16,
118:22, 118:24,
131:6, 158:13
**late**
92:11
**later**
8:6, 186:9
**latoya**
109:7
**latter**
87:19
**law**
3:5, 4:6
**lawsuit**
69:16, 70:5,
70:15, 164:7,
164:10, 164:14
**lawsuits**
154:18
**lawyers**
69:13
**lay**
24:24, 25:1
**laying**
121:18, 158:20
**lead**
185:2
**leading**
40:9, 170:3
**leads**
60:5

Transcript of Thomas Kelly
Conducted on July 14, 2020 68

lean
111:23
learn
89:21, 90:4
learning
89:20
least
80:22, 135:9,
149:10, 162:22
leave
29:20, 29:23,
66:19, 93:11,
93:13, 177:21
led
70:14, 93:20,
103:10
left
25:9, 26:7,
82:6, 82:22,
83:1, 83:2,
111:9, 140:11
left-hand
82:13, 82:17,
107:9, 112:11
legitimate
53:9
lenahan
154:19
lend
92:24, 93:2
length
171:17
less
30:21, 39:10
let's
8:3, 9:6, 9:8,
31:5, 51:9,
60:23, 61:1,
83:4, 93:15,
101:13, 103:20,
109:15, 111:1,
112:6, 131:7,
144:22, 145:5,
177:11, 177:17
license
25:4
lie
42:6, 123:5,

137:24, 153:14,
153:19
lies
123:24, 124:18
lieu
6:3
life
10:16, 164:20
light
8:18, 73:17,
156:20, 156:24,
169:23
liked
14:24
likely
146:23, 147:12
limit
17:2
line
105:21
lisa
4:5, 23:16,
36:18, 39:19,
43:11, 69:22,
129:1
list
27:9, 27:14,
27:17, 79:24
listed
59:20, 116:24
listen
55:22
lists
116:6, 116:8
literally
131:24
little
20:6, 36:9,
41:5, 71:2,
71:4, 73:15,
75:20, 80:5,
80:15, 81:3,
81:18, 89:8,
89:15, 119:1,
154:20, 170:10
live
106:21
located
14:6

location
105:9, 116:9
loevy
3:12
long
13:15, 14:9,
17:1, 18:12,
20:4, 21:18,
25:17, 25:23,
26:20, 28:4,
30:15, 33:2,
33:10, 33:16,
67:18, 67:19,
73:4, 73:8,
73:17, 80:4,
144:24, 149:12,
169:9, 171:11,
176:6
long-term
13:23
longer
32:3, 71:4
look
54:7, 55:3,
60:8, 82:4,
83:22, 111:1,
113:3, 116:21,
138:10, 151:11
looked
73:14, 86:20,
106:13, 156:9,
156:14
looking
41:9, 48:10,
52:6, 56:23,
57:1, 83:16,
98:15, 125:5
looks
82:23, 84:1,
121:14
loop
16:19
lost
91:11
lot
21:14, 21:17,
29:10, 36:14
louis
101:7, 106:22,

107:5
lowell
19:22
lucia
1:24, 2:16,
189:3, 189:23
M
made
25:12, 27:5,
95:13, 140:10
main
21:10
maintain
140:21
maintained
140:3, 163:4
major
11:19
majority
28:15, 31:1
make
10:16, 36:14,
50:17, 50:18,
52:1, 54:19,
54:23, 55:5,
55:11, 88:5,
105:18, 111:10,
128:24, 140:2,
140:6, 147:20,
165:3, 165:17,
172:23, 182:23
makes
8:17
making
47:20, 150:7
male
76:7, 76:8,
76:19, 76:20,
77:1
males
76:14
malfunction
134:15, 177:4,
182:1
man
122:24
management
19:1

Transcript of Thomas Kelly
Conducted on July 14, 2020                                      69

mandatory
35:23
many
7:14, 17:22,
18:17, 27:8,
27:11, 90:17,
95:13, 137:13,
144:1, 144:4,
144:8, 144:17,
144:18, 154:14,
162:19
march
26:23, 53:12,
63:3, 63:11
mark
46:13, 46:19,
81:20, 98:20,
103:20, 108:21,
115:11, 146:2
marked
20:9, 20:18,
20:22, 26:14,
46:16, 81:23,
98:21, 103:23,
108:17, 115:6,
115:7, 115:11,
146:4, 150:17,
152:10
married
18:10, 18:12
maryland
22:5
mask
88:2, 88:3,
88:6, 88:7
matter
80:4
maybe
16:14, 20:6,
29:18, 33:4,
73:14, 80:17,
84:10, 148:10
meador
4:5, 6:20,
23:3, 23:16,
36:18, 39:19,
43:11, 47:1,
47:8, 47:12,

47:19, 52:20,
54:10, 56:10,
58:19, 59:2,
59:4, 59:7,
59:16, 61:6,
61:15, 63:24,
69:17, 69:19,
69:23, 74:16,
74:19, 75:1,
95:15, 96:18,
116:15, 123:11,
124:5, 124:23,
125:12, 126:19,
127:17, 128:20,
128:22, 129:4,
129:11, 129:18,
130:16, 130:19,
130:21, 130:22,
131:4, 131:16,
132:2, 134:4,
134:12, 134:16,
135:22, 137:4,
139:22, 144:9,
145:11, 145:13,
147:2, 147:4,
147:14, 151:22,
151:24, 152:8,
177:6, 180:3,
186:13
mean
8:21, 28:3,
46:11, 52:7,
78:18, 93:3,
113:3, 130:23,
133:6, 158:6
means
91:9, 97:3
measure
95:11
medals
14:18
medical
11:5, 12:14,
12:15, 65:18
medication
11:6, 12:15,
13:1, 13:3,
13:4, 13:5,

13:6, 13:10
medications
11:10, 12:9,
12:19
meet
67:1, 67:4,
67:15, 67:23,
68:1
meeting
67:11, 67:13,
67:18, 126:14
member
14:19, 17:19,
21:3
members
17:18, 18:7,
54:20, 55:20,
159:12, 159:15,
159:18
memorialize
183:3, 183:8
memory
12:4, 12:7,
41:22, 60:13,
86:4, 143:15,
149:13, 155:1
men
82:17
mendel
16:3
mentioned
89:20, 93:18,
177:13
message
164:20
messages
164:18
met
162:20
michael
100:5, 100:7
michigan
24:20
middle
7:9, 73:16
midnight
32:10
midnights
32:8

might
23:13, 33:20,
36:14, 36:15,
60:1, 60:7,
60:12, 73:15,
82:14, 94:11,
112:12, 142:22,
152:9, 158:20,
160:9, 164:11
miguel
101:1, 106:23
mike
73:23, 78:11,
78:12, 80:20,
106:8, 106:13,
154:11, 154:18,
155:5, 155:7,
155:16, 155:19,
155:24, 156:4
military
13:13, 14:5,
15:1, 15:4,
17:16
mind
43:15, 60:20
minimally
45:24
minimum
32:6, 54:20
minutes
144:24, 145:3,
171:12, 176:14
mischaracterizes
59:6, 61:16,
126:19, 127:15,
183:10, 183:16
mishap
41:22
misremembering
42:19
miss
130:21, 131:5
missing
22:16, 23:20,
166:8, 166:10
misstate
9:10, 9:13
misstated
9:3, 9:16

Transcript of Thomas Kelly
Conducted on July 14, 2020                                     70

mistaken
34:16
mistakenly
114:20
money
25:11, 166:7,
166:8, 166:9,
166:14
months
14:10, 15:8,
17:14, 19:12,
19:15, 29:18
moran
8:10, 8:14,
67:8
more
20:7, 30:21,
30:22, 30:23,
32:13, 49:10,
52:1, 52:17,
54:8, 59:11,
63:21, 64:2,
65:10, 65:13,
66:6, 67:21,
90:18, 99:7,
100:16, 146:23,
147:12, 149:10,
162:22, 165:23
morning
13:3, 13:5,
13:6, 13:9
moser
75:22, 78:13,
79:9, 79:11,
79:18, 81:14
most
21:15, 21:16,
171:12
mother
106:2, 106:17,
106:21
motion
132:20, 132:23,
133:6
motions
134:18
move
83:4, 117:15,

117:17, 130:19,
130:22, 134:8
moved
34:4
much
60:14, 65:16,
65:24, 110:22,
115:23, 129:1
murder
32:11, 66:13,
84:17, 121:7,
137:22, 148:16,
148:21, 149:1
murphy
29:2, 34:23,
149:20, 152:16,
152:21, 152:23
must
30:5
mustache
71:14, 72:23,
75:11, 75:20,
76:1
mute
116:15
muted
23:5
myself
23:4, 24:16,
85:8, 85:12

**N**

name
7:6, 7:8, 7:9,
14:7, 26:8,
26:24, 28:3,
53:4, 68:14,
68:19, 77:22,
85:5, 85:17,
85:22, 96:9,
99:23, 104:24,
111:12, 112:18,
154:13, 160:12,
160:20, 160:23,
161:14, 177:11,
177:14, 177:18,
177:24, 185:7,
185:21

named
98:15, 154:2,
164:7, 164:10,
164:13
names
78:8, 79:6
narrative
105:21, 115:21,
116:20, 117:8,
119:7
near
14:7
neater
110:22, 110:23
necessarily
59:20
need
11:20, 78:9,
99:5, 145:24,
154:20
neither
189:12
never
17:6, 30:3,
53:8, 57:18,
57:20, 57:21,
143:8, 143:21,
164:20, 182:10
nevest
2:3, 84:15,
84:24, 85:2,
85:23, 86:11,
86:19, 87:15,
87:22, 88:20,
91:3, 91:8,
91:13, 92:1,
92:5, 92:8,
93:7, 93:21,
100:17, 102:11,
102:15, 104:23,
115:17, 117:13,
119:18, 120:8,
121:11, 121:22,
122:2, 122:5,
122:17, 123:4,
123:23, 126:9,
126:14, 127:12,
127:14, 141:15,

141:16, 142:2,
146:12, 146:21,
148:6, 148:16,
159:12, 163:24,
178:2, 178:11,
178:16, 178:24,
179:7, 179:22
new
54:6
news
148:12
next
1:13, 10:16,
21:21, 25:12,
26:3, 33:14,
56:15, 116:7,
118:12
nicholas
3:4
nick
133:23, 160:12,
183:24
night
8:22, 120:21
nine
29:18
nobody
85:13, 117:19,
135:2
nod
10:2
nonmedical
11:16
nonpublic
44:10, 45:5
normal
65:11, 66:7,
92:14, 175:10
normally
10:4, 15:10
north
3:13, 3:21
northern
1:2
notarial
189:17
notary
2:17, 189:1,

Transcript of Thomas Kelly
Conducted on July 14, 2020                                            71

note
50:18, 94:18,
104:22, 150:15,
172:23
noted
141:24, 142:3
notes
36:4, 36:13,
36:16, 36:23,
86:5, 141:5,
179:22, 180:11,
180:20, 181:1,
184:14
nothing
70:18, 88:5,
91:23, 125:14,
177:1, 179:3,
185:24, 186:1,
186:5, 186:14
notice
2:16
notified
65:23
november
57:4
number
65:18, 71:16,
105:3, 105:13,
138:22, 161:10,
161:12, 161:13,
161:15, 161:21,
161:24, 162:23,
176:4
numbered
81:21, 98:24,
108:22, 109:6,
146:7, 150:22
numbers
115:13, 164:9,
164:13
nutshell
22:15

**O**

o'brien
74:6, 75:5,
78:11, 78:12,

81:1, 83:3,
112:1
o'leary
29:4
oath
126:8
object
6:7, 23:6,
59:7, 66:17,
126:18, 128:22
objections
51:20, 69:24,
129:1, 129:23,
136:19, 184:16
observations
11:17
observe
178:23
observed
25:9, 120:15,
121:21, 122:1,
143:21
observes
121:15
observing
76:18
obtain
100:10, 162:12,
162:17
obtained
17:6, 139:14,
161:13
obvious
162:15
obviously
145:23, 152:10,
178:15
occasion
180:22
occasions
29:11
occur
41:1
occurred
72:13
offender
65:20, 65:21
offenders
65:22

offer
62:2
office
4:11, 8:20,
67:16, 91:15,
91:19, 91:24,
138:5, 138:8
officer
1:9, 3:17,
24:16, 25:8,
58:16, 84:3,
87:7, 95:12,
96:9, 143:8,
143:18, 143:22,
189:6
officer's
37:4, 37:7,
85:22
officers
6:17, 15:6,
15:18, 17:19,
36:13, 62:23,
78:7, 87:7,
94:5, 94:6,
94:8, 94:10,
94:13, 94:15,
94:20, 95:5,
95:17, 96:13,
96:16, 96:24,
97:2, 97:4,
97:7, 97:9,
98:4, 98:5,
98:15, 98:16,
116:6, 116:8
offices
3:5, 172:5
official
64:24, 140:3,
140:10
often
58:16
ogden
154:23
oh
15:14, 34:11,
43:20, 47:3,
47:15, 48:14,
80:19, 102:10,

110:19, 118:1,
124:11, 129:19,
136:3, 145:23,
150:14, 169:14,
175:14, 177:8
okay
7:20, 9:8,
10:3, 10:9,
12:1, 13:2,
13:12, 14:1,
23:9, 23:18,
25:23, 34:21,
43:20, 44:5,
46:13, 48:15,
53:16, 53:24,
58:2, 62:24,
63:21, 68:1,
69:21, 69:23,
70:11, 73:1,
75:7, 82:16,
88:15, 95:4,
99:18, 99:20,
108:10, 115:6,
116:1, 119:4,
120:24, 121:17,
124:13, 137:20,
145:21, 159:2,
160:15, 164:2,
164:22, 165:22,
167:1, 167:12,
168:22, 169:2,
169:15, 170:5,
173:4, 173:24,
174:9, 174:18,
175:14, 175:23,
176:3, 177:8,
177:17, 177:22,
178:6, 178:14,
178:18, 179:2,
180:14, 183:7,
183:13, 184:8,
184:23, 186:15,
186:24
old
69:16, 72:16
once
26:24, 27:13,
40:7, 137:14,

Transcript of Thomas Kelly
Conducted on July 14, 2020

72

179:17
**one**
13:1, 15:6,
18:1, 18:20,
18:24, 34:1,
43:3, 44:8,
47:12, 48:4,
59:11, 60:11,
70:19, 72:23,
77:1, 82:17,
83:16, 87:7,
87:16, 91:10,
95:11, 98:2,
108:10, 109:3,
111:6, 111:9,
112:1, 112:2,
114:9, 114:21,
120:19, 122:24,
126:8, 128:3,
134:16, 136:11,
144:20, 144:21,
146:22, 147:12,
149:22, 154:23,
156:17, 161:12,
164:16, 165:23,
166:3, 167:14,
168:16, 169:19,
176:5, 179:24,
180:22, 185:1
**one-way**
24:19
**ones**
78:9, 136:5
**only**
9:23, 24:11,
43:6, 44:12,
52:2, 76:19,
77:1, 83:16,
86:4, 112:2,
133:5, 136:5,
136:10, 147:17,
147:23, 161:11,
164:16, 176:12,
179:10
**ooh**
102:3
**open**
87:1, 87:4,

106:8, 106:10,
126:9, 126:16,
127:12, 171:22,
172:3
**operations**
15:4, 26:9,
79:19
**opinion**
22:12, 148:15,
148:19, 148:23,
167:1
**opportunities**
30:21, 30:23
**opportunity**
119:9, 147:22,
175:7, 182:22,
183:4
**opposed**
63:19, 91:13
**ops**
26:21
**oral**
150:6, 150:7
**orally**
120:16, 121:15,
122:1, 122:23
**order**
150:5, 155:21
**ordered**
119:22
**ordering**
119:21
**original**
140:13
**originally**
31:16
**originals**
141:11
**other**
12:15, 18:1,
18:6, 18:7,
18:24, 19:9,
22:23, 23:10,
23:19, 24:10,
28:17, 34:17,
42:8, 42:16,
46:12, 49:11,
58:23, 63:14,

63:17, 64:6,
64:19, 65:5,
68:8, 69:4,
69:9, 69:12,
70:18, 76:13,
79:20, 82:19,
83:19, 96:24,
108:11, 116:21,
122:21, 122:24,
141:17, 146:22,
149:12, 149:19,
157:23, 159:12,
159:15, 160:8,
160:22, 162:23,
164:3, 164:7,
164:10, 164:13,
167:17, 171:4,
171:6, 176:12,
176:21, 180:1,
185:2
**others**
79:6, 79:12,
109:4, 110:23
**otherwise**
50:21, 189:14
**out**
15:6, 15:9,
15:11, 15:12,
24:22, 32:11,
45:6, 60:3,
66:2, 66:20,
73:15, 81:4,
87:15, 92:18,
92:24, 93:2,
93:17, 94:3,
97:17, 97:19,
100:2, 100:6,
102:4, 128:2,
138:10, 138:15,
161:14, 162:23,
175:9
**outcome**
154:17, 155:3,
189:15
**outcry**
91:6, 91:9,
171:1, 174:12
**outline**
64:12, 64:18

**outside**
69:5, 78:21,
78:22, 156:21
**over**
7:18, 7:20,
9:8, 22:21,
25:15, 34:4,
73:10, 82:7,
83:5, 83:14,
146:10, 156:5,
162:19, 162:24,
176:5, 186:17
**overtime**
30:22, 30:24,
31:5, 31:8,
31:13, 31:15,
31:20, 32:5,
32:20, 92:13,
92:16, 159:3
**overturned**
70:14
**own**
8:13, 32:15,
32:16, 32:21,
93:13, 103:13,
140:21, 171:5

**P**
**pad**
84:8
**page**
1:13, 2:1, 5:2,
5:14, 46:24,
47:5, 47:6,
48:11, 52:11,
53:4, 56:15,
56:16, 57:1,
99:21, 100:17,
109:17, 109:21,
112:11, 116:5,
116:7, 117:2,
118:13, 118:22,
118:24, 119:7,
120:8, 121:20,
122:9, 146:20,
169:20, 171:15
**pages**
1:23, 47:6,

Transcript of Thomas Kelly
Conducted on July 14, 2020
73

119:7, 119:8,
169:9, 176:6
**paid**
16:14, 155:5
**pain**
11:16, 116:17
**paladino**
33:15, 33:16,
33:19, 34:3,
34:15, 88:17,
88:18, 97:12
**paladinos**
33:22
**panicked**
122:7
**paper**
84:8, 92:24
**paperwork**
37:3, 37:6,
139:8, 139:10
**paragraph**
117:14, 118:12
**paragraphs**
121:8
**pardon**
155:3
**park**
105:6, 105:10,
148:11, 154:24
**parked**
24:22
**part**
22:11, 37:4,
37:6, 45:10,
47:8, 52:7,
116:21, 140:3,
140:10, 151:9,
155:11, 155:12,
155:14, 183:2
**parted**
73:16
**participate**
17:3, 176:9
**participated**
95:21, 96:1,
96:6
**particular**
15:11, 61:12,

62:20, 101:20,
124:18, 138:9,
144:20, 174:20
**parties**
189:13
**partner**
32:24, 33:3,
33:5, 33:8,
33:14, 33:19,
71:17, 73:6,
88:16, 97:11,
97:19
**partnered**
33:17
**partners**
33:10, 34:17,
98:2, 153:4,
153:8
**party**
8:16, 79:1,
80:15, 80:18,
81:3, 81:19
**passed**
24:8
**patricia**
112:19
**patrol**
20:9, 20:18,
26:11, 62:22
**patrolled**
20:17
**patrolling**
20:22
**pause**
48:6, 50:12,
82:11, 112:14,
117:16
**paying**
98:10
**penalties**
6:6
**penalty**
96:15
**pending**
12:1
**people**
19:9, 19:14,
24:11, 27:18,

28:17, 41:23,
42:6, 49:12,
76:13, 79:5,
82:5, 82:7,
82:16, 83:13,
83:14, 97:7,
102:5
**people's**
41:21
**perceive**
41:23
**percent**
20:20, 20:21
**perfectly**
134:19, 136:4
**period**
153:4
**perjury**
6:6, 96:15
**permanent**
57:7
**perpetrator**
43:6, 44:13
**person**
24:10, 25:13,
41:11, 62:11,
67:13, 67:14,
76:19, 86:5,
156:23, 157:10,
158:13, 158:15,
158:20, 161:23,
166:11, 172:22
**person's**
161:14
**personal**
88:4, 136:24
**personnel**
25:5, 66:4,
66:5, 117:1
**persons**
101:24
**pertaining**
184:14
**peruses**
117:21, 118:7,
118:15, 119:2
**phone**
105:3, 164:9,

164:12
**photo**
82:14, 83:7,
84:7
**photograph**
81:21, 82:3,
82:5
**photographs**
68:10
**phrased**
49:14, 49:17
**phrasing**
51:19
**physical**
71:1, 71:22,
71:24, 73:24,
75:8, 75:17,
77:13, 97:8
**physically**
24:24, 94:8,
98:4
**picture**
177:20
**piece**
186:8
**pill**
60:19
**pipe**
84:19, 89:21,
89:22, 90:5,
90:9
**place**
86:23, 87:3,
87:22, 91:22,
157:18, 163:11
**places**
66:1
**plaintiff**
2:4, 3:3, 3:9,
6:13, 6:14
**plaintiffs**
1:7
**planning**
15:4
**plate**
160:20
**plates**
160:23

Transcript of Thomas Kelly
Conducted on July 14, 2020

74

playing
115:13
pleadings
152:3
please
6:2, 7:6,
10:20, 11:21,
24:15, 36:10,
43:23, 47:2,
50:21, 51:14,
59:12, 117:23,
131:5, 144:15,
184:11
plus
123:19
point
40:7, 57:10,
66:23, 93:17,
103:16, 114:21,
135:1, 135:10,
136:11, 139:11,
150:8, 172:10,
181:21
pointed
124:16
pointing
52:10
points
41:24, 66:1
pole
83:15
police
1:9, 3:16,
16:9, 16:12,
17:12, 17:16,
17:18, 17:20,
18:8, 19:3,
22:10, 22:14,
28:16, 36:13,
37:2, 37:4,
37:7, 44:8,
45:11, 46:9,
53:7, 54:16,
57:14, 58:10,
58:15, 58:16,
58:23, 59:14,
59:15, 60:2,
60:4, 60:5,

61:5, 80:6,
84:3, 85:21,
90:13, 95:12,
96:24, 106:18,
120:9, 122:19,
123:22, 125:6,
138:3, 140:4,
140:10, 141:8,
143:8, 143:18,
143:19, 143:22,
144:2
policeman
58:11
policing
123:19
policy
151:4
polygraph
22:16, 22:18,
22:21, 23:21,
23:24, 24:3,
24:5, 24:6,
24:8, 61:22,
62:3, 62:9,
166:6, 166:16,
166:19, 166:23,
167:2, 167:6
poorly
93:16
portion
37:11, 105:21,
117:8
portion's
119:7
portions
94:10, 115:21,
116:21, 119:13
posed
11:2, 137:16
posing
173:9
position
134:4, 135:8
positive
149:11, 150:9
possibility
58:6, 58:8
possible
65:24, 78:6,

167:2
possibly
16:15, 26:22,
38:4, 40:23,
94:9, 144:21
post
16:7
post-high
17:7
pounds
72:5
powers
22:20, 64:18
practice
38:8, 53:21,
55:10, 85:17,
86:7, 86:8,
86:9, 103:5,
103:8, 127:22,
157:8, 157:24,
173:18, 174:6,
174:9, 175:10,
175:16, 179:11,
180:16, 180:17,
181:4, 181:8,
181:19, 181:20,
183:8, 183:14,
184:2, 184:12,
184:21
prefer
132:19
preference
133:2, 136:24
preferred
30:17
preliminary
64:21, 64:22,
116:21
premise
133:9
prep
16:3
preparation
54:17, 68:5,
176:20
prepare
66:15, 67:1,
68:2, 146:16

prepared
68:6
prepared"
48:17
preprinted
38:18
prescribed
12:20, 31:10,
31:11
presence
59:21, 69:5,
98:3
present
67:11, 69:8,
69:10, 69:13,
84:23, 85:1,
85:6, 85:10,
85:14, 85:16,
85:18, 94:8,
94:14, 95:6,
95:18, 96:10,
96:17, 97:2,
97:7, 98:4,
98:16, 178:8,
178:10, 182:13
pressured
39:13
presume
84:2, 84:4,
182:5, 183:2
presuming
87:17, 87:19
pretty
110:24, 132:15
previous
2:1
previously
26:17, 81:13,
117:11, 141:15,
142:13
prior
23:5, 28:16,
29:11, 47:21,
47:24, 56:20,
68:2, 79:13,
114:7, 152:19,
152:20, 172:18
prison
148:7

Transcript of Thomas Kelly
Conducted on July 14, 2020

75

privilege
50:20
probably
14:8, 32:9,
71:3, 72:24,
75:19, 77:16,
80:16, 81:3,
81:18, 89:24,
90:1, 91:16,
149:10, 156:16,
162:15
problem
49:15, 51:13,
52:2, 134:1,
137:21, 143:14
procedure
11:19, 12:14,
108:8, 162:16
procedures
159:4
proceed
9:6, 51:10,
160:15
proceeding
6:8, 9:24
process
64:3, 161:8
produced
53:3
productivity
95:12
progress
104:19, 104:20
promoted
27:9, 27:17
promotion
79:1, 81:12
proper
129:5, 133:12,
133:15, 135:4,
159:4
prosecution
93:21
prosecutor
78:5
protection
63:18, 63:22
provi
58:4

provide
44:11, 122:11,
142:15
provided
42:24, 48:20,
49:9, 58:5,
58:9, 60:7,
60:17, 63:2,
64:17, 65:2,
104:24, 105:9,
121:4, 131:1,
146:21, 182:22
provides
121:12, 122:12
providing
122:19, 124:18,
137:23
province
14:8
public
2:17, 189:1,
189:4, 189:24
punching
149:22
punishment
22:12, 152:17
purnell
154:11, 154:18,
155:5, 155:7,
155:16, 155:19,
155:24, 156:4,
156:11
purpose
104:20, 172:10
purposes
175:19
pursuant
2:16
pursue
17:4
push
106:9
put
8:3, 47:18,
55:13, 85:15,
93:15, 94:9,
94:11, 94:20,
150:12, 161:14,

172:10, 173:18
putting
9:1

### Q

qualified
27:18
question
10:1, 10:10,
10:11, 10:16,
10:21, 10:23,
11:1, 11:2,
11:24, 23:6,
23:9, 23:11,
23:12, 34:6,
34:13, 36:7,
36:21, 38:11,
39:1, 41:5,
41:18, 43:22,
49:14, 49:17,
49:20, 50:2,
50:4, 50:7,
50:9, 50:16,
50:24, 51:12,
51:16, 51:19,
51:23, 54:4,
54:6, 59:10,
66:17, 66:19,
66:22, 70:2,
76:24, 91:10,
93:16, 102:22,
110:2, 123:20,
125:15, 125:19,
125:20, 126:11,
127:4, 127:5,
127:7, 127:9,
127:19, 128:23,
129:15, 130:13,
131:3, 131:8,
131:11, 131:13,
131:24, 132:18,
132:20, 132:22,
133:5, 133:10,
133:12, 133:15,
134:3, 134:5,
134:10, 135:4,
142:3, 142:4,
142:24, 144:14,

144:16, 146:19,
162:14, 163:24,
165:24, 174:1,
182:12, 183:18,
184:10, 185:1
questioned
120:9
questioning
53:9, 91:13
questions
10:20, 40:8,
40:9, 55:18,
99:7, 120:1,
126:8, 131:2,
135:12, 142:9,
143:5, 143:9,
160:8, 160:14,
166:3, 167:17,
168:9, 169:7,
170:19, 173:9,
177:2, 177:6,
181:11, 186:4
quick
8:4, 167:18
quickly
99:8
quiet
23:5
quit
51:11
quite
58:6, 162:24,
163:2

### R

rachel
3:11
ran
24:21, 120:19,
122:7
range
47:2, 75:19
rank
15:22
raring
89:11
rather
10:2, 84:20

Transcript of Thomas Kelly
Conducted on July 14, 2020

76

rd
24:20
reach
66:2, 156:24
reached
8:15, 81:4
read
38:18, 38:21,
44:3, 48:22,
59:20, 78:8,
79:6, 102:6,
102:17, 105:19,
106:15, 106:19,
107:1, 107:6,
115:12, 115:22,
117:5, 117:7,
119:6, 119:9,
131:5, 131:9,
146:10, 175:8,
175:11, 175:16,
176:5, 179:8,
179:23, 181:6,
181:16, 188:4
reading
86:16, 102:13,
102:20, 105:18,
117:20, 119:12,
167:15, 189:11
reads
105:22, 106:1,
121:20
ready
89:9
real
8:4
reality
133:22
realize
148:13, 150:21
really
72:24, 75:4,
83:16, 84:21,
100:8, 102:8,
133:6, 135:2
reask
10:21, 23:9
reason
21:10, 39:14,

93:11, 142:16,
171:5, 171:6,
183:2, 183:7
reasons
39:9
reassigned
22:11
recall
14:6, 33:11,
34:13, 37:14,
37:17, 49:5,
57:17, 57:20,
58:1, 63:6,
65:3, 66:10,
66:12, 73:22,
74:5, 74:11,
75:4, 77:19,
78:6, 80:16,
80:22, 81:10,
84:19, 86:22,
87:9, 87:15,
89:17, 90:2,
91:1, 92:10,
102:2, 102:21,
103:15, 107:19,
111:18, 111:20,
120:2, 126:11,
138:12, 138:13,
138:16, 139:24,
140:19, 141:13,
141:22, 143:6,
143:12, 144:3,
144:6, 153:24,
154:1, 155:1,
155:15, 155:16,
155:19, 155:24,
156:4, 156:22,
159:2, 161:3,
161:4, 162:13,
162:15, 163:3,
163:15, 165:21,
166:15, 169:19,
170:21, 171:10,
172:12, 177:15,
179:6, 180:17,
182:20
recalled
177:18

receive
36:1
received
52:14, 53:20,
54:15, 66:8,
124:15, 152:17,
161:18, 167:14
receiving
162:4
recess
60:24, 101:12,
145:4
recognize
83:6, 83:14,
83:19, 109:5,
109:13, 109:16,
109:19, 109:22,
109:23, 110:4,
110:7, 110:10,
110:13, 110:16,
110:19, 111:5,
111:12, 112:7,
112:20, 112:23,
113:8, 113:9,
113:11, 113:13,
113:15, 113:17,
113:19, 113:21,
113:23, 114:1,
114:4, 177:21
recollection
16:20, 24:8,
25:22, 35:1,
48:23, 57:7,
57:12, 84:16,
86:3, 86:10,
87:5, 87:11,
92:4, 102:10,
102:23, 103:2,
103:9, 108:2,
108:10, 117:9,
119:14, 119:17,
119:20, 119:24,
126:13, 127:13,
137:19, 146:12,
153:15, 163:10,
163:17, 164:5,
171:20, 176:18
recollections
115:24

record
7:7, 8:4, 8:13,
9:2, 46:21,
47:18, 50:19,
51:5, 51:15,
53:3, 53:19,
56:24, 57:8,
58:9, 60:1,
60:6, 60:23,
61:2, 63:2,
101:14, 130:24,
131:9, 132:6,
134:21, 145:6,
150:15, 151:24,
152:12, 161:20,
161:22, 169:9,
187:1, 189:8
recorded
8:18, 8:19
recording
8:11, 8:15
records
58:3, 58:16,
58:23, 58:24,
59:14, 59:15,
61:5, 100:3,
102:4, 152:2,
161:9, 162:7,
162:17, 163:12
recover
90:20
recovered
66:5, 90:11
rectangular
156:17
redacted
152:3
reduced
189:10
refer
71:7, 71:24,
138:23
referencing
186:8
referred
86:14, 92:23,
114:20
referring
11:14, 52:14,

Transcript of Thomas Kelly
Conducted on July 14, 2020

77

86:13, 186:7
**refers**
52:11
**refresh**
84:16, 87:10,
119:14, 119:17,
119:20, 119:24
**refreshed**
155:1
**refreshes**
115:24, 117:9,
146:11
**refuse**
142:24, 143:4
**refused**
142:3, 142:4,
143:9, 173:8,
173:19
**refusing**
142:9
**regan**
29:6
**regard**
41:11, 63:10
**regarding**
46:12, 54:16,
57:6, 58:4,
60:15, 68:6,
93:19, 140:22,
153:15, 153:21
**regardless**
125:21
**regular**
32:24, 33:2,
62:22, 65:11,
79:4
**regulation**
157:3
**regulations**
143:19, 143:22
**reinvestigation**
149:4
**related**
81:13, 162:8,
164:3, 166:3,
189:12
**relation**
166:17, 176:22

**relative**
174:13
**released**
148:6
**reliability**
43:3, 44:9
**reliable**
42:24, 44:21
**relieved**
31:23
**religious**
137:2
**relying**
10:2, 86:5
**remain**
20:4, 21:24,
152:6
**remained**
120:20
**remember**
17:2, 27:1,
27:4, 34:14,
36:15, 37:21,
60:9, 60:10,
60:14, 77:22,
84:20, 84:22,
86:15, 86:19,
127:5, 127:7,
144:8, 144:18,
144:20, 149:15,
149:18, 154:11,
154:13, 176:6,
177:19, 180:14,
185:14
**remind**
54:19
**rental**
66:9
**repeat**
43:22, 125:3,
144:15
**repeating**
130:1
**rephrase**
10:20, 36:9,
182:12
**report**
64:22, 65:11,

65:14, 66:7,
93:6, 93:12,
93:14, 93:19,
94:7, 94:9,
94:12, 94:17,
94:19, 95:2,
96:4, 96:14,
97:3, 97:9,
97:20, 97:23,
98:3, 98:6,
100:18, 101:1,
101:6, 104:19,
104:21, 108:12,
115:15, 115:21,
115:23, 116:1,
116:22, 117:8,
119:7, 119:8,
119:13, 121:1,
121:8, 121:11,
121:20, 122:13,
148:12, 150:7,
151:7, 151:17,
153:14, 153:20,
186:8
**reported**
1:24
**reporter**
2:17, 6:2, 6:4,
10:17, 23:1,
34:7, 39:22,
59:3, 94:24,
98:11, 126:23,
131:5, 134:24,
136:8, 145:16,
182:1, 189:1,
189:4
**reporter's**
8:20
**reports**
64:13, 68:12,
68:15, 68:20,
92:18, 94:3,
97:17, 98:14,
102:15, 102:24,
103:4, 103:18,
119:21, 141:8,
176:5, 176:10
**reprehensible**
39:10

**represent**
71:23, 108:24,
160:12
**represented**
53:19
**represents**
23:16, 43:17
**reprimanded**
159:2
**republic**
15:7
**request**
100:3, 100:4,
100:7, 100:17,
101:1, 101:6,
101:17, 103:14
**requested**
101:21, 103:17,
131:9, 162:7,
189:11
**requesting**
102:24, 161:8
**requests**
103:9, 176:15
**require**
132:15, 134:5,
134:8, 180:20
**required**
64:21, 65:9,
65:10, 65:12,
65:14, 157:3,
165:3, 184:22
**requirements**
64:12
**reserve**
186:15
**resided**
101:22, 102:3,
102:7
**residents**
159:7
**resource**
64:16
**respond**
62:17, 137:17
**responding**
179:16
**response**
9:20, 41:16,

**responsive** 126:8, 131:10
132:4
**rest** 120:21
**restrained** 158:16
**restroom** 156:2
**result** 41:21, 152:18
**results** 23:21, 27:15, 27:18, 62:11
**retail** 18:24
**retire** 35:7
**retired** 35:22, 80:5, 80:24, 150:8, 151:19, 152:19, 153:7
**retirement** 35:2, 35:5, 35:9, 35:15, 35:23, 79:1, 80:15, 81:12, 150:11
**return** 162:4
**reveal** 44:10
**review** 68:4, 68:8, 68:10, 68:12, 68:22, 77:23, 78:3, 138:18, 139:3, 139:5, 141:2, 141:10, 162:21, 163:4, 163:11, 182:18, 182:22, 183:4, 183:9, 183:15, 184:13
**reviewed** 84:14, 115:16, 176:19

**reviewing** 98:8, 98:13
**rfc** 98:24, 99:1, 109:2, 109:6, 109:12, 109:21, 109:24, 110:2, 110:5, 110:8, 110:11, 110:14, 110:17, 111:4, 115:15, 116:5, 146:8
**rfc1** 108:22, 115:4
**rfc2** 109:16
**rich** 33:15, 33:16, 33:19, 34:3, 34:15, 88:17, 88:18
**ridges** 100:13, 100:14
**right-hand** 151:15
**rights** 38:17, 38:22, 38:24, 172:18
**riley** 34:19, 97:12, 154:19
**ring** 156:18, 157:17, 158:16
**road** 3:6, 66:3
**rock** 3:20, 67:15
**roger** 34:23, 149:19
**rogers** 153:11
**role** 15:15, 176:8, 176:21
**roll** 48:22
**room** 156:21, 156:24,

157:5, 157:11, 157:18, 157:19, 158:2, 158:15, 158:21, 167:23, 168:2, 168:6, 172:8, 172:11, 172:17, 178:10
**rooms** 156:8, 156:14, 158:12
**roughly** 80:10
**rule** 150:4, 150:6, 151:2
**rules** 7:20, 9:9, 132:15, 136:10, 143:18, 143:22
**run** 59:11
**runner** 111:16, 111:22
**running** 121:5
**runs** 121:17, 123:2
**russ** 169:11
**russell** 3:10, 8:1, 9:11, 47:1, 47:9, 51:5, 99:2, 116:16, 128:23, 129:5, 129:21, 133:23, 135:24, 151:22, 168:14, 170:5, 186:17
**russell's** 136:11, 169:13
**ryan** 4:13

---S---
**s** 25:21, 72:21, 72:24, 78:10,

149:8
**s-z-u-d-a-r-s-k-i** 149:21
**said** 9:12, 9:14, 24:23, 32:13, 51:4, 59:24, 66:24, 67:19, 86:8, 98:9, 121:1, 130:2, 132:12, 134:6, 166:2, 166:5, 177:6, 177:18, 178:15, 178:19, 189:9
**same** 10:14, 19:9, 19:10, 19:15, 21:24, 26:7, 26:17, 39:23, 48:1, 51:20, 59:16, 69:22, 71:17, 73:7, 75:1, 79:14, 97:1, 110:2, 123:5, 124:2, 124:19, 125:2, 128:19, 129:18, 130:8, 131:24, 136:19, 137:22, 137:23, 157:24, 163:24, 164:1, 174:21, 184:16, 188:5
**satisfy** 135:16
**saw** 24:17, 79:23, 80:1, 80:13, 80:14, 80:21, 106:13, 120:9, 120:12, 122:5, 148:8, 148:12
**say** 10:4, 11:13, 16:15, 19:23, 19:24, 20:20, 21:15, 25:15,

Transcript of Thomas Kelly
Conducted on July 14, 2020                                    79

25:16, 31:5,
32:11, 32:14,
41:10, 41:20,
42:21, 44:17,
44:23, 45:7,
45:8, 45:9,
45:24, 47:16,
54:17, 55:10,
63:15, 63:23,
66:7, 72:4,
73:16, 74:11,
76:8, 79:2,
79:9, 86:2,
86:4, 90:1,
96:5, 96:6,
108:6, 112:2,
120:11, 120:18,
122:4, 122:7,
129:24, 136:12,
138:8, 141:16,
146:22, 156:13,
157:21, 161:1,
166:4, 169:24,
171:12, 171:13,
172:2, 178:14,
178:17, 178:18,
178:22
**saying**
10:3, 23:3,
24:12, 24:13,
48:1, 51:1,
51:2, 57:24,
58:2, 58:17,
58:18, 58:22,
59:13, 59:19,
61:14, 96:11,
122:18, 125:16,
125:19, 125:20,
130:1, 133:17,
137:20, 143:11,
153:24, 166:9,
171:16, 177:15
**says**
48:16, 53:5,
106:21, 107:3,
120:9, 121:1,
121:3, 122:10,
132:8, 151:14

**scan**
170:10
**scared**
123:1
**scenarios**
137:16
**scene**
42:17, 44:10,
63:19, 81:22,
90:8, 90:10,
90:14, 90:21,
98:16, 115:17,
120:20, 122:8,
153:22
**school**
15:24, 16:2,
16:5, 16:7,
17:7, 27:22,
28:1, 28:4,
28:7, 37:15,
37:24, 38:3
**screen**
46:15
**scroll**
116:19, 146:15
**scrolls**
116:7
**seal**
189:17
**seat**
25:1
**seated**
87:7
**second**
46:4, 48:4,
86:24, 87:1,
87:3, 107:3,
126:10, 126:17,
127:11, 168:17,
172:1, 172:3,
180:7
**section**
115:21, 116:20,
161:17
**secure**
157:17
**security**
105:12

**see**
18:21, 24:10,
25:14, 41:19,
44:11, 46:22,
47:16, 48:10,
48:13, 48:14,
48:17, 52:5,
53:5, 56:16,
56:17, 62:17,
62:24, 63:4,
80:20, 82:2,
82:4, 82:5,
82:9, 82:15,
83:8, 83:12,
84:4, 84:11,
98:15, 100:18,
101:1, 101:7,
101:8, 101:23,
104:2, 104:4,
105:17, 106:4,
110:22, 115:23,
117:2, 120:8,
120:22, 120:23,
140:20, 151:13,
169:8, 169:13,
169:14, 170:15,
170:16, 177:11,
177:17
**seeing**
121:4
**seem**
30:16, 47:19
**seemed**
28:18
**seen**
53:8, 71:24,
80:23, 99:13,
99:15, 99:18,
114:8, 143:17,
169:5
**sees**
121:12, 122:21
**self**
93:13
**seminar**
63:3, 63:7
**send**
47:24, 61:22,

186:17, 186:21,
186:22
**sending**
44:22
**sense**
45:16
**sent**
47:9, 47:13,
47:17, 47:21,
161:18, 164:18,
164:20
**separate**
124:1
**sergeant**
32:2, 32:7,
32:9, 32:10,
100:10, 100:13,
107:11, 107:16,
107:17, 107:20,
108:3, 108:9,
138:9, 174:7
**sergeant's**
137:11, 138:5,
138:7, 140:11
**series**
166:3
**serve**
13:15, 13:19,
14:9, 17:16,
26:20, 35:4
**served**
13:12, 13:17,
14:2, 34:4
**service**
14:14
**set**
189:16
**seven**
15:17, 19:12,
19:15
**several**
11:10, 16:10,
17:14, 21:20,
33:11, 33:18,
67:20, 90:3,
105:22
**sex**
121:16, 122:22,

Transcript of Thomas Kelly
Conducted on July 14, 2020

80

| | | | |
|---|---|---|---|
| 123:1 | 151:12 | 136:8 | **slip** |
| **shape** | **showed** | **since** | 31:22, 41:22 |
| 73:14, 111:15 | 114:9, 141:14, | 18:6, 35:9, | **slow** |
| **share** | 177:20 | 69:12, 80:24, | 21:13 |
| 103:22, 108:22, | **showing** | 81:5, 99:18, | **smelled** |
| 115:12 | 71:7, 112:5, | 174:11 | 105:22 |
| **sharing** | 114:22 | **sister** | **social** |
| 150:14, 151:11 | **shown** | 107:4 | 78:22, 105:12 |
| **sheet** | 176:3 | **sit** | **socialize** |
| 188:8 | **shows** | 27:8, 27:11, | 78:10, 78:18, |
| **shift** | 116:8, 116:11 | 55:12, 137:11, | 79:2 |
| 103:17 | **shrink** | 139:13 | **socialized** |
| **shirt** | 72:7 | **sitting** | 79:3 |
| 83:10 | **sic** | 87:16, 169:15, | **soft** |
| **shoes** | 109:6 | 169:18, 169:24, | 20:24 |
| 55:13 | **side** | 170:20 | **some** |
| **shoot** | 82:13, 82:17, | **situation** | 7:20, 10:21, |
| 150:14 | 136:11 | 126:3, 131:18, | 13:6, 16:21, |
| **shooting** | **sight** | 131:20, 137:8, | 16:22, 28:17, |
| 153:23, 154:23 | 29:10 | 138:1 | 28:22, 40:8, |
| **shoplifter** | **sign** | **situations** | 47:20, 51:24, |
| 63:20 | 31:19, 31:22, | 60:12, 136:22 | 54:19, 59:13, |
| **shoplifting** | 31:24, 107:11, | **six** | 59:14, 60:9, |
| 64:3 | 138:11, 138:14, | 15:8, 33:4, | 62:4, 62:5, |
| **short** | 161:15 | 73:14, 74:1, | 69:11, 99:7, |
| 60:24, 101:12, | **signature** | 77:9, 77:15, | 109:4, 116:6, |
| 120:14, 145:4, | 100:9, 100:10, | 154:16 | 143:9, 156:17, |
| 171:14, 171:16 | 107:8, 111:8, | **six-foot** | 156:18, 162:23, |
| **shorthand** | 112:10, 113:3, | 75:9, 75:19 | 166:7, 170:19, |
| 2:17, 189:3 | 186:16, 188:13 | **six-four** | 171:4, 171:5 |
| **shortly** | **signature-xzw** | 74:8, 112:3 | **somebody** |
| 19:11, 47:17 | 189:21 | **six-one** | 44:22, 62:9, |
| **shortness** | **signed** | 74:1, 75:24, | 65:3, 80:15, |
| 11:15 | 85:5, 96:14, | 77:9, 111:15 | 91:13, 103:14, |
| **shot** | 97:23, 100:12, | **six-oneish** | 123:17, 135:14, |
| 45:1, 45:6 | 139:19, 140:7, | 74:1 | 142:23, 143:9 |
| **should** | 140:8, 188:8 | **six-three** | **somebody's** |
| 138:8, 150:15, | **signing** | 74:8, 112:3 | 42:18 |
| 166:4 | 189:11 | **six-two** | **someone** |
| **show** | **similar** | 111:15 | 44:24, 48:22, |
| 46:2, 46:13, | 122:23, 123:24 | **sketch** | 55:11, 55:12, |
| 46:15, 81:20, | **similarly** | 13:24 | 65:23, 138:24, |
| 95:12, 95:21, | 14:18 | **skip** | 166:7, 171:8 |
| 95:24, 98:19, | **simply** | 109:1 | **something** |
| 115:10, 115:20, | 40:11, 42:19, | **sleep** | 9:3, 9:10, |
| 116:5, 134:22, | 50:21, 127:21 | 155:22 | 9:16, 30:12, |
| 139:8, 139:10, | **simultaneous** | **slightly** | 31:19, 39:15, |
| 141:20, 146:2, | 113:5, 134:14, | 77:11, 156:13 | 48:22, 78:22, |

Transcript of Thomas Kelly
Conducted on July 14, 2020

81

81:11, 87:10,
96:21, 96:23,
105:22, 106:10,
137:1, 142:6
**sometime**
161:17
**sometimes**
31:4, 41:20,
42:6, 42:9,
94:3, 97:16,
97:19, 138:17,
139:13, 142:14,
142:17
**somewhat**
83:17
**somewhere**
84:21
**soon**
18:22
**sorry**
23:6, 28:21,
29:12, 34:11,
43:20, 47:4,
47:23, 49:3,
69:20, 78:11,
81:22, 83:2,
91:11, 104:6,
116:13, 121:24,
150:15, 154:9,
177:5
**sort**
47:20
**sotos**
4:6
**sound**
27:3, 71:19
**sounds**
186:2
**south**
14:7, 62:20
**sox**
148:11
**spanned**
119:8
**spates**
149:16, 153:12,
153:17, 153:21
**speak**
28:18, 49:11,

92:1, 92:5,
92:8, 125:23,
139:5, 171:3,
171:8, 172:21
**speaking**
50:17, 54:19,
55:14, 55:17,
91:3, 127:14,
129:22, 130:6,
170:21, 170:22,
185:6, 185:15
**spec**
133:14
**special**
26:8, 26:21,
79:19
**specialist**
15:23, 62:23
**specialists**
62:21
**specific**
46:10, 46:11,
103:8
**specifically**
37:14, 37:17,
66:11, 69:6,
92:6, 103:15,
153:19, 157:15,
166:13, 175:3
**speculate**
124:9, 124:11,
125:21, 126:4,
126:6, 128:12,
128:17, 129:9,
129:17, 130:11,
130:14, 131:11,
131:14, 131:19,
131:22, 132:8,
133:19, 134:6,
134:7, 135:14,
136:17, 136:21,
137:3, 137:9,
138:2, 147:6,
165:12, 165:13,
165:17, 165:20,
179:18, 180:21
**speculated**
126:15

**speculating**
102:1, 102:14,
179:13
**speculation**
42:3, 123:9,
124:3, 124:20,
125:8, 133:11,
133:15, 165:3,
165:7, 165:17,
173:3, 173:13,
185:12, 186:2,
186:7
**speed**
117:19
**spell**
7:6, 34:19
**spelled**
149:20
**spent**
19:15, 120:4
**spoke**
23:15, 81:8,
81:17, 104:23,
126:16, 171:10,
171:19, 172:13,
173:8, 185:8
**squad**
20:18, 20:22,
21:2, 25:1,
26:14
**squared**
20:9
**st**
86:24, 87:3,
126:10, 126:17,
127:12
**stabbed**
45:6
**stamped**
150:22
**stan**
76:3, 76:6,
76:19, 78:13
**standard**
108:8
**standing**
121:24, 122:6
**stands**
122:20

**star**
14:21, 14:23
**stare**
55:13
**start**
40:18, 136:1,
136:2
**started**
17:11, 71:19,
72:7, 174:16
**starting**
82:6, 82:13,
134:17
**state**
2:18, 7:6,
50:21, 51:15,
189:5
**state's**
4:10, 4:14,
43:18, 54:18,
55:18, 65:23,
77:20, 139:5,
139:15, 139:19,
140:9, 140:21,
141:7, 141:11,
149:3, 162:21,
177:12, 177:14
**stated**
38:20, 120:14
**statement**
25:15, 42:22,
43:4, 44:9,
44:17, 44:21,
122:14, 139:18,
140:7, 140:13,
141:15, 178:23,
182:11, 182:14,
182:18, 182:23,
183:5, 184:15
**statements**
42:24, 139:13,
141:12, 178:3,
178:11, 178:24,
181:22, 182:4,
182:21
**states**
1:1, 57:5
**statin**
13:7

Transcript of Thomas Kelly
Conducted on July 14, 2020                                    82

station
108:15, 138:18
stationed
14:20
stay
23:4
stayed
26:23
steve
29:8
still
11:19, 31:17,
32:11, 124:19,
125:8, 167:12,
183:16
stipulate
6:3
stolen
66:10
stop
24:21, 130:17,
151:11
stopped
24:22
stories
41:21
story
121:12, 122:19
straight
77:16, 83:17
street
3:21, 4:16,
24:19, 106:24
strike
36:2, 90:12,
127:23, 174:1,
178:9, 182:11
striking
153:11
struggling
41:19
stuff
185:2
submit
176:15
substantive
135:5
substantively
132:17

succinctly
51:15
suddenly
16:12
sued
68:18, 69:13,
154:3, 154:15
suggest
24:5, 39:9,
49:2
suggested
65:12
suggesting
23:20, 49:4
suggests
85:22, 91:24
suing
154:11
suite
3:6, 3:21, 4:7
suits
88:4
summary
121:8, 175:15
sun
30:5
superfluous
135:2
supervisor
31:23, 91:16,
92:7, 107:12
supervisors
32:6
supp
68:12, 68:14,
68:20, 92:18,
93:6, 93:8,
93:11, 93:13,
93:19, 115:14,
115:17
supplemental
176:4, 176:9
supplementary
64:22
supposed
13:8, 89:14
suppressed
155:13

sure
7:16, 36:12,
41:8, 53:14,
59:13, 71:14,
71:21, 88:5,
90:6, 91:12,
99:9, 105:18,
111:20, 116:4,
132:15, 140:2,
140:7, 144:14,
147:20, 154:22,
169:1, 170:8,
172:7, 177:23
surgery
11:9
surrounding
103:3
suspect
38:13, 39:5,
39:6, 39:8,
39:14, 39:15,
41:12, 44:10,
44:11, 45:7,
97:8, 139:19,
140:8, 157:4,
157:6, 157:9,
158:13, 158:14,
167:23, 168:1,
168:5
suspect's
43:4, 44:9
suspects
38:3, 38:5,
38:9, 40:4,
61:22, 124:17,
127:24, 137:22,
139:14, 141:12,
158:1
suspend
151:19
suspended
22:10, 22:13,
144:5, 144:8,
144:19, 149:7,
149:9
suspension
25:17, 25:19
suspensions
149:12

suspicions
160:4
sustained
150:3, 150:24,
151:2, 151:6,
152:18, 152:24
swearing
6:3
switch
29:17, 156:24
switched
33:12
switches
156:20
switching
156:12
sworn
6:22, 7:3
szudarski
149:20, 152:17,
152:19, 153:11

T

t-h-o-m-a-s
7:9
take
12:24, 13:6,
13:7, 13:8,
24:6, 36:4,
36:13, 42:14,
60:19, 61:22,
61:24, 62:2,
82:4, 99:5,
101:11, 117:18,
125:17, 130:20,
141:5, 141:8,
141:11, 144:12,
144:22, 147:19,
151:11, 157:13,
160:16, 180:11
taken
12:19, 13:9,
23:20, 24:11,
25:11, 82:3,
116:15, 156:2,
166:7, 166:14,
167:14, 181:22,
182:4, 182:10,

Transcript of Thomas Kelly
Conducted on July 14, 2020

83

182:14, 189:7,
189:9
**taking**
11:6, 12:16,
12:23, 104:22,
138:10, 178:23,
181:1, 182:18
**talk**
69:1, 136:12,
152:16
**talked**
66:18, 69:4,
69:11, 69:15,
76:13, 81:2,
81:4, 117:11,
126:9, 171:1
**talking**
60:16, 69:7,
69:9, 83:9,
101:17, 113:7,
120:10, 127:11,
142:13, 171:6,
172:18, 174:22,
176:13
**tall**
77:8
**tallest**
74:13, 74:22,
112:1
**tan**
83:17
**task**
20:15, 20:16,
21:4, 21:8,
21:19, 21:24,
22:9, 31:9,
31:21
**tavern**
80:14
**taylor's**
148:24
**team**
15:10
**technical**
23:1
**tell**
32:10, 38:24,
39:3, 46:12,

52:3, 53:6,
54:3, 65:4,
65:7, 69:8,
72:24, 77:24,
82:8, 83:24,
84:5, 90:18,
112:13, 117:8,
121:2, 127:20,
138:9, 142:5,
143:10, 146:11,
147:12, 147:17,
147:23, 148:9,
151:12, 153:3,
159:21, 167:2,
169:10, 174:16,
179:7, 179:10,
179:20, 180:19
**telling**
22:17, 24:9,
49:11, 66:24,
102:2, 123:5,
123:24, 136:2
**tells**
121:10
**ten**
7:18, 90:19,
156:16, 156:17,
176:5
**tendency**
88:10
**testified**
7:3, 185:13
**testify**
11:8, 12:10,
12:16, 45:19,
54:18, 54:23,
55:6, 78:4,
88:8, 88:12
**testimony**
6:5, 46:10,
46:12, 59:6,
61:16, 68:23,
126:20, 127:16,
183:11, 183:17,
183:19, 188:5,
188:6, 189:9
**text**
164:18, 164:20

**th**
19:22, 22:5,
35:8, 57:4,
67:24, 80:9,
99:17, 106:24,
138:22, 189:17
**thank**
9:21, 23:18,
35:20, 47:14,
54:11, 60:22,
88:14, 96:2,
96:13, 118:6,
129:1, 129:23,
136:14, 152:14,
160:18, 168:21,
170:16, 180:6
**thanking**
96:3, 96:10,
97:3
**thanks**
9:17, 168:20,
169:2, 170:9,
170:13, 185:15,
186:16
**theft**
66:7
**themselves**
157:1, 157:21,
157:22
**thereafter**
189:10
**they'd**
15:8
**thin**
75:9, 75:12
**thing**
7:23, 48:1,
97:1, 104:6,
176:13
**things**
41:23
**think**
12:23, 16:24,
20:3, 24:20,
26:1, 26:7,
36:23, 41:4,
45:2, 51:22,
57:16, 58:6,

61:11, 62:8,
64:11, 67:22,
70:5, 70:11,
71:3, 71:6,
71:11, 72:4,
72:7, 72:8,
73:20, 74:1,
74:3, 75:4,
76:1, 77:5,
77:7, 80:14,
83:3, 88:17,
91:16, 92:13,
92:15, 92:17,
114:6, 132:24,
133:7, 133:10,
133:14, 133:17,
133:19, 133:20,
133:21, 133:22,
134:21, 135:11,
144:7, 144:17,
144:18, 144:20,
148:8, 149:14,
149:17, 150:8,
151:18, 154:23,
162:14, 165:22, 166:22,
177:24
**thinking**
69:22, 102:3,
102:10
**third**
48:15, 88:23,
104:8, 104:11,
122:21
**thomas**
1:15, 2:11,
5:2, 6:9, 7:1,
7:9, 46:20,
188:3
**thomas"**
53:5
**thought**
47:23, 47:24,
62:5, 65:7,
105:22, 149:8
**threaten**
134:17, 134:22
**threatened**
135:2

Transcript of Thomas Kelly
Conducted on July 14, 2020

84

three
13:16, 32:7,
48:19, 67:21,
82:6, 132:12,
133:12
three-quarters
171:15
throat
45:1, 45:2
through
70:23, 99:1,
99:8, 108:22,
114:21, 115:4,
117:7, 119:8,
159:4, 169:16
throw
162:23
thumbnail
13:24
thursday
1:17
time
7:17, 11:20,
15:8, 17:2,
19:9, 19:10,
19:15, 19:18,
19:21, 20:11,
20:20, 20:21,
21:23, 28:16,
30:13, 30:22,
31:6, 31:10,
31:11, 32:4,
32:14, 32:15,
32:16, 32:18,
32:20, 32:21,
36:24, 38:14,
40:23, 59:11,
71:10, 71:13,
72:23, 73:4,
73:8, 74:23,
75:14, 75:17,
77:22, 79:23,
80:1, 80:13,
80:21, 81:2,
81:7, 81:16,
86:9, 88:24,
89:3, 91:16,
91:19, 92:1,

99:5, 99:6,
100:8, 102:14,
116:9, 117:18,
120:14, 139:11,
149:8, 153:5,
158:20, 161:11,
162:4, 174:10,
174:21, 176:1,
179:11, 185:8
time-due
31:22
times
7:14, 27:8,
27:11, 88:2,
88:3, 90:17,
132:12, 133:13,
137:13, 144:1,
144:4, 144:8,
144:18, 154:14,
158:11, 162:20,
162:24, 163:2,
165:2
timing
47:22
to-from
153:14, 153:19
today
11:8, 12:11,
12:17, 12:20,
13:10, 88:8,
114:7, 126:7,
159:23, 169:6,
169:15, 169:17,
169:18, 169:24,
170:20, 176:4,
176:6
today's
106:1
told
12:6, 24:24,
25:8, 44:24,
65:8, 91:16,
101:23, 105:5,
106:17, 126:7,
127:10, 127:22,
128:1, 129:21,
130:1, 132:5,
132:7, 143:14,

153:2, 159:23,
166:24, 175:15
tone
130:20
tony
107:5
took
16:14, 16:21,
24:3, 24:5,
27:15, 85:4,
86:22, 87:2,
87:22, 91:21,
166:16, 178:11,
179:22, 180:19,
184:14
tool
62:6, 62:9,
167:10, 167:13
top
53:4, 83:7,
169:8, 185:20
topic
166:4
totally
130:24, 152:21,
152:23
touches
66:18
tour
24:17, 31:4,
31:12, 32:1,
92:14
towards
24:18, 24:19,
122:5
traffic
25:4, 25:5,
25:6, 25:7,
25:8, 30:21,
89:16, 166:11
train
37:3
trained
36:4, 36:12,
37:10, 37:16,
37:19, 38:2,
44:7, 45:18,
52:17, 54:7,

57:13, 57:18,
57:22, 63:9,
63:13, 63:16,
64:5, 96:13,
137:1
training
14:2, 36:1,
45:10, 46:21,
48:13, 48:16,
48:20, 48:24,
49:5, 49:9,
51:24, 52:14,
53:3, 54:16,
56:16, 57:5,
57:8, 58:4,
58:9, 59:19,
60:6, 60:15,
60:17, 63:6,
63:11, 124:13,
124:14, 168:15,
169:8, 169:19
trainings
52:12, 53:20
transcript
5:12, 6:7,
189:8
transcription
188:6
transcripts
68:22
transfer
22:6
transferred
22:8
trench
83:18, 84:2
trial
54:18, 78:4
tried
106:8
true
6:5, 44:17,
121:5, 128:3,
146:23, 147:12,
154:5, 188:5,
189:8
truth
22:17, 24:9,

Transcript of Thomas Kelly
Conducted on July 14, 2020                                    85

46:12, 49:11,
52:3, 121:2,
121:10, 166:24,
167:2
**truthful**
62:12, 135:13
**truthfully**
11:8, 12:10,
12:17, 88:8,
88:12
**try**
10:14, 23:7,
40:9, 42:17,
44:2, 82:10,
184:11
**trying**
23:4, 47:15,
47:16, 57:16,
60:3, 87:14,
142:18
**turnaround**
162:4
**turned**
108:12, 122:5
**turner**
76:3, 76:6,
76:20, 78:14
**turning**
63:1
**two**
17:23, 18:18,
24:11, 48:12,
52:9, 52:11,
52:12, 52:15,
52:24, 67:5,
80:16, 82:19,
127:24, 137:22,
147:10, 149:10,
149:12, 149:19,
156:18
**two-page**
64:12, 64:16
**two-thirds**
171:15
**type**
65:14, 78:24
**types**
64:7, 105:17

**typewriting**
189:10
**typewritten**
109:2
**typical**
162:3
**typically**
87:17, 88:24,
160:20, 172:23,
182:21

**U**

**uh-huh**
10:3
**uh-uh**
10:3
**unattended**
158:2
**uncle**
18:1, 18:2,
18:3
**uncomfortably**
155:20
**uncooperative**
141:23
**under**
6:6, 16:13,
38:13, 39:4,
41:11, 84:8,
96:14, 126:8,
172:9, 189:10
**understand**
10:8, 10:18,
10:19, 10:22,
11:19, 11:22,
13:12, 19:2,
35:17, 36:6,
36:21, 45:22,
50:3, 56:7,
87:14, 103:7,
123:16, 146:18,
165:15, 174:19,
184:10
**understanding**
8:12, 9:4,
176:12
**understood**
11:2, 38:20

**uniform**
20:19, 20:23,
26:14, 84:3
**unique**
161:2, 161:4
**unit**
26:8, 71:18,
73:7, 79:17,
163:22, 164:3
**united**
1:1
**units**
79:14, 79:15
**unless**
116:20, 168:11
**unmarked**
21:1, 21:2
**unmute**
23:4
**unreliable**
61:5
**until**
8:16, 10:10,
10:15, 26:23,
35:2, 35:5,
99:19
**untrained**
65:19
**unusual**
84:20, 177:24
**updated**
151:16
**upset**
134:11
**upstairs**
106:17
**urinate**
156:1
**use**
8:17, 141:4,
152:3, 156:2,
168:5
**using**
8:12, 87:10
**utility**
167:6

**V**

**vagina**
84:20, 89:21,

**uniform** 89:23, 90:5,
90:9
**vaginal**
122:2, 122:24
**valor**
14:22
**vantage**
41:24
**various**
42:14, 94:10
**verbal**
10:1
**verified**
6:9
**verify**
175:2
**version**
121:3, 146:20,
146:21
**versions**
128:1
**versus**
148:2
**viability**
142:18
**victim**
45:1, 45:6,
64:14, 65:17,
65:18, 90:4,
90:8, 116:13,
120:10, 120:12,
120:15, 121:4,
121:13, 121:15,
121:22, 122:1,
122:3, 122:21,
122:23, 185:7
**victim's**
45:1, 45:2,
89:23, 185:21
**video**
8:10, 8:15,
49:5, 152:4,
186:18, 186:20
**vietnam**
14:6, 14:7,
15:2, 15:5, 15:8
**view**
136:11

Transcript of Thomas Kelly
Conducted on July 14, 2020

86

vigorous
63:21
violate
143:18, 143:22
violation
150:4, 150:6,
151:2
violent
28:8, 28:9,
28:12, 28:21,
31:1, 35:4,
64:11, 120:5,
128:10
virtual
67:13
virtually
1:16, 2:12
voluntary
22:7

**W**

w-a-r-d
33:9
wagon
52:7
wait
10:9, 10:15,
118:1, 158:20
walked
158:15
wall
156:18, 157:17,
158:16
wallet
25:3, 166:14
want
8:5, 9:18,
13:20, 28:9,
28:12, 29:23,
34:19, 44:4,
47:17, 50:6,
69:8, 70:11,
82:3, 88:5,
95:4, 95:17,
95:24, 105:15,
105:18, 109:3,
114:22, 120:7,
121:19, 123:4,

123:23, 125:3,
126:4, 131:11,
131:14, 132:8,
132:24, 133:6,
136:16, 136:17,
142:8, 142:15,
146:2, 146:15,
147:20, 147:22,
160:15, 162:23,
169:11, 170:9,
170:18
wanted
42:23, 44:20,
55:22, 56:1,
56:4, 56:8,
62:24, 65:21,
99:12, 101:23,
121:2, 175:13
wants
186:20
ward
33:9, 33:10,
33:14, 33:21,
97:14
washington
4:16
watch
29:14, 30:17,
31:24, 88:22,
88:23, 89:1,
89:3, 89:6,
104:8, 104:11
watches
32:7
watching
49:5
water
60:19, 156:5
way
6:8, 10:21,
24:16, 24:19,
43:3, 44:8,
45:12, 49:14,
49:16, 51:19,
51:22, 54:2,
54:7, 84:6,
96:3, 96:10,
108:11, 122:23,

145:10, 146:22,
158:10, 173:7,
179:24
ways
41:23, 95:11
we'll
11:21, 32:11,
46:13, 46:19,
66:7, 81:20,
98:19, 99:10,
101:11, 115:11,
146:2
we're
56:23, 56:24,
69:21, 136:12,
186:15
we've
76:13, 100:24,
115:6, 115:10,
117:11
wealth
19:1
wear
71:9, 72:12,
73:21, 74:10,
77:6, 160:20,
160:23
wearing
88:6, 88:7
weddings
79:21
weeks
28:5, 33:4
weighed
72:4
weight
72:2, 73:13
welcome
115:22
went
15:10, 16:13,
21:5, 22:17,
25:9, 26:6,
26:16, 106:12,
106:17, 120:11,
120:14, 120:18,
121:23, 122:4,
122:6, 122:8,

158:21
wentworth
86:24, 87:3,
126:10, 126:17,
127:13
weren't
20:22, 53:22,
94:13, 95:6,
95:17, 96:10,
96:16, 97:2,
97:7, 98:4,
98:10, 98:14,
108:15, 153:8,
172:7, 178:8
west
4:7, 4:16,
106:24, 159:7,
163:18
whatever
56:20, 88:4,
139:10, 145:1,
153:5, 161:19,
175:11
whereby
162:16
whereof
189:16
wherever
139:1
whether
42:18, 42:23,
43:5, 45:5,
98:10, 108:2,
108:11, 148:15,
148:19, 148:23,
150:6, 169:24,
179:8, 179:22,
179:23, 180:19
whichever
170:7
white
83:9, 148:11
whoever
31:16, 31:23,
32:11, 92:22
whole
13:20, 145:12
whomever
32:2

Transcript of Thomas Kelly
Conducted on July 14, 2020

87

**wild**
44:22
**william**
1:10, 3:17
**window**
106:13
**withdraw**
66:22
**withhold**
45:4
**within**
16:11, 80:16,
116:1, 157:10
**without**
33:2, 36:15,
69:13, 84:10,
86:13, 149:24,
159:3
**witness**
6:4, 6:9, 6:11,
6:22, 7:2,
35:19, 36:8,
36:22, 38:12,
40:1, 40:17,
41:3, 41:13,
41:15, 42:5,
43:12, 43:14,
43:20, 44:16,
45:14, 45:23,
50:5, 50:8,
51:21, 52:22,
55:2, 55:9,
59:18, 60:22,
61:8, 61:18,
64:1, 64:9,
65:24, 70:1,
70:8, 75:3,
78:17, 79:8,
87:20, 91:6,
91:9, 93:23,
95:1, 95:8,
95:20, 112:15,
114:22, 117:17,
117:21, 117:22,
118:7, 118:8,
118:15, 118:16,
119:2, 119:3,
124:7, 125:1,

127:6, 130:9,
131:17, 135:13,
136:2, 136:20,
137:7, 139:20,
139:23, 141:1,
142:9, 144:11,
145:1, 145:18,
147:5, 147:16,
153:10, 158:23,
160:1, 163:7,
163:14, 165:11,
168:5, 171:1,
174:5, 174:11,
174:12, 179:15,
180:4, 180:10,
181:21, 182:5,
182:15, 182:22,
183:3, 183:9,
183:15, 184:13,
184:17, 185:13,
189:16
**witness's**
61:16, 126:20,
131:6, 134:17
**witnessed**
168:4
**witnesses**
37:10, 37:16,
37:20, 42:14,
42:16, 62:15,
64:14, 87:13,
87:18, 93:3,
127:22, 142:14,
143:4, 180:12,
181:23
**woman**
89:20
**word**
106:2
**worded**
93:16
**wore**
71:3, 73:16,
75:21, 76:1,
77:17
**work**
14:24, 15:12,
18:23, 26:13,

28:9, 28:12,
30:11, 53:21,
53:22, 70:23,
78:22, 78:23,
80:6, 84:4,
89:9, 90:7,
92:11, 104:12,
148:10
**worked**
15:3, 15:17,
17:13, 28:14,
28:18, 29:11,
34:15, 62:19,
71:15, 73:4,
73:15, 81:13,
92:13, 92:16,
148:13, 160:23,
164:4
**working**
31:23, 32:4,
52:23, 59:21,
65:1, 88:18,
88:22, 139:4,
140:22, 160:19,
162:21
**worn**
75:11
**worried**
158:19, 158:24
**wouldn't**
55:12, 123:22,
142:5, 142:8,
158:19, 177:21
**write**
85:17, 173:21,
174:17, 181:15
**writing**
8:22, 99:20,
173:24, 174:2,
174:19, 175:1,
175:8, 176:14
**written**
139:18, 146:20,
150:6, 150:7,
174:14, 174:15,
175:4, 175:11
**wrong**
24:19, 104:6,

147:23, 154:9
**wrote**
147:17, 147:24,
148:3, 170:18,
175:20, 181:7
**würzburg**
14:2

**Y**

**yeah**
20:1, 29:21,
37:23, 39:21,
45:4, 52:21,
56:21, 70:4,
78:21, 83:2,
83:11, 83:23,
84:12, 93:9,
114:16, 115:2,
118:6, 118:13,
144:16, 151:1,
152:8, 157:22,
168:20, 170:16,
177:3, 186:22
**year**
14:3, 16:11,
17:15, 20:6,
26:1, 27:1,
36:14, 72:13,
128:9
**years**
7:18, 13:16,
16:23, 16:24,
18:13, 21:20,
33:11, 33:18,
53:7, 58:11,
60:2, 66:3,
71:16, 72:16,
80:3, 80:16,
80:22, 81:9,
81:15, 98:1,
98:2, 106:23,
120:4, 123:18,
123:19, 148:9
**yesterday**
67:24
**your's**
110:22
**yourself**
52:1, 93:6,

139:20, 140:9,
168:19, 171:4
**youth**
18:5

**Z**

**zellner**
3:5
**zoom**
8:13, 134:14,
177:4, 182:1

**$**

**$370,000**
155:5

**0**

**00**
30:11, 89:7
**000192**
146:8
**003160**
189:4
**06**
150:10
**084**
189:4

**1**

**1**
26:17, 33:23,
89:7
**10**
1:18, 20:21,
56:16, 151:14
**1000**
3:23
**103**
5:19
**108**
5:20
**109**
48:11
**11**
1:18, 80:22,
81:15, 118:13,
169:9, 169:20
**111**
80:9, 80:11

**115**
5:21
**12**
14:10, 16:15,
30:16, 81:15,
120:8
**1212**
3:8
**1240**
4:7
**129**
98:24
**13**
67:24
**132**
99:1
**14**
1:17, 121:20,
150:6
**141**
4:7
**144**
109:2
**146**
5:22
**15**
57:4
**150**
5:23
**151**
109:6
**152**
109:12
**159**
57:4
**16**
16:15, 119:8
**160**
5:4
**169**
5:5
**17**
1:9, 109:16,
151:14
**172**
109:16
**173**
109:21

**174**
109:24
**175**
110:2
**176**
110:5
**177**
5:6, 110:8
**178**
110:11
**179**
5:7, 110:14
**18**
2:5, 123:19
**180**
110:17
**181**
5:8
**182**
111:4
**183**
112:6, 112:8
**184**
112:20
**185**
5:9, 113:9
**186**
113:11
**187**
113:13
**188**
113:15
**1880**
4:18
**189**
1:23, 113:17
**190**
113:19
**1901**
3:6
**191**
113:21
**192**
113:23
**193**
114:2
**195**
114:4

**1964**
16:6
**1966**
14:4
**1967**
14:16
**1969**
19:3, 53:13
**1971**
60:14, 60:16
**1981**
27:2
**1987**
26:24, 27:5,
35:5, 66:8
**1990**
71:19
**1991**
63:3, 63:11
**1994**
31:6, 71:1,
71:10, 71:13,
71:23, 72:3,
72:10, 72:15,
73:24, 74:7,
75:14, 75:17,
75:23, 76:4,
77:14, 82:3,
88:15, 88:19,
88:22, 89:18,
91:3, 92:19,
93:5, 94:2,
99:17, 104:8,
111:14, 138:4,
146:13, 156:9,
156:11, 156:14,
157:4, 157:24,
160:19, 161:2,
161:5, 161:8,
162:3, 162:11,
163:19, 170:23,
174:10, 178:2

**2**

**2**
187:1
**200**
72:5, 72:9,

Transcript of Thomas Kelly
Conducted on July 14, 2020

89

108:22, 115:4
**2000**
156:12
**2004**
57:5, 60:17
**2009**
35:8
**2020**
1:17, 11:10,
189:18
**2021**
189:19
**22**
98:2, 120:4,
123:18, 128:9
**220**
72:1, 72:4
**2200**
3:21
**22117**
150:22
**22118**
150:23
**22119**
150:23
**23**
106:23
**243**
3:15
**2530**
47:5
**2538**
47:3
**2540**
47:6
**26**
138:22
**28**
88:19, 89:18,
91:3, 99:17,
104:3, 104:8,
146:13, 189:17
**29**
35:8

───────── **3** ─────────

**3**
148:3

**30**
25:18, 89:2,
89:10, 89:13,
149:7
**304**
81:22
**308628**
1:22
**31**
189:19
**311**
3:13
**312**
3:15, 3:23,
4:18
**321**
3:21
**33**
24:20
**3313**
4:9
**35**
19:22
**39**
187:1
**3rd**
3:13, 21:22,
22:3, 22:6,
22:9, 22:12,
25:24, 26:4,
26:10

───────── **4** ─────────

**4**
30:11, 89:2,
89:10, 89:13
**40**
53:7, 58:11,
60:2, 72:16
**45**
18:13
**46**
5:16
**48**
156:6
**494**
3:23

───────── **5** ─────────

**5**
30:11

**50**
162:22
**51**
86:24, 87:3,
126:10, 126:17,
127:12
**55**
106:24
**5900**
3:15

───────── **6** ─────────

**603**
4:18
**60515**
3:7
**60602**
4:17
**60607**
3:14
**630**
3:8, 4:9
**650**
3:6
**66**
155:17
**68**
155:17
**69**
4:16, 37:13

───────── **7** ─────────

**70**
25:21, 72:21,
72:24, 149:8
**71**
189:21
**735**
4:9
**75**
22:5

───────── **8** ─────────

**8**
30:11
**80**
115:15
**81**
5:17

**82**
116:5
**84**
117:2
**8696**
1:9

───────── **9** ─────────

**9**
30:11
**90**
20:20, 78:10
**917**
106:23, 159:7,
163:18
**94**
72:14, 74:14
**955**
3:8
**96**
115:15
**98**
5:18
**998**
2:5
**9th**
19:20, 20:4,
20:8, 20:12,
20:14, 21:9,
21:12