## *Moran v. Calumet City*

United States Court of Appeals for the Seventh Circuit

September 22, 2022, Argued; November 23, 2022, Decided

No. 22-1043

**Reporter**
54 F.4th 483 *; 2022 U.S. App. LEXIS 32509 **; 114 Fed. R. Serv. 3d (Callaghan) 811; 2022 WL 17173891

NAKIYA MORAN, Plaintiff-Appellant, v. CALUMET CITY, et al., Defendants-Appellees.

**Prior History:** **[\*\*1]** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 17-cv-2027 — Robert W. Gettleman, Judge.

*Moran v. Calumet City, 2021 U.S. Dist. LEXIS 250492, 2021 WL 6425094 (N.D. Ill., Dec. 13, 2021)*

**Disposition:** AFFIRMED.

**Counsel:** For NAKIYA MORAN, Plaintiff - Appellant: Paul A. Castiglione, Attorney, Kasif Khowaja, Attorney, KHOWAJA LAW FIRM, LLC, Chicago, IL.

For CALUMET CITY, ILLINOIS, MITCHELL GROWE, Calumet City Officer, KEVIN RAPACZ, Calumet City Officer, Defendants - Appellees: James G. Sotos, Attorney, Laura M. Ranum, Attorney, SOTOS LAW FIRM, P.C., Chicago, IL.

For MARCO GLUMAC, Defendant - Appellee: Laura M. Ranum, Attorney, James G. Sotos, Attorney, SOTOS LAW FIRM, P.C., Chicago, IL; K. Austin Zimmer, Attorney, DEL GALDO LAW GROUP, LLC, Berwyn, IL.

**Judges:** Before WOOD, HAMILTON, and ST. EVE, Circuit Judges.

**Opinion by:** ST. EVE

## Opinion

 **[\*488]** ST. EVE, *Circuit Judge*. A jury convicted Nakiya Moran of attempted murder and aggravated battery with a firearm for a 2006 shooting in Calumet City, Illinois. After the trial, the prosecution learned that exculpatory evidence, including a ballistics report linking the gun used in the Calumet City shooting to a different shooting, had not been turned over to the defense as required by *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*. Moran sought postconviction relief based on the *Brady* violation, **[\*\*2]** and a state court vacated his conviction. Moran was retried in a bench trial and acquitted in 2017.

Moran then filed this suit in federal court, seeking redress for the decade he spent behind bars. He brought federal and state claims against the city, two detectives who investigated the shooting, and a crime scene technician who mishandled the ballistics report. The district court granted the defendants' motion for summary judgment. In its ruling, the district court noted a mistaken allegation in Moran's complaint. This allegation was a judicial admission that negated an essential element of one of Moran's theories of liability. Hoping for another chance to pursue this legal theory, Moran moved for leave to amend his complaint, but the court denied his motion. Moran appealed.

We affirm. The district court properly entered summary judgment in the defendants' favor and did not abuse its discretion in denying Moran leave to amend his complaint.

# I. Background

## A. The Calumet City Shooting

The summer of 2006 was a time of conflict for the Latin Dragons and Latin Kings, two rival street gangs active in the Calumet City area. In the evening of August 22, 2006, the Rostro family and several friends [**3] gathered outside the Rostros' Calumet City home. At least one member of the Rostro family, Eduardo, was a member of the Latin Kings. At around 9:00 p.m., a man emerged from the bushes in an alley across the street and opened fire, hitting Tomas Rostro, Eduardo's father; Yadira Rostro, his sister; and Desiree Dolata, a friend of Yadira's. Tomas ran toward the shooter and was within 16 feet of him when the shooter fled. Eduardo and Yadira were farther away, but they recognized the shooter as Nakiya Moran, a [*489] member of the Latin Dragons whom they had known since childhood.

The police arrived soon after, including Detectives Mitchell Growe and Kevin Rapacz of the Calumet City Police Department ("CCPD"), who are defendants in this lawsuit. The record indicates that Eduardo identified Moran to the police at the scene, but it is disputed when Yadira first identified Moran as the shooter. Although she has never wavered in her identification of Moran as the shooter, Yadira denies that she identified him on the night of the shooting. Detective Growe, however, indicated in a police report written in 2008 and in testimony at a pretrial hearing that Yadira had identified Moran at the crime scene. [**4]

## B. The Investigation

The next day, August 23, 2006, Detectives Growe and Rapacz interviewed Yadira, Eduardo, and Tomas separately. Yadira stated that Moran was the shooter and identified him in a photo array the detectives showed her. In a second photo array, Yadira identified Horatio "Bobby" Loera, another member of the Latin Dragons. She later testified that it was possible she told the detectives she saw Loera in the alley with Moran during the shooting, and she stated that she thought Eduardo had said something about Loera. The detectives presented Eduardo with a clean copy of the first photo array; he too identified Moran as the shooter. Tomas described the shooter as "a young Asian male who was wearing glasses and a baseball hat" but was unable to positively identify the shooter when shown photos of potential suspects. Neither Loera nor Moran is of Asian descent.

That evening, police arrested Loera and a woman named Amanda Torres on information "that they drove [Moran]." Loera and Torres were given *Miranda* warnings, interrogated by Detectives Growe and Rapacz, and released approximately 26 hours later. Little is known about the content of the interrogations. Detectives Growe and [**5] Rapacz could not recall details but thought that the long duration of the detention "was consistent with Yadira identifying [Loera] as being in the alley at the time of the shooting" and therefore implicated in the crime. While preparing for trial, Frank Celani, Moran's attorney, took a sworn statement from Torres, but that statement is not in the record. A note in the Cook County State's Attorney's Office file indicates that Loera and Torres were cleared because "their alibis checked out."

Based on Eduardo's and Yadira's identification of Moran as the shooter, police arrested him on August 24, 2006. A grand jury indicted Moran for attempted first-degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. He remained incarcerated while awaiting trial.

## C. The Hammond Shooting and Ballistics Evidence

Another gang-related shooting occurred on October 22, 2006, this time in Hammond, Indiana, just across the state line from Calumet City. Several days later, police arrested and recovered a 9 mm

handgun from a suspect in the shooting: Nicholas Chavez, a member of the Latin Dragons who resembled Moran. Ballistics analysis performed on Chavez's gun indicated that [**6] it was a possible match for shell casings recovered from the Calumet City shooting.

On January 7, 2009, while Moran's prosecution was still pending, Cook County forensic scientist Leah Kane informed Marco Glumac, a CCPD crime scene technician and a defendant in this case, about the potential match. Kane asked Glumac to resubmit the Calumet City shell casings [*490] for analysis, which he did in April 2009. In May 2009, Kane told Glumac that the Calumet City shell casings had been fired from the gun used in the Hammond shooting, and in June 2009, Kane faxed Glumac an Illinois State Police ("ISP") ballistics report containing the same information.

The ballistics match was exculpatory evidence that should have been turned over to the defense under *Brady v. Maryland*. Under CCPD procedures, Glumac should have forwarded the ISP report to Detectives Growe and Rapacz, who would then have turned it over to the prosecution. Although Glumac wrote the detectives' "star numbers" on the report, he never forwarded it to them. Why he did not is a hotly contested issue. Glumac testified that he intended to forward the report and his failure to do so was an "inadvertent omission." For their part, Detectives [**7] Growe and Rapacz testified that they were unaware of the ISP report prior to Moran's trial. Moran disputes both points, arguing that Glumac intentionally or at least recklessly failed to produce the report and that the detectives knew about it before the trial.

In any event, lead prosecutor Assistant State's Attorney ("ASA") Cordelia Coppleson testified that the prosecution did not receive the report prior to Moran's trial.[1] As a result, Moran's counsel did not receive the report in time to use it in Moran's defense.

### D. State Court Proceedings

Moran went to trial in August 2009. The prosecution's evidence included testimony about Eduardo's and Yadira's prior identifications of Moran, in-court identifications of Moran as the shooter by Eduardo and Yadira, and testimony from Glumac and Detectives Growe and Rapacz. Moran presented an alibi defense, offering testimony from witnesses who stated that Moran had been with them until 9:00 p.m. on August 22, 2006, so it was "physically impossible" for Moran to have shot the victims. The jury found Moran guilty of five counts of attempted murder and two counts of aggravated battery with a firearm.

In October 2010, while Moran's direct appeal was pending, [**8] ASA Coppleson spoke with a CCPD detective who informed her that a shell casing from the Calumet City shooting matched the gun recovered from the suspect in the Hammond shooting. ASA Coppleson obtained a copy of the ISP report and sent it to the public defender representing Moran on appeal and Celani, who had represented Moran at trial. Moran took no immediate action, and the Illinois Appellate Court upheld his conviction in February 2013.

Moran then sought postconviction relief in state court, arguing that the failure to produce the ISP report violated *Brady v. Maryland*. The court agreed and vacated Moran's conviction in June 2015. Moran was retried in a bench trial in November 2016 and January 2017. Eduardo and Yadira maintained that Moran was the shooter, but the trial court found that their testimony was insufficient evidence to prove Moran's guilt beyond a reasonable doubt given the alibi witnesses' testimony and the subsequent use of the gun in a different shooting. The court acquitted Moran in February 2017, and he was released after more than 10 years' imprisonment.

---

[1] As discussed in more detail below, however, in the operative complaint Moran alleged that ASA Coppleson knew about the ballistics match.

**E. District Court Proceedings**

Moran brought this suit in federal district court in March 2017 and amended his complaint [**9] six days later. He asserted claims under 42 U.S.C. § 1983 and state [*491] law against Glumac, Detectives Growe and Rapacz, and Calumet City. The following claims survived the motion-to-dismiss stage: (1) a § 1983 claim against the individual defendants, alleging that they suppressed exculpatory evidence in violation of *Brady*; (2) a § 1983 claim against Detectives Growe and Rapacz, alleging that they fabricated evidence in violation of *Brady*; (3) state law malicious prosecution and civil conspiracy claims against Detectives Growe and Rapacz; and (4) state law respondeat superior and indemnity claims against Calumet City.

During discovery, if not earlier, Moran learned that ASA Coppleson denied having received the ISP ballistics report prior to his 2009 trial. This contradicted Moran's operative complaint, which alleged that ASA Coppleson received the report three months before the trial. Despite learning that this allegation was untrue, Moran made no attempt to amend his complaint before the summary judgment stage.

The district court granted the defendants' motion for summary judgment in July 2021. The court found that Moran could not establish the elements of a *Brady* suppression claim with respect to any of the allegedly [**10] suppressed evidence. The court held that Moran's allegation that ASA Coppleson knew about the report was a judicial admission that negated an essential element of the claim because prosecutorial knowledge of exculpatory evidence blocks civil liability for police officers. Moreover, even without the judicial admission, the record could not allow a reasonable jury to find that the evidence had been suppressed. As to the fabrication-of-evidence claim, the court found that even if the evidence in question had been fabricated, it was not material because there was not a reasonable probability that the evidence influenced the jury's verdict. The district court also rejected Moran's state law claims. It found that the malicious prosecution claim failed because the detectives had probable cause to arrest Moran and there was no evidence that they acted with malice toward him. It further found that the civil conspiracy claim failed because the record contained no evidence of a scheme or agreement to violate Moran's rights. The respondeat superior and indemnity claims depended on Moran succeeding on one of his other claims; once the court concluded that the other claims failed, these claims failed [**11] too.

In an attempt to remedy the judicial admission the district court identified, Moran moved for relief from the judgment under Federal Rule of Civil Procedure 59(e), seeking leave to file a second amended complaint. The district court denied this motion.

Moran appeals the grant of the defendants' motion for summary judgment and the denial of his motion for leave to amend his complaint.

**II. Summary Judgment**

We review the grant of a motion for summary judgment de novo, drawing reasonable inferences and interpreting the facts in the light most favorable to the nonmovant. *Stockton v. Milwaukee County, 44 F.4th 605, 614 (7th Cir. 2022)*. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moran is the nonmovant, but if he does not meet his burden to produce sufficient evidence—not mere speculation—on each essential element of his claims, then the defendants are entitled to summary judgment in their favor. *Stockton, 44 F.4th at 614*; *Khungar v. Access Cmty. Health Network, 985 F.3d 565, 573 (7th Cir. 2021)*.

[*492] **A. Suppression of Evidence**

With respect to his § 1983 suppression claim,

Moran alleges that the individual defendants—Glumac and Detectives Growe and Rapacz—violated his due process rights under *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*, by suppressing exculpatory evidence. Before turning to the merits of this claim, we review the [**12] difference between *Brady*'s application in the criminal and civil contexts.

The suppression of material, exculpatory evidence in a criminal case violates due process. *Brady, 373 U.S. at 87*. Evidence is "'suppressed' if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *United States v. Are, 590 F.3d 499, 510 (7th Cir. 2009)* (quoting *United States v. O'Hara, 301 F.3d 563, 569 (7th Cir. 2002)*); accord *Goudy v. Cummings, 922 F.3d 834, 838 (7th Cir. 2019)*. Nondisclosure of exculpatory evidence violates *Brady* "irrespective of the good faith or bad faith of the prosecution," *Brady, 373 U.S. at 87*, so a *Brady* violation requires a conviction to be vacated regardless of whether the violation was intentional, reckless, or negligent. *Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)*. The duty to disclose exculpatory evidence primarily belongs to the prosecution, but it "extends to police officers, insofar as they must turn over potentially exculpatory evidence ... to the prosecution." *Holloway v. City of Milwaukee, 43 F.4th 760, 767-68 (7th Cir. 2022)* (quoting *Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007)*). Because exculpatory evidence including the ISP report was not disclosed to the defense before Moran's 2009 jury trial, his conviction was vacated, and he received a new trial.

But a *Brady* violation in the criminal context does not necessarily equate to civil liability under [**13] *§ 1983*. Absolute immunity bars suits against prosecutors, at least when the nondisclosure of exculpatory evidence occurs after arrest and before a conviction becomes final. *Fields v. Wharrie, 672 F.3d 505, 512-15 (7th Cir. 2012)*. And while police officers and employees can be held liable for suppressing evidence, they may be entitled to qualified immunity. *Roldan v. Stroud, 52 F.4th 335, 338 (7th Cir. 2022)*. To prevail on a *Brady* suppression claim against a police officer, a plaintiff must prove that "(1) the [nondisclosed] evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice." *Jones v. York, 34 F.4th 550, 559 (7th Cir. 2022)* (quoting *Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016)*). These elements require more than simply proving that exculpatory evidence was not disclosed to the defense.

First, a plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it. A police officer's *Brady* obligation extends only "insofar as they must turn over potentially exculpatory evidence ... to the prosecution." *Holloway, 43 F.4th at 768* (quoting *Harris, 486 F.3d at 1014*). Thus, police officers "discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Beaman v. Freesmeyer, 776 F.3d 500, 512 (7th Cir. 2015)* (citation omitted). Further, a *Brady* violation only exists when suppressed evidence is material, meaning [**14] that "there is 'a reasonable probability' that the outcome would have been different if the evidence had been disclosed." *Jones, 34 F.4th at 559* [*493] (quoting *United States v. King, 910 F.3d 320, 327 (7th Cir. 2018)*). Thus, an officer generally cannot be held liable for failing to disclose exculpatory evidence if the prosecution obtained that evidence from another source; once the prosecution has the evidence, it is the prosecution's—not the officer's—duty to disclose it to the defense.[2]

---

[2] The defendants believe this proposition is absolute. They argue that because *Brady* "encompasses evidence 'known only to police investigators and not to the prosecutor,'" *Strickler, 527 U.S. at 280-81* (quoting *Kyles v. Whitley, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)*), and information known by one prosecutor "must be attributed" to other attorneys in the prosecutor's office, see

Second, for purposes of civil liability, "negligent conduct does not offend the Due Process Clause." *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) (citing *Daniels v. Williams*, 474 U.S. 327, 330-31, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)). Therefore, evidence is considered suppressed in a *§ 1983* suit only if a police officer "acted intentionally or at least recklessly" in failing to turn it over to the prosecution. See *Cairel*, 821 F.3d at 832 n.2. We have not yet decided whether a defendant may be held liable for a *Brady* suppression claim based on reckless conduct, *id.*, but for present purposes, we assume without deciding that a reckless failure to disclose exculpatory evidence constitutes suppression.

Moran identifies five "baskets" of evidence that he argues the individual defendants suppressed in violation of *Brady*. See *Camm v. Faith*, 937 F.3d 1096, 1108-09 (7th Cir. 2019). He argues that the district court erred in granting summary judgment on this claim because for each basket of evidence, [**15] there was a triable issue of fact.[3] We consider each in turn.

## 1. The ISP Ballistics Report

The first basket of evidence Moran identifies is the ISP ballistics report. He alleges that the individual defendants violated his *Brady* rights by suppressing the report.

The district court found that although "[t]here is no doubt that this information should have been provided to the defense," Moran could not succeed on a civil *Brady* claim based on its nondisclosure. As the district court correctly observed, the allegation in Moran's complaint that "on May 19, 2009, Forensic Scientist Kane again contacted ASA Cordelia Coppleson and confirmed" the content of the ISP report dooms this part of his claim. If ASA Coppleson knew about the report, then Glumac and the detectives had no duty to disclose it, and Moran's suppression [*494] claim fails. See *Beaman*, 776 F.3d at 512. An allegation in a complaint is a judicial admission that can be used against the plaintiff. See *Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001) ("It is a 'well-settled rule that a party is bound by what it states in its pleadings.'" (quoting *Soo Line R.R. v. St. Louis Sw. Ry.*, 125 F.3d 481, 483 (7th Cir. 1997))); *Whitlock v. Brown*, 596 F.3d 406, 412 (7th Cir. 2010) ("A judicial admission trumps evidence." (quoting *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996)). Here, Moran was far from prompt in seeking to amend his complaint after receiving information [**16] that contradicted it. He waited until after the defendants relied on his complaint in their motion for summary judgment and the court ruled on that motion. We have no reservations about treating this allegation as a judicial admission, and we affirm on this basis.

Although the judicial admission was sufficient grounds to reject a suppression claim based on this evidence, the district court went on to analyze the merits, concluding that even without this misstep, Moran's claim would fail. As to Detectives Growe and Rapacz, the court found that no evidence in the record showed that they were personally involved in the alleged suppression of the ISP report, so they could not be held liable under *§ 1983*. See *Johnson v. Rimmer*, 936 F.3d 695, 710-11 (7th Cir. 2019). As to Glumac, the court found that "[t]here is

---

*Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), that a single prosecutor's knowledge of certain evidence necessarily shields all police officers from civil *Brady* liability with respect to that evidence. We are skeptical that *Strickler* and *Giglio* establish that, as a matter of law, a single prosecutor's knowledge always protects police officers from liability irrespective of the officers' conduct or the prosecutor's level of involvement with the prosecution in question. Because this issue is not dispositive here, however, we do not decide it.

[3] Moran also argues that because "[t]he state court determined that [the defendants] violated [his] rights under *Brady*," collateral estoppel precludes them from relitigating this factual issue. This argument is facially implausible. The defendants were not parties to the prior proceedings, so they did not have a full and fair opportunity to litigate this issue in an earlier proceeding. See *Creation Supply, Inc. v. Selective Ins. Co. of Se.*, 51 F.4th 759, 764 (7th Cir. 2022). Furthermore, Moran has waived his chance to convince us otherwise by discussing collateral estoppel in a single underdeveloped footnote of his opening brief. See *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013).

simply no evidence in the record from which a reasonable jury could find that Glumac's actions were anything but a simple mistake," so the requisite state of mind was not satisfied. *See Cairel, 821 F.3d at 832 n.2*.

Moran does not challenge the district court's conclusion about the detectives' personal involvement. He argues solely that granting summary judgment as to his claim against Glumac was inappropriate because liability depends on Glumac's state of mind, and "[i]t **[**17]** is rarely appropriate on summary judgment for a district court to make a finding on state of mind." While that is true, this is a rare case in which making a finding about a defendant's state of mind at summary judgment is appropriate.

As the plaintiff, Moran bears the burden to produce sufficient admissible evidence on every element of his claims, including the defendant's state of mind. He cannot simply cast doubt on Glumac's version of events because discrediting the defendant "is not proof that the opposite of [his] statements is true; disbelief would mean that the record is empty, and on an empty record the plaintiff loses ...." *Est. of Logan v. City of South Bend, 50 F.4th 614, 615 (7th Cir. 2022)* (citations omitted). In effect, that is all Moran does. Glumac testified that his failure to forward the ISP report to Detectives Growe and Rapacz was an inadvertent mistake, and Moran did not produce admissible, relevant evidence to rebut that testimony.

An expert witness called by Moran testified that he had "no idea whether [the nondisclosure] was intentional or negligent," but that in his prior experience working with Glumac, he considered Glumac truthful and "held him in high regard." Moran also points to three subpoenas that were served on Glumac **[**18]** before the 2009 trial, arguing that Glumac's failure to produce the ISP report in response to the subpoenas raises an inference that Glumac intentionally withheld the report. But the two subpoenas that ordered Glumac to produce evidence were issued before he received the report, and the third simply requested Glumac's presence at trial. A reasonable jury could not conclude from this evidence that Glumac acted intentionally or recklessly in failing to disclose the ISP report.

**[*495]** Moran falls back on the contention that even though it was unrebutted, Glumac's testimony that he made an inadvertent mistake itself supports an inference that he acted at least recklessly. Put differently, Moran argues that Glumac's story is so unbelievable that a jury could conclude from it alone that Glumac is lying. We doubt that calling a defendant untruthful without any other evidence can satisfy a plaintiff's burden at summary judgment. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul., 988 F.3d 948, 956 (7th Cir. 2021)* ("'Conclusory allegations' like these 'alone cannot defeat a motion for summary judgment.'" (quoting *Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 892-93 (7th Cir. 2003)*)).

Due to Moran's judicial admission, we need not definitively answer that question here, and besides, other evidence supports Glumac's account. Leah Kane, the ISP employee **[**19]** who drafted the report, had an independent obligation to forward it to the prosecution, and Glumac knew about this reporting practice. Glumac had reason to believe that the ISP report would be sent to the prosecution regardless of what he did, so he could not have thought that he had the power to conceal the report. This fact undermines any motive Glumac could have had to conceal the report and corroborates his account that he made an inadvertent mistake. Further, during the postconviction proceedings, the state court found Glumac's account credible, stating that he "was honest" in testifying about the reason he failed to forward the ISP report. Our assessment of Glumac's position might be different if the record lacked this evidence corroborating Glumac's testimony that he made an honest mistake. But nothing contradicts that statement, and in the absence of any other evidence, this record does not support an inference that Glumac acted intentionally or recklessly.

Because Moran pleaded that the prosecution knew about the ISP report, it cannot support a *Brady* suppression claim.

### 2. Yadira's Identification of Loera

Next, Moran contends that Detectives Growe and Rapacz suppressed Yadira's [**20] statements about seeing Bobby Loera in the alley with Moran on the night of the shooting and her identification of Loera from a photo array the day after the shooting.

The district court found that this evidence "was material and at least impeaching, and should have been disclosed," but it could not support a civil *Brady* claim because it was known to the defense and prosecution. Moran argues that this was an error because no "facts in the record ... establish that [he] had personal knowledge of Yadira's photo-array identification" and his attorney denied knowing about the identification and statements. But Moran admitted that the prosecution knew about the identification, which defeats his claim against the detectives.[4]

Moran offers two reasons why the prosecution's knowledge of this evidence does not doom his *Brady* claim. First, he argues that the prosecution's knowledge does not foreclose his claim because no "reports" about this evidence were ever given to the prosecution. In other words, Moran argues that, for *Brady* purposes, a report about the identification constitutes different evidence than the knowledge that the identification occurred, and therefore the detectives had an obligation [**21] to prepare and [*496] produce a formal report about the identification.

We disagree. The form of evidence produced is only relevant for *Brady* purposes when evidence in one form would be more helpful to the defense than evidence in another form—that is, when there is a material difference between the two forms of evidence. *See Goudy, 922 F.3d at 840-41* (explaining why producing a copy of a videotape and the accompanying notes would have been more helpful to the defense than describing that evidence). Here, however, Moran does not explain why knowing that an identification occurred is materially different than receiving a report about the identification, and we see no distinction ourselves. Thus, the detectives had no duty to provide a separate report about the identification.

Second, Moran argues that Detectives Growe and Rapacz did not satisfy their *Brady* obligations because they informed an ASA about the identification "before any criminal charges were filed and any discovery obligations arose." Moran cites no support for this position, and we find it unpersuasive. Officers have a *Brady* duty to "turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Holloway, 43 F.4th at 767-68* (quoting *Harris, 486 F.3d at 1014*). In [**22] a typical case, much evidence is turned over to the prosecutor's office before charges are filed—indeed, that evidence is often necessary to support the charges. Requiring police officers to turn over already-disclosed evidence a second time after charges are filed would create extra work with no benefit. While officers have a continuing duty to turn over newly discovered exculpatory evidence to the prosecutors, we reject the idea that turning over exculpatory evidence before charges are filed is insufficient to discharge police officers' *Brady* obligations.

Although Detectives Growe and Rapacz did not produce evidence of Yadira's identification of and statements about Loera in Moran's preferred form, the record establishes that the prosecution was aware of the evidence. Moran's *Brady* claim based on this evidence therefore fails.

### 3. Loera's and Torres's Arrests

---

[4] Moran admitted that "[t]he State's Attorney's Office also prepared a Case Fact Sheet on August 25, 2006 which contained notes that Yadira saw [Bobby] Loera at the scene in the alley, but there was no other evidence to support charges, as he says he was at home."

Information about Bobby Loera's and Amanda Torres's arrests, detention, and interrogation is the third basket of evidence Moran argues the detectives suppressed. In particular, he argues that Detectives Growe and Rapacz should have disclosed Loera's and Torres's arrest sheets and signed *Miranda* waivers. While the district court did not [**23] discuss this evidence in conjunction with the suppression claim, it found that the information was known to the defense and the prosecution, which means it cannot form the basis of a *Brady* suppression claim. Even viewing the evidence in the light most favorable to Moran, his claim fails because he admits that his trial attorney, Celani, knew about the arrests.[5]

In resisting this conclusion, Moran argues that because he was personally unaware of the statements and the statements are not in the record, Celani's knowledge of the arrests should not be imputed to him. This argument misses the point: the content of these statements is [*497] irrelevant. The fact that Celani asked about the arrests proves that he knew about them, and evidence known to the defense cannot support a *Brady* suppression claim. *Goudy, 922 F.3d at 838*.

Moran also argues that, like with Yadira's identification of Loera, Celani's knowledge of the arrests does not defeat his claim because the arrest records and *Miranda* waivers were materially more exculpatory than mere knowledge of the arrests; therefore, the detectives were obligated to disclose those records. But the arrest records and *Miranda* waivers do little more than note the time of the arrest and release [**24] and the fact that Loera and Torres were advised of their *Miranda* rights. In other words, the records disclose little more than the fact that the arrests occurred, which the defense already knew, and Moran has not stated what additional information he could glean from the records or how they would have enabled him to conduct more effective cross-examinations.

Thus, for *Brady* purposes, the records of Loera's and Torres's arrests are equivalent to Celani's knowledge that they were arrested. This evidence cannot support a *Brady* suppression claim.

### 4. The Police Dispatch Log

The fourth basket of allegedly suppressed evidence is the record of the CCPD's dispatch log from August 22, 2006. The log, Moran alleges, contains no record of a witness identifying the shooter. Detectives Growe and Rapacz acknowledge that "if [they] were provided the identity of the shooter at the scene by a victim[,] that would be important information that [they] would relay to dispatch." Moran asserts that the absence of such an identification in the dispatch log is exculpatory evidence that the detectives should have disclosed.

The district court did not address this basket of evidence, and for good reason: Moran has waived [**25] his ability to rely on it. During discovery, Moran answered an interrogatory asking him to "[s]tate the factual basis for the allegation" that the defendants "deliberately with[held] exculpatory evidence." His response consisted of boilerplate objections and referred the defendants to the factual allegations in his complaint. This is poor discovery practice,[6] and it was costly here. The complaint does not reference the dispatch log, so Moran's interrogatory answer does not include the dispatch log as a factual basis for his claim. Parties have a duty to update interrogatory answers that are "incomplete or incorrect." *Fed. R. Civ. P. 26(e)(1)(A)*. Moran's failure to do so means he "is

---

[5] Moran admits that "Mr. Celani took a sworn statement of Desiree Dolata ... and asked ... about ... 'Bobby' Loera and Amanda Torres, including whether Dolata ... knew that they ... were arrested" and that "Mr. Celani took a sworn statement of [Moran's] girlfriend .... [Mr. Celani asked] if she was aware of the fact that Amanda Torres and Horatio ("Bobby") Loera were arrested in connection with the Rostro shooting ...."

[6] *See Fed. R. Civ. P. 33(b)(4)* ("The grounds for objecting to an interrogatory must be stated with specificity."); 8B Charles Alan Wright et al., Fed. Prac. & Proc. § 2177 (3d ed. Apr. 2022 update) (explaining that answering interrogatories by "[s]imply referring to pleadings ... is frequently found insufficient").

not allowed to use that information ... to supply evidence" at summary judgment "unless the failure was substantially justified or is harmless." *Id.* [r. 37(c)(1)](). Moran argues that any [Rule 26(e)]() violation was harmless because the allegations in question were part of a single *Brady* suppression claim, not a freestanding claim, so they did not prejudice or surprise the defendants. [Rule 37(c)(1)]() refers to "information," not "claims," however, and it would prejudice the defendants if they had to contend with allegations at summary judgment that Moran did not disclose during **[**26]** discovery. [Rule 37(c)(1)]() thus precludes Moran from basing his *Brady* suppression claim on this assertion.

### 5. Tomas's Inability to Identify Moran

The final basket of alleged *Brady* evidence is Tomas Rostro's inability to identify **[*498]** Moran as the shooter. During the shooting, Tomas ran toward the shooter and was 16 feet from him when the shooter fled. Eduardo and Yadira, in contrast, were farther away. Moran argues that the fact that Tomas was unable to positively identify Moran as the shooter despite knowing Moran and seeing the shooter from the closest distance is exculpatory evidence that the detectives suppressed in violation of *Brady*.

The district court did not address this argument, but Moran has waived it for the same reason that he cannot rely on the police dispatch log. Moran's answer to the interrogatory discussed above directed the defendants to his complaint, which contained no allegations that Tomas's failure to identify Moran as the shooter was exculpatory evidence the defendants suppressed. Moran did not amend his interrogatory answer as required by [Rule 26(e)(1)(A)](), and his failure to do so was neither substantially justified nor harmless. Thus, [Rule 37(c)(1)]() precludes Moran from basing his *Brady* suppression claim **[**27]** on Tomas's inability to identify Moran as the shooter.[7]

* * *

Moran cannot establish a civil *Brady* suppression claim using any of the five baskets of evidence that he alleges the defendants suppressed. The district court correctly entered summary judgment in the defendants' favor on this claim.

### B. Fabrication of Evidence

In addition to his suppression claim, Moran raises a second claim under *Brady*, alleging that the detectives fabricated evidence. To prevail on this claim, Moran must prove that "a police officer ... manufacture[d] false evidence against" him, which was "later used to deprive [him] of [his] liberty in some way." [*Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)](). The fabricated evidence must be material, which means "there is a reasonable likelihood the evidence affected the judgment of the jury." [*Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)]() (citing [*United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)]()).

Moran alleges that the detectives fabricated evidence that Yadira identified Moran as the shooter while still at the scene of the crime on August 22, 2006. This evidence comes in three forms, all allegedly reporting the fabricated identification: (1) a police report written in 2008 by Detective Growe; (2) testimony by Detectives Growe and Rapacz at a pretrial hearing; and (3) testimony by Detective Rapacz at Moran's **[**28]** 2009 jury trial. Moran believes the detectives fabricated this testimony because "Yadira has explicitly denied that she ever identified [Moran] at the scene."

The district court held that even if this evidence were fabricated, Moran could not show materiality because there was not a reasonable likelihood that it affected the jury's decision. The court noted the

---

[7] Additionally, we note that all parties knew that Tomas was unable to identify the shooter. A police report containing this information would therefore have been immaterial for *Brady* purposes.

undisputed facts that Eduardo identified Moran at the crime scene; that on the day after the shooting, both he and Yadira identified Moran verbally and in photo arrays; and that they both identified him at the 2009 trial, where Yadira testified that the first time she identified Moran was the day after the shooting. The court concluded that "the jury undoubtedly reached their verdict based on [Yadira's] and Eduardo's **[*499]** unwavering testimony and in-court identifications."

Before turning to the legal analysis, we consider whether Moran has raised a genuine dispute of material fact with respect to the fabricated evidence. The record contains evidence that Yadira did not identify Moran at the crime scene, that Detectives Growe and Rapacz testified that she did at the pretrial hearing, and that Detective Growe's police report indicates **[**29]** that Yadira identified Moran at the crime scene. The record contains no evidence, however, that Detective Rapacz testified to Yadira's on-scene identification during Moran's jury trial. He testified that he interviewed Desiree Dolata and Eduardo, Yadira, and Tomas Rostro and that after talking to them, he had "an idea of what happened" and the police were "looking for" Moran. But Detective Rapacz did not state, and a reasonable jury could not conclude he implied, that Yadira—as opposed to one of the other witnesses—identified Moran at the scene. Therefore, Moran has raised genuine disputes of material fact about Yadira's on-scene identification of Moran, Detective Growe's police report (written two years later), and the detectives' pretrial testimony, but not about Detective Rapacz's trial testimony. Accordingly, we do not assume that Detective Rapacz's trial testimony was fabricated.

We agree with the district court that the allegedly fabricated evidence was not material. Recall that the relevant question is whether "there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick, 974 F.3d at 835*. Because the evidence we assume was fabricated—the police report and the detectives' **[**30]** pretrial testimony—was not introduced at the trial, it could not have influenced the jury's verdict.[8] And the evidence that the jury did hear—Detective Rapacz's testimony—does not support an inference of fabrication.

Moran cannot establish that the allegedly fabricated evidence was material, so his *Brady* fabrication-of-evidence claim fails. The district court correctly granted summary judgment on this claim.

## C. State Law Claims

Moran's state law claims fare no better than his federal claims. The district court found that Moran had failed to create a genuine dispute as to at least one element of his malicious prosecution and civil conspiracy claims and, after entering summary judgment on all claims against the individual defendants, the derivative liability claims against Calumet City necessarily failed.

### 1. Malicious Prosecution

Under Illinois law, malicious prosecution requires proof of: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud, 169 Ill. 2d 504, 662 N.E.2d 1238, 1242, 215 Ill. Dec. 98 (Ill. 1996)* (quoting **[**31]** *Joiner v. Benton Cmty. Bank, 82 Ill. 2d 40, 411 N.E.2d 229, 232, 44 Ill. Dec. 260 (Ill. 1980)*). The district court found that Moran's claim failed on the third element because the eyewitness identifications constituted probable cause. We agree. Moran makes no attempt to overcome the fact **[*500]** that an eyewitness

---

[8] Moran argues that "[t]he detectives' alteration of the report to state that Yadira identified [Moran] at the scene ... no doubt bolstered the case against" him, but the content of the police report is irrelevant because Moran offers no evidence that the report was introduced into evidence at trial.

"identification[], even if questionable, [is] enough to give [the police] probable cause to arrest," *Coleman v. City of Peoria, 925 F.3d 336, 351 (7th Cir. 2019)*, and here there were two witnesses who insisted that Moran was the shooter.[9] The district court correctly entered summary judgment on this claim.

### 2. Civil Conspiracy

Moran's civil conspiracy claim requires him to prove: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties; and (4) the overt act was done pursuant to and in furtherance of the common scheme." *Vance v. Chandler, 231 Ill. App. 3d 747, 597 N.E.2d 233, 236, 173 Ill. Dec. 525 (Ill. Ct. App. 1992)* (citation omitted). This claim fails because, as the district court found, Moran "presented no evidence of any agreement or scheme among the defendants or between the defendant officers and the prosecutors to violate [his] rights." Moran argues that the record discloses "multiple baskets of exculpatory and impeachment evidence" and that "[t]he repeated unlawful concealment [**32] of exculpatory and impeachment evidence constitutes a common scheme ...." But Moran points to no evidence suggesting an agreement or scheme. The record cannot even support an inference that Glumac recklessly failed to forward the ISP report; it is devoid of evidence suggesting that he acted in concert with the detectives. Speculation is not enough, so the district court did not err in entering summary judgment on this claim. *See Khungar, 985 F.3d at 573*.

### 3. Respondeat Superior and Indemnity

Moran's final claims are for respondeat superior and indemnity against Calumet City. These are derivative liability claims that depend on Moran prevailing against at least one of the individual defendants. *See Beaman v. Freesmeyer, 2021 IL 125617, 451 Ill. Dec. 310, 183 N.E.3d 767, 794 (Ill. 2021)*. Because the individual defendants are entitled to summary judgment in their favor, the claims against Calumet City must fail as well. The district court correctly entered summary judgment in Calumet City's favor on these claims.

### III. Leave to Amend the Complaint

We turn next to the denial of Moran's motion for leave to amend his complaint to remove his allegation that the prosecution was aware of the ISP report prior to his trial. *Federal Rule of Civil Procedure 15(a)(2)* supplies the standard for amending a pleading when the time to amend as a matter of [**33] course has expired: "a party may amend its pleading only with the opposing party's written consent or the court's leave." District courts "should freely give leave when justice so requires," *id.*, that is, unless there is a good reason not to, such as "futility, undue delay, prejudice, or bad faith." *Law Offs. of David Freydin, P.C. v. Chamara, 24 F.4th 1122, 1133 (7th Cir. 2022)* (quoting *R3 Composites Corp. v. G&S Sales Corp., 960 F.3d 935, 946 (7th Cir. 2020)*).[10] We review the [*501]

---

[9] The district court also found that there was no genuine dispute as to malice. This point is unnecessary to our decision, so we do not reach it.

[10] The fact that Moran moved for leave to amend after summary judgment complicates matters. "[O]nce a district court has entered final judgment dismissing a case, the plaintiff may not amend under *Rule 15(a)* unless the judgment is modified, either by the district court under *Rule 59(e)* or *60(b)*, or on appeal." *O'Brien v. Village of Lincolnshire, 955 F.3d 616, 629 (7th Cir. 2020)* (citations omitted). Generally, "[a] motion under *Rule 59(e)* may be granted only if there has been a manifest error of fact or law, or if there is newly discovered evidence that was not previously available." *Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021)* (citation omitted). But this rule has an exception: "we review post-judgment motions for leave to amend according to the *Rule 15* standard when a district court enters judgment at the same time it first dismisses a case." *O'Brien, 955 F.3d at 629* (citations omitted). We doubt that this exception applies when claims are disposed of for the first time at summary judgment, *see, e.g., id. at 628-29*; *NewSpin Sports, LLC v. Arrow Elecs., Inc., 910 F.3d 293, 310 (7th Cir. 2018)*; *Runnion ex rel. Runnion v. Girls Scouts of Greater Chi. & Nw. Ind., 786 F.3d*

denial of a motion for leave to amend for abuse of discretion, but "our review for abuse of discretion of futility-based denials includes de novo review of the legal basis for the futility." *Fin. Fiduciaries, LLC v. Gannett Co., 46 F.4th 654, 667 (7th Cir. 2022)* (quoting *Heng v. Heavner, Beyers & Mihlar, LLC, 849 F.3d 348, 354 (7th Cir. 2017)*).

The district court denied Moran's motion. First, it found that Moran had unduly delayed in seeking to amend his complaint because he should have known that his complaint contained factual errors at the outset. And even assuming he learned about the errors for the first time in discovery, he gave no explanation for his failure to seek to amend his complaint until after the entry of summary judgment. Second, the court found that the defendants would be unduly prejudiced if it granted leave to amend, "having based their defense on the allegations in the operative complaint." Third, the court concluded that amendment would be futile because Moran's claim **[**34]** based on the ISP report would fail even without the judicial admission.

Moran's arguments target the district court's findings of undue delay and prejudice, but we need not address them because we affirm on the basis of futility. As discussed above, the record contains no evidence that Detectives Growe and Rapacz knew about the ISP report before Moran's 2009 trial, and the record does not support an inference that Glumac intentionally or recklessly failed to disclose the report. If Moran is permitted to amend his complaint to remove his allegation that ASA Coppleson knew about the ISP report, the defendants would still be entitled to summary judgment in their favor because a reasonable jury could not find for Moran. The district court was correct as a matter of law that amendment would be futile. Therefore, its denial of leave to amend was not an abuse of discretion.

## IV. Conclusion

We regret that Moran was unable to present certain arguments at the 2009 trial and that he spent substantial time imprisoned for a crime of which he was eventually acquitted. Strategic missteps may have hurt Moran's chances of success in this lawsuit. Even though Moran was wrongfully imprisoned for a decade, **[**35]** on this record he is not entitled to the relief he seeks.

The district court did not err in granting the defendants' motion for summary judgment and did not abuse its discretion in denying Moran's motion for leave to amend his complaint. The district court's decision must therefore be

AFFIRMED.

---

**End of Document**

---

*510, 520-22 (7th Cir. 2015)*, but we need not resolve this issue here. Because the result in this case would be the same under either standard, we assume without deciding that the more liberal *Rule 15(a)(2)* standard applies.